# EXHIBIT 3

**STATE OF MICHIGAN**
**MICHIGAN OFFICE OF ADMINISTRATIVE HEARINGS AND RULES**

| | |
|---|---|
| **In the matter of:** | **: Docket No. 24-03457** |
| **C.H. and R.H. o/b/o P.H.** | **: Case No. DP-24-0101** |
| **Petitioner,** | **: Agency: Department of Education** |
| | |
| **v.** | **: Case Type: ED Sp Ed Regular** |
| | **: Administrative Law Judge: Hon. Michael St. John** |
| **East Lansing Public Schools,** | |
| | **:** |
| **Respondent.** | |

Elizabeth K. Abdnour (P78203)
Megan N. Mitchell (P87312)
Jacquelyn Kmetz (P83575)
Abdnour Weiker LLP
325 E. Grand River Ave., Ste 250
East Lansing, MI 48823
(517) 994-1776
liz@education-rights.com
megan@education-rights.com
jacquelyn@education-rights.com

*Attorneys for Petitioners*

Michelle R. Eaddy (P41871)
Erin H. Walz (P55484)
Cathleen M. Dooley (P86148)
Thrun Law Firm, P.C.
2900 West Rd., Ste 400
East Lansing, MI 48826
(517) 484-8000
meaddy@thrunlaw.com
ewalz@thrunlaw.com
cdooley@thrunlaw.com

*Attorneys for Respondent*

## PETITIONER'S CLOSING BRIEF

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 3

   I.    PROCEDURAL HISTORY .......................................................................................... 3

   II.   SUMMARY OF THE ARGUMENT ........................................................................... 5

ARGUMENT ...................................................................................................................... 6

   I.    ELPS'S VIOLATIONS OF FAPE .......................................................................... 7

       *A.   ELPS failed to reevaluate P.H. when his needs warranted a reevaluation* ................ 8

       *B.   ELPS inappropriately used seclusion and restraint* ........................................ 24

       *C.   ELPS failed to offer and/or provide P.H. an appropriate IEP, including failing to provide P.H. the supports as listed in his IEPs* ................................................ 29

       *D.   ELPS failed to educate P.H. in the least restrictive environment ("LRE")* ................ 37

   II.   THIS TRIBUNAL MUST EXERCISE ITS BROAD AUTHORITY TO AWARD PETITIONERS THEIR REQUESTED RELIEF .................................................................................... 39

       *A.   An Award of a Compensatory Education Bank is Appropriate* ................................ 40

       *B.   Reimbursement for educational costs for the remainder of the 2023-2024 school year, and for moving and increased household expenses, is appropriate* ................... 42

CONCLUSION ................................................................................................................ 44

# INTRODUCTION

## I.    Procedural History

On December 2, 2024, Petitioners C.H. and R.H., on behalf of their son P.H., filed a Complaint against East Lansing Public Schools ("ELPS" or "Respondent"), Haslett Public Schools, and Ingham County Intermediate School District ("IISD"). The Complaint alleged violations of the Individuals with Disabilities Education Act ("IDEA") and the Michigan Administrative Rules for Special Education ("MARSE").  The Complaint alleged one issue: a violation of the IDEA by Respondents due to a failure to provide a free and appropriate public education ("FAPE") to P.H.

A Prehearing Conference was held on December 10, 2024.  At the Prehearing Conference, the Administrative Law Judge ("ALJ") asked Petitioners counsel to identify the issues for hearing. Petitioners' counsel advised the Hearing Officer that the issue for hearing was whether Respondents had violated the IDEA by failing to provide P.H. with a FAPE.  The ALJ rejected this issue as "not specific enough," asserting that the Michigan Administrative Rules required ALJs to ensure "specificity" of issues for hearing.  In fact, as Petitioners' counsel pointed out, the Administrative Rules require no such thing, and provide no such authority to ALJs.  The closest language Petitioners' counsel could find in the Rules was the following: "The administrative law judge shall exercise the following authority when  appropriate: … (k) Direct the parties to appear or confer, or both, to *consider* clarification of issues,  stipulations of facts, stipulations of law, settlement, and other related matters."  R 792.10106 (emphasis added).

ALJs may only direct the parties to consider clarifying issues.  They may not order parents to limit their claims in any way.  The IDEA specifically states that parents may file on any matter "relating to the identification, evaluation or educational placement of a child with a disability, or the provision of FAPE to a child." 34 CFR 300.507(a)(1) (emphasis added). The complaint need

only include, as relevant, "a description of the nature of the problem . . . including facts relating to the problem" (*Id*. at (b)(5)) and it "must be deemed sufficient unless the party receiving the due process complaint notifies the hearing officer and the other party in writing, within 15 days of receipt of the due process complaint." *Id*. at (d)(1).  To the extent that the Michigan Administrative Code conflicts with the IDEA, the IDEA preempts the Michigan Administrative Code.[1] Regardless, the ALJ issued an Order identifying the following as issues for hearing:

1. Did the Respondents fail to provide the supports listed in the Student's IEPs?

2. Did the Respondents fail to educate the Student in the LRE?

3. Did the Respondents inappropriately use seclusion and restraint?

4. Did the Respondent ISD fail to provide appropriate training and supervision to the LEA Respondents?

At the Prehearing Conference, it became clear that it was impossible to find a set of dates at which the ALJ, all counsel, and all parties would be able to be present for a weeklong hearing within the timeline required by the IDEA and MARSE from the date of filing of the Complaint. The ALJ advised the Parties that he was not permitted to extend the timeline for the hearing. Therefore, Petitioners agreed to file an Amended Complaint in order to extend the timeline.

---

[1] "[F]ederal law can impliedly preempt state law even when it does not do so expressly. Like its express preemption decisions, the Supreme Court's implied preemption cases focus on Congress's intent. The Supreme Court has recognized two general forms of implied preemption: field preemption and conflict preemption…. Conflict preemption occurs when state law interferes with federal goals."  Congressional Research Service, *Federal Preemption: A Legal Primer* (May 18, 2023), p 17, available at <https://sgp.fas.org/crs/misc/R45825.pdf> (internal citations omitted). "The Supreme Court has identified two subcategories of conflict preemption. First, federal law impliedly preempts state law when it is impossible for regulated parties to comply with both sets of laws (impossibility preemption). Second, federal law impliedly preempts state laws that pose an obstacle to the 'full purposes and objectives' of Congress (obstacle preemption)." *Id*. at 23 (internal citations omitted).  "Federal law also impliedly preempts state laws that pose an 'obstacle' to the 'full' purposes and objectives" of Congress. In its obstacle preemption cases, the Supreme Court has held that state law can interfere with federal goals…impeding the vindication of a federal right." *Id*. at 25 (internal citations omitted). "The Supreme Court has also held that state law can pose an obstacle to federal goals where it impedes the vindication of federal rights."  *Id*. at 27.

In the Amended Complaint, filed on January 10, 2025, Petitioners made several substantive edits, including removing HPS as a Respondent, added facts and allegations, and identified the following specific FAPE violations by Respondents ELPS and IISD:

1. Failing to reevaluate P.H. when his educational or related service needs, including the need for increased emotional, behavioral, and academic supports, warranted a reevaluation, thereby denying him FAPE;

2. Failing to offer and/or provide P.H. an appropriate IEP (including, but not limited to, an appropriate program, placement, services, and accommodations in the least restrictive environment), by failing to develop an IEP reasonably calculated to provide P.H. FAPE, failing to review and revise P.H.'s IEP when his educational or related service needs warranted a revision, and failing to implement P.H.'s IEP as written, thereby denying him FAPE; and

3. Failing to educate P.H. in the least restrictive environment, thereby denying him FAPE.

Am. Compl. ¶ 146.

HPS and IISD were dismissed from the proceeding via Orders issued by the ALJ on January 15 and January 30, 2024, respectively, after filing Motions to Dismiss. On February 10-14, 2025, a Due Process Hearing was held between Petitioner and Respondent ELPS.

## II.    Summary of the Argument

As the record clearly demonstrates, Respondent failed to provide P.H. with a FAPE—an educational program individually tailored to his needs that would allow him to make progress appropriate to his circumstances. In addition to failing to offer or provide an appropriate IEP, Respondent failed to implement the IEPs it did develop for P.H. with fidelity, exacerbating his denial of FAPE. Respondent also inappropriately utilized seclusion and failed to educate P.H. in

his least restrictive environment, even *further* exacerbating P.H.'s denial of FAPE and increasing his already-significant socio-emotional and behavioral deficits. Respondent's failures not only negatively impacted P.H.'s ability to make appropriate progress while attending ELPS but continue to impact him to this day as he is only finally attending an educational program, all the way in Ohio, that is allowing him to begin to make progress. P.H. requires a limited, individualized educational setting to access his education, as well as intensive behavioral and mental health supports that address his underlying social-emotional needs, none of which Respondent provided him.

From the beginning of his time at ELPS, Respondent's failure to take responsibility for the provision of a FAPE to P.H. only worsened. By the time P.H. left ELPS in March 2024, he was not only behind in his education but thoroughly traumatized by his experience in the district. Due to Respondent's failure to meet their obligations to P.H. under the IDEA, P.H. and his family have suffered undue strain mentally, emotionally, and financially. The family remains separated, with R.H. remaining in Michigan for work while C.H. and P.H. reside in Ohio in order to get P.H. the education that he—and every student with disabilities—deserves,  and which he was denied in Michigan.

## **ARGUMENT**

According to the IDEA's implementing regulations: "The party requesting the due process hearing may not raise issues at the due process hearing that were not raised in the due process complaint filed under § 300.508(b), unless the other party agrees otherwise." 34 CFR 300.511(d). Therefore, pursuant to the IDEA, the issues identified in the Amended Complaint are the issues for hearing, as there was no agreement between the parties to modify such.  As outlined in the Amended Complaint, ELPS denied P.H. a FAPE by: (1) failing to reevaluate P.H. when his

educational or related service needs, including the need for increased emotional, behavioral, and academic supports, warranted a reevaluation; (2) failing to offer and/or provide P.H. an appropriate IEP (including, but not limited to, an appropriate program, placement, services, and accommodations in the least restrictive environment), by failing to develop an IEP reasonably calculated to provide P.H. FAPE, failing to review and revise P.H.'s IEP when his educational or related service needs warranted a revision, and failing to implement P.H.'s IEP as written; and (3) failing to educate P.H. in the least restrictive environment.

