# EXHIBIT 1

## STATE OF MICHIGAN
## MICHIGAN OFFICE OF ADMINISTRATIVE HEARINGS AND RULES

| | |
|---|---|
| In the matter of: | **Docket No.** |
| **C.H. and R.H. o/b/o P.H.,** | **Case No.** |
| Petitioners, | **Agency: Department of Education** |
| v. | **Case Type: ED Sp Ed Regular** |
| **East Lansing Public Schools and Ingham Intermediate School District,**[1] | **Filing Type: Appeal** |
| Respondents. | **Administrative Law Judge:** |
| | **AMENDED COMPLAINT AND REQUEST FOR A DUE PROCESS HEARING UNDER THE IDEA** |

Elizabeth K. Abdnour (P78203)
Megan N. Mitchell (P87213)
ABDNOUR WEIKER LLP
325 E. Grand River Ave., Ste. 250
East Lansing, MI 48823
(517) 994-1776
liz@education-rights.com
megan@education-rights.com

*Attorneys for Petitioner*

Erin H. Walz (P55484)
Cathleen M. Dooley (P86148)
Michele R. Eaddy (P41871)
THRUN LAW FIRM, P.C.
P.O. Box 2575
East Lansing, MI 48826-2575
ewalz@thrunlaw.com
cdooley@thrunlaw.com
meaddy@thrunlaw.com
*Attorneys for Respondent East Lansing Public Schools*

Jordan M. Bullinger (P72441)
Mary C. Bradley (P85784)
CLARK HILL PLC
200 Ottawa Ave. NW, Suite 500
Grand Rapids, MI 49503
(616) 608 – 1146
jbullinger@clarkhill.com
mbradley@clarkhill.com
*Attorneys for Respondent Ingham ISD*

---

[1] While the initial Complaint filed on December 2, 2024, named Haslett Public Schools as a Respondent, Petitioners are withdrawing their IDEA claims against that Respondent.

## AMENDED COMPLAINT AND REQUEST FOR A SPECIAL EDUCATION DUE PROCESS HEARING

### I.    INTRODUCTION

1.    The Supreme Court has repeatedly recognized the importance of education and literacy, explaining, "education prepares individuals to be self-reliant and self-sufficient participants in society." *Wisconsin v Yoder*, 406 US 205, 221 (1972). "In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education." *Brown v Board of Education*, 347 US 483, 493 (1954). But that is exactly what Respondents have denied Petitioners R.H. and C.H. on behalf of their son, P.H.

2.    Petitioners, by and through undersigned counsel, hereby submit the following Complaint and Request for Special Education Due Process Hearing against East Lansing Public Schools (ELPS) and Ingham Intermediate School District (IISD), pursuant to the Individuals with Disabilities Education Act (IDEA), 20 USC 1400 *et seq.* and the Michigan Administrative Rules for Special Education (MARSE), MCL 380.1701 *et seq.*

3.    P.H. is an 8-year-old child who has been eligible for special education services since 2022. Throughout P.H.'s short educational career, Respondents failed to provide services reasonably calculated to allow P.H. to access the general educational curriculum as required by his individualized education plan (IEP) and make appropriate progress in light of his unique circumstances, denying him a free and appropriate public education (FAPE) in the least restrictive environment as required by the IDEA and MARSE.

### II.    JURISDICTION

4.    MDE and the Michigan Office of Administrative Hearings and Rules (MOAHR) have jurisdiction over this due process hearing request under 20 USC 1415(b)(6) because this

2

request concerns the legal obligations of Respondents under the IDEA regarding the identification, evaluation, educational placement, and provision of a FAPE to a student with a disability.

## III.   PARTIES

### *The Student*

5.      P.H. (DOB: 11/07/2016) is a child with multiple disabilities, including Autism Spectrum Disorder (ASD), Epilepsy, Muscular Incoordination, Muscle Weakness, Central Nervous System Complication, Dysphasia, Attention Deficit Disorder (ADHD), Obsessive Compulsive Disorder (OCD) and Generalized Anxiety Disorder (GAD). P.H.'s disabilities qualify him for an IEP pursuant to the IDEA and the MARSE under the primary category of Emotional Impairment. *See* MARSE R 340.1706.

### *The Respondents*

6.      ELPS is P.H.'s home district and, as such, is the Local Educational Agency (LEA) responsible for providing P.H. with a FAPE and the procedural protections required under the IDEA. 20 USC 1412. P.H. attended ELPS, making ELPS P.H.'s operating district, from March to August 2021 and from August 2023 to April 2024.

7.      IISD is the intermediate school district (ISD), as defined by MCL 380.4(3), of which ELPS is a constituent school district.

3

    a.  ISDs are considered LEAs, and therefore responsible for providing FAPE, under both federal and state law.[2,3]

    b.  ISDs must submit a plan for special education, which sets forth the special education programs and related services to be delivered within their service area. MARSE R 340.1832.

    c.  Additionally, IISD receives federal funding to provide special education services. MARSE R 340.1801.

    d.  IISD was responsible for overseeing ELPS and for providing services to P.H. from August 2021 to April 2024.

## IV. **STATEMENT OF FACTS**

***Background Information***

    1.  P.H. is an eight-year-old child with a disability, diagnosed with ASD, Epilepsy, Muscular Incoordination, Muscle Weakness, Central Nervous System Complication, Dysphasia, ADHD, OCD and GAD.

---

[2] **Local educational agency.**
 (a) **General. Local educational agency or LEA** means a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for a combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary schools or secondary schools.
 (b) **Educational service agencies and other public institutions or agencies.** The term includes the following:
  (1) **Educational service agency,** defined as a regional public multiservice agency—
   (i) Authorized by State law to develop, manage, and provide services or programs to LEAs; and
   (ii) Recognized as an administrative agency for purposes of the provision of special education and related services provided within public elementary schools and secondary schools of the State.

34 CFR 303.23 (emphasis in original).

[3] "In Michigan, an LEA is the intermediate school district (ISD)." Michigan Department of Education, *Significant Disproportionality* <https://www.michigan.gov/mde/services/special-education/data-and-reporting/significant-disproportionality> (accessed October 10, 2024).

2.     Though P.H. is an overall able student who is capable of learning, symptoms associated with his disabilities have a severe adverse impact on his education and his ability to make meaningful progress.

3.     From March 2021 to August 2024, P.H. resided within IISD and ELPS's service area.

*The 2020-2021 school year at ELPS*

4.     On or around March 18, 2021, when P.H. was four years old, C.H. requested that ELPS evaluate P.H. for special education services because P.H. was exhibiting behavioral symptoms, including verbal and physical aggression and difficulty navigating social situations.

5.     C.H. and R.H. were concerned these behaviors indicated a possible disability that had an adverse impact on P.H.'s ability to receive an education.

