# EXHIBIT 4

## STATE OF MICHIGAN
## MICHIGAN OFFICE OF ADMINISTRATIVE HEARINGS AND RULES

| | |
|---|---|
| IN THE MATTER OF: | Docket No.: 24-034587 |
| **C.H. O/B/O P.H.,** | Case No.:   DP-24-0100 |
| **Petitioner** | |
| **v** | Agency:     Education |
| **EAST LANSING PUBLIC SCHOOLS,** | Case Type:  ED Sp Ed Regular |
| **Respondent** | Filing Type: Appeal |

_____/

**Issued and entered
this 24th day of March 2025
by: Michael J. St. John
Administrative Law Judge**

### <u>DECISION AND ORDER</u>

#### <u>Procedural Background</u>

On December 3, 2024, the Petitioner filed their due process complaint (Complaint) against Respondent and two other Respondents (Student's previous school district and the Intermediate School District (ISD))[1] and on January 10, 2025, filed their amended due process complaint (Amended Complaint) against Respondent and the ISD and explicitly withdrawing their claims against the former school district.  Following the ISD's motion for summary disposition, on January 30, 2025, an Order Granting Respondent ISD's Motion to Dismiss was entered in that case dismissing the ISD.

The matter was heard via video conference on February 10, 11, 12, 13, and 14, 2025.  Attorneys Elizabeth Abdnour and Megan Mitchell represented the Petitioner Mother, Father, and Student.   Attorneys Erin Waltz and Cathleen Dooley represented the Respondent school district.

Following the hearing, the parties jointly requested the opportunity to file post-hearing briefs which was granted in a February 14, 2025 Order.  Both parties submitted timely post-hearing briefs.  Petitioner filed a timely response to Respondent's closing brief.

---

[1] Case 24-034588 covered the complaint against the prior school district and 24-034589 covered the complaint against the ISD.

24-034587
Page 2

## Issues[2]

    a.  Did the Respondent fail to provide the supports listed in the Student's IEPs?

    b.  Did the Respondent fail to educate the Student in the LRE?

    c.  Did the Respondent inappropriately use seclusion and restraint?

## Summary Of Testimony

A summary of testimony is included as Appendix C.

## Applicable Law

The Code of Federal Regulations, 34 CFR 300.39(a)(1), defines "special education" as follows:

> Special education means specially designed instruction, at no cost to the parents, to meet the unique needs of a child with a disability, including—
>
> (i)    Instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings;
>
>                 * * *

Michigan Administrative Rule for Special Education, R 340.1701c(c) defines "special education" as follows:

> "Special education" means specially designed instruction, at no cost to the parents, to meet the unique educational needs of the student with a disability and to develop the student's maximum potential. Special education includes instructional services defined in R 340.1701b(a) and related services.

The Code of Federal Regulations, 34 CFR 300.39(b)(3), defines "specially designed instruction" as follows:

---

[2] The issues as originally articulated related to the three original respondents. These first three issues remain against Respondent in this matter. A fourth issue identified by the Petitioners (failure of the ISD to supervise the local school districts) at the December 2024 prehearing conference does not relate to Respondent and was therefore dismissed as an issue when the ISD was dismissed.

**24-034587**
**Page 3**

Specially designed instruction means adapting, as appropriate to the needs of an eligible child under this part, the content, methodology, or delivery of instruction—

(i) To address the unique needs of the child that result from the child's disability; and

(ii) To ensure access of the child to the general curriculum, so that the child can meet the educational standards within the jurisdiction of the public agency that apply to all children.

The Individuals with Disabilities Education Act (IDEA) 20 USC 1412(a)(5) requires that:

To the maximum extent appropriate, children with disabilities … are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

Supplementary aids and services are defined in 20 USC 1401(33) as "aids, services, and other supports that are provided in regular education classes or other education-related services to enable children with disabilities to be educated with nondisabled children to the maximum extent appropriate …"

34 CFR 300.114(2)(i) and (ii) sets forth the LRE requirements that each school district must follow:

(i) To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are nondisabled; and

(ii) Special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

Students protected by the provisions of IDEA are entitled to be appropriately identified, evaluated, placed, and provided a free appropriate public education (FAPE) that includes special education and related services designed to meet their unique needs

24-034587
**Page 4**

and prepare them for further education, employment, and independent living.  20 USC 1400(d); 34 CFR 300.1.

In *Board of Education of Hendrick Hudson Central School District v Rowley,* 458 US 176 (1982), the U.S. Supreme Court articulated the two bases for assessing the provision of FAPE.  The first was whether the school district had complied with the procedural requirements of the Act, and the second was whether the student's Individualized Educational Program (IEP) was "reasonably calculated" to enable the student to receive educational benefits.  *Id.* at 206-07.

In assessing whether a student's IEP was reasonably calculated to enable the student to receive educational benefits under *Rowley*'s second basis above, the Sixth Circuit Court of Appeals noted that nothing in *Rowley* precludes the setting of a higher standard than the provision of "some" or "any" educational benefit and held that the IDEA requires an IEP to confer a "meaningful educational benefit gauged in relation to the potential of the child at issue."  *Deal v Hamilton County Bd of Ed*, 392 F3d 840, 862 (CA 6, 2004).

Nevertheless, the IDEA requirement that school districts provide disabled children with a free appropriate public education does not require that a school either maximize a student's potential or provide the best possible education at public expense.  *Doe v Tullahoma City Schools,* 9 F3d 455 (CA 6, 1993); *Fort Zumwalt Sch Dist v Clynes,* 119 F3d 607, 612 (8 CA, 1997), *cert den,* 523 US 1137 (1998).  In *Endrew F. v Douglas County Sch. Dist. RE-1*, 580 U.S. 386; 137 S Ct 988, 999 (2017), the US Supreme Court expanded its explanation of FAPE in *Rowley* and stated that to provide a FAPE, the IDEA requires an educational program "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.*

The primary responsibility for formulating the education to be accorded a disabled child, and for choosing the educational method most suitable to the child's needs, was left by IDEA to state and local educational agencies in cooperation with the parents or guardians of the child.  Reviewing courts may not substitute their own notions of sound educational policy for those of the school authorities which they review. *McLaughlin v Holt Pub Schs*, 320 F3d 663 (CA 6, 2003).

In determining whether the District provided and will continue to provide a free appropriate public education in the least restrictive environment for the student in this case, it must be decided whether the IEP is reasonably calculated to enable the student to receive a meaningful educational benefit gauged in relation to the student's potential. *Rowley,* 458 US at 206-07; *Deal*, 392 F3d at 862.

**24-034587**
**Page 5**

34 CFR 300.8 provides:

(a) General

    (1) Child with a disability means a child evaluated in accordance with §§300.304 through 300.11 as having … an other health impairment … and who, by reason thereof, needs special education and related services.

    (2)

        (i) Subject to paragraph (a)(2)(ii) of this section, if it is determined, through an appropriate evaluation under §§ 300.304 through 300.311, that a child has one of the disabilities identified in paragraph (a)(1) of this section, but only needs a related service and not special education, the child is not a child with a disability under this part.

        (ii) If, consistent with § 300.39(a)(2), the related service required by the child is considered special education rather than a related service under State standards, the child would be determined to be a child with a disability under paragraph (a)(1) of this section.

* * *

(c) Definitions of disability terms.  The terms used in this definition of a child with a disability are defined as follows:

* * *

(9) Other health impairment means having limited … alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that –

    (i) Is due to chronic or acute health problems such as … attention deficit disorder or attention deficit hyperactivity disorder … and

    (ii) Adversely affects a child's educational performance.

**24-034587**
**Page 6**

34 CFR § 300.116 provides:

In determining the educational placement of a child with a disability, … each public agency must ensure that-

(a) The placement decision-

(1) Is made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options; and

(2) Is made in conformity with the LRE provisions of this subpart, including §§ 300.114 through 300.118;

(b) The child's placement-

(1) Is determined at least annually;

(2) Is based on the child's IEP; and

(3) Is as close as possible to the child's home;

(c) Unless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled;

(d) In selecting the LRE, consideration is given to any potential harmful effect on the child or on the quality of services that he or she needs; and

(e) A child with a disability is not removed from education in age-appropriate regular classrooms solely because of needed modifications in the general education curriculum.

34 CFR §300.304 provides:

* * *

(b) Conduct of evaluation.   In conducting the evaluation, the public agency must —

**24-034587**
**Page 7**

(1) Use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child, including information provided by the parent, that may assist in determining –

(i) Whether the child is a child with a disability under 300.308 …

(2) Not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability and for determining an appropriate educational program for the child; and

(3) Use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors. …

(c) Other evaluation procedures.  Each public agency must ensure that –
(1) Assessments and other evaluation materials used to assess a child under this part –

\* \* \*

(iii) Are used for the purposes for which the assessments or measures are valid and reliable;

(iv) Are administered by trained and knowledgeable personnel; and

(v) Are administered in accordance with any instructions provided by the producer of the assessments.

34 CFR §300.305 provides:

(a) *Review of existing evaluation data.* As part of an initial evaluation (if appropriate) and as part of any reevaluation under this part, the IEP Team and other qualified professionals, as appropriate, must—

(1) Review existing evaluation data on the child, including—

(i)  Evaluations and information provided by the parents of the child;

**24-034587**
**Page 8**

     (ii) Current classroom-based, local, or State assessments, and classroom-based observations; and

     (iii) Observations by teachers and related services providers; and

* * *

  (2) On the basis of that review, and input from the child's parents, identify what additional data, if any, are needed to determine—

     (i)

        (A) Whether the child is a child with a disability, as defined in § 300.8, and the educational needs of the child; or

        (B) In case of a reevaluation of a child, whether the child continues to have such a disability, and the educational needs of the child;

     (ii) The present levels of academic achievement and related developmental needs of the child;

     (iii)

        (A) Whether the child needs special education and related services; or

* * *

34 CFR §300.306 provides:

  (a) *General.* Upon completion of the administration of assessments and other evaluation measures—

    (1) A group of qualified professionals and the parent of the child determines whether the child is a child with a disability, as defined in § 300.8, in accordance with paragraph (c) of this section and the educational needs of the child; and

    (2) The public agency provides a copy of the evaluation report and the documentation of determination of eligibility at no cost to the parent.

* * *

**24-034587**
**Page 9**

    (c) *Procedures for determining eligibility and educational need.*

      (1) In interpreting underlined evaluation data for the purpose of determining if a child is a child with a disability under § 300.8, and the educational needs of the child, each public agency must—

        (i) Draw upon information from a variety of sources, including aptitude and achievement tests, parent input, and teacher recommendations, as well as information about the child's physical condition, social or cultural background, and adaptive behavior; and

        (ii) Ensure that information obtained from all of these sources is documented and carefully considered.

Pursuant to 34 §CFR 300.115, schools must also ensure a continuum of alternative placements available to meet students' needs including "instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions", and that schools "make provision for supplementary services (such as resource room or itinerant instruction) to be provided in conjunction with regular class placement."

**Exhibits**

At the commencement of the hearing, the parties stipulated to the admission of Petitioner's Exhibits 1-62 and Respondent's Exhibits A-W which were admitted without objection.  Following the hearing, Respondent compiled the notes of various providers and submitted them as Exhibit X; Petitioner offered no objection and Exhibit X was therefore admitted without objection.  Exhibits 1-62 and A-X were therefore admitted without objection:[3]

Petitioner offered the following exhibits (numbers) which were admitted without objection:

1. April 2022 Special Education Evaluation
2. April 2022 IEP
3. August 2022 Behavior Plan
4. September 2023 IEP

---

[3] There is overlap amongst the following exhibits: 1, 39, and 42 with A; 3 with B; 4 with E; 5 with F; 8, 26, and 27 with P; 9, 12, 23, and 24 with R; 10 with Q; 13 with N; 17 with G; 25 with V; 28 with O; 30 with J; 32 and 26 with L; 33, 34, and 35 with K; 37 with I; 38 with H; 41 with C; 49 with U; 19, 26, 47, 48, and 29 with T; and 49 with V.

**24-034587**
**Page 10**

5. March 2024 IEP
6. Services and progress reporting
7. March 2024 letter from Physician
8. February 2024 emails
9. April 2024 emails (removal)
10. March 2024 emails
11. February 2022 emails
12. April 2024 emails (ASD room)
13. April 2024 letter
14. 2023-2024 report card
15. September 2023 Score Snapshot
16. 2023-2024 Reading Improvement Plan
17. March 2024 seclusion and restraint documentation
18. August 2023 letter
19. AAEC Evaluation
20. April 2022 ISD IEP Report
21. August 2023 Seizure Action Plan
22. August 2024 State Complaint Response
23. March 2024 emails (medical releases)
24. April 2024 emails
25. January 2024 emails (field trip)
26. February 2024 emails (seizure)
27. February 2024 emails (schedule)
28. Undated letter
29. May 2024 withdrawal documentation
30. 2023-2024 Social Work Log
31. April 2024 memo regarding medical provider communications
32. August 2024 Aims Web Plus documentation
33. August 2023 schedule
34. 2023-2024 Attendance Log
35. 2023-2024 Aims Web Log
36. 2023-2024 IEP Service Log
37. 2023-2024 Progress Reports
38. March 2024 FBA signed consent
39. March 2022 REED documentation
40. October 2022 IEP amendment
41. October 2022 Seclusion Form
42. April 2022 ASD MET Eligibility Report and Summary
43. March 2021 letter
44. March 2021 REED documentation

**24-034587**
**Page 11**

45. November 2021 REED Documentation
46. Behavioral Availability Chart
47. Behavior Tracking Chart and Rating Scales
48. Self-Check-In Visual and Rating Scales
49. 2023-2024 emails
50. January 2025 IEP
51. December 2024 Evaluation Team Report
52. January 2025 Draft Student Safety Plan
53. 2024-2025 Report Card
54. 2024-2025 Attendance Report
55. 2024-2025 Progress Report
56. 2024-2025 Restraint and Seclusion Documentation Forms
57. Summer 2024 Quarterly Progress Report
58. Petitioner's Expert 2's Expert Report
59. Petitioner's Expert 1's Expert Report
60. February 3, 2025 ELPS Records
61. Petitioner's Expert 1's Curriculum Vitae
62. February 23, 2024 emails

Respondent offered the following exhibits (letters) which were admitted without objection:

A. April 2022 MET and REED
B. August 23, 2022 Behavior Plan
C. October 31, 2022 Emergency Seclusion and Restraint Form
D. August 23, 2023 Transfer
E. September 13, 2023 IEP
F. March 5, 2024 IEP
G. March 7, 2024 Seclusion and Restraint From
H. March 11, 2024 FBA consent
I. September 13, 2023 IEP progress reports
J. 2023-2024 Service Logs
K. 2023-2024 Discipline Log-Attendance Schedule
L. 2023-2024 Aims Web Monitoring Report
M. May 6, 2024 letter
N. April 2, 2024 letter
O. Undated letter
P. February 2024 emails
Q. March 2024 emails
R. April 2024 emails
S. May 8, 2024 email (withdrawal)
T. August and September 2023 emails
U. October and November 2023 emails

**24-034587**
**Page 12**

    V.  December 2023 and January 2024 emails
    W. District Calendar
    X.  Provider Notes[4]

Respondent initially provided an Exhibit X which was identical to Petitioner's Exhibit 22 but did not offer this version of the proposed exhibit at the hearing, so this original submission is not part of the record.

