

# EXHIBIT 6

GRETCHEN WHITMER
GOVERNOR

STATE OF MICHIGAN
**DEPARTMENT OF EDUCATION**
LANSING

MICHAEL F. RICE, Ph.D.
STATE SUPERINTENDENT

August 30, 2024

Dori Leyko, District Superintendent
East Lansing School District
501 Burcham Dr
East Lansing, MI 48823-2798

Rich and Christi Henke
1895 Melrose Ave
East Lansing, MI 48823

Re: Special Education State Complaint 24-0172

Dear Parties:

Enclosed is a copy of the final decision for state complaint 24-0172, which was filed by Rich and Christi Henke (Complainant) against East Lansing School District (District) on July 2, 2024.

**State complaint procedures do not allow for an administrative appeal or reconsideration of a state complaint final decision. The procedural safeguards, which you received at the beginning of the state complaint process, outline options that may be available to you.**

Please direct questions regarding this state complaint to Chantel Mozden at 517-241-6299 or mozdenc@michigan.gov. All correspondence should be clearly marked as pertaining to state complaint 24-0172.

Sincerely,

*Chantel Mozden*

Chantel Mozden, Supervisor
Program Accountability
Office of Special Education

Enclosures [complainant's copy only]

STATE BOARD OF EDUCATION

PAMELA PUGH – PRESIDENT • ELLEN COGEN LIPTON / TIFFANY D. TILLEY – CO-VICE PRESIDENTS
JUDITH PRITCHETT – SECRETARY • MARSHALL BULLOCK II – TREASURER
MITCHELL ROBINSON – NASBE DELEGATE • TOM MCMILLIN • NIKKI SNYDER

608 WEST ALLEGAN ST • P.O. BOX 30008 • LANSING, MICHIGAN 48909 • WWW.MICHIGAN.GOV/MDE • 833-633-5788

Complaint 24-0172
Page 2
August 30, 2024

cc:   Nick Hamilton
      Andrew Rable, Crystal Cutler
      Jason Mellema
      Greg Molenda
      Megan N. Mitchell



**MICHIGAN**
Department of **Education**

OFFICE OF SPECIAL EDUCATION
SPECIAL EDUCATION COMPLAINT INVESTIGATION REPORT

**Complainant:**                                    **Case Number:** 24-0172
Rich and Christi Henke
1895 Melrose Ave
East Lansing, MI 48823

**Public Agency:**                                **COMPLAINT DECISION**
Michigan Department of Education                    **AND**
Office of Special Education                         **PLAN FOR**
Chantel Mozden, Supervisor                      **CORRECTIVE ACTION**
Program Accountability
608 West Allegan
PO Box 30008
Lansing, MI 48909

**District:**
Dori Leyko, District Superintendent
East Lansing School District
501 Burcham Dr
East Lansing, MI 48823-2798

**Case Manager:**
Jennifer Feaster

**Date of Decision:**
August 30, 2024

On July 2, 2024, the Michigan Department of Education Office of Special Education (MDE OSE) received a special education state complaint filed by Rich and Christi Henke (Complainant) on behalf of Patrick Henke (Student). The state complaint alleged that East Lansing School District (District) violated the *Individuals with Disabilities Education Act* (IDEA) and/or the *Michigan Administrative Rules for Special Education* (MARSE).

Pursuant to the 34 CFR §§300.151 through 300.153, the OSE investigated the allegations in this state complaint. Consistent with the IDEA and the MARSE, MDE issues the following state complaint final decision.

**Complaint Issues:**

1. Whether the District provided the Student a free appropriate public education (FAPE) pursuant to 34 CFR §§300.17 and 300.101. Specifically:

   i.  Whether the special education programs and related services and supplementary aids and services were provided in conformity with the Student's individualized education program (IEP), pursuant to 34 CFR §§300.17(d), 300.320, and R 340.1722(3).

    ii.    Whether the District reviewed and revised the IEP to address the Student's unique educational and behavioral needs and enable the Student to be involved in and make progress in the general education curriculum consistent with the least restrictive environment provisions pursuant to 34 CFR §§300.320, 300.324, 300.114 through 300.117, and R 340.1721e(4).

**Investigatory Process:**

Documents reviewed include:

The original state complaint document.
Documentation provided by the Complainant.
The District's response to the complaint.
Documentation and educational records submitted by the District.

The following individuals provided information via an interview or questionnaire:

Complainant.
School social worker.
General education teacher.
Special education teacher.
Principal.
Occupational therapist.
Speech therapist.
Teacher consultant.
Special education supervisor.

The OSE provided the District and Complainant the opportunity to submit additional information for consideration during the investigation of this state complaint.

**Applicable Federal Regulations or State Rules:**

| | |
|---|---|
| 34 CFR §300.17 | Free appropriate public education |
| 34 CFR §300.101 | Free appropriate public education (FAPE) |
| 34 CFR §300.114 | Least restrictive environment requirements |
| 34 CFR §300.115 | Continuum of alternative placements |
| 34 CFR §300.116 | Placements |
| 34 CFR §300.117 | Non-academic settings |
| 34 CFR §300.320 | Definition of Individualized Education Program |
| 34 CFR §300.324 | Development, review, revision of Individualized Education Programs |
| R 340.1721e | Individualized education program |
| R 340.1722 | District responsibilities |

**Relevant Time Period:**

Pursuant to 34 CFR §300.153(c), the OSE has the authority to investigate allegations of violations that occurred not more than one year from the date the state complaint was received. In light of this limitation, the investigation will be limited to the period of time from July 3, 2023, to July 2, 2024, for the purpose of determining if a violation of the IDEA and/or the MARSE occurred. However, records beyond this time frame may be reviewed, as needed, to complete a thorough investigation.