## I.      ELPS's violations of FAPE

The IDEA guarantees "a substantially adequate program of education to all eligible children." *Endrew F v Douglas Co Sch Dist RE-1*, 137 S Ct 988, 995, __ US __ (2017) (citing *Bd of Ed of Hendrick Hudson Central Sch Dist v Rowley*, 458 US 176, 200-02 (1982)). The touchstone of this right is an IEP "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Id.* at 999 (quoting *Rowley*, 458 US at 203-04). "If that is not a reasonable prospect for a child, his IEP need not aim for grade-level advancement. But this educational program must be appropriately ambitious in light of his circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom." *Id.* at 1000. "A reviewing court may fairly expect [school] authorities to be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Id.* at 1002. To that effect, the IDEA and its implementing regulations, along with MARSE, create a series of obligations states and school districts must follow, that are designed to ensure a child is receiving the required FAPE. *See* 20 USC 1400 *et seq.*; 34 CFR  300.1 *et seq.*; MARSE R 340.1701 *et seq.* Respondent these requirements, constituting a denial of FAPE.

### *A.  ELPS failed to reevaluate P.H. when his needs warranted a reevaluation*

The IDEA places obligations on districts as to how to appropriately address a student's behaviors. In developing the IEP, where a child's "behavior impedes the child's learning or that of others," the IEP team must, "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 34 CFR 300.324(a)(2)(i). While IDEA does not directly define positive behavioral interventions and supports ("PBIS"), under state law:

> "Positive behavioral intervention and support" means a framework to assist school personnel in adopting and organizing evidence-based behavioral interventions into an integrated continuum of intensifying supports based on pupil need that unites examination of the function of the problem behavior and the teaching of alternative skill repertoires to enhance academic and social behavior outcomes for all pupils.

MCL 380.1307h(l). Further, IDEA requires related services, which includes behavioral supports, to be "based on peer-reviewed research to the extent practicable." 34 CFR 300.320(a)(4). Guidance issued by the U.S. Department of Education Office of Special Education and Rehabilitation Services notes that, as appropriate, the IEP team should consider providing such supports as appropriate for the student in any of the following "areas: 1) special education and related services, (2) supplementary aids and services, and (3) program modifications or supports for school personnel." US Dep't of Ed, *Dear Colleague Letter* (August 1, 2016), p 6, available at <https://sites.ed.gov/idea/files/dcl-on-pbis-in-ieps-08-01-2016.pdf>.

In addition to requiring districts to consider PBIS when developing behavioral supports in a student's IEP, the IDEA also requires districts to conduct reevaluations if the student's "educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation." 20 USC 1414 (a)(2)(A)(i); 34 CFR 300.303(a)(1). In conducting an evaluation, IDEA and its implementing regulations require a local education agency to, "use a variety of assessment tools and strategies to gather relevant functional,

developmental, and academic information, including information provided by the parent, that may

assist in determining . . . the content of a child's individualized education program, including

information related to enabling the child to be involved in and progress in the general education

curriculum." 20 USC 1414 (b)(2)(A)(ii); 34 CFR  300.303(b)(2). Such assessments include, "those

tailored to assess specific areas of educational need." 34 CFR 300.304(2).

In conducting an evaluation, IDEA and its implementing regulations require a school

district to

> use a variety of assessment tools and strategies to gather relevant
> functional, developmental, and academic information, including
> information provided by the parent, that may assist in
> determining . . . the content of a child's individualized education
> program, including information related to enabling the child to be
> involved in and progress in the general education curriculum.

20 USC 1414 (b)(2)(A)(ii); 34 CFR 300.303(b)(2).

State law specifically indicates a functional behavior assessment is warranted when a

student exhibits a pattern of behavior that increases the risk that emergency seclusion or restraint

will be utilized. *See* MCL 380.1307d(c)(i). While IDEA does not explicitly define "functional

behavior assessment," it does require that all assessments be "used for the purposes for which the

assessments or measures are valid and reliable," and "[a]re administered by trained and

knowledgeable personnel." Further, once again, state law is instructive in its definitions:

> "Functional behavioral assessment" means an evidence- and
> research-based systematic process for identifying the events that
> trigger and maintain problem behavior in an educational setting. A
> functional behavioral assessment shall describe specific problematic
> behaviors, report the frequency of the behaviors, assess
> environmental and other setting conditions where problematic
> behaviors occur, and identify the factors that are maintaining the
> behaviors over time.

MCL 380.1307h(g).

Attached hereto as Exhibit 1 is *District of Columbia Public Schools*, 121 LRP 15672 (March 27, 2021).  In *District of Columbia*, the school district also failed to conduct an appropriate evaluation, resulting in years of FAPE denial for a student with Specific Learning Disability. Using *Endrew F,* the hearing officer found that the Supreme Court instructs that "[u]nderstanding the particulars of a child's current skills and needs is critical to developing an individualized educational plan," *Endrew F*, 137 S Ct at 999, and that "DCPS failed to comprehensively reevaluate Student in order to understand Student's needs after the initial eligibility evaluation in 2015, despite student's dismal academic progress." *Id*. at 8.  The hearing officer awarded a remedy of funding authorization for 410 hours of academic tutoring and 30 hours of counseling, plus independent services. *Id*. at 11.

1. <u>Signs that reevaluation was warranted began during the Fall 2023 semester</u>

At the end of the testimony in this matter, the ALJ stated that it appeared a "switch flipped" in P.H. after the 2023-2024 winter break. Tr 961, l 14-18. However, P.H.'s behavior did not simply change after winter break—the evidence makes clear that his behavior change had already begun in early November 2023. The true extent to which P.H.'s behavior escalated in the Fall 2023 semester is not known due to ELPS's lack of documentation of his behaviors, the lack of communication from ELPS to Petitioners about P.H.'s behaviors during that time, and ELPS's failure to timely initiate an FBA.

From what can be determined through the barebones documentation provided by ELPS staff's testimony, at the very least, P.H. began exhibiting behavioral changes in early November 2023 as his time at ELPS increased. R Ex U at 12-14, 16. However, as his school hours increased, so did his time away from his peers. Tr 47, l 4-11; Tr 730, l 5-10, 22-25.  He began managing his anxiety and overstimulation through frequent and prolonged bathroom breaks. Tr 851, l 13-25; Tr

884, l 3-25. Despite ongoing internal recognition of his struggles by ELPS staff, no formal evaluation was ever conducted. Tr 884-890.   Due to missing or discarded records and documentation, it is impossible to determine exactly when P.H.'s behavioral decline began, but the evidence demonstrates that P.H.'s behavior shift started at the latest on November 13, 2023— the first time that ELPS suggested C.H. shorten P.H.'s school day. Tr 730, l 5-25; Tr 851, l 14-25.

In November 2023, P.H. began taking extended bathroom breaks with a female paraprofessional, Anastasia Shortridge, standing outside. Tr 880-882. P.H.'s general education teacher, Rebecca Spitzer, testified that he was taking bathroom breaks up to three times an hour. Tr 758, l 12-14. In fact, P.H.'s bathroom forays were so frequent that the ELPS principal, Josh Robertson, would routinely be called to assist. Robertson would be enlisted by Shortridge to enter the restroom and check on P.H. because he had been in there for so long. Tr 466 l 6-Tr 467, l 8. Robertson testified that he would open the door to the bathroom and provide a verbal prompt to redirect P.H. back to class. *Id.* Shortridge testified that she decided to keep a log of P.H.'s bathroom breaks because she felt he was using the bathroom as a break from class due to becoming overwhelmed in the classroom as many autistic children do. Tr 884, l 8-19. As ELPS Special Education Director Nick Hamilton testified, it would be concerning if a student was using the restroom three times an hour, assuming that was outside of their baseline. Tr 823, l 4-23. As such, collecting baseline data would be critical. *Id.* In fact, Hamilton testified that gathering such baseline data is important whenever a district is dealing with student behavior. *Id.* On at least one occasion ELPS staff informed Petitioners that P.H. had been in the bathroom for over an hour, and on at least one occasion he even fell asleep. Tr 141, l 7-11. Despite this, ELPS staff never notified Hamilton about the increase in P.H.'s bathroom usage and failed to conduct an FBA and gather data surrounding P.H.'s behavior. Tr 823, l 4-23.

On November 6, 2023, C.H. emailed P.H.'s general education teacher Rebecca Spitzer to request that P.H. extend his day beginning on November 17, 2023. P Ex 60 at 577. By November 13, 2023, C.H. indicated to Mrs. Miller-Hogan that she had started to see P.H. exhibit increased agitation and eloping at home. *Id.* at 579. Petitioners had not seen these behaviors increase in over a year, and they were deeply concerned about this regression. *Id.* C.H. requested that ELPS staff be vigilant about P.H.'s behaviors. *Id.* She also requested notice if ELPS staff saw that P.H. was stressed or had a change in behavior. *Id.* In her reply email, Miller-Hogan suggested shortening P.H.'s day, writing:

> As we work to make these changes, do you want to shorten his day to possibly reduce his level of stress? What would he say if you offered that? Again, his length of his school day is totally up to you but it is an option if it reduces stress and gives him a better sense of control. Maybe even shorten it during the next few weeks and return to 1:00 when we return in January?