6.     On or around March 23, 2021, ELPS held a review of existing evaluation data (REED) meeting for P.H.

7.     In that meeting, ELPS staff told Petitioners that P.H. "sounded normal" and didn't need services.

8.     ELPS ultimately denied Petitioners' request for a special education evaluation for P.H.

9.     As a result, Petitioners decided to use the Michigan Schools of Choice program to enroll P.H. in Haslett Public Schools (HPS) for the upcoming 2021-2022 school year, as they were concerned ELPS would not be able to provide an appropriate education to P.H.

10.     Petitioners also began the process of getting P.H. psychologically evaluated to try to understand the source of his concerning behaviors.

11.     Petitioners also enrolled P.H. in speech, food, and occupational therapy.

*The 2021-2022 and 2022-2023 school years at Haslett Public Schools (HPS)*

12.　　In August 2021, P.H. began Developmental Kindergarten (DK) at Wilshire Early Childhood Center (WECC) within Haslett Public Schools (HPS), a constituent school district of the IISD.

13.　　During the 2021-2022 school year, P.H. exhibited physical aggression and destructive behaviors, such as destroying the classroom, spitting on others, and attempting to stab children or staff with pencils.

14.　　Throughout the 2021-2022 school year, HPS repeatedly put P.H. in seclusion.[4]

15.　　HPS staff also frequently instructed Petitioners to keep P.H. home because, they said, his behaviors were so disruptive and HPS lacked the staff to accommodate P.H.'s needs.

16.　　On or around November 3, 2021, P.H. completed a neuropsychological evaluation and was diagnosed with Autism Spectrum Disorder (ASD).

　　　　a.　　The neuropsychological evaluation report detailed P.H.'s social and behavioral struggles, including but not limited to:

　　　　　　　　i.　　Lack of eye contact;

　　　　　　　　ii.　　Flat affect and reduced advanced gestures;

　　　　　　　　iii.　　Reduced adaptation of behavior based on social context;

　　　　　　　　iv.　　Distractibility;

　　　　　　　　v.　　Cognitive rigidity;

　　　　　　　　vi.　　Restricted interests;

---

[4] "Seclusion means the confinement of a pupil in a room or other space from which the pupil is physically prevented from leaving." Michigan Department of Education, *Policy for the Emergency Use of Seclusion and Restraint* at 21 (March 14, 2017) <https://www.michigan.gov/-/media/Project/Websites/mde/specialeducation/policies/PolicyForSeclusionRestraint.pdf> (accessed January 4, 2025).

vii.     Food restrictions;

viii.    Sensory abnormalities;

ix.     Lack of engagement with tasks;

x.     Opposition to tasks; and

xi.     Emotional regulation/tantrumming.

b.     The report made several recommendations to address P.H.'s autism and related areas of needs, including but not limited to:

i.     Applied Behavioral Analysis (ABA) therapy 5-15 hours a week;

ii.     Family therapy;

iii.     Speech and language pathology;

iv.     Continued occupational therapy to address regulatory and motor skills;

v.     A nutritionist referral;

vi.     A referral to Angel Sense, a GPS monitoring service for children who frequently elope; and

vii.     Special education services through the ISD.

17.    Petitioners informed HPS of the report and P.H.'s diagnosis, but his behaviors continued and HPS did not change their approach; still regularly placing P.H. in seclusion.

***The 2022-2023 school year at HPS***

18.    Almost immediately after the 2022-2023 school year began, P.H. began demonstrating the severe classroom behaviors he had exhibited the previous school year, including hitting, kicking, and spitting on peers and staff.

19.    HPS again began secluding P.H. regularly.

7

20.    In October 2022, P.H. told C.H. he was being placed in seclusion every day and that HPS staff were using physical force to restrain him.

21.    This caused P.H. so much distress that he became increasingly violent against both adults and peers.

22.    In early December 2022, Petitioners decided to withdraw P.H. from HPS and homeschool him for the remainder of the 2022-2023 school year as they could not trust HPS to keep him safe.

23.    Although P.H. had been identified as a student with a disability eligible for special education services, and although P.H. continued to reside within IISD's and ELPS' operating areas, neither made any effort to contact Petitioners regarding P.H.'s special education services and re-enrolling him in school for the remainder of the 2022-2023 school year.

### The 2023-2024 school year at East Lansing Public Schools

24.    On or around August 4, 2023, Petitioners met with ELPS Marble Elementary School principal, Josh Robertson, and ELPS social worker, Michelle Miller-Hogan, to discuss P.H.'s needs and consider returning him to ELPS.

a.    Petitioners shared P.H.'s traumatic experiences with seclusion and restraint during his time at HPS, including detailed information about P.H.'s daily seclusions and the physical restraint incident.

b.    Mr. Roberston and Ms. Miller-Hogan assured Petitioners there was no seclusion room at Marble Elementary.

c.    Petitioners explained that they had previously met with an advocate who suggested P.H. be placed in Kindergarten again, rather than transitioning up to the first grade.

      d.      Despite this, Mr. Robertson and Ms. Miller-Hogan recommended P.H. be enrolled in the first grade, which Petitioners agreed to.

      e.      Petitioners, Mr. Robertson, and Ms. Miller-Hogan also discussed different placement options for children with ASD within ELPS.

      f.      Mr. Robertson and Ms. Miller-Hogan explained that they felt P.H. did not need to be placed in one of the ASD classrooms within ELPS because most of the children placed in those classrooms were nonverbal, and P.H. could speak.

      g.      Mr. Robertson and Ms. Miller-Hogan repeatedly assured Petitioners that P.H. could try attending school at Marble Elementary and, if it was not successful, P.H. could switch to one of ELPS's ASD classrooms at any time.

25.      Based on this meeting, despite the problems during the 2021-2022 school year, Petitioners decided to give ELPS another chance and re-enrolled P.H. at Marble Elementary for the 2023-2024 school year.

26.      P.H. began first grade at Marble Elementary on August 23, 2023. That day, he attended school until 11:30 a.m.

27.      After his first day, P.H. attended school until 12:10 p.m. each day.

28.      ELPS staff reported no aggression from P.H. between August 23 and the Fall 2023 IEP meeting three weeks later.

29.      P.H.'s teacher reported that P.H. took frequent breaks and almost never engaged in unstructured group activities, beginning/ending conversations with peers, conversational turn-taking, or adjusting language based the on situation.

30.    P.H.'s testing during this time also revealed that he did not know his classmates' names, which indicated to Petitioners that he wasn't in the general education setting much, because he generally had instant recall of names.