## Findings Of Fact

Based on the entire record in this matter, including the witness testimony and admitted exhibits, the following findings of fact are established by a preponderance of the evidence:

1.  The following timeline of events is helpful to understand the Student's educational experience to date:

| Date | Event |
|------|-------|
| **Prior Educational History** | |
| January 2020 | Student enrolled in preschool |
| August 2021 | Student attended DK |
| | Student disenrolled from DK |
| August 2022 | Student attended Kindergarten |
| | Student disenrolled from Kindergarten |
| | Student enrolled in ABA program |
| | |
| **Educational History during 2023-2024 School Year[5]** | |
| August | School tour |
| August | Start of school – Student attending 8:45am – 11:00am |
| September | Student's day extended to 1200pm: then 1230pm |
| November 6 | Student's day extended to 1:00pm |
| November | Student starting to need extensive walking and bathroom breaks |
| December 15 | First incident of school avoidance |
| December | Student successfully attended bowling party (for 10 minutes) |
| December | Winter break |
| January | Student refuses to attend school after winter break for several days. |
| January | Student refuses to attend the general education first-grade class |
| February 9 | First elopement incident |

---

[4] Exhibit X consists of SLP's Notes, TC's personal notebook pages, Resource Teacher's Bookworm data, and Social Worker's personal notes.
[5] All dates in the 2023-2024 Educational History section are during the 2023-2024 school year.  August through December is 2023, January through April is 2024.

**24-034587**
**Page 13**

February 27        Second elopement incident
March 5            New IEP (never implemented)
March 6            Seclusion incident
March onward       Student did not return to school
April              Student enrolled in another ABA program

Subsequent Educational History[6]

August             Student enrolled in out-of-state private school
November 13        Student removed from out-of-state private school
January 2025       Student enrolled in out-of-state public school

2. During the events at issue in this case, the 2023-2024 school year, Student was eligible for special education services as a student with an other health impairment (OHI). Student's primary disabilities are autism and anxiety. These disabilities manifested as school avoidance during the 2023-2024 school year.

3. Student made academic progress during the fall semester in the general education classroom. Student advanced from the most basic reading group to the next level group. Student made progress on his letter sounds. Student achieved his reading goal. Student's time in the classroom increased throughout the semester. Student also made some social progress; he made a friend and would sometimes accept (but not reciprocate) hugs from that friend. Testimony of Teacher and Resource Teacher and Ex. F.

4. Elementary School Staff recognized that Student was struggling with school avoidance by taking more frequent bathroom breaks and walking breaks starting in November 2023 and escalating through winter break at the end of December 2023. Elementary School staff responded to Student's increased bathroom breaks by communicating with parents (Ex. V), creating a social story about using the bathroom, teaching Student how to appropriately take breaks, and creating a separate calming area (tent) in the general education classroom that was specifically for Student. Testimony of Teacher and Social Worker.

5. Elementary School Staff recognized that Student was struggling with attending school after winter break in January 2024. Staff worked with Student's parents on Student's re-entry into school. Staff became more concerned in mid-February and informed Former Director. Testimony of Principal, Social Worker, and Former Director.

6. After winter break, Student exhibited two instances of dissociation. Testimony of OT, SLP, and Social Worker.

7. Student eloped from school twice in February 2024, including the second instance where Student left the building and crossed a busy road. Testimony of Mother.

---

[6] All dates in the Subsequent Educational History section are in 2024.

24-034587
**Page 14**

8.  Elementary School staff had a plan if Student eloped.  The plan included attempting to intercept the student and communication with other staff members.  Testimony of Teacher and Principal.
9.  At the March 2024 IEP meeting, a possible change in placement was discussed.  An FBA was ordered to help determine that placement either for the end of the 2023-2024 school year or for the summer of 2024.  Testimony of Former Director.
10. On March 6, 2024, Student had a behavioral meltdown and could not be calmed down for 45 minutes despite multiple attempted interventions by Elementary School staff.  Student was secluded for two minutes until he was told that he could go home.  Testimony of Principal and Social Worker.
11. Student never returned to Elementary School after March 6, 2024.  Respondent was unable to assure parents that Student would not elope and would not need to be secluded and/or restrained.  Testimony of Parents, Former Director, Principal, and Social Worker.
12. Student was secluded, restrained, and possibly assaulted at the out-of-state private school.  Testimony of Mother.
13. As of the hearing, the Student was still not yet attending a full day of school; Student is attending school one hour per day in an intervention classroom only with adult service providers; staff are working on increasing the amount of time Student is able to spend in school.  Student initially attended school for two hours a day, but this proved to be too much for Student.  Testimony of Mother.

## Conclusions Of Law

### Preliminary matters

Petitioner objected to the narrowing of issues for hearing in this matter both at the prehearing conference and in writing (via email) later the same day following the prehearing conference and Order.  Petitioner has timely preserved this objection.  Petitioner's objection was to the "clarifying" of issues when Rule 792.11802(b)(i) instead permits the Administrative Law Judge to "identify and simplify the issues."  Petitioner notes that "The closest language Petitioners' counsel could find in the Rules" was Rule 792.10106 which grants the Administrative Law Judge the authority to "direct the parties to … consider clarification of issues."

Petitioner's proposed issue of whether Respondent failed to provide FAPE is simply too broad, particularly when Petitioner's Amended Complaint is 40 pages and contains 147 paragraphs, many with subparts.  Paragraph 147 reads, "Respondents otherwise violated [Student]'s right to receive a FAPE.  Without clarifying, identifying, and simplifying the issues to be adjudicated, it is not possible for Respondent to know what the Petitioner's allegations are and appropriately prepare for hearing.  Petitioner's objection to the "clarified" or "identified" or "simplified" issues is denied.  Similarly,

24-034587
Page 15

Petitioner's proposed revision of the issues to include language about whether Respondent "failed to provide FAPE to the Student" does not serve to clarify or identify or simply the issues and is denied.   Each of these three issues (a through c) if established would constitute a failure to provide the Student with FAPE.  Petitioner's request to add language to the proposed issues is denied.

Petitioner alleges that 34 CFR 300.507(a)(1), which allows a Petitioner to file a due process complaint on any matter "relating to the identification evaluation or educational placement of a child with a disability, or the provision of FAPE to a child", conflicts with state rules.  It does not.  Merely because a due process complaint can be filed on any issue does not require the Administrative Law Judge to permit Petitioner to proceed on their claim without explaining what the issues to be adjudicated at hearing are.

Petitioner's closing brief lists four alleged violations of FAPE by Respondent: the three issues listed for hearing and additionally that Respondent "failed to reevaluate [Student] when his needs warranted a re-evaluation."   Petitioner never requested to add that issue to the hearing – it first became apparent that it was an issue during the hearing when Petitioner's Expert 1 alleged that Respondent failed to reevaluate Student and was first articulated as an issue in Petitioner's post-hearing brief.  Petitioner's Closing Brief Argument Section additionally lists "failing to offer and/or provide [Student] an appropriate IEP", another issue that Petitioner failed to identify until that closing brief.

Petitioner never explains why they were unable to articulate this hearing issue at either the prehearing conference, at the time of their amended complaint, or even when they filed their witness and exhibit lists and copies of their exhibits.  Petitioner's Exhibit 59, their expert's February 4, 2024 report, includes this alleged failure to evaluate.  Petitioner's argument that they are entitled to bring up any issue they desire, in contravention to the listed issues outlined at the prehearing conference is rejected as incorrect.  Contrary to Petitioner's argument, 34 CFR 500.11(d) does not stand for this proposition; that regulation provides that a party may not raise issues at hearing that are not included in their complaint, not that Petitioner may raise any issue at hearing that was included in their due process complaint, regardless of whether it was identified as a hearing issue at the prehearing conference.  Petitioner was welcome to list these issues at the prehearing conference (or alternatively request to add them later in the hearing process) but failed to do so.  Petitioner's failure to identify these issues prior to the hearing has the potential to deprive the Respondent of the opportunity to properly defend the allegations against them.  It is not too onerous a burden on Petitioner to articulate their proposed issues prior to the hearing.  Petitioner's failure to identify and propose additional issues beyond those articulated at the prehearing conference constitutes a waiver of those additional issues at hearing.

24-034587
Page 16

In Petitioner's reply, Petitioner requests to strike a sentence from Respondent's closing brief alleging that Petitioner alleges is inaccurate. This request is denied. The disputed statement concerns who attended a March 5, 2024 IEP meeting. Whether an advocate attended this meeting has no bearing on the issues to be decided in this case. Further, the appropriate remedy for an alleged inaccurate statement by another party in a closing brief is not to strike that statement but instead is exactly what Petitioner did here: refute the statement in their own brief by providing evidence in support of their position.

<u>Petitioner bears the burden of proof by a preponderance of the evidence.</u>

The principles that govern judicial proceedings also apply to administrative hearings. *Callaghan's Michigan Pleading and Practice* § 60.248, at 230 (2d ed. 1994). In due process administrative hearings, the burden of proof is on the party seeking relief: here the Petitioner, Mom and Student. *Schaffer v Weast*, 546 US 49 (2005). The burden of proof is upon Petitioner to prove by a preponderance of evidence the allegations in the Petitioner's Amended Complaint as narrowed to the issues following the prehearing conference.

Proof by a preponderance of the evidence requires the trier of fact to determine that the evidence supporting the existence of a contested fact outweighs the evidence supporting its nonexistence. *Martucci v Detroit Police Commissioners*, 322 Mich 270 (1948). The standard of proof is a "preponderance of evidence", most frequently described as "that evidence which carries the greatest weight". A "preponderance of evidence" has been defined by the Michigan courts as: "proof by a preponderance of the evidence requires that the fact finder believe that the evidence supporting the existence of the contested fact outweighs the evidence supporting its nonexistence." *Blue Cross and Blue Shield of Michigan v Milliken*, 422 Mich 1 (1985).

<u>Witness Credibility.</u>

As the trier of fact, the Administrative Law Judge must determine the weight, effect, and value of the evidence. The Administrative Law Judge must determine whether to believe any witness or evidence and to what extent. The Administrative Law Judge may take into consideration any bias, prejudice, or motive that may have influenced a witness' testimony. The weight to be given to a witness or evidence is discretionary with the Administrative Law Judge. *Kern v Pontiac Township*, 93 Mich App 612 (1979).

In evaluating the credibility or weight to be given to the testimony of a witness or documentary evidence, the judge may consider the demeanor of the witness, the reasonableness of the testimony or evidence, and the interest, if any, the witness would have in the outcome of the proceedings. *People v Way*, 303 Mich 303 (1942), *cert den* 318 US 783 (1943). Credibility is more than the words of the witness and includes the

24-034587
**Page 17**

overall demeanor of the witness and their speech patterns and demeanor. *People v Lemmon*, 456 Mich 625 (1998).

Parent's testimony during the hearing was credible.  Similarly, the testimony of Student's teachers and service providers was credible.  For the most part, there are not significant factual discrepancies, and those that do exist are not determinative of the outcome in this case.  Whether Student eloped from Respondent's staff or from Mother is ultimately not essential to determine. Respondent had an appropriate plan for handling any future elopements.

The primary factual discrepancy is whether Social Worker and/or Principal told Mother and Father that there was no seclusion room at Elementary School.  It is clear that this is what Parents heard – this is also what they wanted to hear.  It is equally clear that neither Social Worker nor Principal told Parents that there was no seclusion room – they did not lie to Parents.  The truth likely lies somewhere in between where Elementary School staff told Parents, who they knew were concerned about the use of seclusion and restraint in the prior school district, that they would absolutely try to avoid the use of seclusion and the seclusion room.  To what extent Respondent's staff told Parents what they wanted to hear (short of lying about a room that obviously did exist) and to what extent Parents heard Respondent's staff tell them what they wanted to hear is unknown.  Like the other factual disputes in this case, resolving this dispute is not necessary to determine the outcome of the issues in this case.  Any school that promises not to use seclusion or restraint risks students' health and safety when those last resort interventions are needed in emergency situations where students pose a risk to others.

While Petitioner's Expert 1's testimony was mostly credible, her testimony about what constitutes seclusion was incorrect and contrary to Michigan law.  Her misunderstanding of what constitutes seclusion affected her credibility particularly on the issue of whether Respondent inappropriately used seclusion, but also on other issues as well.  Petitioner's Expert 1's belief that school districts must be held to the (rightfully) very high standards of using seclusion when they are not actually engaging in seclusion is a significant misunderstanding of special education standards of practice, her qualified area of expertise.

Petitioner's Expert 2's credibility was significantly diminished by his lack of understanding of Student's educational history with the Respondent school district.  His testimony that almost all IEPs in Michigan are deficient is also without evidentiary support and in contravention to the Administrative Law Judge's understanding and experience.  It is hardly surprising that that Petitioner's Expert 2 believed that Respondent's IEP was inadequate when he believes that almost all Michigan IEPs are. Of particular note, Petitioner's Expert 2 spent almost all of his time testifying about what was wrong with almost all IEPs and very little time explaining what would be appropriate, particularly for Student during the 2023-2024 school year.  His report

similarly notes that Respondent was non-compliant but never indicates what was needed other than vague generalities: "data-driven, aligned with professional standards, and … closely monitored to ensure appropriate progress." Petitioner Expert 2's report also indicates throughout the report that Respondent "repeatedly removed [Student] from the classroom and placed in seclusion" contrary to Michigan law. This indicates either a misunderstanding of what Respondent did or a misunderstanding of what constitutes seclusion.

<u>Respondent did not fail to provide the supports listed in the Student's IEPs.</u>

Petitioner attempts to frame Respondent's alleged failure to conduct reevaluations as falling under this issue. However, as noted elsewhere, this is a separate issue that Petitioner failed to identify. The gravamen of this listed issue is not whether Respondent should have provided additional supports, but rather whether Respondent provided the supports that were listed in the Student's IEPs. They did.

Petitioner correctly notes that Respondent's documentation was poor. OT's documentation of her sessions with Student were as close to ideal as possible. However, Respondent failed to maintain those records for OT's sessions with Student in November. SLP's documentation was woefully inadequate, noting only whether Student attended any given session, or if not, why not. SLP did not document what happened in any session.

Despite Respondent's failure to appropriately document (and maintain that documentation) Student's progress, there is no evidence that Respondent failed to provide the required services. Respondent's service providers credibly testified that they provided the appropriate services to Student. Petitioner's argument that Respondent's failure to produce November 2023 records is evidence that OT did not provide those services is rejected in favor of OT's credible testimony that she did provide those services and create those notes, but that they were not properly maintained.

Petitioner's argument that TC's handwritten notes established that she did not provide ASD teacher consultant services as required in Student's IEP is without merit. TC credibly testified that she provided the required services to Student's teachers. Respondent's failure to invite TC to the March 2024 IEP meeting was certainly an error, but is not determinative of whether Student was provided with his required autism teacher consultant services.