**Findings of Fact:**

1. As of the filing of this complaint, the Student was a seven-year-old first grader who was eligible for special education and related services as a student with autism spectrum disorder.
2. A September 13, 2023 annual IEP included the following relevant information:
   i. Parent concerns: The Parents were happy with the Student's adjustment to the school, but still wanted the Student to be on partial days and were interested in adding more time to the Student's school day. The Parents were concerned about what might happen if the Student displayed heightened emotions during the school day.
   ii. Current evaluations: Fall 2023 District assessments indicated the Student was in the high-risk category for early literacy skills and was below grade level in math.
   iii. Areas of need:
      a. Reading: Letter sound identification and blending and chunking consonant-vowel-consonant words.
      b. Social-emotional/behavioral: The Student followed school routines and rules, had consistent adult support since starting first grade, showed some resistance to school situations, but could process and comply with requests. The Student did not show any aggressive behaviors during the first 13 days of school. In the previous IEP, the Student lacked skills in the areas of emotional regulation and behavior management, which led to physical aggression and destruction of property. Parents chose to send the Student for half days.
      c. Communication: Pragmatic language skills. The Student required support to help engage and socialize with peers.
      d. Perception/motor/mobility: Visual motor skills. The Student had difficulty grasping a writing tool, which reduced the legibility of written work.
   iv. Special factors: Positive behavior interventions and supports were indicated.
   v. Supplementary aids and services:
      a. Adult support for learning, socialization, and safety.
      b. Frequent breaks after long periods of work completion or when agitated.
      c. Seating arrangements that matched the Student's needs.
      d. Repeated directions to ensure understanding.
      e. Extra time to answer questions and formulate responses.
      f. Teacher consultant services for students with autism: One to two times per month for 20 minutes, to address behavioral, social, or academic needs.
   vi. Goals:
      a. Reading: Letter sound identification.
      b. Perception/motor/mobility: Production of writing.
      c. Social-emotional: Identification of when calming strategies were needed and able to be used in the school setting.
      d. Communication: Pragmatic language skills.
   vii. Programs and services:
      a. Program: Elementary- or secondary-level resource program, 150–300 minutes weekly. General education time indicated 1,585–1,735 minutes weekly.
      b. Services:
         1. School social work, 20–35 minutes, one to two sessions weekly.
         2. Occupational therapy, 25 minutes, three sessions monthly.

3. Speech and language, 25 minutes, four to five sessions monthly.

    viii. Notice regarding the provision of special education indicated options considered and reasons not selected:

        a. Parents considered not adding more time to the Student's school day: The Student was adjusting and responding positively. Parents determined time would slowly be added to the Student's school day, but the Student would attend outside therapy on Friday afternoons until further notification.

        b. Need for assistive technology devices and services: The Student did not demonstrate a need.

3. A November 15, 2023 IEP progress report included the following relevant information:

    i. Reading: Achieved one objective, and progressed as expected on another.

    ii. Perception/motor/mobility: Progressed as expected.

    iii. Social-emotional: Progressed as expected.

    iv. Communication: Progressed as expected.

4. Interviews included the following relevant information:

    i. Parent:

        a. At the September 2023 IEP Team meeting, the Parent decided not to send the Student to school for the entire day, but slowly added time to the Student's day. The Student attended school daily until 1:00 and received outside therapy on Friday afternoons.

        b. By December 2023, the Student's behaviors began to change. The Student started taking more breaks, spent up to an hour in the bathroom, and fell asleep on one occasion while in the bathroom.

        c. Due to the Student's anxiety and longer winter break, the Student refused to go to school. The Parent contacted the school, and the District agreed to allow the Parent to attend school with the Student daily. The Student attended school from 8:50 to 10:30 daily with the Parent, and was provided services by special education providers, but was no longer with general education peers.

        d. The Parent reported District staff and the Parent agreed the reduced day was best and the goal was to get the Student back to where the Student was before.

    ii. District:

        a. District staff consistently reported the Student made good progress before winter break and eventually the Student was staying at school until 1:00 daily.

        b. The general education teacher and the special education teacher reported following the Student's supplementary aids and services within the Student's IEP and the following additional support was provided: Walking and bathroom breaks, paraprofessional support, a designated workspace on the rug or a table, instruction in small groups, repeated directions, wait time, and ensured positive peers were around the Student. The special education teacher also reported meeting weekly with the teacher consultant throughout the school year to discuss student needs, including the Student's needs.

        c. The general education teacher reported not being the primary person responsible for documenting the supplementary aids and services, the special education teacher reported not documenting when supplementary aids and services were provided, and the principal indicated not having a system in place for documentation.

    d.  The general education teacher reported the Student met daily with the special education teacher and received support from the speech therapist, school social worker, and occupational therapist. The teacher consultant was also available as needed.

    e.  District staff reported the Parent reached out to the school social worker preceding the Student's return from winter break, indicating the Student was anxious and did not want to attend school. The Student was starting to elope at home, and the Parent was worried the Student would elope while at school, and the Parent requested to accompany the Student to school, to which the District agreed.

    f.  District staff reported when the Student first returned, the Parent went to the general education classroom with the Student for the first couple of days, but the Student did not want to go. The Parent stayed with the Student while at school until 10:30 or 11:00 daily, and would then take the Student home. The Student was provided with services from the Student's providers.

    g.  District staff consistently reported the Parent's attendance at the school made it more difficult for the Student. While the Parent had the Student's best interest in mind, the Parent would make changes to the Student's schedule and would negotiate with the Student for compliance, which made it more challenging.