*Id.* C.H. replied to Miller-Hogan and asked if ELPS had seen increased agitation or behavior from P.H. *Id.* C.H. indicated she wanted P.H. to remain on his current schedule unless the length of his school day was leading to increased stress. *Id.* C.H. suggested creating a plan for P.H. surrounding the length of his school day, as it had not worked to decrease time and increase it in the past. *Id.*

Following the November 6, 2023 email exchange, C.H. again alerted ELPS to P.H.'s long history of decreased class time and sought to establish a plan for P.H. *Id.* at 577. C.H. also asked if Miller-Hogan and the rest of the ELPS staff felt P.H. was better suited at one of the ASD programs. *Id.* This was in line with the information Petitioners had been provided by Miller-Hogan and Robertson at the beginning of the 2023-2024 school year, when they had been assured that P.H. could transfer into an ASD classroom if necessary. Tr 244, l 16-Tr 245, l 1. Miller-Hogan replied to C.H.'s email and stated she wanted to ensure ELPS staff was prepared, and no students or staff would be hurt. *Id.* at 578. She offered to have a conversation with all Marble staff who

12

interacted with P.H. during his school day to ensure they would be aware of potential behaviors from P.H. *Id.* She also stated she would craft a reaction plan with ELPS staff to address heightened behavior from P.H., and they would discuss a way to be more tied into P.H.'s triggers and emotional needs. *Id.*

Miller-Hogan then scheduled a meeting on November 20, 2023, with C.H. and the ELPS team. At this meeting, C.H. learned for the first time that P.H. had fallen asleep in the bathroom at school. Tr 948, l 6-Tr 949, l 21. Also at this meeting, ELPS decided to eliminate use of the multi-stall bathroom for P.H.; instead, ELPS staff would begin knocking on the door to get P.H. to go to class. Tr 948, l 22-Tr 950, l 5.

ELPS staff made light of P.H. falling asleep in the bathroom. In an email dated December 3, 2023, Miller-Hogan wrote to C.H.: "I do still think he is spending more time in the bathroom but he does not use the multi-stall restroom anymore because he says he does not want to fall asleep :) ." P Ex 60 at 584-585. In this same email, Miller-Hogan explained that P.H. had seemed "more agitated" at school and was making self-deprecating comments to his paraprofessionals, stating that they only worked with him because he was "stupid" or "dumb." *Id.* Miller-Hogan wrote that, while she had thought of pulling P.H. out from class and services the next morning to discuss this with him, she chose not to do so because changing his schedule could "cause *more* stress for [P.H.]" (emphasis added). *Id.* She told C.H. that P.H.'s general education teacher Rebecca Spitzer and paraprofessional Anastasia Shortridge would evaluate him in the morning to determine if "something [was] off," then follow up with P.H. at his lunch time. *Id.*

P.H.'s general education teacher Rebecca Spitzer testified that P.H. had pushed his pencil down on his paper "quite hard" over multiple days around the end of November or beginning of December 2023. Tr 733, l 16-22. Spitzer said this was one of the observations of P.H. that ELPS

13

staff had communicated about. *Id.* She said P.H. had appeared more frustrated around tasks that involved writing on paper or using a pencil. *Id.*

By mid-December 2023, P.H. was struggling to go to school at all. His behaviors had manifested in what had what C.H. described to Miller-Hogan as a breakdown in an email dated December 15, 2023. P Ex 60 at 587. P.H. "…has just lost it at the prospect of going to school at all." *Id.* Notably, this breakdown and the events leading up to it occurred *before* the 2023-2024 winter break.

ELPS has repeatedly denied proposing adjustments to P.H.'s schedule and argued that C.H. was the one insisting on schedule adjustments. In her testimony, Miller-Hogan identified an email C.H. sent to her on January 9, 2024, which explained that P.H. wanted to take a shortened day the next day. Tr 912, l 2-11. Miller-Hogan testified that ELPS did not suggest a shortened day, but that assertion is clearly contradicted by the documentary evidence, created contemporaneously to the events in question. On January 8, 2024, Miller-Hogan had written to C.H., "We will plan on [P.H. arriving] early tomorrow. *We can shift anything or shorten his day if that helps him find success in the morning*." P Ex 60 at 592 (emphasis added).

Further, Miller-Hogan testified that ELPS did not direct Petitioners as to what schedule P.H. had to have. Tr 914, l 3-10; Tr 915, l 1-10. The implication throughout Miller-Hogan's testimony was that C.H. was the one pushing for changes to P.H.'s schedule, but the reality is that the changes were initially suggested by ELPS. In an email to C.H. dated January 16, 2024, Miller-Hogan wrote, "I am always going to take your lead on what you feel is best as you know his patterns. We will plan on a regularly shortened day tomorrow unless we hear differently from you." P Ex 60 at 598. On January 23, 2024, Miller-Hogan wrote to C.H.: "These snow days are not working for us!! I think you are aware that Mrs. Spitzer will be gone for the next 3 days and

14

that the field trip is Thursday. I am open to whatever you want to try for the next few days to support [P.H.]." *Id.* at 610. On January 25, 2024, Miller-Hogan emailed C.H. and acknowledged that P.H. "had an awful time" the day before and suggested changing around his provider schedules the next day, but only if working with all three providers wouldn't be "too much for him." *Id*. at 605-606. She went on in that same email:

> I know you have said that you feel you are back at square one with attending school. We can go back to the very beginning. You and dad, with [P.H.], can visit to normalize his day when the school is empty(ier). We can do that on the weekend or after school and walk through his day. This usually really reduces anxiety. *We can shorten his day even more with really preferred activities.*

*Id.* at 606 (emphasis added).

It is clear from this email that Miller-Hogan was suggesting shortened days for P.H. In fact, C.H. was trying to get P.H. in school for a longer day. On February 8, 2024, C.H. emailed Miller-Hogan and expressed that she wanted to work on what P.H.'s schedule could look like without her present in school and ideally with a longer day. *Id*. at 619. On February 9, 2024, Miller-Hogan emailed C.H. with a schedule of services to be provided to P.H. from 8:45 a.m. to 10:00 a.m. *Id.* at 621.

The emails from Miller-Hogan are clear: ELPS often suggested shortening P.H.'s days and changing his schedule, and clearly recognized of P.H.'s behavior struggles in school, yet it failed to initiate an FBA for him until March 2024.

2. <u>An FBA was necessary for P.H. beginning in the Fall 2023 semester, and certainly before March 2024</u>

The cumulative observations, undocumented behaviors, and ongoing concerns surrounding P.H.'s increased anxiety, avoidance tactics, and agitation described above demonstrate a clear and escalating pattern of distress that warranted a FBA well before December 15, 2023. As expert

witness Dr. Cheryl Light Shriner testified, ELPS should have had additional documentation and gathered data surrounding P.H.'s behaviors, mainly because he had behavioral goals on his IEP. Tr 306-307. Dr. Light Shriner explained that an FBA would have been necessary at the very least by the time P.H.'s behaviors escalated, but another concern she had was that the supportive services already in place under P.H.'s IEP needed to be implemented with fidelity. Tr 305-309. Dr. Light Shriner explained that, while there may have been a honeymoon period in the early parts of the Fall 2023 semester as P.H. adjusted to the new school, there were clear signs that he was struggling later in the Fall 2023 semester. *Id.*

Despite this and the fact that P.H.'s IEP included a self-regulation goal, ELPS failed to document any behavior or information relating to his self-regulation goal—even positive information. *Id.* Still, Dr. Light Shriner testified that she felt even the limited documentation available in this case clearly supported an FBA. Tr 327, l 18-25. Dr. Light Shriner also testified that ELPS should have conducted an FBA when C.H. and R.H. requested it. Tr 328 l 23-Tr 329, l 1. Dr. Light Shriner further explained that, due to the absence of data and documentation surrounding P.H.'s behaviors at school and the implementation of his IEP services, she was unable to make a clear determination about exactly when an FBA should have been conducted, but at the very least it should have been when his behaviors escalated in December 2023. Tr 329, l 2-15.  It was Dr. Light Shriner's expert conclusion that ELPS failed to properly document P.H.'s behaviors—whether positive or negative—and his escalations and failed to conduct an FBA. Tr 332-333.

The absence of timely intervention, despite multiple red flags—including prolonged bathroom breaks, agitation, self-deprecating remarks, and a complete breakdown in P.H.'s ability to attend school—demonstrates ELPS's wholesale failure to properly assess and address his needs.

Further, ELPS's clear lack of communication to Petitioners, the myriad missing documentation, and its informal rather than structured responses to P.H.'s increasingly concerning behaviors underscore the necessity of an FBA to identify the root causes of P.H.'s struggles and implement effective supports for him. Given that the concerning behavior began at the latest in early November 2023, and steadily worsened, ELPS had sufficient indicators to initiate an FBA before P.H. reached a breaking point on December 15, 2023, and certainly before it first attempted to initiate an FBA in March 2024.

P.H.'s problematic behaviors during the Fall 2023 semester are described in detail in Section I(A)(1), *supra*. Following the 2023-2024 winter break, his behavioral decline continued. C.H. testified that, for the first several days in January 2024, P.H. would not get out of the car, and she couldn't get him in to school. Tr 55, l 20-22.  As a result, she decided to take him through the front door of the school instead of the back door, to avoid walking across the courtyard.  Tr 55, l 22-25; Tr 56, l 16-Tr 57, l 13.  She testified that "everybody" at Marble knew this was going on. Tr 56, l 1-7.  She testified that, at home, P.H. would say, "I'm not going to school" and "I'm not going to leave," and that he was refusing to get dressed.  Tr 56, l 8-15.  C.H. said P.H. had to be reassigned from paraprofessional Anastasia Shortridge because he had "harsh feelings" towards her and C.H. was afraid he would break her glasses.  Tr 57, l 22-Tr 58, l 1.

C.H. testified that, once she got P.H. in the classroom, she had to sit with P.H. in the school building for about 30 minutes each morning before his special education teacher, Kristen Casby, came to get him, and that she would then sit in the hallway during his classes.  Tr 59, l 4-9. C.H. testified that, in January 2024, P.H. was in the general education classroom for about 30 minutes and would then go to the special education classroom.  Tr 59, l 19-25.  She testified that, after 30 minutes in the general education classroom, P.H.'s day was "filled with providers" or he was

placed in a conference room, and that he did not return to the general education classroom for the rest of the day.  Tr 60, l 17-Tr 61, l 6; Tr 61, l 18-Tr 62, l 3.  C.H. testified that, in late January or early February 2024, instead of spending time with a paraprofessional in the special education classroom, Miller-Hogan decided to move P.H. to a conference room.  Tr 62, l 7-Tr 63, l 23.  C.H. testified that P.H.'s behavior continued to worsen, as he refused to leave the car and began laying down on the floor for minutes at a time once he got inside the school building.  Tr 64, l 12-19. C.H. testified that she tried to phase herself out of having to be with P.H. at school by substituting her mother in, but that this did not work and led to "huge [school] refusal" by P.H.  Tr 65, l 23-Tr 66, l 25.