31.    On September 13, 2023, Petitioners met with P.H.'s IEP team at Marble Elementary to review and revise his IEP.

a.    The IEP identified new areas of need, including reading and perception/motor/mobility, and corresponding goals.

b.    Despite identifying reading as a new area of need, the IEP failed to provide P.H. with any direct services to address this need.

c.    The IEP revised P.H.'s program and services as follows:

i.    Direct social work services, 1-2 times per month, for 20-35 minutes;

ii.    Direct speech and language therapy services, 4-5 times per month, for 25 minutes; and

iii.    Direct occupational therapy services, 3 times per month, for 25 minutes.

iv.    ASD Teacher Consultant Services, 1-2 times a month for 20 minutes.

d.    ELPS did not provide any explanation to Petitioners for why P.H.'s social work services were cut in half.

e.    The IEP eliminated many of P.H.'s prior supplementary aids and services with no explanation, such as visual supports, presenting information through a multisensory approach, providing frequent feedback, and providing behavioral support.

10

f.       The IEP did not include a behavior plan or any PBIS, despite this being a significant area of need for P.H.

g.       The IEP stated that P.H. was to attend school daily until 12:10 p.m., on a shortened day.

32.      P.H. was able to attend Marble Elementary from 8:45 a.m. to 12:10 p.m. for the first half of the 2023-2024 school year with only some success.

33.      P.H. was present, but he was not participating in class and was often on break or with a provider.

34.      P.H. had very few interactions with other children.

35.      P.H. struggled with reading, which caused him to tune out.

36.      Much of the morning consisted of reading blocks, and P.H. knew he was the only child in his class who could not read, which caused him significant frustration and exacerbated his behavioral outbursts.

37.      P.H. began showing signs of school avoidance by asking for more frequent walking breaks. This was confirmed for Petitioners by his general education teacher Rebecca Spitzer and the special education teacher Kristen Casby.

38.      P.H. also spent a lot of time in the bathroom each day, falling asleep in the bathroom on at least one occasion.

39.      By December 2023, P.H. was regularly spending one hour in the bathroom each day as a form of school avoidance.

40.      Further, during the last week of school in December 2023, P.H. became increasingly anxious and would express a desire not to go to school.

41.    Upon his return to school from winter break, on January 8, 2024, C.H. walked P.H. to class like normal and P.H. refused to enter the classroom. When C.H. was finally able to get P.H. to enter the room, he hid underneath his desk.

42.    During this time, P.H. began stimming by making beat-boxing noises, and he indicated to C.H. that he was not permitted to do this during class, but he continued on.

43.    Further, P.H. utilized the bathroom facilities for an extended period of time and took long walking breaks as he had begun doing in December 2023.

44.    By this point in the school year, P.H. was now leaving class for long periods of time and was not able to participate in activities with his class. He was not progressing academically and struggled with reading.

45.    With the exception of one two-hour day on January 12, 2024, C.H. was attending class with P.H. every day.

46.    P.H.'s behaviors became more concerning as he escalated into making threats against a paraprofessional, Anastacia Shortridge. For this reason, he was then assigned to a new paraprofessional, Ms. Sonia.

47.    On January 23, 2024, C.H. emailed Michelle Miller-Hogan expressing that P.H. was struggling to feel comfortable in the classroom because other students were reading and he could not read. As reading was a weakness of his, P.H. was struggling with feeling self-conscious and C.H. believed this was contributing to the school avoidance.

48.    On January 29, 2024, C.H. emailed Michelle Miller-Hogan and inquired about Reading Intervention for P.H. as well as the ASD programs available at ELPS.

49.    During this time, P.H.'s behaviors continued. He frequently eloped from class, would do things like pretending to be a robot or hiding under his desk rather than participate, and even pretended to be dead during an occupational therapy session.

50.    Despite these repeated behaviors, school avoidance, lack of appropriate progress, and the new concerns with school avoidance, ELPS failed to review and revise P.H.'s IEP or request parental consent to conduct an FBA or other evaluations to address P.H.'s increasing needs and lack of progress.

51.    During the second half of the 2023-2024 school year, ELPS began changing P.H.'s schedule daily based on staff availability to supervise him.

      a.    This included the availability of Ms. Miller-Hogan; the special education teacher, Kristen Casby; the speech language pathologist, Stephanie Francisco; the IISD occupational therapist, Stacey Turke; paraprofessionals; and occasionally Mr. Robertson, the principal.

      b.    Instead of doing schoolwork with consistent staff on a consistent schedule, ELPS would place P.H. with whatever staff member had available time that day. He was given a different schedule every day based on who was free to work with him at that time. This was especially difficult for P.H., who struggled with anxiety surrounding the unknown and thrived with routine and structure.

      c.    Even when P.H. was with an academic provider such as Kristen Casby, he was rarely working on academic subject matter. For example, Ms. Casby would play a game with P.H. where he would draw, she would guess what he was drawing, and then he would color.

      d.     Not only would this schedule shift every day for P.H., but there were also times where ELPS could not accommodate him at all.

      i.     On the morning of February 23, 2024, Ms. Miller-Hogan informed C.H. that Ms. Casby was out of the office and asked if C.H. could bring P.H. in to school for only one hour. C.H. replied that she wanted P.H. to attend for his full schedule as usual. C.H. suggested P.H. could work with another paraprofessional he had not seen since the fall.

      ii.     Despite this, P.H. was still released early from school that day.

      e.     Upon information and belief, at least some of the staff supervising P.H. during his school day lacked the necessary training to provide P.H. with the supports and services required by his IEP.

52.     The inconsistency of this schedule negatively affected P.H. due to his ASD.

53.     When his schedule was like this, P.H. would return home from school and would immediately be aggressive and violent upon entering the home. He would throw things, break things, kick and scream.

54.     Further, P.H. was only working with providers during this time and was not around peers, so he regressed in his ability to be around other children in a classroom environment.

55.     In December 2023, during the last week of the semester, P.H. began to exhibit school refusal.

56.     In January 2024, when winter break ended, P.H. felt overwhelmed by going back to school due to the continued lack of schedule consistency and would refuse to leave the house on some school days.

57.    If P.H. would make the trip to school, C.H. could not easily get him out of the car once he arrived.

58.    Due to P.H.'s increasing school avoidance, C.H. started to attend school with him every day.

59.    P.H. would refuse to leave the office and would sit there counting the cars in the parking lot for up to an hour.

60.    P.H.'s aggressive behaviors continued at home, including destroying things, hitting, kicking and screaming.

61.    C.H. was working with P.H.'s medical providers to try to get assistance for the impact this was having on his behaviors. P.H. was put on medications including: Clomipramine, Lexapro, Clonidine and Oxcarbazepine.

62.    On January 29, 2024, C.H. emailed Ms. Miller-Hogan requesting a meeting to discuss transferring P.H. to an ASD classroom, as they had initially discussed at the August 4, 2023 meeting.

63.    C.H. also requested for P.H. to work with the Reading Intervention teacher, Stephani Lampi, based on C.H.'s previous observations that Ms. Lampi was able to get children to work well together.