SLP's reduction of speech and language services from 25-minute sessions to 20-minute sessions was reasonable given Student's struggles staying on task and SLP working with Student one-on-one (rather than in a group setting with other students). Contrary to Petitioner's argument, SLP has the authority to use her professional judgment to work with Student to meet his goals, including if that means minimally modifying the amount

24-034587
**Page 19**

of time spent with Student.  Service providers should have the discretion to perform those services that they feel are appropriate.  To hold otherwise would mean that a service provider would need to continue working with a Student despite making no progress or possibly even causing harm (such as causing a behavioral meltdown) simply because the IEP indicated that 25 minutes was required, even though 20 minutes was more appropriate.  Petitioner is correct that SLP should have documented these changes and communicated them to the parents, however these failures did not affect the quality of services SLP provided to Student.  Any failures by the Respondent to provide the IEP's duration of services constitute the "minor discrepancy" noted by the *Van Duyn* court as not a material failure resulting in a denial of FAPE.[7]

A State Complaint on this issue resulted in a finding that Respondent failed to provide appropriate services (Ex. 22).  That State Complaint was a separate process that presented different evidence than that presented during this hearing; it is not unusual that this would result in a different finding.  A preponderance of the evidence presented at this due process hearing did not establish that Respondent failed to provide Student's required supports.  This decision, however, does not relieve Respondent of their obligations to make the corrective actions outlined by the Michigan Department of Education.

<u>Respondent did not fail to educate the Student in the LRE.</u>

Contrary to Petitioner's assertions in their closing brief, it was Mother who shortened Student's day.  Respondent never required a shorter day, or even suggested a shorter day.  Offering a shorter day as an option (as Social Worker did in a January 2024 email (Ex. 60 page 592) for example) does not constitute Respondent shortening Student's day.  Social Worker's emails to Mother indicating Respondent's willingness to work with Mother's preferred scheduling is not a violation of FAPE or IDEA.  It was Mother who shortened Student's school day.  Given what was going on with Student, this was an entirely reasonable decision.  However, Respondent did not violate Student's right to a FAPE by permitting Mother to shorten Student's school day.

Respondent's failure to educate Student in the general education classroom was the result of the Student's failure to go into the general education classroom.  Forcing Student to participate in the general education classroom was not in the Student's best interests.

Petitioner's argument that the autism classroom, a self-contained classroom with primarily non-verbal students and that allowed Student no access to non-disabled peers, would have been a less restrictive argument is without merit.  The goal at Elementary School was for Student to return to the general education classroom.

---

[7] *Van Duyn ex rel Van Duyn v Baker Sch Dist 5J*, 502 F3d 811 (9th Cir. 2007).

24-034587
**Page 20**

Respondent's actions in January and February 2024 toward that goal were appropriate, even though they involved Student only working with his adult service providers.

It is impossible to know with certainty how Student would have responded to the autism classroom.  Additionally, based on the limited evidence on that placement presented at the hearing, it is not possible to determine whether that was an appropriate placement for Student starting in January 2024.  For the 2024-2025 school year, however, Student's placement in a school for students with autism went terribly.  At the time of the hearing, Student was currently attending a significantly reduced school day (one hour per day) only with adult providers: the same placement that Petitioner alleges was too restrictive in January and February 2024.  The only articulated differences between Student's January/February 2024 placement and his January/February 2025 placement are that an FBA has been/is being conducted and the presence of a BCBA.

<u>Respondent appropriately used seclusion on the one instance it was utilized. Respondent did not use restraint.</u>

Respondent never utilized restraint.[8]  Respondent only used seclusion on one occasion, for approximately two minutes, on March 6, 2024.[9]

Seclusion is the involuntary confinement of a student alone in an area from which the student is physically prevented from leaving.  The term seclusion is synonymous with "emergency seclusion" as defined by MCL 380.1307h(e) as a "last resort emergency safety intervention that is necessitated by an ongoing emergency situation and that provides an opportunity for the pupil to regain self-control while maintaining the safety of the pupil and others."  Contrary to Petitioner's Expert 1's testimony, merely changing a student's placement from a general education setting to a setting where there are not peers present does not constitute seclusion.  If a student is free to leave the area, there is no ongoing seclusion.  There is no such thing as "informal seclusion".  A student is either not free to leave and is secluded or is free to leave and is not secluded.  Student was secluded one time: for two minutes on March 6, 2024.

There was no evidence presented that Respondent's use of seclusion on March 6, 2024 was inappropriate or not justified.  To the contrary, Principal and Social Worker both testified credibly that Student was engaged in unregulated behavior for approximately 45 minutes, was breaking things, and attempting to break the picture window in the

---

[8] Petitioner did not allege that Respondent engaged in restraint.  This issue was never modified following the dismissal of the previous school district as a respondent.  Pursuant to MCL 380.1707h(p), "… Restraint does not include … the minimum contact necessary to physically escort a pupil from 1 area to another …"  Staff's assisted movement of Student from Social Worker's office to the seclusion room was not restraint.

[9] Petitioner alleges in their closing brief (page 25) that Respondent "continued to rely on the inappropriate use of seclusion" but references no instance of seclusion beyond the the March 4, 2024 incident other than Petitioner's Expert 1's incorrect definition of what constitutes seclusion.

24-034587
**Page 21**

office where he was.  Principal and Social Worker concluded that Student was at risk of injuring himself if he broke that window.  This was a reasonable conclusion, and the use of seclusion in that instance was appropriate.

There has similarly been no evidence presented that the seclusion process was inappropriately implemented.  Principal and Social Worker informed Mother about the need for seclusion and then appropriately and safely walked Student to the seclusion room where he stayed for two minutes.  The seclusion was ultimately successful after approximately two minutes and Student calmed down and was able to return to his next scheduled activity: a snack.  Student was ultimately re-triggered by a subsequent event and Mother made the (entirely reasonable) decision to take Student home.

Seclusion should only be used as a last resort, if a student is in danger of hurting himself.  That was the situation here.  Principal and Social Worker credibly testified that they attempted to use less drastic behavioral interventions for approximately 45-minutes but they were unsuccessful.  Because Student presented a credible danger to himself, Respondent made the correct decision to seclude the Student and then appropriately secluded the Student resulting in a cessation of the potentially harmful behavior.[10] Respondent then completed the appropriate paperwork and timely notified Mother of the incident.  Mother also partially witnessed the incident.

While observing this incident was no doubt traumatic for Mother, it is unclear what Petitioner believes that Respondent should have done instead.  Student presented a reasonable danger to himself.  Petitioner's argument appears to be that behavioral interventions would have prevented the triggering incident and the need for seclusion rather than that that decision to use seclusion or the implementation of that seclusion was inappropriate.  As noted below, Petitioner's suggestion that earlier behavioral intervention by the Respondent would have resulted in different, more favorable, outcomes, is speculative and not supported by the evidence presented at the hearing.

Because Respondent did not use restraint, only used seclusion once, appropriately concluded that seclusion was necessary, and correctly implemented and documented that seclusion, Petitioner has not established any Respondent violation of Issue #3.

<u>Petitioner did not establish that any Respondent delay in re-evaluating Student was unreasonable.</u>

As noted above, this is not an issue listed for hearing and Petitioner waived this issue. Additionally, Petitioner failed to prove this allegation at the hearing.  Petitioner alleged that Respondent needed to perform an earlier FBA for Student.  In their closing brief, Petitioner alleges that this was evident starting in November 2023.  However,

---

[10] It is unclear whether the seclusion or Mother promising Student that he could go home (or some combination of the two) resulted in the Student calming down.

24-034587
Page 22

Petitioner's Expert 1 testified at hearing that Respondent needed to conduct an FBA by January 2024 at the latest. The basis for this opinion was that there was a pattern of school avoidance by this time. While there was some evidence of school avoidance in late November and through December with Student over-utilizing breaks, particularly to the bathroom, Respondent recognized this behavior and responded appropriately. Respondent had a plan to address these issues, communicated that plan to parents, and started to implement that plan.

When Student returned from winter break, this is when Student's school-avoidance became considerably more pronounced. Before the break, Student refused to attend school one time. After the break, Student would often refuse to attend school. Before the break, Student's use of bathroom and walking breaks escalated, but Student was still in the general education classroom. After the break, Student refused to participate in the general education classroom at all. Respondent took appropriate actions to work with Student and encourage school participation. This included allowing Mother to come with Student to school, more service provider one-on-one time with Student, and plans to re-integrate the Student in the general education classroom (with his own tent/calming area). These were appropriate interventions in January and February to the Student's school avoidance behavior. Respondent's decision not to start an FBA based on Student's school avoidance was not unreasonable.

Student's most concerning behaviors started in February 2024. Student had two dissociative episodes in February 2024 and two eloping episodes, also in February 2024. In response, Respondent convened another IEP and started the FBA process on March 5, 2024. The timing of this response was also not unreasonable.

It is quite easy to look back on Student's progression/regression starting in November 2023, knowing that Student was hurtling toward the March 6, 2024 meltdown that led to the need for Respondent staff to use seclusion and see the warning signs. However, Respondent's actions must be judged without that benefit of hindsight. Respondent's actions, given the information that they had, were not unreasonable. Even if Respondent had performed an FBA upon the first instance of dissociation and elopement, that FBA would not have been complete before the March 6, 2024 behavioral incident and very likely would not have prevented that incident. Parents opted to remove the child after the Respondent's use of seclusion because Respondent could not meet their demands that Respondent guarantee that seclusion would not be necessary again and that Student would not elope. An earlier FBA would not have solved these issues, and Parents still would have likely withdrawn Student from Elementary School.

With the benefit of hindsight, it is also possible to look back on Mother's actions of attending school with Student, negotiating for less school time with Student, and taking/allowing Student to go home as possibly harmful to the Student. Mother's

24-034587
**Page 23**

actions, too, must be judged with the information available at the time.  In that light, it cannot be said that any of Mother's actions or attempts to handle this incredibly difficult situation were inappropriate.  Indeed, it is also not possible to say that the outcome would have been different if Respondent had not allowed Mother to attend school with Student or if Mother had not removed Student from the school environment when she did.

Although it is always difficult to determine what would have occurred if something different had been done, there was no evidence presented to establish that the outcome in this case would have been any different if Respondent had started the FBA process a few weeks earlier: at the beginning of January 2024.

<u>Petitioner has not established that reimbursement for moving is warranted.</u>

Because Petitioner has not established that Respondent violated IDEA by failing to provide a FAPE, it is unnecessary to address the issue of damages.  Petitioner's requested award of compensatory education (whether a quantity and quality or a bank for Petitioners to pull from) could be an appropriate remedy if there were a violation of FAPE.

However, it is worth noting that even if Petitioner had established one or more IDEA violations based on their enumerated (or unenumerated) issues, Petitioner would still be ineligible for their request for reimbursement for moving expenses.  Petitioner did not establish that this drastic remedy was necessary for Student to receive a FAPE.  Although Educational Advocate testified that Student could only get the help that he needs in one specific out-of-state placement, she also noted that she was not familiar with other Michigan school districts.  The notion that no school district within driving distance of Petitioners' home was capable of meeting Student's needs is without evidentiary support and is rejected.

Additionally, Petitioner offered no evidence in support of their requested reimbursement amounts and rates; Petitioner cited no evidence in support of their request for almost $300,000 in compensation and reimbursement.

Further, although Petitioner argues that it was Respondent's failure to act that caused significant harm to Student, there has been no attempt to delineate the measure of harm caused by Respondent versus the prior Michigan public school district or the subsequent out-of-state private school, both of which Petitioner alleges acted inappropriately (and to a greater extent than the allegations against Respondent).

24-034587
Page 24

## Conclusion

This outcome will no doubt be incredibly frustrating for parents who are doing what they believe is best for their child.  It is abundantly clear from the hearing that these parents care immensely about Student and are doing everything that they can to help him.  This includes splitting up their family and moving out of state to attend another school district.  Parents are frustrated that no one seems to be able to help their son: not the prior district, not the Respondent, and definitely not the out-of-state private school.  While parents were very hopeful that the Student's current out-of-state public school is going to be successful, at the time of the hearing Student had been enrolled for only a very brief time and was only attending school for one hour per day – not in a general education setting.

Parents clearly want what is best for their child and this has involved parents making immense sacrifices in pursuit of that goal.  As noted above, it is unclear whether Mother's presence at Elementary School in January and February 2024 was helpful or hurtful: it was likely both at certain times.  What is clear, however, is that Mother believed that she was helping to further her son's education and Respondent never told Mother that her presence was harming that progress.  Mother's reaction to seeing Student's seclusion was no doubt traumatic.  While her reaction to that event, again with the benefit of hindsight, could have been more measured; her reaction as it was occurring, in real time, was understandable.

Respondent's teachers and service providers wanted what was best for Student and were doing their best to provide those services.  It was clear that all Respondent staff directly working with Student cared a great deal for him and wanted him to be successful.  As noted above, there were often significant deficiencies in Respondent's documentation, but not in the services provided.  Student's teachers and providers were heartbroken that they were not able to be more successful in their interventions with Student.

Student was delightful and mostly engaged when speaking with the Administrative Law Judge, if for only a brief period before he became restless and asked to be excused for a preferred activity.  Without any intended insult to the attorneys and witnesses who participated in the hearing, this was the highlight of the hearing for the Administrative Law Judge who cannot possibly understand how frustrating it must be for Parents to have such a wonderful little boy be so obstructed by anxiety and autism.  There is an amazing young man who is so desperately trying to express himself but has not yet found a way to get through all the noise.  So far, despite tremendous efforts by many, no one has been able to help him to escape.  This is not for lack of trying, but rather the complex and extremely difficult nature of Student's disabilities.

24-034587
Page 25

The undersigned Administrative Law Judge wishes Petitioners well in their continued efforts to find the appropriate educational setting and program to make Student successful, thanks all parties involved for their efforts and for sharing Student's journey, and wishes all parties the best going forward.

### ORDER

**NOW, THEREFORE, IT IS ORDERED** that Petitioner's motion to add issues is **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner's motion to strike a portion of Respondent's closing brief is **DENIED.**

**IT IS FURTHER ORDERED** that Petitioner's complaint is dismissed with prejudice.

**IT IS FURTHER ORDERED** that Petitioner's request for relief is **DENIED.**

**IT IS FURTHER ORDERED** that any claims or defenses under IDEA not specifically addressed herein are dismissed with prejudice.

A party aggrieved by this decision may seek judicial review by filing an action in a court of competent jurisdiction within 90 days of the date of this order.

_____

**Michael J. St. John**
**Administrative Law Judge**

**24-034587**
**Page 26**

## Notice to Agency to Provide MOAHR with Subsequent Agency or Court Orders

The state agency that referred this matter to MOAHR, shall serve MOAHR with any subsequent orders entered because of the ALJ's decision including but not limited to any order to remand the matter to MOAHR for further proceedings, or order on appeal, as soon as practicable following entry of the order to:

Michigan Office of Administrative Hearings and Rules, General Adjudication, by **email (preferred)** to: MOAHR-GA@michigan.gov; **or by regular mail** to: MOAHR-GA, P.O. Box 30695, Lansing, Michigan 48909-8195.
See:  Mich Admin Code, R 792.10120(2)(i).