5.  In a February 9, 2024 email, the Parent told the school social worker the Parent was not sure what to do about the Student's school refusal and did not think the Student would willingly go with anyone the following week. The year had become a repeat of the Student's developmental kindergarten school year, when the Parent had to pull the Student in March. The Parent wanted to keep the Student in school but was not sure how. The Parent asked to meet with the school social worker and the principal.

    i.  The school social worker responded and could meet anytime with the Parent and principal, and suggested including the special education supervisor. The school social worker hoped to start the Student's new schedule, wanted to work with the Parent to make it work, and provided the following schedule:

        a.  8:45: Paraprofessional in general education classroom.
        b.  9:00: Resource program.
        c.  9:30: Speech.
        d.  9:45: School social worker in general education classroom.
        e.  10:00: Resource program.

6.  In a February 12, 2024 email, the principal shared the following information:

    i.  The principal thanked the Parent for flexibility and support as the District helped to increase the Student's time at school. A support plan would be developed for Wednesday and Thursday of that week and would be shared with the Parent the next day.

    ii.  While the Parent was a big support for the Student the last few weeks, the District believed the Student should attend without the Parent's constant support. Although the Student was not experiencing the same level of success as the first half of the year, the Student was showing some progress in recent weeks, even if it was just attending in small groups or individual sessions with the special education providers.

    iii.  If the Parent still wanted to be present at school, the Parent was welcome to stay in the office, and an office check-in could be built into the Student's schedule to reassure the Student the Parent was still there.

      iv.  The special education supervisor would reach out to the Parent in the next week to discuss other options that might exist to support the Student.

           a.  The Parent thanked the principal for the email, and said the Student had a good day, transitions were smooth, and that the Student did not look for the Parent. The Parent also indicated the Student had a seizure that evening and wanted to provide an update, since the Parent had previously reported the Student only had seizures during sleep. The Parent indicated an action plan was on file, but clarified to District staff what should be done if the Student had a seizure at school.

7.  In a February 13, 2024 email, the school social worker shared the Student's schedule with the Parent, and would review it with the Parent the next day:

      i.  9:00 to 9:30: Special education teacher.
      ii.  Check in with the Parent.
      iii.  9:30: School social worker.
      iv.  Check in with the Parent.
      v.  9:45: Speech therapist.
      vi.  Check in with the Parent.
      vii.  10:00: Special education teacher.

8.  A February 27, 2024 behavior log indicated the Student refused to comply with directions, lay on the floor in the hallway, and ran to the office where the Parent was located. When the Parent asked what was wrong, the Student eloped from the building. The Parent was able to stop the Student and decided to take the Student home for the remainder of the day.

9.  A series of emails from February 27 through February 28, 2024, included the following relevant information:

      i.  The school social worker emailed the Parent about the Student's day and explained the Student's behavior was about the backpack, and that it would be best to leave the backpack in the cubby. The school social worker provided the Student's schedule for the next day:

           a.  8:55: Greet and check in with the special education teacher.
           b.  9:00: Math with the paraprofessional.
           c.  9:45: School social worker/check in with the Parent.
           d.  10:00: Work with the paraprofessional or general education teacher.
           e.  10:30: Resource program.

      ii.  The Parent responded and indicated the Student's aggression and elopement were the Parent's biggest concern, and expressed worry the Student would try to leave the building and go home. The Parent believed the elopement from school was a signal the Student did not feel comfortable. The Parent further shared the Student started therapy, with separation anxiety as the foremost issue.

      iii.  The principal indicated the Student made improvements as time was slowly added to the Student's day. The day before was a setback, but the District would continue with the same routine and expectations that were successful the past couple of weeks. The principal shared the Parent's concerns regarding elopement and aggression, but the Team had not seen those behaviors while the Student was working with the school staff, and the behaviors happened when the Student was in the office for check-ins. The Student would be offered opportunities to connect with peers while working with District staff, including attending library time with the Student's class. The principal indicated the school social worker had also offered a preferred peer to join the Student during small group sessions, but the Student declined.

      iv.  The Parent wanted the Student to work with a peer and would talk with the Student in advance to prepare the Student to make it easier. The Parent indicated the Student enjoyed the assembly last year and wanted the Student to attend with the class.

10.  A February 28, 2024 IEP progress report included the following relevant information:
      i.  Reading: Achieved/maintained.
      ii.  Perception/motor/mobility: Limited progress/no progress. Notes indicated since the Student returned from winter break, the Student had limited opportunity to engage and did not attend school except to receive special education services.
      iii.  Social-emotional: Progressed as expected on one objective and limited progress on another. Notes indicated the Student could ask for a walk and a bathroom break, and practiced calming strategies in a one-on-one setting, but had not generalized skills outside the therapy session.
      iv.  Communication: Limited progress. Notes indicated the Student came to speech alone for increased safety and engagement with the learning environment.

11.  A March 5, 2024 annual IEP included the following relevant information:
      i.  Student strengths:
          a.  The Student was successful in general education and special education services in the fall leading up to winter break. The Student was engaged in learning, and participated with related services, at times with peers. The Student had lunch and attended recess with peers. Since returning from winter break, the Parent chose to accompany the Student during the school day. In January, the Student's time in school was initially decreased, but time was added back and the Student left school daily at 11:00. The Student's special area classes were scheduled in the afternoon; therefore, the Student did not attend.
          b.  The Student had a medical plan for a seizure disorder. Seizures occurred at night, but recently the Student had a seizure in the evening after the school day.
          c.  The Student was offered a full-day school schedule and started the year with an early Parent pickup to attend outside therapy daily, was then reduced to leaving early on Fridays, and then early departure was eliminated in late November. At that time, the Student was still offered a full day of school, but left daily at 1:00. Before winter break, the Student followed the general education classroom routine and, with support, engaged in the curriculum, often utilizing walking and bathroom breaks to manage emotions.
      ii.  Parent input:
          a.  Lack of progress, since returning in January.
          b.  The Student could not attend without the Parent in the building.
          c.  Elopement and the Student's attempts to run home.
          d.  Lack of peer interaction and not gaining social skills. Interaction in the general education classroom had ceased, and Parents wanted the Student to interact daily with peers, whether through social groups, attending the library with the classroom, or visits to the classroom.
          e.  Anxiety increased related to attending school, and attendance seemed impossible without the Parent present at school.
          f.  Lack of attendance, given the Student missed a significant portion of the day. Parents wanted the Student to ultimately attend special classes and at the time could not even attend recess.
          g.  Increasingly disruptive behavior with support staff and school property.