C.H. testified that the amount of time P.H. was spending with his peers began to decrease in late January 2024, and that she was told that P.H. didn't "work well with students."  Tr 68, l 7-Tr 69, l 20.  C.H. testified that, after the end of January 2024, P.H. never returned to the general education classroom and was never put in another classroom with students at Marble.  Tr 69, l 21-Tr 72, l 1.  C.H. testified that, at that point, P.H. began remaining in the office with her and counting cars for 30 to 45 minutes at a time, sometimes while lying on the floor.  Tr 72, l 7-Tr 73, l 16. During this time, P.H. also began kicking his paraprofessional.  Tr 74, l 2-5.  C.H. testified that P.H.'s behavior became noticeably stranger, as he stopped counting cars and just began saying the numbers one and two over and over or would count in a pattern that did not align with the pattern of the cars.  Tr 74, l 13-24.  C.H. testified that this went on for weeks, through February 2024, and that P.H. could only accomplish one or two of the items on his school schedule because he was spending so much time in the office.  Tr 75, l 1-20.  C.H. testified that the occupational therapist, Stacey Turke, asked her to come wait outside her classroom so C.H. could intervene if necessary. Tr 76, l 10-17. C.H. testified that things go "much worse" in February.  Tr 77, l 3-4.  On February

18

9, 2024, Turke came into the office and told C.H. and Miller-Hogan that she had "lost" P.H.  Tr 77, l 8-16.  C.H. said the three of them began looking for P.H., and she ultimately found him hiding in a classroom with the lights off.  Tr 77, l 19-25.

C.H. testified that she began asking Robertson about the possibility of moving P.H. to the autism classroom in January 2024.  Tr 80, l 14-19.  C.H. also testified that, around that same time, she began asking for ELPS to initiate a FBA.  Tr 82, l 16-Tr 83, l 16.  ELPS staff told her she needed to make these requests to Nick Hamilton, the Special Education Director.  Tr 79, l 18-21; Tr 83, l 8-12.  C.H. testified that, at a meeting with Hamilton in mid-February 2024, he told her he was "not going to consider" the autism classroom for P.H. that year, with no explanation. Tr 87, l 4-9.

In February 2024, P.H. also began eloping from school. Tr 96, l 24-Tr 97, l 23.  During the first incident, he left the building. Tr 99, l 14-18.  During the second incident, he bolted from school and crossed the street again. Tr 99, l 19-Tr 100, l 25.  C.H. testified that she was able to talk him into meeting her at a bus station by promising that he could go home for the day. Tr 101, l 1-25.  C.H. testified that P.H. tried to elope a third time between February 25 and March 5, 2024, but Robertson was able to catch him. Tr 103, l 5-16.  P.H. then tried to elope a fourth time on March 5, 2024, but C.H. was able to catch him.  Tr 102, l 1-19.

C.H. testified that, during the week of March 4, 2024, P.H. began spending a significant amount of time in the conference room because his behavior had continued to decline.  Tr 88, l 10-17.  C.H. testified that on around March 2 or 3, 2024, P.H. had torn out the TV, knocked down coat racks, and "done some damage" in the conference room.  Tr 88, l 19-24.  Then, on March 4, again in the conference room, P.H. said he was going to pull down the TV again, broke a remote control, tried to overturn a mini fridge, and hid under the desk. Tr 89, l 5-9.

On March 5, 2024, C.H. testified that she met with several ELPS staff, including Nick Hamilton. Tr 101, l 1-19.  Finally, on March 8, 2024, Hamilton sent her a consent form for ELPS to perform an FBA, which she signed and returned within three days.  Tr 174, l 14-18. During the due hearing, Respondents suggested that Petitioners delayed the process by refusing to sign consent for the FBA. However, the evidence and timeline of events do not support this conclusion. Formal notice of the March 5, 2024 meeting was sent by email from Miller-Hogan on March 4, 2024. This email outlined discussion points for the March 5 IEP meeting, but an FBA was not included on the agenda. R Ex Q at 13-24. As ELPS Special Education Director Nick Hamilton testified at the due process hearing, he was concerned that an FBA had not been conducted for P.H. before the March 5, 2024 IEP meeting. Tr 797, l 12-16.

Hamilton further testified that C.H. had at first refused to sign an FBA, and had left the March 5, 2024 meeting at a "standstill" with a "disconnect on whether the student would be returning to school and how we would manage this change in placement or the FBA in and of itself." Tr 800, l 7-25. However, an email from C.H. to Miller-Hogan sent just hours after the IEP meeting directly contradicts Hamilton's assertion. P Ex 60 at 665. In this email, C.H. expressed her support for the FBA and made clear P.H. was returning to school the following day. *Id. There* is simply no verifiable record indicating that C.H. was uncooperative in signing the FBA consent. Even Superintendent Dory Leyko's May 6, 2024, email to C.H. explicitly states that C.H. signed the consent for an FBA to be completed. R Ex M at 2. Nowhere in that email does Leyko suggest that C.H. delayed or failed to provide timely consent for the FBA she had requested. *Id.*

After the March 5, 2024 meeting, ELPS had no plan to convene the IEP team again, but an emergency meeting was held on March 8, 2024 to address the seclusion P.H. on March 6, 2024. R Ex Q at 2. By that March 8, 2024, ELPS finally expressed that it was ready to contact P.H.'s

medical providers and perform an FBA. *Id.* at 3. It was then that Hamilton emailed C.H. a consent form that would permit him to speak with P.H.'s medical providers. *Id.* C.H. provided P.H. doctor's information along with a signed FBA consent form on Monday, March 11, 2024. *Id.* at 7.

Further, ASD teacher consultant Kelsey Kujawa testified that the first time an FBA had been recommended to her was after the March 5, 2024 IEP meeting—a meeting that she had not been invited to. Tr 689, l 3-11. Kujawa indicated that a variety of behavior could justify conducting an FBA including behaviors that could pose a risk of harm to P.H. or others such as elopement, severe task avoidance or other disruptive behavior. Tr 689, l 13-20. Kujawa also indicated that, had she been permitted to attend the March 5, 2024 IEP, it is likely that she would have recommended increasing her consultative services in P.H.'s IEP. Tr 691, l 2-9.

The absence any mention of an FBA on the agenda for the March 5, 2024 IEP team meeting, coupled with the fact that Kujawa was not invited to the meeting and Hamilton's clear lack of awareness that an FBA had not been conducted before that point, all indicate that ELPS was not planning on even discussing an FBA on March 5, 2024, and the delay in conducting an FBA was not due to any inaction by Petitioners.

3.   Medication changes did not contribute to P.H.'s behavior changes

Following the conclusion of testimony in this matter, the ALJ requested that parties address whether medication changes contributed to the change in P.H.'s behavior that occurred following the 2023-2024 winter break. Tr 961, l 18-21.  P.H. did not have any changes in medication during the Fall 2023 semester; therefore, the changes in P.H.'s behavior in the fall were not related to medication. Adjustments to P.H.'s medications began in January 2024 as a direct response to his anxiety surrounding attending school at ELPS that arose mid-fall. P Ex 60 at 594. On November 13, 2023, C.H. emailed Miller-Hogan and informed her that P.H. had not had any medication

changes in over a year. *Id*. at 579. In this email, C.H. expressed concern about whether the stress from school was causing the changes in P.H. *Id.*

On January 8, 2024, C.H. emailed Miller-Hogan and explained P.H.'s medications were being adjusted to try to address his struggles at school. *Id.* at 594.  Miller-Hogan responded that she hoped P.H. would be able to return to his normal day soon. *Id.* On January 16, 2024, C.H. again emailed Miller-Hogan with an update about P.H.'s medications. *Id*. at 599. She informed Miller-Hogan that one medication that was meant to soothe P.H.'s anxiety instead kept him awake, so they were discontinuing it and would try another. *Id.* On January 18, 2024, C.H. emailed Miller-Hogan informing her that P.H. would be starting Lexapro. *Id.* at 601. On January 21, 2024, C.H. emailed Miller-Hogan explaining that P.H. was tolerating the Lexapro well. *Id.* On January 25, 2024, C.H. emailed Miller-Hogan explaining that he had been prescribed an additional dose of Clonidine, a medication P.H. had tolerated well for years but had never been increased. *Id.* at 604. This was previously a medication P.H. was only administered at night, but C.H. and R.H. were hoping to see if P.H. would tolerate it during the day without becoming too tired. *Id.*

In her testimony during the due process hearing, C.H. explained that she and R.H. started the medication solely to assist P.H. with going to school, but P.H. had a negative reaction, which unfortunately made things even worse at home. Tr 152, l 1-13. Based on the documented timeline and testimony, it is clear that P.H.'s medication changes did not contribute to his anxiety and behavior changes at school. As C.H. explained, substantial changes in medication did not occur during the Fall 2023 semester, when P.H.'s struggles at school initially arose. *Id.* Instead, his difficulties in school are what led to an attempt to address his anxiety through medication adjustments beginning in January 2024. Tr 150, l 1-Tr 151, l 2. Instead, the record supports that the medication changes were reactive—attempts by Petitioners to manage P.H.'s worsening

anxiety and school-related struggles, rather than the cause of those struggles themselves. *Id.* Given that the new medications were short-lived and did not have time to take prolonged effect, and that P.H.'s school-related challenges predated any changes in treatment, it is evident that his behavioral changes stemmed from factors unrelated to his medication. *Id.*

4. Elopement at Marble Elementary

As discussed in Section I(A)(2) *supra*, P.H. had two successful elopements from Marble Elementary in February 2024 and made two additional unsuccessful attempts to elope in late February and early March 2024.