64.    Despite this, P.H. was not assigned to work with Ms. Lampi.

65.    On February 12, 2024, Principal Josh Robertson responded that ELPS Director of Support Services, Nick Hamilton, would be reaching out to schedule the requested meeting.

66.    Mr. Hamilton never contacted C.H. to schedule the meeting.

67.    Starting in early February 2024, ELPS allowed P.H. attend school from 8:55 a.m. to 10:30 a.m., and only in the special education classroom.

15

68.     Despite this significant change in placement and apparent unilateral redetermination of P.H.'s LRE, ELPS failed to review and revise P.H.'s IEP or otherwise ensure P.H. received FAPE.

69.     Due to the lack of appropriate supports and services, P.H.'s school avoidance continued to increase.

70.     P.H.'s anxiety around school increased and he began eloping.

71.     One of these eloping incidents occurred on or around February 9, 2024.

        a.     On that day, C.H. was in the main office while P.H. was attending occupational therapy with the IISD Occupational Therapist, Stacy Turke.

        b.     As Ms. Turke, was returning to the office to transition P.H. to the next provider, he ran away from her.

        c.     Ms. Miller-Hogan and Ms. Turke, as well as C.H., began searching for P.H.

        d.     C.H. ultimately found P.H. in the STEM classroom, which was not occupied at the time, hiding between cabinets.

        e.     Upon information and belief, ELPS did not document this eloping incident.

72.     Following P.H.'s elopement on February 9, 2024, C.H. emailed Principal Josh Robertson asking if she, R.H., Mr. Robertson and Ms. Miller-Hogan could schedule a meeting to discuss P.H.'s ongoing struggles at Marble. She expressed her concern that, by this point in the school year, things unfortunately felt like a repeat of P.H.'s Developmental Kindergarten year. On or around February 9, ELPS then told C.H. she could no longer attend school daily with P.H. Rather, C.H. was relegated to the main office until ELPS needed assistance with P.H.

73.     On or around February 11, 2024, C.H. proposed a schedule that would allow her to attend school with P.H. from 8:45-9:00 a.m. in the general education classroom, which would

allow Ms. Casby to retrieve P.H. from that classroom for his special education services. Ms. Miller-Hogan responded and informed her that Mr. Robertson did not want C.H. attending with P.H. at all.

74.     On or around February 11, 2024, Mr. Robertson told C.H. that she was no longer allowed to accompany P.H. in class at all and that her proposed schedule was being denied.

75.     Mr. Robertson did not provide C.H. any rationale for this.

76.     However, despite this Ms. Miller-Hogan continued ask C.H. to assist with P.H. and accompany him to or from meetings with his providers, so she did.

77.     During this time, P.H.'s behaviors were not improving. When he was in the main office, he would count cars in the parking lot, repeating the numbers over and over. He would fight with C.H. during transitions, he would be aggressive with his paraprofessional and would climb on the principal's door frame, among other things.

78.     After February 11, 2024, ELPS denied P.H. access to the general education classroom and his general education peers for the remainder of the 2023-2024 school year, confining him to the special education classroom, office conference room, or a seclusion room.

79.     Upon information and belief, even within the special education classroom, P.H. remained isolated from peers for the remainder of the school year.

80.     Upon information and belief, on the handful of occasions where other children were present in the special education classroom with P.H., they were kept at other tables and did not directly interact with him.

81.     In or around February 2024, Ms. Casby told C.H. that things "worked best" when P.H. was alone, a statement she repeated during an IEP meeting in March 2024.

82.     Throughout the remainder of the school year, C.H. repeatedly asked for P.H. to be given time with peers and requested that P.H. attend library time with his class.

83.     ELPS did not implement those requests.

84.     In or around February 2024, C.H. again asked for P.H. to work with the Reading Intervention teacher, Stephani Lampi, based on C.H.'s previous observations that Ms. Lampi was able to get children to work well together.

85.     ELPS denied this request, telling C.H. that Ms. Casby was handling P.H.'s reading intervention and claiming that P.H. was ahead of the students Ms. Lampi worked with.

86.     C.H. responded that she had witnessed Ms. Lampi's students reading, which was something P.H. could not do.

87.     ELPS continued to deny the request with no further explanation.

88.     On February 27, 2024, P.H. had another significant eloping incident, during which he attempted to run home.

    a.     At the time the incident started, C.H. was in the office and heard P.H. shouting.

    b.     C.H. then saw P.H. run out of the building.

    c.     C.H. ran after P.H. and observed him run into the middle of the intersection of Hagadorn Road and Burcham Drive – one of the busiest intersections in East Lansing, Michigan.

    d.     C.H. followed P.H. into the intersection and retrieved him.

89.     On or around February 28, 2024, C.H. spoke with Ms. Miller-Hogan and Mr. Robertson regarding the February 27 elopement incident.

     a.     C.H. suggested the Marble Elementary doors be locked during the school day to prevent students from eloping.

     b.     Ms. Miller-Hogan and Mr. Robertson said the doors could not be locked due to the fire code.

     c.     Mr. Robertson told C.H. that Marble Elementary staff would try to adequately supervise P.H. to prevent future elopement into traffic but failed to provide any further information as to how that would be accomplished.

     d.     ELPS did not implement any interventions or supports to protect P.H.'s safety and address his eloping behaviors.

90.     Due to ELPS' failure to address P.H.'s increasing elopement, C.H. was forced to begin sitting in the main office every school day to watch the front doors of Marble Elementary while P.H. was attending school.

91.     On March 4, 2024, another significant behavioral incident with occurred.

     a.     Mr. Robertson, Ms. Miller-Hogan, and P.H.'s paraprofessional, Ms. Sonia, were trying to get P.H. to work in the conference room inside the main office.

     b.     Although C.H. could not see the conference room from her position inside the office, she was able to hear everything that occurred.

     i.     P.H. began laying on the floor and making noises and then started to pull at Ms. Sonia.

     ii.     P.H. then began to run around the conference room, kicking and spitting (including spitting on Mr. Robertson), begging to leave the room, and attempting to destroy the TV.

19

iii.    Mr. Robertson had P.H. lay on the floor and press his hands against Mr. Robertson to try to calm himself down.

iv.    P.H. got up, hit the TV and coat racks, and repeatedly opened and closed the mini fridge.

v.    After several minutes, P.H. ran by the door and tried to open it.

c.    At this point, C.H. entered the conference room to assist.

d.    When C.H. entered, P.H. asked her about the "calm down room," and C.H. responded there was no "calm down" room at Marble Elementary, as Mr. Robertson and Ms. Miller-Hogan had told her at the August 4, 2023 meeting.

e.    P.H. insisted Marble Elementary did have a "calm down" room and Ms. Miller-Hogan reiterated it did not.

f.    P.H. then went on to describe it with specificity, saying it was "by the speech room."

g.    Only at that time did Mr. Robertson and Ms. Miller-Hogan acknowledge that P.H. was correct.

h.    Ms. Miller-Hogan told C.H. she had "forgotten" about the room and claimed not to know how P.H. knew of it, despite his detailed description of it.

i.    During this discussion, P.H.'s agitation and outburst continued.

    i.    P.H. said he couldn't breathe, and his eyes welled with tears.

    ii.    P.H. was having a panic attack, something that had only happened to him once before.

j.    Due to P.H.'s extreme level of agitation, C.H. decided to take him home for the rest of the day.