**24-034587**
**Page 27**

## GLOSSARY OF ACRONYMS

| | |
|---|---|
| ABA | Applied Behavior Analysis/Analyst |
| ACE | Authorized Continuing Education |
| ASD | Autism Spectrum Disorder |
| ASD START | Statewide Autism Resources and Training |
| BCBA | Board Certified Behavior Analyst |
| BIP | Behavior Intervention Plan |
| CPI | Crisis Prevention Institute |
| DK | Developmental Kindergarten |
| FBA | Functional Behavior Assessment |
| OHI | Other Health Impairment |
| OT | Occupational Therapy/Therapist |
| PT | Physical Therapy/Therapist |
| PLAAF | Present Levels of Academic and Functional Performance |
| SLP | Speech and Language Provider |
| SLT | Speech and Language Therapy/Therapist |

## KEY OF INDIVIDUALS, LOCATIONS, AND SERVICES

| | |
|---|---|
| Elementary School | Marble Elementary School |
| Former Director | Nick Hamilton |
| Mother | C.H. |
| OT | Stacy Turke |
| Paraprofessional | Anastasia Shortridge |
| Petitioner's Expert 1 | Cheryl Light Shriner, Ph.D. |
| Petitioner's Expert 2 | Kurt Hulett, Ed.D. |
| Physician | Greg Holzhei, D.O. |
| Principal | Josh Robertson |
| Private School | The Learning Center |
| Resource Teacher | Kristen Casby |
| SLP | Stephanie Francisco |
| Social Worker | Michelle Miller-Hogan |
| Teacher | Rebecca (Becky) Spitzer |
| TC | Kelsey Kujawa |

24-034587
Page 28

## <u>SUMMARY OF WITNESS TESTIMONY</u>

The following represents a summary of the testimony of the witnesses who testified at the hearing.  Any opinion is that of the testifying witness.

<u>Student's Mother, Petitioner</u>
1.  About age three, Student enrolled in preschool in January 2020.  The pandemic happened three months into his preschool.
2.  Student attended another district for developmental Kindergarten (DK) and Kindergarten.
3.  Student is very creative, enjoys building things, and music.
4.  Mother requested a special education evaluation while the Student was in pre-Kindergarten.  At that time, Respondent indicated that the Student was "normal" but offered therapy.
5.  Student did well in DK but they were awaiting an autism evaluation.  Following the evaluation, Student was diagnosed with autism and special education services were provided.
6.  Student was showing extreme aggression in the classroom.  Another student in DK was having panic attacks which triggered the Student.  Student was placed in special education but eventually withdrawn and educated at home with the assistance of a supplemental ABA program.
7.  Student was secluded in Kindergarten at the prior district about five times.  He had never been secluded previously.
8.  Mother met with the Elementary School staff to discuss the issue of seclusion (during the Student's Kindergarten year with another district).  The Student was also being restrained at the prior district.  The seclusion and restraint increased Student's anxiety.  The Student also expressed a desire not to go to school or wanting to go home.  It also reinforced poor behavior because the Student learned that if he acted out, he could go home.
9.  Student was becoming increasingly agitated at home.  Mother was unsure whether this was due to the autism or the school environment.
10. Elementary School allowed Student to tour the school over the summer, meet with his homeroom teacher, and work with the school's dog.
11. Mother had a phone call with Elementary School's Principal and discussed options for the Student including a cognitive impairment program, an autism program, and a behavioral program at Elementary School.
12. At the initial meeting with Elementary School's Principal and Social Worker, Principal told Mother that if the Student was verbal that the autism program would not be the best placement since most of the students in that program are non-verbal.  Principal said that the general education classroom was the best

placement and noted that if it was not successful that they could always revisit the other programs.  Only the autism room and general education classroom were offered.

13. Social Worker told Mother that Elementary School did not have a seclusion room. Without that assurance, Mother would have wanted to discuss seclusion further.

14. Mother agreed to try the first-grade general education classroom.

15. Elementary School staff told Mother that Teacher would be a good fit for Student because of Teacher's autism experience and vibrant personality.

16. Mother would walk Student to the Elementary School's front door.  Student would go into the classroom and start his day.  Mother would then leave and go to work.

17. The first few weeks of school things mostly went well.  Student was progressing.

18. Student did not want to participate in the reading group.  Student is not able to read.

19. In September 2023, there was an IEP meeting.  Several services were removed from the IEP.  There was no discussion of what services were being added or removed during that meeting.  Student still had a paraprofessional at Elementary School.

20. Student attended school from 8:40 a.m. to 11:00 a.m. and then went to an ABA program from 12:00 p.m. to 3:00 or 3:30 p.m.  Mother then increased school to end at 11:30 a.m. and then 12:00 p.m.  Mother then needed to stop the ABA program once school was extended to 12:00 p.m. at the beginning of November.  Respondent did not offer additional supports to assist with the transition.

21. After the ABA program stopped, staff informed Mother that Student was spending increased time in the bathroom and taking extended walking breaks.

22. In November, Student was selected as a student of the week.  Student was very anxious about receiving the award.

23. Student's anxiety further escalated in December.  Mother and Student went on the school field trip (bowling) but were only able to stay for 10 minutes, which Mother considered to be a success.  Student has difficulty with bowling because of the stimulation.

24. The final week before winter break, Student refused to go to school one day. Student was scheduled to work in the gym that day.  Student was able to go the next day and work with the gym teacher.

25. After winter break, during the first few days, Student refused to go to school. School staff (Principal and Social Worker) knew that this was happening. Teacher also knew that Student was absent because Student was refusing to attend school.

26. Student's paraprofessional was changed during the school year.

27. Someone suggested that Student only attend school for two hours.  Mother would sit with Student for the first half hour and then sit in the hallway while the

Student was seeing therapists or providers. Student attended the general education classroom at the start of the day for about 30 minutes.

28. Student's IEP was not amended despite Student spending less time in the general education classroom.

29. Starting in February, Student only saw providers; he did not spend any time in the general education classroom.

30. Elementary School was having staff shortages which caused some of the provider changes.

31. Student could/would not go into the special education classroom if there were other students in the classroom.

32. Student was not able to work with other students in the special education classroom.

33. At the end of January or beginning of February, Student was removed from the general education classroom and so he no longer spent any time with any other students.

34. In late January/early February 2024, Student was engaging in repetitive behaviors (counting cars for 45 minutes) and laying on the floor of the main office at the beginning of most school days.

35. Mother was not with Student in Elementary School except in the main office or when school staff asked her to accompany them for transitions.

36. On February 9, 2024, Student eloped from his occupational therapy session. Student did not run from Mother.

37. Mother considered the fall to be largely successful other than the refusal incident at the end of December.

38. Mother believed that every day was chaos. Mother asked Principal about the autism classroom.

39. Mother first requested an FBA in January 2024 but was told that she needed to ask others about that. It was first proposed at the meeting with the Former Director. There was no behavior plan at Elementary School.

40. Former Director told Mother that he was not going to consider placing Student in the autism room for the 2023-2024 school year. Former Director indicated that this could be a consideration during the summer.

41. During the first week of March 2024, Student was in the conference room because of his behavior issues. Student said that he was going to go to the calm down room. Student said that he was not able to breathe, so Mother took Student home for the day.

42. Student was receiving more conference room time than speech and language services. Student refused to go with Speech Therapist.

43. At the March 5, 2024 meeting, it was noted that it was difficult to place the Student because he was verbal and so the ASD classroom would not be a good fit.  Student also was not a good fit for the behavior classroom.

44. Mother was concerned that Student might elope, leave the building, and cross a main road to go home.

45. At the second elopement incident, Student was transitioning between providers and the Student left the building.  Mother and staff tried to stop the Student because the Student does not understand traffic.  Student sat down at the bus stop and Mother was able to speak with Student.  Student agreed to return if they could go home, which Mother agreed to do.

46. Mother told Principal that "this can never happen again."  Mother asked to lock the school doors, but was told that this was not possible.

47. Student tried to elope the next day, but Mother was able to stop him.  There was another incident where Principal stopped the Student from eloping.

48. At the meeting, Former Director said, "listen, this is just what these kids do."  Mother asked how staff were going to keep him in the school.  The plan was to ensure that staff were aware that the Student could attempt to escape.

49. Mother told Former Director that she did not want to use seclusion.  Former Director said that if the Student was going to elope, that they would need to use seclusion.  Former Director said that students get used to seclusion.

50. Social Worker said that staff needed to seclude the Student.  Mother said that they could use seclusion for two minutes.  After a minute, staff had Student in a CPI hold and escorted the Student to the seclusion room.  Student was shouting that he did not want to go to the seclusion room and that he hated that room.

51. The seclusion room looked like a closet.  Student was jumping at the door.

52. Mother was very upset because she had never seen a seclusion room.

53. Principal told Student that he could leave when he had a "calm body".  Student then said that he needed to go to the bathroom.  Mother took him to the bathroom for four or five minutes.  Then Student had a snack.

54. Student then destroyed Social Worker's office.  Mother asked why they were allowing this to happen.  Principal said that if they did not allow this to happen, the Student would win.  Mother then took the Student home.

55. Mother believes that the seclusion room was hidden from her.

56. Two days later, Mother attended a virtual meeting with Former Director, Principal, and Social Worker.

57. Mother provided a doctor's note that said that Student could not be secluded.  Former Director said that this could not be accommodated.

58. Mother asked why they could not go back to her walking the Student into the school.  Principal said that Mother could not return to the school because of her behavior the prior day (cursing in the classroom).

24-034587
**Page 32**

59. Student has epilepsy and had recently had a seizure.  Mother asked what the plan was if he tried to elope and was told that they would keep trying to do different things.
60. Mother held Student out of school following the seclusion incident.  He remained enrolled.
61. In April 2024, Mother had another meeting with Respondent staff.  It was clear that the Student would not be placed in the autism classroom and not honor the no-seclusion doctor's note.  There was no plan for what the Student would do while in school or how to get the Student out of the car into the school.
62. During this time, Student received tutoring, particularly in reading.  Mother was able to get Student into another ABA program at the end of April 2024.
63. The March 5, 2024 IEP was never implemented.
64. No Respondent staff member ever told Mother that she was disruptive.
65. Mother eventually withdrew Student from Respondent because there was nothing that would be done differently and she was concerned about the Student eloping and being secluded.
66. Mother took Student out-of-state to enroll the Student in a private school.  Student is now in public school out-of-state.  The new school performed a FBA on the first day and have provided training to staff on autism.  They do not seclude the Student.  They are working on getting him up to a full day.
67. Mother guarantees that Student will never be secluded again.
68. Student attended the other district for DK from August through November before Mother withdrew the Student.
69. Student was at Elementary School for about seven months.
70. Student was at the out-of-state private school for about three-and-a-half months in the Fall of 2024.
71. Mother requested that Student only attend in the mornings – initially to attend the ABA program in the afternoons.
72. On November 6, 2023, Mother told Respondent that Student had 'graduated' from the ABA program.  Mother then added time to the Student's school day.  Respondent noted that they were prepared to have the Student attend school for the full day.
73. When the Student started staying for lunch, he would have lunch with a staff member because the Student was not able to handle the sensory issues of the lunchroom.  Mother requested this accommodation, and everyone agreed that this was best for the Student.
74. On August 29, 2023, Mother asked to have the Student stay for the full day.  On August 30, 2023, Teacher responded that Student could stay at school longer.

24-034587
Page 33

75. Student stayed at school longer, through 1:00 p.m. on Monday through Thursday starting in September 2023.  Student continued to attend ABA on Friday afternoons.

76. In October 2023, Student was doing well at Elementary School.

77. Mother has no issues with Student's education through October 2023; this is why she withdrew him from the ABA program.  She did not know how many walking and bathroom breaks Student was taking.

78. Mother was in daily contact with Social Worker.  Mother did not ask about Student's walking or bathroom breaks.

79. Mother reported additional agitation and adverse behavior starting in November 2023, and Mother reported this to the school.  Mother noted that things were going well at Elementary School but did inquire whether Student would be better placed in the autism classroom.

80. Social Worker was always very timely addressing Mother's concerns and setting meetings to discuss issues.

81. Student's IEP provided for adult support, frequent breaks, seating arrangements, repeated directions, extra time, and ASD teacher consultant services.  Respondent provided frequent breaks and a seat by the Teacher.  Mother is unsure whether Student was given repeated directions or extra time.  Mother believes that Social Worker forgot to speak with the ASD Teacher Consultant.

82. In December, Teacher reported that Student had high energy and high engagement.

83. Through December, Mother reported that Student's growth at Elementary School was "profound".

84. Social Worker checked in with Mother the day before school restarted in January 2024.

85. Student had difficulty over winter break.  Mother changed Student's medications during that time in response to the behavior issues.

86. Student refused to return to school on the first scheduled day of school in January 2024.  Mother notified Respondent that Student had agreed to go to school for a shortened day in the conference room.

87. When Mother asked for a meeting, it happened within a few days.

88. In January and February 2024, Mother was working with Social Worker on Student's schedule and gradually increasing Student's time at school.  Ex. P and Ex. V.

89. Mother would include four incidences of significant behavior that should have been documented.  The two included in Ex. K (the February 27, 2024 elopement from the school and the March 6, 2024 seclusion) and the occasion of the Student sleeping for an hour in the bathroom and the Student eloping inside the school.

24-034587
**Page 34**

90. Mother decided to remove the Student from school on each occasion, in consultation with school staff.  Mother unilaterally decided to remove the Student on March 6, 2024.

91. Former Director sent the FBA authorization on March 8, 2024; Mother signed that authorization within a couple of days.

92. Student did not return to Elementary School after the March 6, 2024 incident.

93. Student attended a private special education school starting in August 2024.  Mother believes that all students in the school had autism.

94. Mother did not receive the restraint/seclusion documentation from the private school (Ex. 56) until after the Student had stopped attending.  Student was secluded on September 13, 2024.

95. Student was restrained many times at the private school.

96. Mother received the September 18, 2024 seclusion and restraint notification and called for a meeting with the school.  Mother did not receive additional reporting of seclusion or restraint after that meeting.

97. Mother withdrew the Student from the private school on November 13, 2024.

98. Mother believes that the private school staff hit the Student on the back of his head; she does not believe that he fell and hit his head.

99. The private school adopted Respondent's IEP but was not able to introduce either a mobility or communication goal.  Student made limited progress on his social-emotional goal.

100.    Student is currently attending public school out-of-state.  He has an IEP that was implemented on January 15, 2025.  Student's current school day is only one hour.  They are working to increase the duration.

101.    Mother believes that Student's walking breaks are appropriate.  Student was able to work for 20 minutes before needing a break.

102.    Mother reported that Student was not successful in a classroom where other children were present.  Although Student was attending general education class for part of the day at Respondent, he was not interacting with other students.  Mother believes that Student only had success with other students on three occasions.

103.    Student is currently attending his one hour of school a day in the intervention classroom.  This time is spent with a BCBA and a paraprofessional.  Most of the time is spent only with the two adults – they are trying to gradually increase the amount of time that Student spends with other students.  That is a self-contained classroom: the other students are all special education students.

104.    Student initially attended school two hours a day but that was too much – Student was having horrible behavior issues.

105.    Student started exhibiting aggression toward the family cat starting at age six.

24-034587
**Page 35**

106.    Student's current placement and behavior plan involves the Student being escorted to a sensory or de-escalation room (called the CARE room): a large padded room without a door.

107.    Student had a good summer of 2024.  He seemed to enjoy school at first. The private school was providing photographs that showed everything was going okay.  Mother first learned that things were not going well in mid-September.