h. Wanted engagement with the District's teacher consultant for students with autism, as provided in the IEP.
i. The Parents reenrolled the Student in outside therapy, but the goal remained to attend school full time.
j. Regression during the summer break and requested extended summer learning.
k. An overall concern about the Student's placement due the Parents' aforementioned concerns.

iii. Current evaluations: District January 2024 assessment data indicated the Student was 73% proficient when reading, segmenting, or blending consonant-vowel-consonant words independently in the first-grade classroom.

iv. Areas of need and progress on previous IEP goals:
   a. Reading, phonological awareness: The Student achieved the goal and it was no longer an area identified as a need.
   b. Perception/motor/mobility, visual motor needs: Before winter break the Student was averaging 90% towards goal, but since returning from break, progress was minimal. The Student would engage in portions of the occupational therapy sessions weekly, remaining in the area for 15 to 40 minutes each time before withdrawing into a "robot" persona or eloping from the space. The Student required a high level of control over the environment at the time.
   c. Communication, pragmatic language: The Student required maximum prompting with scripted language, and continued work towards this area of need was indicated.
   d. Social-emotional: The Student showed interest in identifying feelings and calming strategies in the therapy setting. Since returning from winter break, the Student was more reluctant to attend general education classes, and to attend school in general without the Parent being present. Until recently, the Student had not engaged in any physical or aggressive behavior. The Student had consistent adult support, relied on adults for cues, voiced resistance to some changes, but overall took processing time and complied with tasks. The Student had not eloped from the building, except recently running to the office, then running from the Parent in the office.

v. Special factors: Communication and positive behavioral interventions and supports were indicated as areas of need.

vi. Supplementary aids and services: Consistent with previous IEP, and medical plan for seizure protocol provided by a physician was added.

vii. Goals:
   a. Perception/motor/mobility, visual motor skills: Engage in visual and fine motor activities to support endurance and legibility.
   b. Communication, pragmatic language: Engage in conversational turn-taking perspective of others and use flexible thinking.
   c. Social-emotional: Consistent with previous IEP with two additional objectives added.

viii. Programs and services:
   a. Program: Elementary- or secondary- level resource program: 150-1200 minutes, weekly. General education time indicated 711 to 1,761 minutes weekly.
   b. Services:
      1. School social work, 20–50 minutes, one to five sessions weekly.

  2.  Occupational therapy, 25 minutes, three sessions monthly.
  3.  Speech and language, 20 minutes, four to five sessions monthly.
  ix.  Other considerations:
  a.  Extended school year services: Due to the Student's difficulty and resistance to returning from breaks from school, the Team recommended extended school year services.
  b.  The Student did not require a shortened school day. Parents were choosing to shorten the day so the Student could attend outside therapy each day.
  c.  The Team would collect data over the next few weeks to determine current learning needs.
  x.  Notice regarding the provision of special education and options considered, but not selected:
  a.  Parents considered not adding more time to the Student's school day: The Student was adjusting and responding positively to the school routine, until returning from winter break. Parents agreed to slowly add time, and the Student was currently attending until 11:00. Parents chose to have the Student attend outside therapy daily in the afternoons until further notice. The whole Team wanted the Student to continue to add time and stay for both recess and lunch.
  b.  Need for assistive technology: The Student was able to utilize technology in the classroom to access the curriculum.
  c.  District signed notice on March 7, 2024.
12.  During interviews, the following relevant information was shared:
  i.  Parent:
  a.  The teacher consultant was never engaged or involved with the Student, and the Parent was frustrated the consultant's expertise was not utilized to help support the Student.
  b.  During the March 2024 IEP Team meeting, the school social worker indicated forgetting to include the teacher consultant, and the teacher consultant was never utilized or consulted with. The special education supervisor asked to speak with the principal regarding the matter in the hallway during the IEP Team meeting.
  c.  The Parent requested the Student attend the autism spectrum disorder program at the March 2024 IEP Team meeting, but was told by the special education supervisor the Student could not attend this school year. At a subsequent meeting, the Parent was told the Student may be able to attend the autism spectrum disorder program in the summer.
  d.  The District would regularly tell the Parent the District was prepared to keep the Student for a full day; however, would not admit the Student was not being successful.
  ii.  District:
  a.  District staff reported the Parent wanted the Student immediately placed in the autism spectrum program following the March IEP Team meeting. District staff were concerned about the level of verbalization and socialization in the autism spectrum disorder program, and wanted the Student to get back to where the Student was functioning before winter break.
  b.  District staff reported attempts to get the Student to join the general education classroom, attend library class with peers, and offered to have a peer join the Student in school social work sessions, but the Student was

not interested.

   c. In a questionnaire, the special education supervisor reported the Parent requested a change in programming just before the March 2024 IEP Team meeting, and the Parent agreed to discuss programming at the IEP. At the IEP Team meeting a change of placement was discussed, the Parent was told it was not appropriate at the time, and the District would initiate a functional behavior assessment and behavior intervention plan and follow up with observations from potential service providers. The special education supervisor indicated the Parent was upset regarding the length of time for the process.

   d. In a questionnaire, the special education supervisor reported the teacher consultant services were provided from the start of the school year and were listed as a supplementary aid. The special education supervisor recalled asking why the teacher consultant was not at the March 2024 IEP Team meeting, and the school social worker apologized and said the teacher consultant was not listed as a service provider and forgot to invite the teacher consultant to the IEP.

   e. When asked about the Parent's concern regarding the teacher consultant's involvement, the school social worker indicated forgetting to invite the teacher consultant to the March 2024 IEP Team meeting; however, the teacher consultant provided consultation regarding the Student throughout the year.