As C.H. testified, on February 9, 2024, P.H. eloped from his session with ELPS occupational therapist Stacy Turke, and Turke alerted Miller-Hogan for assistance. Tr 77, l 9-25. As C.H. was present when Miller-Hogan received the message, she aided in the search for P.H. *Id.* After several minutes, she found P.H. in a STEM-classroom, hiding with the lights off. *Id.* As C.H. explained, she met with Robertson and Miller-Hogan after this elopement and raised her concerns about P.H.'s safety at Marble. Tr 80, l 3-10; Tr 96, l 13-Tr 97, l 11.  At this meeting, she again requested that P.H. be transferred to an ASD classroom. *Id.*

On February 27, 2024, P.H. again eloped from Marble, but this time he made it outside the building and was in the intersection of Hagadorn and Burcham, two busy streets in East Lansing during rush hour traffic for MSU. Tr 249, l 21-Tr 250, l 12. Fortunately, C.H. was able to recover P.H. from the intersection of Hagadorn and Burcham before he was hit by a car or otherwise harmed. Tr 97, l 24-Tr 101, l 25. The next day, February 28, 2024, P.H. again tried to elope from Marble, but C.H. quickly caught him. Tr 102, l 13-19. At one other point between late February and early March 2024, P.H. again tried to elope but was stopped by Robertson. Tr 103, l 5-16. Following these elopements, a meeting was held on March 5, 2024. Tr 102, l 1-12. At this meeting, Petitioners requested a plan to keep P.H. safe and ensure he could not elope from Marble and end

up in harm's way at a busy intersection again. Tr 102, l 3-Tr 103, l 22. Robertson met this request

with a blanket statement that all ELPS staff could do was be aware that P.H. might elope. *Id.*

During this meeting, ELPS Special Education Director Nick Hamilton made the statement: "That's

just what these kids do," in what appeared to be a broad-stroke generalization of children with

disabilities.  Tr 102, l 20-Tr 103 l 4; Tr 250, l 8-12. ELPS took no substantive measures to keep

P.H. safe, and never even suggested creating a safety plan to address potential future elopement

attempts.

For these reasons, ELPS denied P.H. FAPE by failing to reevaluate P.H. when his

educational or related service needs, including the need for increased emotional, behavioral, and

academic supports, warranted a reevaluation.

### B.  ELPS inappropriately used seclusion and restraint

While IDEA does not specifically reference seclusion or restraint, it does repeatedly place

obligations on the District on how to appropriately address a student's behaviors. As explained in

the preceding section of this brief, where a child's "behavior impedes the child's learning or that

of others," the IEP team must, "consider the use of positive behavioral interventions and supports,

and other strategies, to address that behavior." 34 CFR 300.324(a)(2)(i). MCL 380.1307b

expressly prohibits the use of any seclusion other than in an emergency. Seclusion is defined as,

"[T]he confinement of a pupil in a room or other space from which the pupil is physically

prevented from leaving." MCL 380.1307h(s). MCL 380.1307c then goes on to further qualify what

constitutes an emergency, thus allowing the use of emergency seclusion or restraint, noting it may

only be used "under emergency situations *and only if* essential to providing for the safety of the

pupil or safety of another" (MCL 380.1307c(a) (emphasis added)) and it "may not be used in place

of appropriate less restrictive interventions." *Id.* at (b). When emergency seclusion is used, it

should generally be no longer than 15 minutes. *Id.* at (f). Not only must schools notify parents each time emergency seclusion is used (*see* MCL 380.1307d(a)), if the student exhibits a pattern of behavior that indicates such emergency seclusion or restraint is likely in the future, schools are encouraged to "conduct a functional behavioral assessment [or] (ii) [d]evelop or revise a positive behavioral intervention and support plan to facilitate the elimination of the use of seclusion and restraint." As noted above, state law specifically indicates a functional behavior assessment is warranted when a student exhibits a pattern of behavior that increases the risk that emergency seclusion or restraint will be utilized.

Yet rather than conducting an FBA or any other relevant reevaluations timely or otherwise revising P.H.'s IEP to provide appropriate positive behavioral interventions and supports, ELPS instead continued to rely on the inappropriate use of seclusion. As extensive hearing testimony demonstrated, P.H. was subjected to at least one traumatic seclusion while a student at Marble Elementary. On or around March 4, 2024, C.H. was in a conference room with P.H., Robertson and Miller-Hogan when P.H. began tearing things down around the room. Tr 88, l 16-Tr 89, l 15. During this time, P.H. told C.H. he would "just go to the calm down room." Tr 89, l 16-Tr 90, l 9. When C.H. said that there was not a seclusion room at Marble, P.H. insisted there was, and described it with specificity. Tr 90, l 17-24. Miller-Hogan at first said there was no seclusion room at Marble, but then she and Robertson admitted there was, which she said she had forgotten.  Tr 89, l 18-Tr 91, l 14.  As the adults discussed the seclusion room, P.H. began to panic and informed C.H. that he felt like he could not breathe.  Tr 90, l 1-5.  This was extremely unusual for P.H., so C.H. made the decision to take him home from school at that time.  Tr 90, l 5-6, 25.

At Robertson's instruction, P.H. was placed in the seclusion room at ELPS on March 6, 2024. Tr 104, l 24-Tr 108, l 25. It was extremely emotional for C.H. to witness her son being

secluded. Tr 108, l 22-25. This was primarily due to the inappropriate overuse of seclusion P.H. had been subjected to while he attended HPS.  Tr 26, l 3-Tr 30, l 11.  C.H. described that, upon witnessing the March 6 seclusion, she was: "…beside myself because I have never seen a seclusion room at this point.  And let me tell you, the one thing you don't ever want to see is your child in a seclusion room." Tr 108, l 22-25.

C.H. emailed Robertson the following day and expressed how deeply this seclusion had impacted P.H. and her. P Ex 24 at 191. She wrote:

> It broke my heart to hear him shouting in the hall that he "hated that room" and to see him begging not to go there. When we left the school, [P.H] asked me if I still loved him. He has never asked such a question. Seclusion is not an option again.

*Id*. Further, P.H.'s medical provider Dr. Gregory Holzhei sent a letter to ELPS detailing that seclusion was not a safe option for P.H. due to his epilepsy. P Ex 7 at 109. As he testified at the due process hearing, his position on this never changed. Tr 367, l 4 -Tr 370, l 6. There is no doubt that by March 2024, ELPS was well aware of C.H.'s seclusion concerns. Tr 37, l 2-18; Tr 104, l 7-233. Robertson testified that, following the extensive conversations ELPS staff had with Petitioners in August 2023, the District knew they had reservations about the use of seclusion following P.H.'s seclusion experiences at HPS. Tr 489, l 11-14.

Seclusion of P.H. did not work. As Dr. Light Shriner discussed, P.H was informally secluded in the conference room at ELPS multiple times at ELPS. Tr 331, l 90-Tr 331, l 15. On March 6, 2024 alone, P.H. was secluded three times; one documented, and two informally in a conference room and Miller-Hogan's office. P Ex 17 at 139; Tr 104, l 24-Tr 108, l 25.  In Michigan, seclusion is defined as: "…confinement of a pupil in a room or other space from which the pupil is physically prevented from leaving." MCL 380.1307h. Prior to P.H.'s March 6, 2024 documented seclusion, P.H. engaged in 15 minutes of behavior described by Robertson in the seclusion report

as: "tearing things off of the wall and destroying them, attempting to shatter the large window, ripping up books and papers, and destroying anything within reach. Any time a staff member would get close to [P.H.] or prevent him from striking the window, he would become physical and hit, grab, or kick them." P Ex 17 at 139.   P.H.'s time in the conference room prior to his documented seclusion would arguably satisfy the definition of a seclusion.

Robertson made the decision to formally seclude P.H. and it was Robertson who authored two different accounts of P.H.'s March 6, 2024 two-minute seclusion. P Ex 17 at 139, 148. The second seclusion report makes clear that C.H. demanded an end to the seclusion after two minutes, and states: "Once [P.H] was in the seclusion room, he was pacing around, pounding on the door, and yelling. [C.H.] entered the special education room and demanded that [P.H.] only be secluded for one more minute so we could collect data and that this seclusion end." P Ex 17 at 148. As C.H. testified at the due process hearing, after several minutes had passed in seclusion and at the time of C.H.'s demand, P.H. was thrusting himself violently against the seclusion door window. Tr 108, l 10-17. As documented in the seclusion forms and testimony, the seclusion only ended after two minutes because C.H. stopped it. P Ex 17 at 139, 148; Tr 108, l 10-17.

After C.H. ended the seclusion, P.H. ran out and said, "I have to go to the bathroom." Tr 109, l 4-8.  P.H. then walked back to the office and sat in the bathroom for approximately four or five minutes." Tr 109, l 11-14. Following this, ELPS staff attempted to have P.H. work in the special education room with Robertson accompanying him. Tr 496, l 1-6.  At this time, P.H. became upset and seemingly eloped. *Id.* As Robertson testified, P.H. "…became frustrated and upset and exited the special education classroom with me close behind." Tr 496, l 1-6. Robertson further testified that P.H. went with him to Miller-Hogan's office and began to engage in aggressive behaviors. Tr 496, l 7-Tr 497, l 17. Robertson testified that P.H. held a pair of scissors

toward him in a threatening manner and, when those scissors and another pair of scissors were confiscated by Robertson, P.H. hit Robertson in the head with a closed fist. *Id.*

It is clear from Robertson's testimony that P.H. was surrounded by unsafe objects. Tr 496, l 7-Tr 497, l 17. During her testimony at the due process hearing, P.H.'s general education teacher Rebecca Spitzer stated that ELPS staff would "work to make sure that scissors were put away and not left out on the table. We also moved things like picture frames or things that could be picked up or thrown just as a preventative measure just to try and help, because it was reported that the student sometimes would take things and throw them if they were feeling frustrated, which is not uncommon with students who may struggle with managing those or regulating those feelings." Tr 701, l 22-Tr 702, l 6. Amidst the chaos ensuing in Miller-Hogan's office between P.H. and Robertson, C.H. pleaded with ELPS staff to end P.H.'s seclusion.  Tr 109-110. When C.H. requested that Robertson release P.H. from Miller-Hogan's office, Robertson responded, "If we don't do this, he wins." Tr 110 l 1-3. After 40 minutes, C.H. insisted that Robertson release P.H.; finally, he did so, after several more agonizing minutes. Tr 110, l 9-15.

This third and final seclusion on March 6, 2024, lasted over 40 minutes and resulted in severe destruction. Tr 109, l 21-Tr 110, l 8. ELPS provided no documentation of the seclusion being documented as required by law.  MCL 380.1307h.  Again, the seclusion only ended because C.H. stopped it. P Ex 17 at 139, 148; Tr 108; l 10-17. The evidence is clear: P.H. spent the entire day of March 6, 2024 in crisis, with no safety plan, behavior intervention plan, or functional behavior assessment.