92.    After that, Petitioners requested an IEP team meeting due to concerns about P.H.'s lack of progress since January, his increased eloping, his lack of social skills, his increasingly disruptive behavior, his heightened anxiety and stress, and the fact that his IEP was not being implemented with fidelity.

93.    Upon information and belief, P.H. failed to make progress towards any of his IEP goals, or towards the general education curriculum from August 2023 to March 2024.

94.    ELPS convened the requested IEP meeting on March 5, 2024.

95.    At the meeting, Petitioners said they felt P.H. was not doing well at Marble Elementary, again requested an FBA, and expressed their concern that P.H. would never return to a general education classroom.

96.    Petitioners also shared their concerns about the following:

a.    P.H.'s overall safety;

b.    P.H.'s elopement from the building;

c.    P.H.'s heightened stress and anxiety;

d.    P.H.'s escalating behaviors;

e.    P.H.'s difficulty socializing with peers;

f.    P.H.'s lack of academic progress, specifically in reading;

g.    P.H.'s inability to make it through an entire school day; and

h.    P.H. missing recess and elective classes, such as gym.

97.    Petitioners learned the ASD Teacher Consultant identified in P.H.'s IEP had never been consulted.

98.    Petitioners learned that P.H. was not receiving the speech and language therapy services identified in his IEP.

21

     a.    Ms. Francisco, the speech and language therapist, said she could not conduct speech therapy sessions with P.H. in the presence of any other peers because of his behaviors.

     b.    Ms. Francisco did not define what specific behaviors she was referencing.

     c.    Ms. Francisco said whenever she tried to get P.H. to work with a peer, he was unwilling, but did not say how often she was trying to get P.H. to work with peers.

     d.    Ms. Francisco also said sometimes P.H. would not come to speech therapy because he did not want to, and he would sometimes elope, but she did not explain why she would not go to P.H. to provide speech therapy.

99.    At this meeting, P.H.'s September 2023 IEP was updated.

100.    In the Present Levels of Academic Achievement and Functional Performance (PLAAFP) section, there is a clear indication of increased behavioral needs as compared to the September 2023 IEP.

     a.    Communication: Speech & Language:

        i.    September 2023 IEP: "[P.H.] always is friendly and greets all familiar adults. He does a good job asking the names of staff members that are not familiar to I him. He shows enthusiasm talking to familiar adults and likes to share his interests and thoughts with them. He is inquisitive and asks many clarifying questions and generally seems to enjoy time with adults…. [P.H.] relies on adults for cueing to engage and respond to students. [P.H.] is unable to identify students names from his class when retelling what occurred in class. [P.H.] needs help engaging and socializing with other peers."

22

ii.     March 2024 IEP: "[P.H.] needs maximum prompting with scripted language to engage in conversations with non-preferred topics or topics chosen by others. He also needs prompting to take other's perspectives and have flexible thinking during structured language activities.... [P.H.] needs maximum prompting with scripted language to engage in conversations with non-preferred topics or topics chosen by others. He also needs prompting to take other's perspectives and have flexible thinking during structured language activities."

b.     Socio-Emotional Behavioral:

i.     September 2023 IEP: "[P.H.] has voiced some resistance to school situations but has taken a few seconds to process and has complied with requests and prompts.... In the 13 days that [P.H.] has attended 1st grade at Marble School, [P.H.] has not shown any aggressive behavior when responding to change, sensory overload or requests by staff members."

ii.     March 2024 IEP: "Since the return from winter break, [P.H.] has been more reluctant to attend general education classes and to attend school in general without mom being present. Until very recently, [P.H.] has not engaged in any physical or aggressive behavior when responding to change, sensory overload or requests by staff."

c.     Perception/Motor/Mobility:

i.     September 2023 IEP: "[P.H.] demonstrates a right hand dominance for writing and fine motor activities. He was able to trace and copy most letters when provided with a model in the Fall of 2023. Letter placement and formation is limited by the grasp pattern that [P.H.] typically uses which resembles a full hand,

partially supinated grasp pattern without thumb opposition. He was able to imitate the adult's step-by-step grasp going from a pinch to a modified tripod grasp but he was unable to maintain it."

ii.        March 2024 IEP: "When school ended for winter break, [P.H.] was engaging in all activities designed by the OT to support the use of a strong fingertip-type grasp pattern and improved legibility of writing. He was enjoying collecting 'data' on how often he used his finger tip grasp and how often he remembered to do it without prompts. He was averaging nearly 90% of opportunities at that time. Since the return from winter break, progress has been minimal toward these goals and objectives. [P.H.] is struggling to return to engaging in school activities, coming only for special education services and supports. He is able to attend portions of OT sessions weekly, remaining in the area for 15 to 40 minutes each time, before either withdrawing into a 'robot' like persona, or eloping from the space. Activities have been specially designed to support his ability to remain in the space engaging in the tasks, though he has had difficulty following the adult's plan or directions for the materials. He seems to need a high level of control over his environment at this time."

101.    The supplementary aids and services in the March 2024 IEP were identical to those in the September 2023 IEP, except for the addition of a medical action plan.

a.        Notably, C.H. provided ELPS with the medical plan for seizure protocol from P.H.'s doctor along with a Valtoco inhaler (used for the treatment of seizures) on August 23, 2023, the first day of school.

24

b.    Further, C.H. regularly discussed P.H.'s epilepsy with Ms. Miller-Hogan and C.H. notified ELPS that P.H. had suffered a focal seizure in February 2024.

c.    Despite this, ELPS had failed to include P.H.'s medical plan in his IEP until March 2024.

102.    The IEP provided the following programs and services to P.H.:

a.    Direct social work services, for 20-50 minutes, 1-5 times a week;

b.    Direct occupational therapy, for 25 minutes, 3 times a month; and

c.    Direct speech and language services, for 20 minutes, 4-5 times a month.

103.    Although the programs and services reflected an increase in P.H.'s social work services, there were no changes to P.H.'s occupational therapy services and his speech and language services were reduced with no explanation.

104.    Further, despite P.H.'s lack of reading progress, ELPS failed to provide any specially designed instruction, evidence based interventions or otherwise provide any direct services to address this need.

105.    The IEP identified the general education classroom as P.H.'s LRE, even though P.H. was not permitted to enter the general education classroom or interact with his general education peers.