108.    Mother is unsure what triggered the Student's problematic behaviors.

109.    Mother decided to move the Student to the public school following the reporting of the Student's seclusion at the private school.  Student enrolled in December to meet the team and for observation and evaluation.  Student started receiving instruction after the winter break.

<u>Danielle Randolph, Educational Advocate</u>

110.    Ms. Randolph is an educational advocate with the law firm representing Petitioner.  Ms. Randolph is a licensed school psychologist and served in that role for about seven years; she also previously served as school district special education coordinator.

111.    Petitioner hired Ms. Randolph in the spring of 2024.  The goal was to get the Student back into the Respondent's school district or another appropriate placement.

112.    Petitioner's concerns were about the Student's behavior, particularly the elopement and behavior that was leading to the seclusion.

113.    Respondent never conducted an FBA.  There was a BIP, but it was from the Student's prior school district.

114.    Ms. Randolph requested an FBA which Respondent eventually agreed to do.  Ms. Randolph also requested to place the Student in the autism classroom, but the Former Director denied the request for this placement claiming that there was insufficient data to support that placement.  Former Director noted that they could try that placement in the summer of 2024.

115.    Ms. Randolph worked with the family and the Student's current public school to obtain a comprehensive evaluation of the Student.  That evaluation created academic, social-emotional, and behavior goals.

116.    Student has multiple providers addressing the Student's many needs as part of the Student's current IEP.  Student is having a positive experience at the Student's current placement at the out-of-state public school.

117.    Student's current district is providing a BCBA for Student.

118.    Student currently has a safety plan that addresses how staff are to respond to Student's behavior escalation.  There is a behavior response team. The current district is performing evaluations to develop the FBA.

119.    Student is currently doing well at his placement.  Student had no behavioral issues four of the five days last week.

24-034587
Page 36

120.    Michigan schools are not required to have a BCBA on staff.

121.    Ms. Randolph would like to see data that supports moving a student from a general education placement to a more restrictive special education placement.

122.    Ms. Randolph has worked with other parents who attended school with their children, but has never had a case where a parent attended every day.

123.    Ms. Randolph helped Mother choose the public school. Student was enrolled in the public school but Mother chose the private placement.

124.    Ms. Randolph learned after the fact that the private placement used seclusion and restraint often: almost daily.

125.    Ms. Randolph does not believe that the private school did a good job with the Student.

126.    Student attends school for one hour per day at the out-of-state public school. The goal is to increase time to two hours a day and get the Student to work with one other student. The Student's behavior needs to be under control before the Student can have additional instructional time.

127.    Student struggled with the transition back to school. Student is embarrassed that he cannot read and struggles with this issue.

128.    An FBA identifies the function of the behavior: the antecedent of the behavior, the behavior itself, and then what happens next. Sometimes the cause of behavior is unknown.

129.    Ms. Randolph is qualified to perform an FBA.

130.    A team should consider an FBA after an increase in behavior within a week or two. The FBA takes time to collect data and compile.

<u>Student's Father</u>

131.    Father noticed that Student was having issues with Student's behavior as early as 2019. The behavior issues really manifested when the Student was home from school following the pandemic in March 2020.

132.    Father noticed that Student would 'stim', dyskinetic motions, and that he would become obsessed with specific things. Student failed to respond to any criticism, critique, correcting, or discipline.

133.    Father first requested that Student be evaluated for special education in March 2021. Respondent told him that Student did not need special education services.

134.    Father then enrolled Student in a neighboring district's developmental Kindergarten (DK). This program is like a pre-Kindergarten class.

135.    Student continually acted up in the DK classroom even though the Student's teacher was the best educator that Student has had thus far. Student's behavior deteriorated throughout the year despite that teacher's efforts.

136.    Student was diagnosed with autism in November 2021.

24-034587
Page 37

137.    Student's teacher at Respondent was often absent.  Teacher did not know who the Student was and the teacher was disengaged.

138.    Student came home at the end of October 2022 and was inconsolably sad and extremely angry.  Student eventually informed his parents of the incredible physicality of the substitute teacher from the other school district.

139.    Student's behavior was also poor at home.

140.    Father wanted to avoid any repeat of the use of seclusion and restraint.  They met with the staff at Respondent.  That meeting was reassuring because Social Worker and Principal both told Father and Mother that there was no seclusion room at Elementary School.

141.    Principal and Social Worker told Father that Student could transition to an autism classroom if it became necessary.

142.    Student's destructive behavior became most pronounced at the end of 2023/start of 2024.  There were episodic destructive behaviors in the fall of 2023.

143.    Following the March 2024 seclusion, Student's destructive behavior at home was at its worst.  Father believes that Student is bright enough to know what is most important to destroy.

144.    Following the seclusion incident, Principal banned both Mother and Father from the school.  Father had only been to school three times.  Father was not provided with a reason why he was banned.

145.    Father was concerned with Student's safety to return to Elementary School without a plan to address the seclusion and elopement into the busy intersection across from the school.

146.    After learning that the out-of-state school district had the best programs for autistic students, the parents made the decision to have Mother and Student move out-of-state.

147.    Student is very confused by his parents living apart.

148.    Student shows an aptitude for chess.  Father is teaching Student how to play chess.  Their living apart limits the continuity of this teaching.

149.    Student has not had a seizure at any school that he has attended.

150.    Student is now engaging in less destructive behavior at home.

151.    Father does not remember the Student engaging in destructive behavior at school during the fall of 2023.  He is unsure whether there was destruction prior to the incident on March 6, 2024, that led to the seclusion.

152.    Student had fewer destructive behaviors at Elementary School than at the other schools.  The pre-Kindergarten year at the other district was also relatively destruction-free.

153.    Student is only attending one hour a day, without any peers.  Student's current safety plan includes seclusion and restraint if necessary.

24-034587
Page 38

154.    Father believes that he was unaware of some of the issues that Student was having in the fall of 2023.

Petitioner's Expert 1

155.    Petitioner's Expert 1 has a Ph.D. in educational psychology with an emphasis in special education and severe disabilities.  She has a bachelor's degree in psychology and a master's degree in therapeutic recreation.  She also has certificates in behavior analysis and therapy.  She is a board-certified behavior analyst (BCBA) at the doctoral level.

156.    Petitioner's Expert 1 is a teacher in a special education teacher preparation program.  She teaches special education teachers looking to become BCBAs.  She was previously a service provider for children with disabilities for about 15 years in homes, schools, and institutions.  She also previously served as a teacher consultant for preschool teachers and a behavior technician paraprofessional trainer.

157.    Petitioner's Expert 1 is an expert in special education.

158.    Petitioner's Expert 1 reviewed the Due Process Complaint and the Student's relevant educational records and reports as listed in her report (Ex. 59).  Petitioner's Expert 1 has not met the Student because it has been about a year since the events of this case took place and the child may be in a different place now.

159.    Petitioner's Expert 1 believes that the Respondent failed to document an escalation of the Student's behaviors and responses to the Student's escalating behaviors.  She believes that the Respondent failed to timely conduct an FBA within a reasonable time after concerns were expressed.

160.    Petitioner's Expert 1 was concerned that there was no documentation of any behavior prior to January 2024.  She would have expected this documentation because this was an IEP goal regarding self-regulation.  There was no progress report or data that the Student was making progress on that goal.

161.    The IEP included behavioral supports for the Student.

162.    In December 2023, Mother reported that the Student was becoming increasingly anxious and had school-avoidance issues which Mother attributed to anxiety about being unable to read.

163.    An FBA is required if a restrictive response (seclusion or restraint) to a behavior is required more than two or three times.

164.    Seclusion and restraint are a last resort to be used only when the safety of the child or others require that intervention.

165.    An FBA looks at the child's need and what is causing the problem behavior: why does the child need to engage in the behavior.  It is more than just the trigger for the behavior.

166.    The child is engaging in behavior to get what he needs.  The FBA is done to find a way to give the child their need in a more beneficial and positive manner.

167.    An FBA requires collection of data in a formal way.  This includes observing when behavior occurred and when it did not and comparing the two times to determine potential causes of behaviors.  Documentation, shortly after the behavior occurs, of what happened before, during, and after the problematic behavior is also part of the FBA process.

168.    The goal is to avoid behavior triggers, teach students to replace problematic behaviors with appropriate behaviors to allow the child to meet the need, and appropriately responding to negative behaviors.

169.    Petitioner's Expert 1 believes that an FBA was required, at the latest, in January 2024 following multiple instances of school avoidance.  Respondent should have conducted an FBA when the parents requested that it be performed.

170.    Following the seclusion in March 2024, an FBA should have been conducted (if one had not already been performed).  At this point, it was becoming dangerous for the Student.

171.    Petitioner's Expert 1 believes that removal of a student from the placement constitutes a change in placement and seclusion if there are no other children present.  If a student is in a changed placement without their peers, more than their regular classroom placement, Petitioner's Expert 1 believes that this constitutes seclusion.

172.    Petitioner's Expert 1 believes that Respondent failed to educate the Student in the LRE.

173.    A staff member may be qualified to work with a student with behavioral issues even without being a certified BCBA.

174.    Student's IEP-required communication section/goal(s) need to include data on the Student's progress towards the Student's goals.

175.    Petitioner's Expert 1 believes that taking breaks, including going for a walk, could be an appropriate intervention for a student's potential sensory overload.  Those breaks would need to be appropriately implemented.

176.    Taking a break from school can cause regression in progress toward goals.

177.    Student had difficulty returning from winter break.  Mother attended school with Student because of this difficulty.

178.    Petitioner's Expert 1 had not seen the emails between school staff and Mother (Ex. V).

179.    The behavior that triggered the need for the FBA in this case is the Student's school avoidance.  Here, that FBA should have been started within one or two weeks of the Student's return to school in January 2024.

24-034587
**Page 40**

180.    An FBA could have been completed even if the Mother was at the school with the Student.

181.    Petitioner's Expert 1 was surprised that Respondent prevented Mother from attending school with Student.

182.    Respondent did start the FBA process and obtained consent from parents, but the Student did not return to school.  It is not possible to conduct an FBA if the Student is not in attendance.

183.    Respondent staff were responding to the Student in a caring manner.  Because Respondent did not determine the function of the interfering behaviors, Petitioner's Expert 1 believes that the school environment was not pleasant for the Student.  This, in and of itself, is not indicative of whether the Respondent was providing appropriate services.  Petitioner's Expert 1 believes that the collection of additional data in the form of an FBA was required to determine if the Respondent's interventions were appropriate.

184.    Even caring behaviors can reinforce negative behaviors in students.  Petitioner's Expert 1 believes that this is why an FBA is important.

185.    Petitioner's Expert 1 believes that complying with the Student's IEP requires communication of data-based evidence to the parents.

186.    When a student is on a shortened school day, if there is no behavior that is preventing a longer school day, Petitioner's Expert 1 would expect the team to get together to discuss getting the Student into school toward a full day.

187.    The Student's attendance at an ABA program would be an indicator that the Student might need an FBA and would be cause for the school to discuss the Student's progress in that ABA program.  The ABA assessment could have been helpful to the Respondent's team.  Petitioner's Expert 1 is unaware of whether Respondent staff communicated with the staff at the ABA program.

Physician

188.    Physician is a doctor of osteopathic medicine (D.O.) who is a board certified family medicine physician.  Physician has been Student's family physician since the Student's birth.

189.    Student has been diagnosed with autism.  He also has a seizure disorder, ADHD, and anxiety.  Those disorders result in hyperactivity and impatience.

190.    Physician believes that Student should not be placed in seclusion as it may worsen his anxiety.  Physician wrote the letter indicating this opinion (Ex. 7) at the request of Mother.

191.    Physician discussed Student's behaviors and the appropriateness of seclusion with Former Director in March 2024.  Physician encouraged Respondent to use alternatives to seclusion since seclusion could possibly serve to worsen or reinforce the behavior.  He recommended that the Respondent seek guidance from a behavior specialist.

24-034587
Page 41

192.    Former Director indicated that he could not guarantee that seclusion would not happen.

193.    Physician does not have a background in special education or behavior interventions for children.

Petitioner's Expert 2

194.    Petitioner's Expert 2 received degrees in special education teaching and administration.  He earned master's and doctorate degrees in in administration. He served as a special education teacher for three years, served as an assistant principal for two years, and as a principal for a few years.  He also served as a special education coordinator for a school district.

195.    He has consulted with parents and families of special education students. Petitioner's Expert 2 is currently a legal trainer of principals and administrators.

196.    Petitioner's Expert 2 is an expert in special education and K-12 administration.

197.    Petitioner's Expert 2 found Respondent's IEPs of the Student were common of IEPs.  A goal needs to have data included in the PLAAF to establish a baseline for the student.

198.    Respondent's IEP only included observations as a form of measuring the Student's progress.

199.    Student came to Respondent with years of severe behavioral issues.

200.    Petitioner's Expert 2 does not believe that Student's objectives/benchmarks had any data to determine whether the goals were met.

201.    Petitioner's Expert 2 has never seen a range of minutes for a student to receive therapies.

202.    Respondent needed to perform an FBA on the Student because of the Student's behavior issues.

203.    Respondent did not identify the correct triggers and did not provide the correct interventions.

204.    Petitioner's Expert 2 believes that Student's behavioral issues went unaddressed.

205.    Petitioner's Expert 2 believes that Respondent needed to perform an FBA when it became clear that additional information was needed.  For Student, Petitioner's Expert 2 initially believed that this was within the first week of enrollment but then noted that it was when the behavior became apparent. Petitioner's Expert 2 is unsure when that was for Student at Elementary School.

206.    Student was having aggressive behavior starting in Kindergarten.  Student was hitting, kicking, and punching during that prior school year.

207.    Petitioner's Expert 2 is unsure who determined that the Student needed to have a reduced school day.  Petitioner's Expert 2 does not know how many times the Student eloped from school.

24-034587
Page 42

208.    Petitioner's Expert 2 believes that the Student's IEP is "100% non-compliant."

209.    An IEP team meeting needs to be reconvened when there is a change in behavior and there needs to be a change in services.  There needs to be data collection before the team meeting.

210.    Petitioner's Expert 2 would be surprised that the Student was not having significant behaviors during the fall of 2023.

211.    Petitioner's Expert 2's primary concern is that there were no reasonable measurable goals that could be implemented.

Elementary School Principal

212.    Principal has been the principal at Elementary School for seven years.  He previously served as a general education teacher.  He has a master's degree in teaching and curriculum and a year of certification coursework to achieve his administrator certificate.

213.    Principal first spoke with the parents after reviewing the Student's IEP.  Principal spoke with the parents over the summer to create a plan for the Student.

214.    Principal and Social Worker met with parents in-person over the summer.  They also had the Student come in over the summer to allow the Student to get acclimated to the building and for him to meet with the special education providers and his teacher.

215.    Principal also met with the Student's ABA providers.

216.    Student's parents told Principal that they wanted the Student to attend a partial day.  Principal told the parents that the goal was to have the Student attend a full day of school.  The parents told Principal that they wanted the Student to continue to attend the ABA program in the afternoon.  This was documented in the Student's IEP (Ex. E).