13. A March 6, 2024 behavior log indicated the Student did not want to work with the paraprofessional, and the Student's behavior escalated, resulting in items being destroyed. When staff would get close to prevent the Student from striking the window, the Student became physical. The Student was placed in seclusion, and the Student was able to calm down. After eating a snack and taking a walking break, the Student's behavior escalated again when the Student had to wait to work with the special education teacher. The Student eloped from the room and began destroying items in another area. The Student threw scissors, attempted to stab the principal with a pencil, and hit the principal on the head. The Parent requested the Student be signed out for the day.

14. In a March 7, 2024 email, the principal provided the Parent with the seclusion paperwork and requested to meet with the Parent the next day for a follow-up conversation and to discuss a plan for the Student the next week.

   i. The Parent responded and requested the seclusion documentation be amended, requested the Student not be placed in seclusion again, and included a letter from the Student's physician indicating seclusion was not medically sound for the Student. The Parent agreed to a meeting the next day with District staff.

15. A March 7, 2024 medical letter from the Student's physician indicated the Student was being treated for epilepsy, autism, and anxiety and it was recommended the Student not be placed in seclusion, as it could worsen the Student's anxiety. Additionally, the physician indicated the Student may need closer supervision due to a history of epilepsy.

16. In a March 8, 2024 email, the special education supervisor thanked the Parent for the meeting and attached a release of information form so the District could talk with the Student's providers. A consent form for a functional behavior assessment was also attached.

   i. The Parent responded on March 11, 2024, and indicated the releases would be completed that day.

17. A March 11, 2024 consent form, for a functional behavior assessment, was signed by the Parent.
18. Attendance records from March 11 through May 10, 2024, indicated excused absences.
19. A series of emails from March 20 through April 1, 2024, between Parents and District staff included the following relevant information:
    i. March 20: The Parent's advocate requested an IEP Team meeting, which could be scheduled after spring break.
    ii. March 21: The special education supervisor indicated an expedited IEP meeting would be scheduled after spring break.
    iii. March 21: The advocate indicated the Student would return to school on April 2 and wanted to verify the Parent would be allowed to attend with the Student, the functional behavior assessment would begin, and the seclusion room would not be used.
    iv. April 1: The special education supervisor indicated the functional behavior assessment could start as soon as the Student returned to school, and could not guarantee that seclusion would not be used if it was due to safety in an emergency.
    v. April 2: The principal confirmed that an IEP Team meeting was scheduled for April 5, 2024.
20. During interviews, District staff reported a virtual meeting took place on April 5, 2024, with the Parent and District Team to discuss a back-to-school plan, but the meeting turned into a discussion about the Parent's request for the Student to attend an autism spectrum disorder program. District staff reported not having enough data to support a change to the Student's program.
21. A series of emails from April 5 through April 10, 2024, between the Parent and the District included the following relevant information:
    i. April 5: The Parent was disappointed that an alternative placement at one of the District's autism spectrum disorder programs could not occur during the current school year. The Parent indicated being told at the beginning of the school year that the autism spectrum disorder programs would be an option if things did not work out at the school. The Parent requested an immediate transfer to one of the autism spectrum disorder programs and the completion of the functional behavior assessment. The Parent further requested the Student's file include all of the incidents that occurred at the school.
    ii. April 8: The special education supervisor indicated the other classrooms were not off the table during the current school year if it was determined appropriate. The special education supervisor reminded the Parent that what was said in the meeting was that the special education supervisor did not want to trial a program during the school year, but brought up the potential of a trial program over the summer.
    iii. April 8: The Student's other Parent indicated the autism specialist had not observed the Student all year.
    iv. April 10: The special education supervisor attached a summary of the conversations with the Student's medical professionals, indicated wanting to see the Student back in school as soon as possible, and proposed meeting with a smaller group to discuss a return plan. As part of the plan, the special education supervisor indicated the team could discuss documented observations and data collection to support the functional behavior assessment, which would determine the support needed for the Student's present level, goals, accommodations, and the least restrictive environment.

22. An April 9, 2024 letter from the special education supervisor to the Parents regarding communication with the Student's medical providers included the following relevant information:
    i. Purpose: To discuss the Student's medical condition and the implications of seclusion.
    ii. One physician indicated the Parent reported the Student was spending the day in a padded room and needed a letter saying the school should not do that, so the physician followed up to get additional information. It was agreed seclusion should only be used as a last resort.
    iii. The other physician indicated using strategies to prevent the need for seclusion and recommended all attempts be made not to use seclusion, but agreed that it may not be possible when student/staff safety was in question. The physician suggested insight from a behavioral specialist to determine preventative measures.
23. An April 22, 2024 letter from the Parent's attorney to the superintendent included the following relevant information:
    i. The Student had an IEP in place with a one-on-one aide, had a behavior plan, was frequently secluded, was rarely in the general education classroom, and spent time in the special education classroom or the "calm down" room. Additionally, a functional behavior assessment was never completed, despite the Parent's requests.
    ii. The Parent made the principal and school social worker aware at the beginning of the year the Student was sensitive to seclusion due to trauma the Student endured. It was indicated to the Parent that there were no "calm down" or seclusion rooms at the school.
    iii. The family felt good about the Student's placement and the Student attended from 8:45 to 1:00 during the fall, but by December, the Student would spend one hour in the bathroom regularly and on one occasion fell asleep in the bathroom.
    iv. When the Student returned in January, the Student was only able to attend school from 8:55 to 10:30, solely in the special education classroom, and the Parent had to attend with the Student daily. The Student was struggling with anxiety and regularly eloping.
    v. On February 27, 2024 the Student eloped from the school and ended up on a busy intersection, while trying to run home; however, the Parent was able to run out and get the Student from the street.
    vi. On March 5, 2024, the Parent had a three-hour meeting with the special education director and other District staff to discuss the Student's IEP, requested a functional behavior assessment, and indicated the Student would not return to the general education classroom.
    vii. At the meeting, the speech therapist indicated the Student could not be provided services with another peer.
    viii. The Student was only with providers, one-on-one, for the two hours the Student was there. In the last weeks of attendance, the Student would spend the first hour staring out the window, counting cars.
    ix. During the meeting, the Parent asked what the plan was to keep the Student in school, given the doors were open and the Student knew how to run home. An answer was not provided, other than to say the District would try to contain the Student and could not guarantee the Student's safety.
    x. A March 11, 2024 meeting took place with the special education director, principal, and social worker. The Parent was told the District would need to