Following the March 6, 2024 seclusion, ELPS banned C.H. from campus due to her using a swear word after she witnessed her son being secluded in a room that she had been repeatedly assured by ELPS staff did not exist—a word heard only by Robertson. Tr 112, l 21-Tr 115, l 23.

28

As a result of C.H.'s single use of profanity in a moment of overwhelming fear and shock, both C.H. and R.H. were banned from entering Marble Elementary. *Id*.; Tr 252, l 21-Tr 254, l 4. ELPS eventually agreed to permit R.H. two 30-minute observations over the course of the remainder of the year on non-consecutive days. Tr 520, l 11-19. Ultimately, it was because of ELPS's failure to ensure P.H.'s safety and security that Petitioners made the difficult decision to keep him home from school while they attempted to work out a solution with ELPS. P Ex 24 at 197. Unfortunately, ELPS failed to appropriately provide for P.H.'s safety, which led to Petitioners' decision to withdraw P.H. from ELPS in May 2024. R Ex S at 1.

Seclusion did not work in Haslett, seclusion did not work in East Lansing, seclusion did not work at P.H.'s first school in Ohio, and only now is P.H. enrolled in school that has engaged a behavior expert and a personally assigned BCBA, finally providing P.H. with the FAPE he deserves in his LRE. New Albany Primary School has recognized what ELPS would not: that for P.H., seclusion does not work.

For these reasons, ELPS denied P.H. FAPE by inappropriately utilizing seclusion.

### C. ELPS failed to offer and/or provide P.H. an appropriate IEP, including failing to provide P.H. the supports as listed in his IEPs

In *Endrew F v Douglas County School District*, the Supreme Court held that an IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F,* 137 S Ct at 999. Endrew F. was an elementary school student diagnosed with autism.  Endrew attended Douglas County schools from preschool through fourth grade. However, by fourth grade, Endrew's "academic and functional progress had essentially stalled" as he faced behavioral problems in the classroom. *Id.* at 996. As evidence of this stall, Endrew's IEPs "largely carried over the same basic goals and objectives from one year to the next." *Id*. When the school district presented a proposed 5th grade IEP which was "pretty much

the same as his past" IEPs, Endrew's parents removed him from his school and enrolled him in a private school specializing in educating children with autism. *Id*.

At the new school, Endrew was given increased academic goals and a new behavioral intervention plan. Almost immediately, Endrew's behavior improved, and he began making academic progress well beyond that made at his prior school. Six months later, Endrew's parents met again with the Douglas County School District, and the district presented a new IEP that parents believed was "no more adequate" than the prior IEP, and no new behavioral plan that incorporated the changes and progress made at the private school. *Id*. at 997. Endrew's parents continued sending Endrew to the private school and filed a complaint alleging a denial of FAPE and seeking reimbursement of tuition. In the administrative hearing, Endrew's parents "...contended that the final IEP proposed by the school district was not 'reasonably calculated to enable him to receive educational benefits…'" and therefore the school district denied Endrew FAPE. *Id*.

The Court held that "a student offered an educational program providing 'merely more than *de minimis*' progress from year to year can hardly be said to have been offered an education at all. For children with disabilities, receiving instruction that aims so low would be tantamount to 'sitting idly . . . awaiting the time when they were old enough to drop out.'" *Id.* at 1001 (citing *Rowley*, 458 US at 179). The Court further held that where a student is not in a general education setting, an IEP "need not aim for grade-level advancement" if that "is not a reasonable prospect for the child." *Id*. at 1000. Instead, an "educational program must be appropriately ambitious in light of [the child's] circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom. The goals may differ, but every child should have the chance to meet challenging objectives." *Id*.

The Court noted that because an IEP "is not a form document" and the offered instruction must be specially designed to meet the unique needs of a child on an individualized basis, "the IEP must be appropriate in light of the child's circumstances." *Id.* at 999. This analysis must be performed on a case-by-case basis because "the adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." *Id.* at 1001. The Court explicitly stated that "the 'reasonably calculated' qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials. . . . informed not only by the expertise of school officials, but also by the child's parents or guardians." *Id.* at 999.

As the *Endrew F* holding indicates, one of the primary obligations on school districts under the IDEA is to develop and implement appropriate IEP for students with disabilities. In addition to developing an initial or annual IEP, IDEA and its implementing regulations also require a local education agency to "ensure that the IEP Team . . . revises the IEP as appropriate to address any lack of expected progress toward the annual goals and in the general education curriculum . . . ; the results of any reevaluation conducted . . . ; the child's anticipated needs; or other matters." 20 USC 1414 (d)(4)(A)(ii); 34 CFR 300.324(b)(1)(ii). School districts must then implement a student's IEP as written to provide FAPE. As explicitly stated in IDEA's implementing regulations, "FAPE means special education and related services that (a) Are provided at public expense, under public supervision and direction, and without charge; . . . and (d) *Are provided in conformity with an individualized education program (IEP)*." 34 CFR 300.17 (emphasis added). The IEP "embodies a binding commitment and provides notice to both parties as to what services will be provided to the student during the period covered by the IEP." *MC by and through MN v Antelope Valley Union High Sch Dist*, 858 F3d 1189, 1197 (9th Cir 2017).

As explained previously, Respondent failed to conduct the evaluations necessary to determine why P.H. was not making educational progress appropriate to his circumstances and was continuously regressing behaviorally. Not performing comprehensive evaluations is unconscionable and entirely at odds with the letter and spirit of IDEA. The law requires evaluations to identify both the student's eligibility and their educational needs. *See* 34 CFR 300.304(b)(1). *See also* 34 CFR 300.301(2); 34 CFR 300.303(a)(1).  Due to its own failure to investigate and perform evaluations so routine as an FBA, Respondent failed to appropriately identify P.H.'s educational and related needs sufficient to provide him with an IEP reasonably calculated to provide him with FAPE and failed to review and revise his IEP when his educational or related service needs warranted a revision, thus denying him FAPE.

Further, Respondent utterly failed to appropriately document P.H.'s services, behaviors and progress or lack thereof, and failed to turn over what little documentation they did have until the hearing. During her testimony, IISD ASD Teacher Consultant Kelsey Kujawa testified that she kept log notes of her consultations with P.H.'s teacher Kristen Casby beyond the one-page log that had been provided in discovery. Tr 683, l 3-15. Kujawa testified that her logs were provided to MDE during the investigation process of the state complaint filed by C.H. and R.H. on July 2, 2024. *Id.* Kujawa said she would have logged any concerns raised to her by P.H.'s teachers in her notes. Tr 688, l 8-20. She testified that no concerns were raised about P.H. in November or December 2023. *Id.* ELPS obviously had access to these documents because it submitted them to MDE in the course of MDE's investigation of Petitioners' special education state complaint, filed in July 2024, but it failed to provide them in response to Petitioner's request for documents in this matter. *See* P Ex 22; Exhibit 2, attached.  When the logs were turned over mid-hearing, they consisted of five handwritten notes, each less than a paragraph. R Ex X at 3-7. These logs evidence

that ELPS did not provide ASD teacher consultant services 1-2 times a month for 20 minutes, as required by P.H.'s September 2023 IEP. P Ex 4 at 44. Further, Kujawa testified that she was not notified of P.H.'s IEP meeting in March 2024 until after it had occurred and was not part of the decision to keep his ASD teacher consultant services at the same level rather than increase his service time. Tr 686, l 2-25. This is further evidence of ELPS's pattern of failing to make a good faith effort to address P.H.'s needs, implement P.H.'s IEP with fidelity, and appropriately track and document P.H.'s aids and services as required by his IEP.

During her testimony at the due process hearing, ELPS Speech and Language Pathologist Stephanie Francisco testified that she met with P.H. weekly for speech in accordance with his September 2023 IEP. Tr 568 l 21- Tr 569, l 6; P Ex 4 at 49. However, when asked about what dates she met with P.H. or even how many sessions she engaged in, she could not recall. *Id.*; Tr 569, l 20-Tr 570, l 2. According to P.H.'s September 2023 IEP, he was supposed to receive speech and language services 4-5 times a month for at least 25 minutes per session. P Ex 4 at 49. Francisco testified that she decided to unilaterally reduce P.H.'s speech and language services from 25-minute sessions to 20-minute sessions even though he was struggling with his speech goals. Tr 570, l 3-Tr 572, l 16. Francisco said she thought this provided P.H. with quality over quantity but provided no data or other documentation to support a conclusion that she was able to provide more "quality" speech services to P.H. by reducing his service time by five minutes per session. Francisco also provided no explanation for what authority she believed she had to reduce P.H.'s service time without the consent and approval of his IEP team.  She could not do that, because no such authority exists.

Francisco testified that even though she made determinations on a week-by-week basis about what length and quantity of speech services time would be appropriate for P.H. based in part

on conversations with his teachers and observations of his behaviors, she never documented those conversations or observations. Tr 572, l 10-23. Francisco also testified that she did not maintain data sheets or log notes to track P.H.'s progress on his speech goals. Tr 577, l 7-Tr 580, l 17. Francisco testified that she failed to document the data she obtained from conversations with P.H.'s teachers that influenced her decision to reduce his speech services time. Tr 582, l 10-Tr 583 l 16. When asked, "How can we show here in court when these sessions occurred or how frequent they were, what happened at these specific sessions, if we don't have that documentation?" Francisco replied: "I don't know." Tr 584, l 12-16.

Francisco testified that she kept an attendance log of P.H.'s speech services attendance, and that she provided those logs. Tr 578, l 8-16. ELPS failed to produce these logs in response to Petitioners' request for production of documents. Then the logs were produced during the hearing, they consisted of one page with dates listed, but no substantive notes regarding what occurred at sessions, and a one-page schedule for the 2023-2024 school year, indicating that P.H.'s speech services were supposed to take place on Fridays at 9:30 a.m. R Ex X at 1-2.