106.    At the meeting, it became clear to Petitioners that ELPS had been isolating P.H. from both general education and special education peers since the end of January 2024.

a.    Upon information and belief, ELPS staff kept P.H. away from other students and in sessions with providers for the entire two hours he was in school each day.

       b.      Upon information and belief, P.H. would spend the first hour of school each day sitting in the office, completing very little schoolwork, instead engaging in play activities like drawing and guessing games.

107.    C.H. again raised her concerns about P.H.'s safety and eloping and asked what ELPS's plan was to keep P.H. in school.

       a.      Mr. Hamilton failed to present any specific suggestions or interventions, said that staff would "do their best" to keep P.H. from eloping, and stated he "could not possibly guarantee [P.H.'s] safety."

       b.      Mr. Hamilton said ELPS could not document every time "these kids" eloped because "they" do it all the time and it is just what "they" do.

       c.      By "these kids," Petitioners understood Mr. Hamilton to mean students with disabilities.

       d.      No one else at the meeting provided any other information to Petitioners about how ELPS would address P.H.'s ongoing elopement and keep him safe.

108.    Due to ELPS's failure to propose any supports or services to address P.H.'s elopement and other significant behaviors that were interfering with his learning and ability to make progress, Petitioners requested a change in placement to one of ELPS' ASD classrooms.

109.    Mr. Hamilton unilaterally stated that he would not entertain such a request during the school year but "might" consider giving it a try during the summer.

110.    The minimal changes made to P.H.'s IEP failed to address the severity of his behaviors, and the IEP was not reasonably calculated to meet P.H.'s needs and allow him to make appropriate progress, both academically and functionally.

111.    Despite P.H.'s ongoing behaviors, at no time during the 2023-2024 school year to date had ELPS conducted reevaluations, including the FBA that Petitioners had previously requested, to accurately identify P.H.'s needs and why he was not making progress, and to identify appropriate services and supports moving forward.

112.    On March 6, 2024, C.H. was in the main office, as usual, when P.H.'s behavior again began escalating.

      a.    P.H. began tearing things off the wall and destroying them, attempting to shatter a large window, and ripping up books and papers.

      b.    Whenever a staff member would get close to P.H., or prevent him from striking the window, he would hit, grab, or kick them.

      c.    Ms. Miller-Hogan informed C.H. that since P.H.'s behavior was not improving; the next step would be to seclude him. C.H. approved a brief, two-minute seclusion. Ms. Miller-Hogan and Mr. Robertson then each took P.H. by the arm and walked him across the school to the "calm down," or seclusion, room.

      d.    C.H. followed them.

      e.    During the walk to the "calm down" room, P.H. was screaming, "Do not bring me to that room! I hate that room!"

      f.    As Ms. Miller-Hogan and Mr. Robertson had recently admitted, the "calm down" room at Marble Elementary was hidden in the back of a classroom designated for children with behavior issues who were specifically assigned to the classroom through indication on their IEPs called the "Behavior Room." P.H. had never been assigned to the Behavior Room.

g.     Upon entering the Behavior Room after Ms. Miller-Hogan and Mr. Robertson, C.H. was shocked at the size of the room, which was no bigger than a walk-in closet.

h.     Ms. Miller-Hogan left, and the only adults in the area were C.H. and Mr. Robertson.

i.     P.H. was alone inside the "calm down" room.

j.     After more than two minutes went by, C.H. requested P.H. be released from the "calm-down" room.

k.     Mr. Robertson released P.H. at that point.

l.     C.H. then walked P.H. back to the main office.

113.    Later that day, Mr. Robertson secluded P.H. in Ms. Miller-Hogan's office, where P.H. had another severe behavior episode.

a.     C.H. was in the office during this time but was able to see what was happening through the open door into Ms. Miller-Hogan's office.

b.     P.H. destroyed hundreds of papers and personal items, threw a water bottle at Mr. Robertson, and took apart picture frames.

c.     C.H. repeatedly asked Mr. Robertson to end the seclusion so she could take him home, but Mr. Robertson and Ms. Miller-Hogan told her that P.H. would "win" if they did that.

d.     Ultimately, after approximately 45 minutes, C.H. took P.H. out of Ms. Miller-Hogan's office to protect and deescalate him.

114.    On March 7, 2024, C.H. provided ELPS with a note from P.H.'s doctor directing that he not be secluded.

115.    That same day, C.H. met with Mr. Hamilton, Mr. Robertson, and Ms. Miller-Hogan
to address the prior day's events.

    a.    Mr. Hamilton told C.H. that ELPS would not comply with P.H.'s doctor's
recommendation and would continue secluding P.H.

    b.    Mr. Hamilton said ELPS wanted to consult with P.H.'s doctor directly and
would then decide whether to honor the doctor's recommendation.

    c.    Mr. Hamilton claimed P.H. would elope without seclusion and. responded
quickly to seclusion, which was directly contrary to the data and evidence.

    d.    Mr. Hamilton claimed that, after seclusion, P.H. would then not need to be
secluded again for a long period of time, which was again directly contrary to the data and
evidence.

    e.    Mr. Robertson claimed P.H. had responded well to many commands given
to him while he was destroying Ms. Miller-Hogan's office the previous day, despite C.H.
directly observing the opposite and the incident lasting almost an hour, ending only when
C.H. removed P.H.

    f.    C.H. again raised concerns about P.H.'s eloping and asked how ELPS
would keep P.H. in school.

    g.    ELPS staff had no response.

    h.    Mr. Robertson said he would tell staff to keep P.H. in the school, with no
further explanation or details on how this directive would be implemented.

    i.    ELPS staff acknowledged that P.H. would likely be secluded on Monday,
March 11, 2024, upon his return to school.

29

j.     C.H. explained that, based on P.H.'s doctor's recommendation, due to his epilepsy and ASD diagnosis, the continued seclusion was unacceptable and that she would bring P.H. to school on Monday and would attend with him to keep him safe.

k.     Mr. Robertson then told C.H. she was being banned from Marble Elementary because she had used profanity during P.H.'s seclusion on March 6, 2024.[5]

l.     C.H. said R.H. would attend with P.H. instead, but Mr. Robertson, with no rationale, told C.H. that R.H. was also being banned from the premises.

116.     Following the meeting, due to ELPS's insistence that neither Petitioner was allowed to attend school with P.H., and ELPS's failure to provide P.H. with any supports, services, or interventions to address his behaviors other than continued seclusion, Petitioners decided not to send P.H. to school on Monday, March 11, 2024, as they did not believe ELPS would keep P.H. safe.

117.     However, C.H. did consent to ELPS contacting P.H.'s pediatrician, Dr. Gregory Holzhei, and to ELPS initiating an FBA.

a.     This is the first time ELPS requested Petitioners' consent to conduct an FBA, despite P.H. demonstrating significant behavior issues all school year.

b.     ELPS failed to request Petitioner's consent to conduct any other evaluation, despite P.H.'s increasing needs and lack of academic or functional progress.