217.    Principal did not tell the parents that there was no seclusion room at Elementary School.  Social Worker also did not tell the parents that there was no seclusion room.  There is a seclusion room at Elementary School, so Principal would never tell any parent that.

218.    Student had not exhibited any aggressive behaviors in September 2023 when the IEP was drafted.  Principal had almost daily interaction with the Student.  Student often ate lunch with Social Worker.  Principal would talk with Student during those lunch times.  Petitioner did well and was successful in the fall of 2023.

219.    Student ate lunch in the office at Parent's request because Student had a large aversion to certain smells and foods that would have been difficult for the Student to eat in the cafeteria.

24-034587
Page 43

220.    Student did not have any aggressive behaviors during the fall of 2023 that were not documented in the Student's records.

221.    In December 2023, Student started engaging in avoidance behaviors: particularly going to the restroom to avoid non-preferred activities like schoolwork.

222.    Principal would check with Student's paraprofessional when she was outside the bathroom.  Principal would check in with Student while he was in the bathroom and prompt the Student to return to class.  Student did not respond to those prompts with aggression.

223.    There was an occasion when Student said that he was not feeling well. Principal called Mother to let her know that Student was not feeling well.  Mother decided to pick up the Student early.  Later that week, a similar incident occurred in the restroom, but Principal redirected the Student back to class.

224.    In Fall of 2023, Student participated in the obstacle course school-wide event with his grade.  Student had support from a paraprofessional and from Mother.

225.    Student also participated in a school-wide bowling event with support from a paraprofessional and Mother.  At that event, Mother took the Student home early.

226.    Principal felt that Student's parents were happy with the progress that the Student made during the fall 2023 semester.

227.    Mother had reported that Student was struggling over the winter break and requested to attend school with Student.  Principal agreed to allow Mother to attend school with the Student.

228.    Parents request to attend school frequently; parents are generally not allowed to attend pursuant to school board policy.  Principal allowed Mother to attend because they had a good working relationship with the parents and were invested in Student's success.  Principal believed that Mother's additional support could help.

229.    Principal did not see an improvement in Student's behavior while Mother was attending.  Student's behavior escalated.

230.    In mid-February 2024, Principal was trying to wean the Student from the Mother's assistance.  He wanted to have the Mother wait in the office and have the Student check in with her throughout the school day.

231.    Student initially started every day in the general education classroom. Student was participating in some of the instruction and class lessons.

232.    Principal was not present on February 27, 2024 when the Student first eloped.  Principal sent Mother an email about the incident the next morning (Ex. P).  Principal reported that Respondent had not seen aggression or elopement from the Student prior to that incident.

24-034587
**Page 44**

233.    Principal remembers another incident where Student attempted to leave the building, but Mother was able to redirect the Student back into the school office.

234.    Mother asked for the Elementary School's doors to be locked.  Principal indicated that the fire code required everyone to be able to leave the building. Mother was upset with this answer and that this could not be used as a strategy.

235.    Principal's plan for this Student was to have staff be aware of the Student's elopement and to have staff communicate with each other.

236.    Respondent had an IEP meeting six days after the first elopement incident (Ex. F).  Former Director attended this March 5, 2024 IEP meeting to discuss a possible change in placement.  Student's parents were asking about other possible placements.

237.    On March 6, 2024, Student was struggling with behavior in Social Worker's office.  Principal was called to assist.  Student was dysregulated and throwing papers around the Social Worker's office; Student broke a picture and wore the frame around his head, and was attempting to break the office window.

238.    Principal was prompting Student to use regulation strategies while also attempting to remove objects from the office.  Student's behavior continued to escalate despite the attempts to regulate.

239.    Principal knew that Student's parents had concerns about the use of seclusion.

240.    Social Worker went to the office and told Mother that seclusion was a possibility.  After a conversation, Mother said that use of seclusion was okay if necessary.

241.    Principal prompted Student and told him that if the behavior continued that seclusion was going to become necessary.  Social Worker and Principal walked beside the Student holding his arms to exit the office and down the hallway.

242.    The teacher in the special education classroom removed all students from that classroom adjacent to the seclusion room.

243.    Principal and other staff member walked the Student into the seclusion room.  Mother entered the special education room.  Mother was very upset and said, "you need to stop in two minutes or less so you can have your data; I can't believe you have this fucking room in your school."  Mother then left the special education classroom.

244.    Student was in the seclusion room for less than two minutes.  Principal told Student that when he had a calm body that he would go in and talk with the Student.  Student quickly calmed down and Principal went into the room with Student.  Student said that he wanted to check in with Mother.

245.    Principal and Student did 'hand squeezes' while walking back to the office. Student checked in with Mother.  There was a discussion about moving back to

the regular schedule which was snack time in Social Worker's office.  Principal was talking with Student about managing feelings during that snack time.

246.    Principal and Student took a walking break through the school and checked in at the special education classroom which was next on the Student's schedule.  Student asked why he wasn't going to work with the special education teacher but was upset with the answer.  Student went back to the office and Social Worker's office and re-engaged in the destructive behaviors.

247.    Student found a pair of scissors and held the scissors in a threatening manner.  Principal told Student to be safe with scissors but the Student did not respond except to try and stab Principal with the scissors.  Student and Principal saw a second pair of scissors on the floor.  Principal grabbed the scissors and Student hit Principal on the top of the head with a closed fist.

248.    Principal told Student that Mother was going to take Student home.  Student then calmed down and they walked to the office and Mother checked out the Student.

249.    Mother requested that the seclusion report include her request that the Student be secluded for less than two minutes.

250.    In the IEP meeting shortly before the seclusion incident, Former Director had told parents that additional data was needed before the Student could be moved to another placement.

251.    At that March 2024 IEP meeting, Respondent proposed performing an FBA.  Student's parents had not requested an FBA before the March 2024 IEP meeting.

252.    Principal told Mother that she was not able to sit in the front office or walk through the school during the Student's school day.  This was a result of the Mother's behavior and choice of words during the seclusion incident.

253.    Student never returned to Elementary School after the seclusion incident.

254.    Principal never called Mother to pick up the Student because of behavior issues.

255.    Principal attended another meeting with the family at the beginning of April 2024.  That meeting involved problem solving to try and have the Student return to school as well as the parents' limitations on attending school with the Student.  Mother was concerned with the possibility of the Student eloping or the use of seclusion.

256.    Mother wanted reinstatement of her ability to be in the school with the Student.  Mother also wanted a guarantee that there would be no further use of seclusion and no possibility of the Student eloping.

257.    The Student's first aggressive behavior was the incident on March 6, 2024.  Principal was unaware of any aggression by Student toward his peers.

258.    There are family members that volunteer in classrooms.  Parents are also able to observe instruction or come to the office to check in with family members.  Mother's rights were less than other parents.  Father was afforded the rights of other parents.  Principal felt that two 30-minute observations would be enough to allow Father to observe without being obstructive.  Father was not permitted to sit in the office during the Student's school day.

259.    Elementary School has about 310 students, a young five classroom, and two sections of each class K-5.  Elementary School is also home to Respondent's emotional impairment (EI) program.  Student was not part of that program.  There are 13 general education teachers, two special education teachers, a general education reading and math interventionist, a speech and language pathologist who is primarily assigned to Elementary Schol, an OT, PT, an ASD consultant, and a hearing impaired consultant.  The ASD consultant provided consultation in this case; she sometimes provides direct services to other students.

Speech and Language Pathologist (SLP)

260.    SLP has a master's degree in communicative disorders.  She is a licensed speech and language pathologist in Michigan which allows her to provide those services in a school setting.  She has worked as a speech therapist for the Respondent for ten years and was previously with another district for one year in a preschool setting.  SLP was previously a general education middle school teacher.  She attends continuing education to maintain her professional certification.

261.    SLP provides speech and language therapy for special education students at Elementary School.  SLP is at Elementary School full time.

262.    SLP first met Student in the late summer of 2023 when Student came in to Elementary School so he could get acclimated to the campus and his providers.  Providers each had their picture taken and Student was given a schedule of his day with those photos so he would know where he was going and who he was meeting with at each point of the day.

263.    SLP received a Transfer of Student with Disability form (Ex. D) which provided the information about the Student and his services that he was receiving from the prior district.

264.    Student was receiving only consultative speech and language services from the prior district: five to ten minutes a month.

265.    SLP provided the information for Student's September 2023 IEP (Ex. E) Speech and Language skills.  SLP had been providing services to the Student since the start of the school year, for a few weeks prior to this IEP.  SLP provided direct services to Student.

24-034587
Page 47

266.    Student was very friendly and was interested in making friendships, particularly with adults.  Student enjoyed speaking, primarily about issues that he was interested in.  Student had difficulty speaking with peers, listening to others, taking turns, and adjusting language based on the situation.

267.    SLP drafted the Student's two speech and language goals. Communication is often a challenge for students with ASD: particularly functional use of language.  ASD students often are only able to only see their own perspective.  SLP wanted to work on sharing interests with the Student.  This included engaging with other students, taking turns, and talking about other students' interests.

268.    SLP offered 20 to 35 minutes of direct services one to two times per week. The services were to be provided in the special education office, special education classroom, and/or the general education classroom.  SLP met with Student for 20 or 25 minutes a week, on Fridays, in her office.

269.    SLP observed Student in the general education classroom, but never provided services in the general education classroom.  SLP thought it made more sense to provide services in her office.  The goal was to transition to working with peers after Student became acclimated.  A peer would sometimes come with Student in her office during those sessions; Student would work on appropriate interactions when the peer was present.

270.    Student enjoyed his time working with SLP.  Student did well and was making progress on his goals.  SLP tracked this progress with documented observations and monitored progress.  SLP keeps a log of what she worked on with the Student during each session and sends out a progress report each marking period (Ex. I).

271.    SLP measured Student's progress on November 15, 2023 and March 1, 2024.  In November, Student was "progressing as expected"; in March, Student was making "limited progress".

272.    Student was coming alone to speech in the winter of 2024 because of safety concerns.  SLP never saw aggressive behaviors from the Student toward her or any peers.

273.    Student was consistently receiving speech services at Elementary School.

274.    After the winter break, Student's behaviors escalated.  There was additional reluctance to attending school which went along with increased behaviors while in school.

275.    SLP met with Teacher and the rest of the team and made the decision not to have peers attend the Student's speech therapies.  There was concern that a peer might be triggering for Student, and so SLP decided to have Student work directly with her.

24-034587
Page 48

276.     SLP was able to work on Student's objectives even without having a peer come with them for the therapy.  Sometimes the goal would be as simple as coming to speech therapy and staying in the room.  SLP wanted the Student to feel engaged in the school process.  Student did not resist coming to speech therapy, but Student made very limited progress on his speech and language goals.

277.     Mother would sometimes sit outside the speech room while they were working.  If the Student was very resistant to be in school, Student knew that if he could leave the room that he would likely be able to leave school entirely.

278.     SLP was flexible and saw Student on other and/or additional days than those days that were scheduled.  SLP tried to see Student when he was at school.

279.     SLP attended the March 5, 2024 IEP (Ex. F) and provided the information on Student's speech and language needs.  There was a continued need for pragmatic language skills.  Student needed maximum prompting to engage in conversations on non-preferred topics.  Student had more needs in March 2024 than in September 2023.

280.     Student's March 2024 IEP goals remained the same as in September 2023.  SLP reduced the time to 20 minutes because the Student was coming alone.  Student was also having difficulty coming to school and staying engaged in learning.

281.     In the fall of 2023, Student usually had a peer come with him to the speech and language therapies.

282.     SLP may have been distracted by Mother in the hallway.  The IEP team discussed this with Mother, but SLP did not participate in those discussions.  SLP never asked Mother not to be in the hallway outside of the speech sessions.

283.     SLP prepared an attendance log but did not prepare formal data sheets.  Her data is observational data and from her personal notes that she takes throughout her day.

284.     Peer interactions were difficult for Student.  Adult interactions were much easier for the Student.

285.     Student never expressed aggressive behaviors toward peers during speech and language therapies.

286.     SLP recorded whether she saw the Student or why she did not see the Student on a scheduled day.  SLP created the log for the state complaint.  SLP used a personal calendar to gather that data.

287.     SLP does not take notes every time she works with a student.  When she does take notes, she notes anything of importance to her.  SLP took notes on Student on occasion.  SLP uses those notes to create her progress notes.

288.     After SLP stopped seeing the Student, SLP discarded her notes.

289.     SLP did not use the electronic progress notes system that was new to the Respondent.

Occupational Therapist (OT)

290.     OT works for the intermediate school district (ISD) but she has been assigned to the Respondent school district since 1994.  This is her 40th year as a school occupational therapist.

291.     OT has a B.S. in occupational therapy.  A master's degree is now required, but she is grandfathered into the profession.  She is licensed as an occupational therapist in Michigan.  She maintains continuing education as part of her profession and her job.

292.     OT is at Elementary School on Fridays.

293.     OT first met Student in his first-grade classroom.  OT observed Student in the classroom, worked with him in the classroom, and then did some brief simple assessments and introductory activities with Student.  OT also looked at the Student's prior records.

294.     OT initially provided Student with those therapies that were in the Student's prior IEP from the previous school district.

295.     OT provided the data for Student's visual motor skills goals in the September 2023 IEP (Ex. E page 5).  OT was working with Student on hand strength and endurance so that the Student was able to write; Student particularly had difficulty writing lower-case letters.

296.     OT was working to make Student's grasp of the pencil to be automatic so that the Student's focus and attention could be on writing (versus how to hold the pencil).

297.     OT drafted Student's motor goals (Ex. E p. 7).  The goals were proper grasp, copying/tracing letters, words, and sentences up to six words with 80% accuracy.

298.     OT recommended at least 25 minutes a session, three sessions per month in either the general or special education classroom.  OT saw Student on Fridays at 9:00 a.m.

299.     OT would go to the first-grade classroom and have the Student walk with her to the small office where they would work.  They would chat about what they were going to do.  Student had a schedule of activities that the Student would check off as he completed the tasks.  This schedule would go home with Student each day.

300.     OT would share her data with Student and Mother at Student's request.  Student was excited to show his improvement.

301.     Student remembered the strategy of how to pick up the pencil although he would need some prompting at the start of each session.

302.    Student was excited about his progress and wanted to share that with his Mother.

303.    OT was making progress throughout the fall of 2023, particularly with the first two objectives (letters and words).  Student was starting to see progress at the sentence level.

304.    OT reported that Student was progressing as expected on the November 16, 2023 progress report and making limited progress on the February 23, 2024 progress reports (Ex. I p. 2).

305.    On August 25, 2023, OT observed that Student was grasping his pencil with his fist.  OT demonstrated the proper grip, and the Student was able to sustain it for 45 seconds.

306.    Student was using the proper grasp with 50% success on September 29, 2023.  OT noted that Student was making moderate progress meaning that the Student participated in the activity and made progress toward the goal but was not yet near completion.  Student was actively working on the goal and was making progress toward that goal.

307.    OT entered her progress notes into the Student's records after the sessions on the same day as the session.

308.    OT worked with Student one-on-one.  Student never exhibited any aggression toward OT.

309.    OT did not see any concerns or changes with Student in December 2023.  There was a snow day the first Friday back in January 2024, so OT saw the Student that second Friday.