consult with the Student's physicians regarding the Parent's request for the District to stop using restraint and seclusion with the Student. The Parent was also told the Student would elope without seclusion, would likely respond quickly, and seclusion would not be long.

xi. On April 5, 2024, the IEP Team met, but the IEP Team did not come to a solution regarding the Student's needs. The Parent tried to get the Student moved to one of the District's autism spectrum programs, but the District refused. The District also did not amend the Student's records to include a February 9, 2024 incident when the Student was lost within the school and the Parent ultimately found the Student in a science room cabinet.

24. A letter from the superintendent, in response to the Parent's attorney letter, included the following relevant information:

   i. Alternative placement could be considered after completion of the functional behavior assessment, a behavior intervention plan, data collection, and the recommendation from the IEP Team.

   ii. The Student had a successful first four months of school, and it was only after the District allowed the Parent to sit in the office that the Student's behavior escalated and created a dynamic where the Student would go to the office to interact with the Parent as a way to avoid doing things the Student did not want to do.

   iii. The District wanted the Student to return and would complete the functional behavior assessment, behavior intervention plan, collect data, and make a recommendation for placement. Further, the Team would collaborate with the Parents on a reentry plan so the Student could re-engage with classmates and teachers as the Team evaluated the most appropriate placement.

25. A May 8, 2024 email from the Parent to District staff indicated the Parent was withdrawing the Student from the District; the Student would be homeschooled for the remainder of the school year, and enrolled in a new district in the summer.

26. A District exit form indicated the Student exited from the District on May 11, 2024, and was enrolled in homeschool.

27. A May 14, 2024 email from the building administrative assistant indicated the Student was withdrawn as of May 11, 2024, per the Parent's request.

28. Teacher consultant service logs for the 2023–2024 school year indicated services were provided in the form of "consult/coach/correspondence" for 20 minutes each month from August through May. An additional 60 minutes was indicated in September 2023 for an IEP Team meeting and an additional 60 in April 2024 for a Team meeting.

29. Teacher consultant notes indicated the following relevant information:

   i. September: IEP Team meeting, services added. Looked at extending the Student's day, taking walking breaks on request, and accepting first finish work/then take a break.

   ii. October: Continuing to extend the day, discussed breaks/schedule, and adding math in general education.

   iii. November: Student was staying until 1:00 daily, doing well, and no concerns.

   iv. February: The Parent continued to attend with the Student for shortened days. The Student was not as engaged, but no behaviors other than withdrawn. Discussed engagement strategies.

   v. March: The Student's IEP meeting was held, discussion of property destruction from the day before, attempted to obtain functional behavior assessment consent from Parents and would assist the Team.

   vi. April: Student meeting, longer bathroom breaks, refusal to come to school after

break according to the Parent, documentation of eloping/spending time in the bathroom, Parent indicated a request for a functional behavior assessment, Parent was asked not to come into the school, Parent requested not to use seclusion and restraint, and the Parent wanted a change of placement to an autism spectrum program or emotionally impaired program.

30. Resource program attendance logs for the 2023–2024 school year indicated the Student received services daily, except when the Student was absent, and on September 13, 20, 22, and 29, which indicated a meeting.
    i.   A lesson plan template indicated the Student was scheduled daily from 10:30-11:00.
31. Occupational therapy contact notes for the 2023–2024 school year included the following relevant information:
    i.    August: 25 minutes.
    ii.   September: 120 minutes.
    iii.  October: 60 minutes. An additional session on October 27 was noted, but did not include the service time.
    iv.   November: November 3, 10, 17, and 24 were indicated but did not include time or notes.
    v.    December: 60 minutes. A note indicated the Student arrived late on December 15 and missed the scheduled occupational therapy session. The Student was also noted as absent on December 22.
    vi.   January: 45 minutes. January 12 indicated a snow day and a note indicated the Student only attended two partial days of school the week of January 26.
    vii.  February: 30 minutes. February 2 was indicated but did not include a time.
    viii. March: The Student was noted as absent March 1, 8, and 15. No school was noted on March 22 and 29 due to spring break.
32. A speech therapy document indicated dates the Student was provided with speech services, but did not include times or contact notes:
    i.    September: Four sessions.
    ii.   October: Two sessions. Provider was absent October 6 and professional development was noted on October 13.
    iii.  November: One session. Provider was absent November 3 and professional development was noted on November 10.
    iv.   December: Four sessions. The Student was noted as absent December 22.
    v.    January: Two sessions.
    vi.   February: Four sessions. Provider was absent on February 2, professional development was noted on February 16, and the Student was absent on February 27.
    vii.  March: One session. Professional development was noted on March 8, and the Student was absent on March 15.
    viii. April and May: The Student was noted as absent and withdrew on May 8.
33. School social work service logs indicated dates the Student was provided with school social work services, but did not include times or contact notes:
    i.    August: Two, one-on-one sessions.
    ii.   September: Four, one-on-one sessions and two push-in/general education.
    iii.  October: Three, one-on-one sessions and one push-in/general education.
    iv.   November: Four, one-on-one sessions and one push-in/general education.
    v.    December: Two, one-on-one sessions and three push-in/general education.
    vi.   January: Two, check-ins/conference room and three one-on-one sessions.
    vii.  February: Seven, one-on-one sessions.

    viii.  March: One, one-on-one session.