ELPS Occupational Therapist Stacy Turke testified that she kept consistent logs when she met with P.H., and the logs she provided in response to Petitioners' document request constituted the full documentation of the sessions she had with P.H. during the 2023-2024 school year. Tr 650 l 11-24. However, there are no logs at all for OT services in November 2023. P Ex 6 at 103. Assuming Turke's contemporaneously kept logs are more reliable than her testimony given fifteen months after the fact, it is more likely than not that ELPS did not provide P.H. with *any* occupational therapy during the entire month of November 2023, in violation of his IEP.

During her testimony at the due process hearing, Michelle Miller-Hogan testified that she kept additional progress monitoring notes for P.H. that were not provided to Petitioners in response

to their document production request. Tr 943 l 6-Tr 944, l 14. When Miller-Hogan's progress notes were finally provided to Petitioners mid-hearing, they consisted of one page of handwritten numbers relating to his IEP goals with no specific dates indicating when specifically P.H. was provided with services. R Ex X at 12.

Further, in August 2024, the Michigan Department of Education found that ELPS failed to properly document the P.H.'s supplementary aids and services. "The general education teacher reported not being the primary person responsible for documenting the supplementary aids and services, the special education teacher reported not documenting when supplementary aids and services were provided, and the principal indicated not having a system in place for documentation." P Ex 22 at 173.

Neither the Supreme Court nor the Sixth Circuit Court of Appeals have specifically addressed the appropriate standard for evaluating whether a school district's failure to implement a provision of a student's IEP violates the student's right to FAPE. In *Van Duyn ex rel Van Duyn v Baker Sch Dist 5J*, the Ninth Circuit Court of Appeals considered the question. While not binding, the *Van Duyn* decision is instructive here, and *Van Duyn* has been favorably cited by several other U.S. District Courts and Courts of Appeals outside of the Ninth Circuit.[2]

Christopher Van Duyn was a student with autism. Before he entered middle school, his IEP team met and agreed to an extensive plan for his following year's education. The plan laid out how many hours per week and what days he would work on specific subjects, provided him with a full-time behavior management plan, required him to be placed in a self-contained classroom and to regularly see a specialist, and described how his progress was to be evaluated. *Van Duyn ex*

---

[2] *See, e.g., Hernandez v Grisham*, 494 F Supp 3d 1044 (D NM 2020); *RS v Highland Park Indep Sch Dist*, 951 F3d 319 (5th Cir 2020); *LJ v Sch Bd of Broward Co*, 927 F3d 1203 (11th Cir 2019); *Wade v Dist of Columbia*, 322 F Supp 3d 123 (D DC 2018); *Fortes-Cortes v Garcia-Padilla*, 128 F Supp 3d 458 (D PR 2015).

*rel Van Duyn v Baker Sch Dist 5J*, 502 F3d 811, 815-16 (9th Cir 2007).  Once the school year

began, Christopher's parents noticed that he was not getting enough hours of math instruction

compared with the number of hours identified in his IEP, that his behavioral management plan was

different from what had been identified, that some of his assignments were not on his educational

level, and that he was not being educated in a self-contained classroom.  *Id*. at 816, 823-25.  The

*Van Duyn* court found that the school district had denied Christopher FAPE when it provided only

slightly more than half the number of hours of math instruction per week called for in his IEP. *Id*.

at 823-25.  According to the court, even if an IEP meets the procedural and substantive

requirements of the IDEA, a school may still violate a student's right to FAPE if a material or

important part of the IEP was not implemented.  *Id*.  The *Van Duyn* court defined material as

follows: "A material failure occurs when there is more than a minor discrepancy between the

services provided to a disabled child and those required by the IEP."  *Id*. at 811.

Here, like in *Van Duyn*, ELPS failed to implement numerous material or important parts

of P.H.'s IEP. P.H. was denied at least an entire month of occupational therapy services, many

minutes of speech and language services over multiple sessions, and consistent implementation of

his supplementary aids and services. As further described in the preceding sections of this brief,

P.H. was repeatedly placed in seclusion and on a shortened schedule, although his IEP clearly

stated he was attending a full day of school in the general education setting. Due to ELPS'

failures to implement P.H.'s IEPs as written, P.H.'s behavioral and social-emotional needs continued to

exponentially increase.

For these reasons, ELPS denied P.H. FAPE by failing to offer and/or provide P.H. an

appropriate IEP by failing to develop an IEP reasonably calculated to provide him with FAPE,

failing to review and revise his IEP when his educational or related service needs warranted a revision, and failing to implement his IEP as written.

### D. ELPS failed to educate P.H. in the least restrictive environment ("LRE")

With respect to educational placement of students, IDEA requires the following:

> Each public agency must ensure that—
>
> (i) To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are nondisabled; and
>
> (ii) Special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

34 CFR 300.114(a)(2). School districts are required to provide alternate educational settings for students who cannot access a FAPE in general education classes: "Each public agency must ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services."  34 CFR 300.115(a).  IDEA defines LRE as a concept, not a place, based on the individual student's needs and their capacity to withstand the regular education environment.  *See* 34 CFR 300.411(a)(2).  Hence, the use of such phrases as "to the maximum extent appropriate" and approving removal based on the severity or nature of the disability, not just having a disability in general. *Id.*

The individuality of LRE has repeatedly been upheld by courts. As one extreme example, in *Anchorage School District v DS*, the court considered a matter in which a hearing officer had found as follows for the student:

> The hearing officer found that ASD's April 2004, April 2005, and January 2006 IEPs were not reasonably calculated to confer on D.S. a meaningful educational benefit and therefore denied him FAPE. She found that the home-based educational program utilizing intensive behavioral therapy ("IBT") and supervised by Autism

> Partnership was an appropriate educational program for D.S. and that the equitable considerations favored parents in the analysis of the appropriate remedy….

*Anchorage Sch Dist v DS*, 688 F Supp 2d 883, 886 (D Alaska 2009) (internal citations omitted). The matter was before the court on a motion for summary judgment filed by the school district, which argued that the Autism Partnership could not provide FAPE because, in relevant part, it was not the LRE.  *Id*. at 890.  Denying the district's motion, the *Anchorage* court held that the LRE must be considered in light of the individual student's needs:

> …where a home-based program is necessary for a student to receive meaningful benefit from his education, it is appropriate. "Disabled children, to the maximum extent appropriate, should be educated with children who are not disabled, i.e., they should be mainstreamed.... The education of a disabled child should take place in the least restrictive environment.... However, residential placement is appropriate for a disabled child if necessary for her to receive benefit from her education."

*Id*., quoting *Seattle Sch Dist v BS*, 82 F3d 1493, 1500 (9th Cir 1996).

As the record in this matter clearly demonstrates, the nature of P.H.'s disability is such that, upon enrolling in ELPS, he required extensive supplementary aids and services to be educated in the general education environment for a full school day.  "'The term 'unique educational needs' [shall] be broadly construed to include the handicapped child's academic, social, health, emotional, communicative, physical and vocational needs.'" *Seattle Sch Dist*, 82 F3d at 1500 (quoting H.R. Rep. No. 410, 1983 U.S.C.C.A.N. 2088, 2106).

ELPS claims it educated P.H. in his identified LRE. ELPS identified P.H.'s LRE as the general education setting. *See* P Ex 4; P Ex 5. Yet, he was not being educated in the general education setting. The reality is P.H. was isolated from his peers every time ELPS staff made him work in the office or the hallway – not just during the times he was in the seclusion room - he was virtually out of the classroom environment – both general education and special education - when

he was at school. C.H. inquired again and again about putting C.H. in the ASD classroom, which was repeatedly denied by ELPS. Tr 86, l 21-Tr 87, l 18. Placing P.H. in the ASD classroom would have been *less* restrictive and isolating than the way he was being educated at ELPS: assigned to general education on paper yet left to work separated from peers almost all day in various offices and solitary settings. ELPS should have reassessed P.H.'s LRE and put him in the ASD room, but they chose not to. Instead, they repeatedly documented general education as being P.H.'s LRE, then failed to educate him in it.

Even if the Tribunal were to determine that P.H. was not being isolated from peers in this way, ELPS has still failed to demonstrate that it educated P.H. in the general education environment as required by his IEP. As ASD teacher consultant Kujawa testified, she regularly met with P.H.'s teacher to find out how he was doing in class. Tr 685, l 12-23. Kujawa testified that she only met with the special education teacher Kristen Casby during her consultative sessions, not general education teacher Rebecca Spitzer. *Id. It* makes sense that Kujawa never met with Spitzer to provide consultative services, because, despite the requirements of his IEP, P.H. was not actually in the general education classroom.

For these reasons, ELPS denied P.H. FAPE by failing to educate him in the least restrictive environment.

## II.    This Tribunal must exercise its broad authority to award Petitioners their requested relief

The IDEA affords broad authority to hearing officers to fashion appropriate relief, including equitable factors to effectuate the IDEA. *Sch Comm of Burlington v Dep't of Educ,* 471 US 359 (1985); *Forest Grove Sch Dist v TA,* 129 S Ct 2484 (2009) (hearing officers have reimbursement authority); *see also, Letter to Kohn*, 17 IDELR 522 (OSEP 1991) ("based upon the facts and circumstances of each individual case, an impartial hearing officer has the authority to

grant any relief he/she deems necessary"); Perry A. Zirkel, *The Remedial Authority of Hearing and Review Officers under the Individuals with Disabilities Education Act: The Latest Update*, 37 J Nat'l Ass'n Admin L Judiciary 505 (2018).

### A.  An Award of a Compensatory Education Bank is Appropriate

Under the IDEA, courts have recognized that hundreds of hours of compensatory education delivered from a school district may not be the most appropriate remedy for a student.  Instead, the hours can be converted to a fund from which the parent draws to provide supports to the student that will provide them with maximum benefit. *See, e.g., Somberg v Utica Community Sch*, 908 F3d 162, 167 (6th Cir 2018) (converting 1,200 hours to a dollar figure). This is *not* considered "damages." *Id.*  In addition to *Somberg*, the Sixth Circuit affirmed an award of "768 hours of one-to-one compensatory education with a teacher certified with an endorsement to teach students with autism." *Woods v Northport Pub Sch*, 487 F App'x 968, 972 (6th Cir 2012).