118.     Dr. Holzhei spoke with Mr. Hamilton on or around April 1, 2024, and, upon information and belief, Mr. Hamilton advised Dr. Holzhei that he "[would] not guarantee no seclusion, no matter what."

---

[5] C.H. had said, "You told me you didn't have this fucking room!" when she had first seen the "calm down" room.

119.    On April 5, 2024, C.H. and her special education advocate met with Mr. Hamilton and several other staff to try to create a plan to allow P.H. to safely return to ELPS.

    a.    C.H. again asked for P.H. to be transferred to one of ELPS's ASD classrooms, for ELPS to commit to stop secluding P.H., and for ELPS to lift the ban on her and R.H.'s presence at Marble Elementary.

    b.    ELPS denied all these requests, other than agreeing to allow R.H. two thirty-minute observation periods.

    c.    The meeting concluded with no plan to allow P.H. to return to school safely.

120.    As a result of ELPS's failure to propose or implement additional or more intensive supports and services to address P.H.'s significant and increasing behavioral and social-emotional needs, as well as his safety, Petitioners decided not to return P.H. to Marble Elementary until an appropriate plan was in place.

121.    On April 22, 2024, Petitioners sent a letter to ELPS Superintendent, Dori Leyko, regarding their concerns with ELPS's use of seclusion on P.H. against the recommendation of his doctor and ELPS's failure to properly respond to P.H.'s elopements and requesting that the District work with the family to resolve the concerns.

122.    On May 6, 2024, Ms. Leyko responded to Petitioners' letter, accusing them of sending a letter "filled with inaccuracies," while failing to actually identify what any of those inaccuracies were.

123.    Due to Respondents' failure to address Petitioners' concerns about P.H.'s safety, address P.H.'s lack of progress and increasing needs by revising his IEP and conducting additional reevaluations to determine the appropriate and necessary supports and services, and ensure P.H. was receiving FAPE, Petitioners withdrew P.H. from ELPS on May 8, 2024, to homeschool him.

124.    Respondents' failure to address P.H.'s needs and provide him with FAPE directly harmed both P.H. and Petitioners.

a.    Petitioners were forced to take significant time away from work, resulting in loss of income.

b.    C.H. moved to Ohio with P.H. so he could attend a school that would provide him with FAPE, forcing Petitioners the expense of maintaining two households and forcing P.H. to be regularly separated from his father, who remained in East Lansing.

c.    C.H. was forced to decline a significant promotion, resulting in additional loss of income and professional growth.

125.    On July 2, 2024, Petitioners filed a state complaint against ELPS with the Michigan Department of Education (MDE). The issues were:

a.    Whether ELPS provided P.H. with FAPE pursuant to 34 CFR 300.17 and 300.101. Specifically:

i.    Whether the special education programs and related services and supplementary aids and services were provided in conformity with P.H.'s IEP, pursuant to 34 CFR 300.17(d), 300.320, and R 340.1722(3).

ii.    Whether ELPS reviewed and revised the IEP to address P.H.'s unique educational and behavioral needs and enable P.H. to be involved in and make progress in the general education curriculum consistent with the least restrictive environment provisions pursuant to 34 CFR 300.320, 300.324, 300.114 through 300.117, and R 340.1721e(4).

126.    On August 30, 2024, MDE issued a determination finding that ELPS violated the IDEA by failing to implement speech and language and occupational therapy services and failing

32

to document the provision of supplementary aids and services in accordance with P.H.'s IEP and issued a Corrective Action Plan.

## V.    CAUSES OF ACTION

127.    Petitioners re-allege all prior paragraphs as though fully set forth herein.

128.    The IDEA requires that qualifying children with disabilities receive a FAPE. 20 USC1412(a)(1)(A); 34 CFR 300.101(a). To achieve this goal, IDEA and its implementing regulations require that Respondents design and develop an IEP for each qualifying child with a disability in their district. 20 USC 1412(a)(4), 1414(d); 34 CFR 300.112, 300.320-24.

129.    34 CFR 300.17 defines a FAPE, in relevant part, as "special education and related services that . . . are provided at public expense, under public supervision and direction, and without charge . . . [and] are provided in conformity with an individualized education program (IEP)."

130.    The IDEA and its implementing regulations define Special Education as specially designed instruction to meet the unique needs of a child with a disability and ensure access to the general curriculum. 20 USC 1401(29); 34 CFR 300.39(b)(3).

131.    In *Endrew F v Douglas County School District Re-1*, 580 US 386, 392 (2017), the Supreme Court defined FAPE as an offer of education, "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *See also* U.S. Department of Education, *Q&A on U.S. Supreme Court Case Decision Endrew F. v. Douglas County School District Re-1*, 5 (Dec. 7, 2017), available at <https://sites.ed.gov/idea/files/qa-endrewcase-12-07-2017.pdf> (accessed January 4, 2025).

132.    In *Endrew F*, the Court further clarified that, in designing an IEP, "every child should have the chance to meet challenging objectives," and the team must give, "careful

33

consideration to the child's present levels of achievement, disability, and potential for growth."
580 U.S. at 392-393.

133.    In developing the IEP, IDEA and its implementing regulations require that the IEP
include, "a statement of the special education and related services and supplementary aids and
services, based on peer-reviewed research to the extent practicable, to be provided to the child."
34 CFR 300.320(a)(4).

134.    Related services include, but are not limited to, "such developmental, corrective,
and other supportive services as are required to assist a child with a disability to benefit from
special education and includes speech-language pathology and audiology services . . .
psychological services, physical and occupational therapy . . . counseling services . . . and parent
counseling and training." 34 CFR 300.34(a).

135.    IDEA and its implementing regulations also require a local education agency to
"ensure that the IEP Team . . . revises the IEP as appropriate to address any lack of expected
progress toward the annual goals and in the general education curriculum . . . ; the results of any
reevaluation conducted . . . ; the child's anticipated needs; or other matters." 20 USC 1414
(d)(4)(A)(ii); 34 CFR 300.324(b)(1)(ii).

136.    Pursuant to IDEA's Reevaluation mandate, a local educational agency shall ensure
that "a reevaluation of each child with a disability is conducted . . . if the local educational agency
determines that the educational or related services needs, including improved academic
achievement and functional performance, of the child warrant a reevaluation." 20 USC 1414
(a)(2)(A)(i); 34 CFR 300.303(a)(1).

137.    MARSE requires the district to "[c]omplete a full and individual evaluation." R
340.1721a.

138.    IDEA and its implementing regulations require a local education agency to, "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent, that may assist in determining . . . the content of a child's individualized education program, including information related to enabling the child to be involved in and progress in the general education curriculum." 20 USC 1414 (b)(2)(A)(ii); 34 CFR 300.304(b).