310.    After winter break, OT observed that Student had a very difficult session.  Student accompanied OT to the classroom.  Student sat down as though he was going to begin to work but forgot to put the tally mark grid on the schedule.  Student "melted" and tried to go under the table.  Student "became like a robot."  OT was holding Student's hand.  Student continued to pretend that he was a robot.  Student said that Student was dead, and gave the robot's name.  Student then became another robot and then the two robots began to talk to each other.  OT had never seen Student act like this previously.

311.    OT messaged Social Worker that she needed support because the Student was really struggling.  Social Worker then came to the room.

312.    At the second January 2024 session, Student was accompanied by both Social Worker and Mother.  Student said something about how the pencil grip "nearly killed me last time."  OT reassured Student that this would not happen.  Student engaged in some of the easier activities but did not engage in any writing activities.

313.    OT was able to get Student to use writing tools subsequently, but OT did not emphasize correct grasp.  Student reverted to a whole-hand grasp.

314.    OT attended the March 2024 IEP meeting.  In March 2024, Student was struggling with the tasks that were presented.  Student would sometimes leave the room and would sometimes withdraw into a robot persona.  The goal became to stay on the assigned task and become comfortable with attending school.  OT was still working on fine motor skills, but in a less academic way: games and puzzles.

315.    OT prepared the March 2024 goals and changed them to reflect the new goals of having the Student engage in therapist-directed activities (versus copying letters, words, and sentences).

316.    Student was never aggressive toward OT.

317.    OT recalls the Student being lost one day.  It was not on OT's watch.  OT had transitioned Student to the SLP's room which was next door.

318.    Mother told OT that Student had run from her.  OT had another adult transition her assigned student back to that student's classroom.  OT searched for the Student and when she returned, Mother had found the Student in another classroom.

319.    OT does not have a walkie-talkie.  She would not have radioed staff that she had lost the Student.

320.    The ISD required their providers to start using their electronic log system in August of 2023.  Prior to the 2023-2024 school year, OT kept her own records.  OT is unsure whether Respondent's providers (like SLP) were using the same system.

321.    OT documented her sessions with Student in November 2023.  She is unsure why those are not included amongst the exhibits.

322.    OT does not believe that Student regressed on his goals but rather seemed incapable of working on them because of behavioral issues.  Student struggled to engage in the tasks as OT requested.  Student needed to be in control of his environment.

323.    Student still had the skills but lacked the ability to access those skills after winter break.  OT did not believe that additional time was needed in the Student's IEP.

## ASD Teacher Consultant (TC)

324.    TC has bachelor's and master's degrees in special education and a certificate in applied behavioral analyst.  She is a BCBA.

325.    TC is currently employed by the ISD and assigned to Respondent and another school district.  She provided services to the Student's school district during the 2022-2023 school year (his Kindergarten year).  This is her sixth school year with the ISD.  Prior to that she was a special education teacher in another school district.

24-034587
**Page 52**

326.    As a teacher consultant, TC helps staff working with students who have autism.   Respondent provides her consultative services to all students with autism.

327.    TC has received training in completing an FBA; she conducts FBAs for her assigned school districts.   She conducts an FBA when a student is engaging in behavior that is a risk for the student or others.   An FBA is also typically performed before deciding whether to change a student's placement to a more restrictive environment.

328.    TC knew Student in the prior district during the 2022-2023 school year.

329.    TC attended Student's September 2023 IEP team meeting.   TC is a support for a person and discusses what services she will be providing to the Student.   TC explains that she's providing a consult service rather than a direct service with the Student.   TC typically works primarily with the case manager – usually the special education teacher.

330.    TC initially worked on the Student's schedule and then worked with staff on any issues that they were having.   TC logged her time spent working on Student's case (Ex. J).

331.    There were no concerns with the Student in the fall of 2023.   There were behavioral concerns after winter break.   Student was not engaged, Student was attending for a shorter time each day, and Mother was attending school with Student.

332.    TC attended a virtual meeting for 60 minutes on April 5, 2024.

333.    Many students working with TC struggle with a longer break because of the change in routine.   Initially staff were monitoring the situation to see if there were improvements after the Student returned to the school routine.   For this reason, TC did not feel like an FBA was necessary in January 2024.   There were also not many observable behaviors of concern during this time.

334.    FBAs are often gauged on aggressive or destructive behavior.   Avoidance behavior is difficult to observe because it is the absence of a behavior.   Student had no aggressive or destructive behaviors in January 2024.

335.    For some students, having a parent attend school with the student can create difficulties.   For some students it can be helpful to have a parent attend.

336.    Student was very successful in the fall but there was a change in the winter.   It is difficult to know what the change was.   It is hard to know whether having Mother attend school was helpful for Student.

337.    Following the eloping and seclusion incidents, TC determined that an FBA was necessary.   An FBA was not completed because the Student never returned to school following receipt of parental permission.

338.    At the April 2024 meeting, Student's parents requested to place Student in the ASD classroom.   The ASD classroom is a self-contained classroom.   Most of

the students in the ASD classroom have intense behavioral, communication, and/or academic deficits.

339.      TC was not invited to the March 2024 IEP team meeting.

340.      TC would have likely increased her consultation time with the teachers in March 2024 given the Student's increased behavioral issues.

341.      TC would have wanted to perform an FBA, create a BIP and see how that went in the general education setting at Elementary School before considering changing the Student's placement either to the autism or behavioral classroom settings which are more restrictive placements.

Student's First-Grade Teacher (Teacher)

342.      Teacher worked as a day care provider in high school.  She earned an early childhood associate's degree, a bachelor's degree in early childhood services, a teaching certification, and then her master's degree in early elementary education.  She worked in another district as a teacher and as a HeadStart supervisor.  She has been with the Respondent for twelve years.  She was previously a third-grade teacher and went back to first grade for the 2023-2024 school year.

343.      Teacher met with Student and his parents about a week before classes started in the summer of 2023.

344.      Teacher and Student's parents discussed having a place for Student to go if he became overwhelmed.  They also discussed having Student sit near quieter classmates.  Scissors were also put away and picture frames and other things that could be thrown were put up so that Student had a clear space.  Scheduled breaks and breaks upon request were also made available.

345.      Parents also reported that Student had sensory issues with food and food smells, so Student's lunch was eaten away from other students.  There was also a discussion about how to handle elopement because Elementary School is on busy roads.

346.      Teacher sends out a welcome packet in the fall regarding schedule, snacks, extra clothes, etc. (Ex. T p. 23).  The first week of school is spent working on routines and building focus.

347.      Mother told Teacher that Student would leave earlier in the day to attend the ABA school.  Student's school day was extended throughout the fall with the goal to attend school all day.

348.      The first 15-20 minutes of the day are social and interactive.  During this time, Student would initially watch the other students.  The paraprofessional would prompt the Student to complete the tasks on the checklist.  Over the course of the year, Student began to complete those tasks with fewer prompts. Student developed a friendship with another student.

24-034587
**Page 54**

349.     Student did well in the Fall of 2023.  Teacher agreed with Mother that Student could extend his school day through 1:00 p.m.  This allowed Student to work on math.

350.     Student did not go into the cafeteria for lunch; he ate in Social Worker's office with the paraprofessional and the school's service dog.  Student enjoyed the dog.  Student did go out with the classes after lunch for recess.  Student enjoyed the swings.

351.     Student was present for 15 minutes of reading with Teacher and 15 minutes working in a small group with two other students.  Student made progress and so Student transitioned to the next level of reading in the second level reading group that had five students.  Student was invited to attend that group when he wanted while also continuing to work with the first group.  Student enjoyed writing on the white board.

352.     Student had the opportunity to take walking breaks.  Student would typically take a walking break after the morning meeting before the reading block.  Student enjoyed the phonics word sort.  Student would also often request another break during the next reading session when everyone was reading at the same time.

353.     Student's initial assessment showed that Student did understand all letter names and sounds.  Student was placed in the basic alphabet letters and sounds group with two other students.

354.     Teacher had a virtual conference with the parents in the fall of 2023.

355.     Student was making progress in reading during the fall of 2023.

356.     Teacher had 23 students in her classroom during the 2023-2024 school year.

357.     Student was very successful most days during the fall of 2023.  There were times when the Student needed to take breaks.  There were increases in breaks and using the bathroom starting at the end of November through December.  Teacher felt that Student's bathroom time was used for task avoidance.

358.     Teacher would never tell a student that they could not use the bathroom.  There's only one bathroom in the classroom, but students could use the bathroom in the hallway if necessary.  Because Student had a paraprofessional, Student could always use the hallway bathroom.

359.     Student exhibited increased anxiety and nervousness with writing and handwriting.  Using lower case letters was challenging for Student, so Teacher did not require this of Student.  When Student was having a good day, Teacher would encourage Student to use small case letters for one word and then praise that success.

24-034587
**Page 55**

360.     There is a calm down space in Teacher's classroom.  It is a fabric tent in the corner of the classroom with some calming sensory inputs, stuffed animals, and books nearby.

361.     Student did not typically use the calm down space; he preferred the walking breaks or drawing time.  Teacher created a second calm down space specifically for Student.

362.     Student was participating in the general education classroom when he was there.  Student had a lot of successful days in the fall of 2023.

363.     Teacher was not able to inform Student's parents about all of Student's successes.  Those communications were limited to major successes.

364.     Sometimes Student would accept a hug from one of his classmates (an affectionate student), but Student would not hug back.

365.     Student had a few preferred classmates that he liked to work with. Student did not typically use other students' names but knew the other students' names.

366.     Student did not participate in special subjects because those were in the afternoon.   There were a few exceptions on half days with an afternoon schedule; when that happened, Teacher would communicate with parents about what they thought was best.

367.     In January 2024, Student was not willing to come to the Teacher's classroom.  Teacher went to the office to try and encourage Student to come with her to the classroom, but she was not successful.

368.     The other students in Teacher's classroom expressed hope that Student would return to the classroom.

369.     There was one day after winter break that the Student put his backpack away but then immediately left the classroom.  There was another day when the Student and Mother came into the class to ty and work on reading.

370.     Student never eloped from Teacher's classroom.   Student always requested a break or to use the restroom.

371.     There was a plan if the Student eloped to try and intercept the Student and prevent him from leaving the building.  The team was also to communicate with each other through walkie talkies about any elopement.

372.     Student was never aggressive with another Student in Teacher's classroom.

373.     Teacher would introduce the next day's reading lesson with Student so the Student could look at that material in advance.  Teacher built Student's reading ability slowly and talked with him about the goals: moving from a few words to one sentence to two sentences.  The goal was to catch up the Student to his peers.  By the end of November, Student was able to read the twelve words on a page with a clear voice.

24-034587
**Page 56**

374.    At the start of the school year, Student would request to go the bathroom once an hour.  Starting in November, the requests increased to two to three times an hour: about once per 15 to 20-minute activity.

375.    Also in November, Teacher started seeing additional anxiety surrounding handwriting.  Teacher observed two instances of Student pushing the pencil down so hard that he broke the pencil; Teacher spoke with Student to attempt to discern what was going on with the Student.

376.    Teacher shared Student's difficulties with the other staff members.  OT did a lesson with all students on how to hold the pencil without breaking it.

Former Director

377.    Former Director was the Director of Special Services; special education fell under that umbrella.  He has a master's degree in educational administration.  He has been in education for 13 years.  He was a special education teacher for three years, an administrator for five years, and the director for five years with Respondent.  He is currently the special education director in another district.  He was the Respondent's Director during the 2023-2024 school year.

378.    Former Director spoke with Mother briefly about an initial evaluation prior to the pre-kindergarten year.  Student then re-enrolled for his first-grade year during the 2023-2024 school year.

379.    Former Director spoke with Mother during the summer of 2023 and coordinated with the Elementary School to have them meet with the family during the summer.  Staff reported to Former Director that they had created a transition plan which included accommodating Student attending a partial day so that the Student could attend an ABA program for the rest of the day.

380.    Former Director received informal updates on Student's progress, but there were no significant changes prior to the winter break.

381.    Elementary School staff informed Former Director in January that Student was struggling.  The team met with the family to work on re-entry into school in January 2024.

382.    Former Director started to get more involved in Student's plan in mid-February 2024.  Principal and/or Social Worker contacted Former Director about the parents' concerns and request for a different placement.

383.    Former Director is unsure whether he reached out to the parents or if he chose to cover it all at the upcoming IEP meeting.

384.    At the March 2024 IEP meeting, parents requested to talk about what programming was available at other placements.  Former Director explained the change in placement process: exhausting all services at the current placement and then looking at other options including having Student's teachers observe the other placement(s) and the other placement(s)' teachers observe Student.

24-034587
**Page 57**

385.    Former Director was concerned that there was no FBA done, so he wanted to accomplish this.  The team had not felt that behavior was the roadblock to the Student's success in January and February 2024.  If a change in placement was being considered, an FBA was required.

386.    Former Director explained what an FBA was, what was required, and how long it would take.  The parents asked for it be completed in a day, and Former Director told the parents that it could not be done in one day; he would have told them that it could take up to six weeks but that they could expedite that process.

387.    Former Director requested consent for the FBA.  The parents did not sign the consent at the IEP meeting.  This created a standstill since the change in placement process that the parents were seeking required an FBA.  It was also unclear whether the Student was going to return to school.

388.    The parents requested a trial ASD placement at the IEP meeting and at a follow up meeting.

389.    Former Director discussed seclusion with the parents at the remote meeting that occurred on March 8, 2024.  At that meeting, Mother reported that there was a doctor's note and Mother then provided that note to Former Director.

390.    Mother reported that she would sign the FBA release on March 11, 2024 (Ex. Q).  Mother and Former Director signed that FBA on that date (Ex. 38).

391.    Former Director reached out to the Student's doctors.  He spoke with two of them on the phone.  He was unable to contact the third doctor despite leaving several messages – she never called back.  Former Director memorialized his conversations with the physicians in Ex. 31.

392.    Former Director told Student's advocate that Mother could not come to school with the Student.  Former Director was unable to guarantee that seclusion and restraint would not be used.

393.    Former Director suggested the option of using summer school as a trial placement for the Student in the ASD classroom.

394.    On April 10, 2024, Former Director told the parents that he wanted the Student to return to school and to develop a plan for the Student's return.

Resource Room Teacher (Resource Teacher)

395.    Resource Teacher has a master's degree in special education.  She has been a resource room teacher for one-and-a-half years.  She has been in education for 21 years.  She taught general education, first and second grades and young fives for approximately 20 years.

396.    Resource Teacher met with parents remotely prior to the 2023-2024 school year commencing.  Student also came into the school a few times before the school year, and she met Student during one of the summer visits.

24-034587
Page 58

397.    Resource Teacher started the 2023-2024 school year using the outdated prior IEP.  Student started on a shortened day at parents' request so that Student could attend an ABA therapy program.

398.    School starts at 8:45 a.m.  Student initially stayed through 11:00 a.m. Student spent about 30 minutes a day with Resource Teacher; the rest of his day was in the general education classroom.  Student had a one-on-one paraprofessional during the general education time.

399.    Initially, Resource Teacher started by doing push-in work with Student in the general education classroom.  Resource Teacher then worked with Student (and Student's reading group) on reading in the special education classroom.

400.    Resource Teacher was working with Student on letters, sounds, and eventually three-letter words.

401.    Resource Teacher observed Student in the general education classroom. Student initially was comfortable in both the general education and special education (resource) classrooms.  Student initially did well working with peers although he did not often seek out peers.