**Conclusions:**

Issue #1i:

1. Free appropriate public education (FAPE) means special education and related services that are provided in conformity with an IEP that meets the requirements of §§300.320 through 300.324. 34 CFR §300.17(d).
2. Consistent with 34 CFR §300.320(a)(4), an IEP must include a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided to enable the child—
    i.  To advance appropriately toward attaining the annual goals;
    ii.  To be involved in and make progress in the general education curriculum in accordance with paragraph (a)(1) of this section, and to participate in extracurricular and other nonacademic activities; and
    iii.  To be educated and participate with other children with disabilities and nondisabled children in the activities described in this section.
3. Each public agency shall provide special education and related services to a student in accordance with the student's individualized education program. R340.1722(3).
4. A review of documentation and interviews demonstrates the Student was provided with resource program and school social work services consistent with the Student's September 2023 and March 2024 IEPs; however, speech and language services and occupational therapy were not provided in conformity with the Student's IEPs.
5. A review of the documentation showed the Student was to receive 25 minutes of speech and language services, four to five sessions each month; however, the Student was not provided with the minimum amount of service time for the months of October, November, and January.
6. A review of the documentation showed occupational therapy services were to be provided for 25 minutes, three sessions each month, for a total of 75 minutes monthly. The Student was provided with occupational therapy services beyond 75 minutes for some of the months, while other months the Student was not provided with the 75 minutes outlined in the IEPs.
7. Although the Parent believed the Student was not provided with teacher consultant services, evidence shows the teacher consultant met with the special education teacher regularly and provided consultation to the District regarding the Student's needs consistent with the September 2023 and March 2024 IEPs. While the District forgot to invite the teacher consultant to the March 2024 IEP Team meeting, teacher consultant services continued to be provided to the Student in conformity with the Student's IEPs.
8. Interviews demonstrated the Student was consistently provided with supplementary aids and services in conformity with the Student's September 2023 and March 2024 IEPs; however, the District failed to document the Student's supplementary aids and services as required; therefore, a procedural violation occurred.
9. Overall, a convergence of evidence demonstrates the Student was not provided with speech and language services and occupational therapy in conformity with the Student's IEPs, and supplementary aids and services were not documented.

Issue #1ii:

1. The term individualized education program or IEP means a written statement for each child with a disability that is developed, reviewed, and revised in a meeting in

accordance with §§ 300.320 through 300.324, and that must include—

    i. A statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided to enable the child to advance appropriately toward attaining the annual goals. §300.320(a)(4).

2. Consistent with 34 CFR §300.324(b)(1)(ii)(A), each public agency must ensure that the IEP Team reviews the child's IEP periodically, but not less than annually, to determine whether the annual goals for the child are being achieved; and revises the IEP, as appropriate, to address:

    i. Any lack of expected progress toward the annual goals described in §300.320(a)(2), and in the general education curriculum, if appropriate.

3. In developing each child's IEP, the IEP Team must consider the strengths of the child; the concerns of the parents for enhancing the education of their child; the results of the initial or most recent evaluation of the child; and the academic, developmental, and functional needs of the child. 34 CFR §300.324(a)(1).

4. In the case of a child whose behavior impedes the child's learning or that of others, the IEP Team must consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior. 34 CFR §300.324(a)(2)(i).

5. Consistent with 34 CFR §300.114(a)(2), each public agency must ensure that—

    i. To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are nondisabled; and

    ii. Special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

6. Each public agency must ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services. 34 CFR §300.115(a).

7. In determining the education placement of a child with a disability, each public agency must ensure that in selecting the least restrictive environment (LRE), consideration is given to any potential harmful effect on the child or on the quality of services that he or she needs; and a child with a disability is not removed from education in age-appropriate regular classrooms solely because of needed modification in the general education curriculum. 34 CFR §300.116(d)(e).

8. In providing or arranging for the provision of nonacademic and extracurricular services and activities, including meals, recess periods, and the services and activities set forth in §300.107, each public agency must ensure that each child with a disability participates with nondisabled children in the extracurricular services and activities to the maximum extent appropriate to the needs of that child. The public agency must ensure that each child with a disability has the supplementary aids and services determined by the child's IEP Team to be appropriate and necessary for the child to participate in nonacademic settings. 34 CFR §300.117.

9. To be sure, disabled students cannot be removed from regular classes unless "the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." But this does not say that schools must actually try supplementary aids and services before removing children from regular classes. Instead, the IEP Team must simply look into whether supplements could be used instead of separate schooling. *Letter to Estavan*, Feb. 7,

1997 (OSEP) (cited in I.L. by *Taylor v. Knox County Bd. of Educ.*, 257 F.Supp. 3d 946, 3:15-cv-558, (USDCED Tennessee 2017)).

10. Documentation and interviews demonstrate the September 2023 IEP was developed to address the Student's needs in reading, social-emotional, communication, and visual-motor skills. Supplementary aids and services, including adult support and teacher consultant services for students with autism, were provided. Goals were developed in each area of need, and the Student was provided with school social work, occupational therapy, speech and language, and resource program support. While the District offered a full day of programming, the Parent chose a reduced-day schedule for the Student.