In *Woods*, the student T.W. "was denied a FAPE for two academic school years and was significantly behind in reading, writing, and mathematics." *Id.* at 978. The appeals court held that "[b]ased upon this deficit, it was reasonable for the IHO to conclude that substantial compensatory-education hours were needed for T.W. to 'reasonably recover' from the lengthy denial of a FAPE." *Id.* Here, the evidence clearly shows that ELPS failed to provide P.H. with a FAPE for the entirety of the 2023-2024 school year. As a remedy, this Tribunal should award P.H. the monetary equivalent of 360 hours[3] of compensatory education in a fund so he may seek out appropriate educational providers and pay them directly.

"An appropriate award of compensatory education is 'relief designed to ensure that the student is appropriately educated within the meaning of the IDEA.'" *Bd of Ed of Fayette Co, Ky v*

---

[3] In Michigan, public schools are required to provide 180 days of pupil instruction per year. MCL 388.1701(3)(a). 360 hours of compensatory education would provide P.H. with fourteen hours of services per week for one year's worth of school, as detailed later in this section.

*LM*, 478 F3d 307, 316 (6th Cir 2007) (quoting *Parents of Student W v Puyallup Sch Dist No 3*, 31 F3d 1489, 1497 (9th Cir 1994)). The United States Court of Appeals for the Sixth Circuit has endorsed "a flexible approach, rather than a rote hour-by-hour compensation award." *LM*, 478 F3d at 316. However, "there is no support for the proposition that [an hour-by-hour compensation award] is never appropriate." *BH v W Clermont Bd of Ed*, 788 F Supp 2d 682, 700 (SD Ohio 2011). Rather, "[c]ompensatory education is meant to 'place children in the position they would have been in but for the violation of the Act.'" *Id.* (quoting *Draper v Atlanta Indep School Sys*, 518 F3d 1275, 1289 (11th Cir 2008)).

The amount of compensatory education P.H. receives should be designed to "place [P.H.] in the position [he] would have been in but for the violation of the Act." *BH*, 788 F Supp 2d at 700; *Draper*, 518 F3d at 1289. Compensatory education that would "place [P.H.] in the position [he] would have been in but for the violation of the Act" should give him the opportunity to catch up in terms of his social and emotional skills. *Draper*, 518 F3d at 1289.

Petitioners seek compensatory education for P.H. both in academics and in social-emotional services. Regarding academic instruction, Petitioners seek a compensatory education award calculation based on an hourly rate of $79.00.  This hourly rate is reasonable and is based on the low end of what the Michigan Department of Education was paying its Title I supplemental educational services providers in 2009-2010, the most recent date that counsel for NS was able to find comparable statistical data (*see* Mich Dep't of Ed, *2009-10 Supplemental Educational Services Provider Hourly Rates* <https://www.michigan.gov/-/media/Project/Websites/mde/Year/2009/11/05/Provider_Hourly_Rates_0910.pdf>) at a 44% inflation rate (*see* Federal Reserve Bank of Minneapolis, *Inflation Calculator* <https://www.minneapolisfed.org/about-us/monetary-policy/inflation-calculator>, which provides a 44% inflation rate from 2010 to 2024).

Regarding social-emotional services, Petitioner seeks a compensatory education award calculation based on an hourly rate of $120.00. This hourly rate is reasonable for social emotional services, such as Applied Behavioral Analysis ("ABA") therapy, which is appropriate for a student like P.H.[4]

### B.  Reimbursement for educational costs for the remainder of the 2023-2024 school year, and for moving and increased household expenses, is appropriate

The IDEA affords broad authority to hearing officers to fashion appropriate relief, including equitable factors, to effectuate the IDEA. *Sch Comm of Burlington v Dep't of Educ*, 471 US 359 (1985); *Forest Grove Sch Dist v TA*, 129 SCt 2484 (2009) (hearing officers have reimbursement authority); *see also Letter to Kohn*, 17 IDELR 522 (OSEP 1991) ("based upon the facts and circumstances of each individual case, an impartial hearing officer has the authority to grant any relief he/she deems necessary"); Perry A. Zirkel, *The Remedial Authority of Hearing and Review Officers under the Individuals with Disabilities Education Act: The Latest Update*, 37 J Nat'L Ass'n Admin L Judiciary 505 (2018). The fact that Petitioners did not specifically request this remedy in their complaint is no barrier to granting this relief. "[W]here legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Bell v Hood*, 327 US 678, 684 (1946), and the existence of a statutory right implies the existence of all necessary and appropriate remedies. *Sullivan v Little Hunting Park, Inc.*, 396 US 229, 239 (1969) (citations omitted).

Reimbursement from school districts for the costs of making a "unilateral placement" is available to parents if: 1) the District's IEP is found inappropriate (i.e. not likely to produce progress or afford the student greater than mere trivial advancement); 2) the private program is

---

[4] *See, e.g.,* Cross River Therapy, *How Much Does ABA Therapy Cost?* (February 24, 2025), <https://www.crossrivertherapy.com/aba-therapy-cost>; Apricott ABA, *ABA Therapy Cost Breakdown and How to Afford It* (June 23, 2024), <https://www.apricott.com/resources/aba-therapy-cost-breakdown>.

found to be appropriate under IDEA; and 3) the equities weight in favor of reimbursement (collectively, "the Burlington-Carter test").  *Burlington*, 471 US at 369-370 ("Burlington"), *Florence County Sch Dist Four v Carter*, 510 US 7, 12 (1993) ("Carter"); *Cleveland Heights-University Heights City Sch Dist v Boss By and Through Boss*, 144 F.3D 391, 399 (6th Cir 1998); *Knable ex rel Knable v Bexley City Sch Dist*, 238 F3d 755, 770 (6th Cir 2001). While Petitioners are not seeking reimbursement for a private school, they are seeking reimbursement for the private educational services they provided to P.H. from March to June 2024 and for the related educational expenses with relocating P.H. and C.H. to Ohio and setting up a second household to ensure he would receive a FAPE. Thus, the Burlington-Carter test applies.

As described extensively in the preceding sections of this brief, the record makes it clear that P.H.'s IEP was inappropriate and failed to provide him with FAPE. Moving onto the next factor, under the Burlington-Carter test, Petitioners bear the burden of proving the placement is appropriate. A private placement is appropriate if the "education provided by the private school is 'reasonably calculated to enable the child to receive educational benefits.'" *Knable*, 238 F3d at 770 (citing *Florence County*, 510 US at 11). In determining whether the private placement is appropriate, the placement must, "at a minimum, provide some element of special education services in which the public-school placement was deficient." *Berger v Medina City Sch Dist*, 348 F3d 513, 523 (6th Cir 2003). "[A] private school placement must be consistent with the purposes of the IDEA." *Id*.

Courts have repeatedly held the standard of placement in the least restrictive environment is not as strictly applied to parents as it is to school districts. *See Boss*, 144 F3d at 399-400 (refusing to bar reimbursement to parents for private placement that only admitted learning disabled student); *Knable*, 238 F3d at 771 ("Bexley contends that the Knables are not entitled to

reimbursement because Grove School was not the 'least restrictive' placement as required by the IDEA . . . We would vitiate the right of parental placement recognized in Burlington and Florence County were we to find that such private school placements automatically violated the IDEA's mainstreaming requirement.").    Here, C.H. and P.H. relocated to Ohio in 2024 based on Petitioners' intent to educate P.H. in the least restrictive environment, while R.H. remained in Michigan.    P.H. was initially enrolled in a private program in Ohio which ended up being unsuitable for him and now is enrolled in public school.    Because and P.H. has been receiving and must continue to receive services in Ohio as he now lives there, providing Petitioners with compensation for their out-of-pocket costs and for future compensatory education—which cannot be provided by ELPS in Ohio—is appropriate.

For these reasons, Petitioners respectfully request that this Tribunal award all relief requested, including awarding Petitioners the monetary equivalent of 360 hours compensatory education and related services at a rate of $79.00 per hour, in the amount of $28,440.00, so they may seek out appropriate educational providers for P.H. and pay them directly; compensation for an ABA therapy program, local to P.H., to address his ASD-related behavioral and academic needs, to be delivered by providers of Petitioners' choosing at a rate of $120.00 per hour for an average of 20 hours per week for 6 months, in the amount of $62,400.00; reimbursement for tutoring evaluation and services for P.H. during the 2023-2024 school year in the amount of $1,300.00; and reimbursement for Petitioners for lost income, moving expenses, and increased household expenses necessitated by Respondents' failure to provide P.H. with FAPE, in the amount of $200,000.00.

## CONCLUSION

For the reasons stated above, this Tribunal should (1) find that Respondent failed to provide P.H. with FAPE; (2) award Petitioners the monetary equivalent of 360 hours compensatory

education and related services in the amount of $28,440.00; (3) award Petitioners compensation for a 6-month ABA therapy program in the amount of $62,400.00; (4) award Petitioners reimbursement for tutoring evaluation and services for P.H. during the 2023-2024 school year in the amount of $1,300.00; (5) award Petitioners reimbursement for lost income, moving expenses, educational expenses and increased household expenses necessitated by Respondent's failure to provide P.H. with FAPE in the amount of $200,000.00; and (6) find that Petitioners are the prevailing party in this matter.

Respectfully submitted,

ABDNOUR WEIKER LLP

Dated: March 10, 2025

/s/ Megan N. Mitchell
Elizabeth K. Abdnour (P78203)
Megan N. Mitchell (P87312)
Jacquelyn Kmetz (P83575)
325 E. Grand River Ave. Ste. 250
East Lansing, MI 48823
(517) 994-1776
liz@education-rights.com
megan@education-rights.com
jacquelyn@education-rights.com

*Attorneys for Petitioners*

## PROOF OF SERVICE

I have served a copy of Petitioner's Closing Brief via electronic mail only on this 10th day of March, 2025. Please notify me if you would like a hard copy of this document.

**_s/Megan N. Mitchell_**
Megan N. Mitchell

Michigan Office of Administrative Hearings and Rules
611 W. Ottawa St.
Ottawa Building, 2nd Floor
P.O. Box 30695
Lansing, MI 48909
MOAHR-GA@michigan.gov

Michelle R. Eaddy
Erin H. Walz
Cathleen M. Dooley
Thrun Law Firm, P.C.
2900 West Rd., Ste 400
East Lansing, MI 48826
meaddy@thrunlaw.com
ewalz@thrunlaw.com
cdooley@thrunlaw.com