139.    LEAs must "use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors." 20 USC 1414(b)(2)(C); 34 CFR 300.304(b)(3). LEAs must also ensure that "assessments and other evaluation materials include those tailored to assess specific areas of educational need and not merely those that are designed to provide a single general intelligence quotient." 34 CFR 300.304(c)(2). The evaluation must be "sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified." 34 CFR 300.304(c)(6).

140.    In addition, LEAs are charged with ensuring that assessments "are administered by trained and knowledgeable personnel." 20 USC 1414(b)(3)(A)(iv); 34 CFR 300.304(c)(1)(iv).

141.    As part of a reevaluation, the IEP Team and other qualified professionals shall review existing evaluation data on the child, including: "(i) evaluations and information provided by the parents of the child; (ii) current classroom-based, local, or State assessments, and classroom-based observations; and (iii) observations by teachers and related services providers." 20 USC 1414(c)(1)(A); 34 CFR 300.305(a)(1). On the basis of that review, and input from the child's parents, the IEP Team and other qualified professionals, as appropriate, must identify what

additional data, if any, are needed to determine if the child is a child with a disability and their

educational needs. 20 USC 1414(c)(1)(B); 34 CFR 300.305(a)(2).

142.    The IDEA further requires, through the least restrictive environment (LRE)
requirement, that LEAs "ensure" that:

> [t]o the maximum extent appropriate, children with disabilities . . .
> are educated with children who are not disabled, and special classes,
> separate schooling, or other removal of children with disabilities
> from the regular educational environment occurs only when the
> nature or severity of the disability of a child is such that education
> in regular classes . . . cannot be achieved satisfactorily.

20 USC 1412(a)(5).

143.    Parents are entitled to meaningful parent participation and LEAs are prohibited

from predetermining services. *See Deal v Hamilton Cnty Bd of Educ*, 392 F3d 840 (6th Cir 2004).

144.    IISD, as an LEA, failed to ensure P.H. received a FAPE and is thus a proper party

to this administrative proceeding.  20 USC 1415(b); 34 CFR 300.2.

145.    At all times relevant to this complaint, P.H. has been a student with a disability

under 20 USC 1401(3).

146.    Respondents violated P.H.'s rights under IDEA by:

a.    Failing to reevaluate P.H. when his educational or related service needs,

including the need for increased emotional, behavioral, and academic supports, warranted

a reevaluation, thereby denying him FAPE;

b.    Failing to offer and/or provide P.H. an appropriate IEP (including, but not

limited to, an appropriate program, placement, services, and accommodations in the least

restrictive environment), by failing to develop an IEP reasonably calculated to provide P.H.

FAPE; failing to review and revise P.H.'s IEP when his educational or related service needs

warranted a revision; and failing to implement P.H.'s IEP as written, thereby denying him FAPE;

      c.      Failing to educate P.H. in the least restrictive environment, thereby denying him FAPE.

147.    Respondents otherwise violated P.H.'s right to receive a FAPE.

## III.   PRAYER FOR RELIEF

WHEREFORE, as a "proposed resolution of the problem" under 20 USC 1415(b)(7)(A)(ii)(IV) and 34 CFR 300.508(b)(6), Petitioners seek the following relief:

A. Find that Respondents violated state and federal law;

B. Order Respondents, jointly and severally, to provide P.H. with a compensatory education and related services bank of 400 hours, with no expiration date, for academic and related services, including but not limited to academic tutoring, speech and language therapy, occupational therapy, social-emotional support, and behavioral therapy, to be delivered by providers of Petitioners' choosing at their normal and customary rates;

C. Order Respondents, jointly and severally, to provide financing for a 3-6 month ABA therapy program, local to P.H., to address his ASD-related behavioral and academic needs, to be delivered by providers of Petitioners' choosing at their normal and customary rates;

D. Order Respondents, jointly and severally, to reimburse R.H. and C.H. for tutoring evaluation and services for P.H. during the 2023-2024 school year in the amount of $1,300;

E.  Order Respondents, jointly and severally, to reimburse Petitioners for lost income attributed to Respondents' failure to provide P.H. with FAPE;

F.  Order Respondents, jointly and severally, to reimburse Petitioners for moving and increased household expenses necessitated by Respondents' failure to provide P.H. with FAPE;

G.  Find that Petitioners are the prevailing party;

H.  Order attorney fees be awarded to Petitioners as the prevailing party; and

I.  Any other relief deemed necessary and available to Petitioners, pursuant to case law, statute, and equity. The IDEA expressly gives broad authority to hearing officers and courts to order appropriate remedies, without regard to whether the family specifically mentions each and every possible remedy that might be deemed appropriate by a hearing officer. "[W]here legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Bell v Hood*, 327 US 678, 684 (1946), and the existence of a statutory right implies the existence of all necessary and appropriate remedies. *Sullivan v Little Hunting Park, Inc*, 396 US 229, 239 (1969) (citations omitted).

Dated: January 10, 2024                    Respectfully submitted,

                              */s/ Megan N. Mitchell*
                              Megan N. Mitchell (P87213)
                              Elizabeth K. Abdnour (P78203)
                              ABDNOUR WEIKER LLP
                              325 E. Grand River Ave., Ste. 250
                              East Lansing, MI 48823
                              (517) 994-1776
                              liz@education-rights.com
                              megan@education-rights.com

Petitioner:  
Christi Henke (Jan 10, 2025 09:46 EST)

C.H.

Petitioner:  
Richard Henke (Jan 10, 2025 11:00 EST)

## PROOF OF SERVICE

I have served a copy of Petitioner's Amended Complaint and Request for Due Process Hearing under the IDEA upon the parties listed below by electronic mail on this ⎿ O day of January, 2025.

/s/ Megan N. Mitchell  
Megan N. Mitchell

Michigan Department of Education  
Office of Special Education – Due Process Complaints  
608 West Allegan  
P.O. Box 30008  
Lansing, MI 48909  
Email: MDE-MIComplaints@michigan.gov

Erin H. Walz (P55484)  
Cathleen M. Dooley (P86148)  
Michele R. Eaddy (P41871)  
THRUN LAW FIRM, P.C.  
P.O. Box 2575  
East Lansing, MI 48826-2575  
ewalz@thrunlaw.com  
cdooley@thrunlaw.com  
meaddy@thrunlaw.com  
*Attorneys for Respondent East Lansing Public Schools*

39

Jordan M. Bullinger (P72441)
Mary C. Bradley (P85784)
CLARK HILL PLC
200 Ottawa Ave. NW, Suite 500
Grand Rapids, MI 49503
jbullinger@clarkhill.com
mbradley@clarkhill.com
*Attorneys for Respondent Ingham ISD*

Robert A. Dietzel (P67567)
THRUN LAW FIRM, P.C.
P.O. Box 2575
East Lansing, MI 48826-2575
rdietzel@thrunlaw.com
*Attorneys for Haslett  Public Schools*