402.    Resource Teacher gathered data on Student during the first few weeks she was working with him.  Student came to first grade knowing all the names of the letters and was working on understanding their sounds.

403.    OT and Teacher were working with Student on writing.

404.    Resource Teacher created Student's reading goal and objectives: recognizing letters' names and sounds.

405.    Student was able to name the letters with 100% accuracy and 88% accuracy of their sounds in October 2023.  Student was able to articulate the letters' sounds in December 2023.

406.    Student participated in and responded appropriately to Resource Teacher's instruction in the fall of 2023.  Student's time in school increased over the course of the fall semester: through about 1:00 p.m.

407.    Resource Teacher saw Student and Mother walk into the December bowling field trip but did not interact with them during that time.

408.    Student was using the bathroom more often in November or December of 2023.  At times, the Student was in there for extended periods.  Resource Teacher reached out to parents who indicated that they would discuss appropriate usage of time in the bathroom.

409.    After winter break, Student did not want to come to school and did not want to go the general education classroom.  Mother also started attending school with Student.

410.    After winter break, Resource Teacher had difficulty even having a chance to work with Student.  When she was able to work with Student, it was in the

24-034587
Page 59

resource room classroom.  Mother would walk with Student to the classroom. Initially, Mother would wait in the hallway or an adjoining classroom.

411.    Student refused to attend the general education classroom.

412.    Having mother nearby did not help Student focus on his work.  Resource Teacher believed that she had a good relationship with Student.

413.    Resource Teacher reported Student's progress on his reading goals. Student had achieved his letter sounds with 90% accuracy on objective one and was progressing as expected ("wonderfully") on objective two of letter sounds.

414.    Student had difficulty with the nonsense word test (Ex. L).  Student initially did okay in November but his scores slipped and decreased significantly in February.  There were many times when no data was able to be collected.

415.    Resource Teacher tried to make some adjustments to the Student's reading strategies but it was becoming increasingly difficult to get the Student to attend class.

416.    After winter break, it became difficult for Student to participate in the classroom.   Student was engaging in mimicking and shouting behaviors in groups of other students.

417.    Student told Resource Teacher, "I like you, I don't want to go dead."  This concerned Resource Teacher, and she spoke with a colleague who in turn spoke with Mother.   Resource Teacher tried to make Student as comfortable as possible.

418.    Resource Teacher started working with Student one-on-one.  Resource Teacher worked with Student every day that Student attended school and continued to provide the Student with the resources and supports on his IEP.

419.    Student achieved his reading goals on February 28, 2024.  Student knew the names and sounds of the letters.

420.    Resource Teacher reported Student's new reading proficiencies in his March 2024 IEP (Ex. F).  Resource Teacher decided not to have another reading goal because Student had achieved his first grade reading goal and Student was working on grade level appropriate material.

421.    Student never refused to work with Resource Teacher, but it would sometimes take time to get to the work by doing preferred activities first.

422.    Student's special education minutes increased in the March 2024 IEP – from a high of 300 minutes a week to 1200 minutes.  The low end remained 150 minutes.  Student could have returned to the general education classroom if he became able to do so.

423.    Resource Teacher believes that in March 2024, Student was unable to remain in the general education classroom but was able to remain at Elementary School in the resource room/special education classroom as the Student's LRE.

424.    Student was using the bathroom a couple of times day starting in November or December 2023.  Resource Teacher is unsure how often Student was using the bathroom while he was in the general education classroom.

425.    Resource Teacher emailed Mother in November 2023 about Student using the restroom more often.

426.    Resource Teacher did not tell Mother about her opinion that her staying in the hallway was not helping the Student.  She does not believe that Mother's attendance was harming the Student.

427.    Resource Teacher wanted Student to have success in the resource room so that they could transition the Student back to the general education classroom.

428.    Respondent's goal was to increase the Student's resource room time to eventually increase the Student's general education classroom time.

<u>Paraprofessional</u>

429.    Paraprofessional was working at Elementary School and worked with Student during the 2023-2024 school year.  She worked with Student starting the second week of school and worked with Student through December 2023. Paraprofessional did not work with Student after the winter break.

430.    Paraprofessional started tracking Student's bathroom use in a notebook where she keeps for personal notes.  She would note the day and time that Student went into the bathroom as well as how long he was in the bathroom. She also took notes on the other student that she was working with.

431.    At the end of the 2023-2024 school year, Paraprofessional recycled the notebook since she no longer needed it.

432.    Paraprofessional shared the information about how long the Student was in the bathroom with Resource Teacher and Teacher.

433.    Student was taking longer and longer in the bathroom.  Paraprofessional thought that Student was using the bathroom as a break.  Students with autism become overwhelmed in the classroom.  Paraprofessional wanted to see if there was a pattern of when Student might need a break and to see if staff could encourage to communicate his needs and have Student take a break in a more constructive way than in the bathroom.

434.    Student would stay in the bathroom between 5 and 10 to 20 minutes: less than 30 minutes.  Paraprofessional would take Student for a walk, so the Student was using the bathroom in the hallway.

435.    Student also used the bathroom in the first-grade classroom.

436.    Staff offered other breaks which the Student sometimes used, but the bathroom issue was ongoing through the winter break.

24-034587
Page 61

Social Worker

437.  Social Worker has a master's degree in social work which she earned in 2001.  She is currently employed by Respondent and has been since the start of the 2002-2003 school year.  She has been a social worker since 1992 when she received her undergraduate degree in social work.

438.  Social Worker met the parents at meetings in August 2023 to prepare for the Student's needs and ensure that the supports were in place for the Student's transition to Elementary School.  Student walked through Elementary school over the summer and was able to meet his teachers and providers.  Social Worker gave Student a social story complete with pictures for Student's day.

439.  Social Worker met with Student's ABA providers.  They shared information about the Student's preferences (Ex. T).  When Social Worker learned that Student liked to use a trampoline and flags, Elementary School purchased a trampoline, a book of flags, and mat for Student to take breaks.

440.  Social Worker never told parents that there was no seclusion room at Elementary School.  There is a seclusion room at Elementary School.  Social Worker does not lie to parents.

441.  Every classroom at Elementary School has a calming space.  Elementary School received a grant to create those calming spaces.  Teacher used a tent for the first-grade classroom.

442.  The seclusion room at Elementary School is in the behavioral resource room.  It is for emergencies only if a student is at risk of harming themselves, other students, or staff members.

443.  Student never exhibited escalated behavior prior to the winter break.

444.  Social Worker decided that Student would be best placed in the first-grade based on the Student's level of functioning, the Student's anxiety, and the Student's size.  It is important for early elementary students to be with classmates of roughly the same size and abilities.

445.  Elementary School never required Student to leave early: this was the parents' choice.

446.  Student's support time included all the Student's teachers and providers and the Student's parents.

447.  Parents told providers that Student likes to check off items as he completes them.  Social Worker created checklists for the open house and the daily schedule to help him and reduce his anxiety.  There was a daily visual schedule of Student's schedule each day.

448.  Student did not have any aggressive behavior during the first 13 days before the Student's September 2023 IEP.  Parents reported aggressive behavior at the prior school, but that was not seen at Elementary School initially.

24-034587
Page 62

449. Social Worker monitored Student's social-emotional goals and provided services in support of that goal.

450. In September 2023, Social Worker provided 20 to 35 minutes of social work services once or twice per week. The prior IEP (Ex. A) had 20-30 minutes of social work services two to four times per month, so Student received additional time at Elementary School compared to the prior year at the other district.

451. On December 3, 2023, Social Worker notified parents about the Student using the bathroom more frequently (Ex. V). There was a meeting with staff and parents about the Student's needs, including this issue. Staff planned to address this issue by introducing a social story about using the bathroom and re-teaching how to take a break.

452. On December 15, 2023, Social Worker responded to Mother's email that Student refused to attend school by asking how staff could help, including starting in the office. This was the first instance of Student exhibiting school avoidance behavior.

453. Student did attend school on December 15, 2023, went right to speech therapy, and seemed to be doing well.

454. Social Worker reached out to Mother at the end of winter break to see how staff could help. Mother reported that they were working with Student's psychiatrist on Student's medication. Mother also reported an incident of aggression.

455. Student did not go to the general education classroom upon return from winter break.

456. Mother proposed the shortened day for Student in the conference room. Ex. V.

457. Elementary School staff were able to get Student into the general education classroom the first week back after winter break with support from both Paraprofessional and Social Worker.

458. Social Worker is unsure of the cause of Student's increased behavioral issues.

459. Students with disabilities do often have increased behavioral issues following long breaks.

460. Mother was attending school with Student daily starting in mid-January 2023. Mother was present in the conference room for Student's instruction during at least some of the time (Ex. V p. 27 and 28).

461. Social Worker kept case notes on her interactions with Student (Ex. J). She also keeps a progress monitoring chart.

462. Parents received the progress notes on all of Student's goals (Ex. I). Parents never asked for data in support of those progress notes.

24-034587
Page 63

463.     Social Worker reported on November 15, 2023, that Student was progressing as expected on both of his objectives on the social-emotional/behavioral goal.  On March 4, 2024, Student was progressing as expected on identifying scenarios where calming/coping strategies would be needed but had limited progress on practicing and demonstrating those techniques.  Student was able to use calming strategies but had difficulty generalizing them to situations outside of the therapy sessions.

464.     Student engaged with Social Worker and participated in the sessions in the fall of 2023.  These were one-on-one sessions focused on calming strategies.

465.     Student disassociated at Elementary School after winter break.  This happened in both OT and in the resource room; Social Worker was called to assist when this happened.

466.     Social Worker reported the two incidents to Mother, who was present at Elementary School.  Mother was not surprised and said, "he does that sometimes."

467.     Disassociation is not common with autistic students.

468.     Social Worker set up a February 13, 2024 meeting in response to parents' request to meet with Former Director.  The meeting did not happen on February 13th: instead there was an IEP two weeks later.

469.     Principal reported to Mother that staff wanted to work on having the Student attend without Mother present.  Student was no longer needing to check-in with Mother after each service.

470.     On February 20, 2024, Social Worker created a schedule for Student for the rest of that week (Ex. P).  Social Worker was working on weaning the Student away from being with Mother at school.

471.     Student was refusing to go to the general education classroom.  Social Worker was working on getting the Student back into general education.

472.     Mother was in the office or outside of providers' rooms.  Mother had negotiated with Student and promised to be outside of classrooms.

473.     On February 27, 2024, Mother reported to Social Worker what she had negotiated with Student.

474.     The Student's elopement was about the Student's backpack.

475.     Social Worker tried to make Student's schedule as consistent as possible.

476.     Social Worker was in the school when Student eloped.  Social Worker followed Mother and Student outside.  Student was upset about the choices he was given about where he could keep his backpack.  In the office, Student argued with Mother.  Mother tried to stop Student from leaving the office and school, but Student was able to leave.

477.     Social Worker and another staff member observed Mother working with Student and bringing Student back into Elementary School.

24-034587
Page 64

478.    The March 2024 IEP (Ex. F) increased Student's social work time to 20 to 50 minutes for one to five sessions per week.

479.    There was a second significant behavioral event in March 2024. Student was working with a paraprofessional in Social Worker's office. Although not initially present, Social Worker went into the office during the behavioral incident. Student was agitated, had taken a picture off the wall, broken it, and was trying to break the window.

480.    Social Worker and Principal agreed that Student could harm himself.

481.    Social Worker told Mother about the issue, her concern, and that seclusion was going to be needed; Social Worker explained the seclusion protocol to Mother. Mother agreed.

482.    Social Worker and Principal transported the Student using CPI to the seclusion space. Social Worker was having trouble catching her breath, so a paraprofessional took over for Social Worker getting Student to the seclusion room. Social Worker went to an empty room to catch her breath.

483.    Social Worker met remotely with Principal and Former Director and Mother. Former Director discussed getting releases for Student's medical team. Principal addressed Mother's language in the classroom.

484.    Student never returned to Elementary School following the seclusion incident.

485.    There was another meeting with the advocate and the Elementary School team members.

486.    Social Worker was disappointed when she received the Due Process Complaint. The Elementary School has a great team and she believed that she had a good working relationship with both Student and the family. Student made a video in February 2023 about a snow man for Social Worker because Social Worker likes snow men.

487.    Social Worker does not believe that Elementary School did anything wrong implementing the services for the Student.

488.    Social Worker believes that the family had issues with Respondent's administration rather than the service providers. The meeting between parents and Former Director and Principal was heated. Social Worker does not believe that the family was upset with the services that were provided to Student.

489.    Social Worker also did progress monitoring for Student each month.

490.    Social Worker met with Student's teachers about the increasing frequency of bathroom breaks. They created a plan to address the issue. There was a social story about using the bathroom and how to take breaks. Teacher also got a separate tent specifically for Student. There was also a meeting with the parents about the issue.

**24-034587**
**Page 65**

491.    There are many triggers for behavioral episodes.  Social Worker is unsure of the cause of Student's increased behaviors.  An FBA helps to determine causes of behaviors and might have helped the providers understand Student's behaviors after winter break.

492.    During the transport to seclusion, Student was not resisting.  It was a safe transfer to the seclusion room.

493.    Social Worker started in the ASD classroom at Elementary School before she became the full-time social worker.  Social Worker received Statewide Autism Resources and Training (START).

494.    Social Worker is not familiar with any literature on the frequency of dissociation in autistic children.

**24-034587**
**Page 66**

## <u>PROOF OF SERVICE</u>

I certify that I served a copy of the foregoing document upon all parties and/or attorneys, to their last-known addresses in the manner specified below, this 24th day of March 2025.

*P. Moore*
_____
**P. Moore**
**Michigan Office of Administrative**
**Hearings and Rules**

<u>**VIA ELECTRONIC MAIL:**</u>



EAST LANSING PUBLIC SCHOOLS
501 BURCHAM DR
EAST LANSING, MI 488232750
**PRECIOS.ARMSTRONG@ELPS.US**

ELIZABETH ABDNOUR
JACQUELYN N KMETZ, ESQ.
MEGAN N. MITCHELL
ABDNOUR WEIKER, LLP
325 E GRAND RIVER AVE
STE 250
EAST LANSING, MI 48823
**LIZ@EDUCATION-RIGHTS.COM**
**JACQUELYN@EDUCATION-RIGHTS.COM**
**MEGAN@EDUCATION-RIGHTS.COM**

CATHLEEN M. DOOLEY
ERIN WALZ
MICHELE R. EADDY
THRUN LAW FIRM, P.C.
PO BOX 2575
EAST LANSING, MI 48826-2575
**CDOOLEY@THRUNLAW.COM**
**EWALZ@THRUNLAW.COM**
**MEADDY@THRUNLAW.COM**

PRECIOUS BOONE
MDE OFFICE OF ADMINISTRATIVE LAW
PO BOX 30008
LANSING, MI 48909
**MDE-ADMINLAW@MICHIGAN.GOV**

BETHANIE EGGLESTON
DUE PROCESS COORDINATOR
MDE-OFFICE OF SPECIAL EDUCATION
PO BOX 30008
LANSING, MI 48933
**EGGLESTONB1@MICHIGAN.GOV**