11. Documentation and interviews show the Student spent most of the day in the general education setting, was involved in and made progress in the general education curriculum, and successfully participated in activities with nondisabled peers. The Student followed the school routine and rules, could process and comply with requests, and did not show any aggressive behaviors before the District's winter break.

12. Following the winter break, the Student did not want to attend school, and the District agreed to allow the Parent to attend school with the Student daily. The District made clear the Student was still able to attend for a full day; however, per the Parent's request, a reduced-day schedule was developed for the Student, in collaboration with the Parent, to ease the Student back into the school setting. By March, the Student attended school daily until 11:00.

13. A review of documentation and interviews demonstrates a March 2024 IEP Team meeting was held to review and revise the Student's IEP. The District continued to offer a full-day schedule for the Student, although the Student continued to leave school with the Parent daily at 11:00.

14. Revisions to the March 2024 IEP included an increase in resource program time and school social work services, the Student's medical protocol for seizures was added, and extended school year services were included due to the Student's challenges with returning to school after an extended break. Further, the IEP Team discussed the Parent's request for the Student to be placed in an autism spectrum disorder program. The District determined additional data would need to be gathered, including a functional behavior assessment, behavior intervention plan, and observations, before placing the Student in a more restrictive setting.

15. In determining the educational placement of a child with a disability, the District must ensure that in selecting the least restrictive environment, consideration is given to any potentially harmful effect on the child or the quality of services the student needs, and the student is not removed from general education solely because of needed modification in the general education curriculum.

16. The Student was making progress in the general education setting before winter break. Upon the Student's return from winter break, the District was working collaboratively with the Parent to extend the Student's day, although the Parent's attendance may have played a factor in the Student's progress. Additionally, District staff were concerned the level of verbalization and socialization in the autism spectrum disorder program was limited, and wanted to see the Student get back to where the Student was functioning before winter break. Therefore, the District considered, as required, the possible harmful effects to the Student if moved to a more restrictive setting.

17. In terms of the provision of nonacademic and extracurricular services such as lunch, recess, and other such activities, the District must ensure students with disabilities participate with nondisabled students to the maximum extent appropriate to meet the needs of that child.

18. A review of documentation and interviews demonstrates following the Student's return from winter break, the District made attempts to include the Student in the general education setting, tried to get the Student to attend library class with peers, and offered to have another peer join the Student in school social work sessions; however, the Student would not participate.

19. Overall, a convergence of evidence demonstrates the District reviewed and revised the Student's September 2023 and March 2024 IEPs to address the Student's unique educational and behavioral needs and enable the Student to be involved in and make progress in the general curriculum, consistent with the least restrictive environment provisions.

Overall FAPE:

1. A FAPE means special education and related services that are provided in conformity with an individualized education program (IEP) that meets the requirements of §§300.320 through 300.324. 34 CFR §300.17(d).

2. A free appropriate public education must be available to all children residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled from school, as provided for in §300.530(d). 34 CFR §300.101(a).

3. The implementation mandate does not mean that a district must perfectly implement a student's IEP to provide the student with FAPE. A minor discrepancy between the services provided and the services required under the IEP is not enough to amount to a denial of FAPE. *I.Z.M. v. Rosemount-Apple Valley-Eagan Pub. Schs.,* 863 F. 3d 966, 16-1918 (8th Cir. 2017).

4. Overall FAPE for this Student:
    i. Although the Student attended school on a reduced day, it was at the request of the Parent. The District continued to offer a full-day schedule for the Student.
    ii. Although the Student was provided resource program and school social work services in accordance with the Student's IEPs, speech and language services and occupational therapy were not provided in accordance with the Student's IEPs. However, the Student was making progress prior to winter break and the Student did not return to school after March 11, 2024. The discrepancy between the services provided and the services outlined in the IEPs did not amount to a denial of FAPE.

## Decision:

1. Whether the District provided the Student a free appropriate public education (FAPE) pursuant to 34 CFR §§300.17 and 300.101. Specifically:

    i. Whether the special education programs and related services and supplementary aids and services were provided in conformity with the Student's individualized education program (IEP), pursuant to 34 CFR §§300.17(d), 300.320, and R 340.1722(3).

    **The District did not provide speech and language services or occupational therapy in conformity with the Student's IEPs and did not document the provision of supplementary aids and services. MDE determines a violation.**

    ii. Whether the District reviewed and revised the IEP to address the Student's unique educational and behavioral needs and enable the Student to be involved in and make progress in the general education curriculum consistent with the least restrictive environment provisions pursuant to 34 CFR §§300.320, 300.324, 300.114

through 300.117, and R 340.1721e(4).

**The District reviewed and revised the IEPs to address the Student's unique educational and behavioral needs, consistent with the least restrictive environment provisions. MDE determines no violation.**

**Corrective Action Plan:**

The District must review, revise, and/or develop procedures regarding IEP implementation, as needed, by March 1, 2025 to document and ensure for this and all students:

1. The District is required to provide programs and services in conformity with the students' IEPs.
2. The District is required to document the provision of FAPE, including supplementary aids and services.
3. The District will develop a process to ensure programs and services are provided consistent with student IEPs and supplementary aids and services are documented.
4. Training will be provided to building principals and special education case managers regarding the documentation of the provision of supplementary aids and services. Principals will ensure District staff understand the process. Each principal will develop a procedure for how the documentation process will be monitored.
5. The District will provide OSE with written procedures for documentation, and a summary from each principal regarding how the principal will monitor implementation of the process.

The District must provide professional development by March 1, 2025, for all relevant staff regarding the new procedures.

Evidence of a change in the District's practices must be submitted and verified by the OSE.

Evidence of timely compliance and required submissions for corrective action must be documented in Catamaran.

Please direct questions regarding the state complaint investigation to Chantel Mozden at 517-241-6299 or mozdenc@michigan.gov. All correspondence should be clearly marked as pertaining to state complaint 24-0172.