# EXHIBIT A

## STATE OF MICHIGAN
## MICHIGAN ADMINISTRATIVE HEARING SYSTEM

| | | |
|---|---|---|
| **In the matter of:** | : | **Docket No.** |
| **C.H. and R.H. obo P.H.,** | : | **Case No.** |
| **Petitioners,** | : | **Agency: Department of Education** |
| **v.** | : | **Case Type: ED Sp Ed Regular** |
| | : | **Administrative Law Judge:** |
| **Haslett Public Schools, East Lansing Public Schools, and Ingham Intermediate School District,** | : | **COMPLAINT AND REQUEST FOR A DUE PROCESS HEARING UNDER THE IDEA** |
| **Respondents.** | | |

---

Elizabeth K. Abdnour (P78203)
Megan N. Mitchell (P87213)
ABDNOUR WEIKER LLP
500 E. Michigan Ave, Suite 130
Lansing, MI 48912
(517) 994-1776
liz@education-rights.com
megan@education-rights.com

*Attorneys for Petitioners*

---

## COMPLAINT AND REQUEST FOR
## SPECIAL EDUCATION DUE PROCESS HEARING

### I.  INTRODUCTION

1.      The Supreme Court has repeatedly recognized the importance of education and literacy, explaining, "education prepares individuals to be self-reliant and self-sufficient participants in society." *Wisconsin v Yoder*, 406 US 205, 221 (1972). "In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an

education." *Brown v Board of Education*, 347 US 483, 493 (1954). But that is exactly what defendants have denied Petitioners R.H. and C.H. on behalf of their son, P.H.

2.      Petitioners, by and through undersigned counsel, hereby submit the following Complaint and Request for Special Education Due Process Hearing against Haslett Public Schools (HPS), East Lansing Public Schools (ELPS), and Ingham Intermediate School District (IISD), pursuant to the Individuals with Disabilities Education Act (IDEA), 20 USC 1400 *et seq*. and the Michigan Administrative Rules for Special Education (MARSE), MCL 380.1701 *et seq*.

3.      P.H. is an 8-year-old child who has been eligible for special education services since 2022. Throughout P.H.'s short educational career, Respondents failed to provide services reasonably calculated to allow P.H. to access the general educational curriculum as required by his individualized education plan (IEP) and make appropriate progress in light of his unique circumstances, denying him a free and appropriate public education (FAPE) in the least restrictive environment as required by the IDEA and MARSE.

## II.    JURISDICTION

4.      MDE and the Michigan Office of Administrative Hearings and Rules (MOAHR) have jurisdiction over this due process hearing request under 20 USC 1415(b)(6) because this request concerns the legal obligations of Respondents under the IDEA regarding the identification, evaluation, educational placement, and provision of a FAPE to a student with a disability.

## III.    PARTIES

*The Student*

5.      P.H. (DOB: 11/07/2016), is a child with multiple disabilities. P.H.'s disabilities qualify him for an IEP pursuant to the IDEA and the MARSE under the primary category of Emotional Impairment. *See* MARSE R 340.1706.

2

*The Respondents*

6.    ELPS was P.H.'s operating district from March to August 2021 and from August 2023 to April 2024.

7.    HPS was P.H.'s operating district from August 2021 to December 2022.

8.    IISD is the ESA responsible for providing services to P.H.[1]

9.    In Michigan, ISDs and ESAs are considered LEAs.[2]

## IV.    STATEMENT OF FACTS

*Background information*

10.    P.H. is a child with a disability which adversely impacts his educational performance.

11.    From March 2021 to August 2024, P.H. resided within ELPS's service area.

12.    On or around March 18, 2021, when P.H. was four years old, C.H. requested that ELPS evaluate P.H. for special education services because P.H. was exhibiting behavioral symptoms including aggression, hitting, kicking, spitting, and struggling to navigate social situations, and C.H. and R.H. were concerned that these behaviors indicated a possible disability and would interfere with his ability to receive an education.

---

[1] **Local educational agency.**
   (a) **General. Local educational agency or LEA** means a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for a combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary schools or secondary schools.
   (b) **Educational service agencies and other public institutions or agencies.** The term includes the following:
      (1) **Educational service agency**, defined as a regional public multiservice agency—
         (i) Authorized by State law to develop, manage, and provide services or programs to LEAs; and
         (ii) Recognized as an administrative agency for purposes of the provision of special education and related services provided within public elementary schools and secondary schools of the State.
   34 CFR 303.23 (emphasis in original).
[2] "In Michigan, an LEA is the intermediate school district (ISD)." Michigan Department of Education, *Significant Disproportionality* <https://www.michigan.gov/mde/services/special-education/data-and-reporting/significant-disproportionality> (last visited October 10, 2024).

3

13.    On or around March 23, 2021, ELPS held a review of existing educational data (REED) meeting for P.H.

14.    In that meeting ELPS staff told C.H. and R.H. that P.H. "sounded normal" and didn't need services.

15.    ELPS ultimately denied C.H. and R.H.'s request for a special education evaluation for P.H.

16.    As a result, C.H. and R.H. decided to use the Michigan Schools of Choice program to enroll P.H. in HPS for the upcoming school year, as they were concerned ELPS would not be able to provide an appropriate education to P.H.

17.    R.H. and C.H. also began the process of getting P.H. psychologically evaluated to try to understand the source of his concerning behaviors.

18.    They also ensured P.H. began extensive speech, food and occupational therapy at Children's Therapy, a local private provider.

***The 2021-2022 school year at Haslett Public Schools***

19.    In August 2021, P.H. began Developmental Kindergarten at Wilkshire Early Childhood Center (WECC) within HPS.

20.    Developmental Kindergarten (DK) is a program at WECC that allows young learners to develop social and academic skills in preparation for Kindergarten.

21.    During the 2021-2022 school year, P.H. exhibited aggression and destructive behaviors. Among these were classroom destruction and physical altercations with other children, as well as spitting and attempting to stab children or staff with pencils.

22.     Throughout that year, HPS repeatedly put P.H. in seclusion.[3]

23.     In the Fall 2021 semester, when C.H. and R.H. asked HPS social worker Allison Winslow and school psychologist Kristen Stohrer (formerly Shirey) what could be done to help P.H., they responded that P.H. couldn't go into the special education or sensory rooms or even have a paraprofessional, until he was given a special education evaluation

24.     On or around November 3, 2021, P.H. was diagnosed with Autism Spectrum Disorder (ASD).

25.     On or around November 28, 2021, C.H. notified HPS of the diagnosis and provided HPS a copy of the evaluation report.

26.     This neuropsychological evaluation, conducted by Hope Network, detailed P.H.'s social and behavioral struggles including but not limited to:

      a.     Lack of eye contact;

      b.     Flat affect and reduced advanced gestures;

      c.     Reduced adaptation of behavior based on social context;

      d.     Distractibility;

      e.     Cognitive rigidity;

      f.     Restricted interests;

      g.     Food restrictions;

      h.     Sensory abnormalities;

      i.     Lack of engagement with tasks;

      j.     Opposition to tasks

---

[3] "Seclusion means the confinement of a pupil in a room or other space from which the pupil is physically prevented from leaving." Michigan Department of Education, *Policy for the Emergency Use of Seclusion and Restraint* at 21 (March 14, 2017) <https://www.michigan.gov/-/media/Project/Websites/mde/specialeducation/policies/PolicyForSeclusionRestraint.pdf>.

   k.  Tantrumming.

27. The evaluation diagnosed P.H. with Autism, and made several treatment recommendations including:

   a.  ABA Therapy 5-15 hours a week, which the evaluation emphasized was medically necessary;

   b.  Family Therapy;

   c.   Speech and Language Pathology (SLP) Therapy;

   d.  Continuing Occupational Therapy to address regulatory and motor skills;

   e.  A nutritionist referral;

   f.  A referral to Angel Sense, a GPS monitoring service for children who frequently elope;

   g.  Special Education Services through the ISD.

28. Despite P.H.'s struggles and the information provided in the ASD evaluation report, HPS did not initiate a special education evaluation of P.H. at that time.

29. On February 28, 2022, C.H sent an email to Stohrer and HPS Director of Special Education James Polasek asking that P.H. be evaluated for special education services.

30. By March 2022, because of his severe behavioral needs, P.H. was attending school at WECC for only one hour per day, in the Special Education classroom, despite not being identified as a student eligible for special education services.

31. Throughout the school year, HPS staff frequently instructed R.H. and C.H. to keep P.H. home because he was so disruptive in school and the school had inadequate staff to accommodate him.

32.     Often, HPS would tell C.H. to keep P.H. home after she was already in the drop-off line, minutes before the start of school.

33.     Due to the one-hour school day and the repeated requests to keep P.H. home, he was barely receiving any education.

34.     In April 2022, Stohrer told C.H. that in order for P.H. to get the comprehensive services he needed, HPS would need to conduct an FBA.

35.     However, HPS did not perform an FBA, even though its own psychologist had identified this as a need for P.H.

36.     C.H. repeatedly asked the IEP team to conduct an FBA over the next months, beginning at an IEP meeting on April 29, 2022.

37.     On or around April 27, 2022, Shirey, Winslow, speech-language pathologist Nicole Dixon, and occupational therapist Kelli Youtz completed a multifactored evaluation team (MET) report for P.H.

38.     The MET report did not include any information from the ASD evaluation report the family had provided to HPS in November 2021.

39.     The MET report noted the following serious concerns:

    a.  As reported by C.H.:

        i.   Obsessive-Compulsive Disorder-like behaviors such as no flexibility with his thinking;

        ii.  Being overwhelmed by public spaces;

        iii. Struggling to go out places without P.H. eloping;

        iv.  Getting so excited on the rare occasions that he interacted with peers that he would push them or make vocalizations and react oddly;

      v.     Staying up all night and struggling to go to sleep; and

      vi.    Not eating much due to struggling with food and smells.

b.  As reported by P.H.'s teacher, Lori Watrich:

      i.     Loud vocalizations;

      ii.    Physical aggression towards friends that he likes; and

      iii.   New irrational behaviors every month such as fearing arrest by the police.

c.  As reported in the psychological assessment's observations section of the report:

      i.     Loud vocalizations; and

      ii.    Hiding under a table.

d.  As reported in the psychological assessment's testing observations section of the report:

      i.     Stabbing items with a pencil;

      ii.    Ripping pages out of books and papers;

      iii.   Throwing items; and

      iv.   Attempting to hit adults around him.

e.  As reported in the social work assessment's social/behavioral observations section of the report:

      i.     Slamming items;

      ii.    Attempting to color on school materials;

      iii.   Attempting to color on adults' clothing;

      iv.    Trying to snap an American flag in half;

      v.     Hitting computer monitors off the desk;

      vi.    Dumping a toy bin over and stating that he would not clean it up;

     vii.    Pushing an adult;

    viii.    Attempting to hit an adult with a toy bin;

     ix.    Pushing a peer;

     x.    Hitting a peer;

     xi.    Telling an adult to shut up; and

     xii.    Grabbing a lanyard off an adult's neck.

f.    As reported in the occupational therapy resource classroom observation section of the report:

     i.    Banging random objects;

     ii.    Tossing a coffee mug on the floor; and

     iii.    Pushing over two monitors.

40.    The MET report included results from the Clinical Evaluation of Language Fundamentals-5 Pragmatic Profile administered to P.H.'s parents and teacher. The scores fell in the 3rd and 1st percentiles respectively.

41.    The MET report made the following recommendations:

a.    Eligibility for special education services as a student with Autism Spectrum Disorder;

b.    Direct social work services to continue with behavior support and building social-emotional regulation skills;

c.    Consultative speech services to support social communication in the classroom;

d.    Direct occupational therapy services to support sensory integration needs in the classroom;

e.    The use of visuals or lists to provide [P.H.] with clear, concrete directions as to what tasks he needs to complete during each part of the day;

f.    Front-loading transitions and changes within the schedule when they occur;

g.    Continued use of breaks, and access to items to support his sensory needs; and

h.    Additional recommendations to be discussed at the IEP meeting.

42.    An IEP Team Meeting was held on April 29, 2022 in which C.H., R.H. and members of the IEP team discussed the MET and began plans an IEP for P.H.

43.    At that meeting, C.H. and R.H. learned that P.H. was beginning his hour-long school day in seclusion every day.

44.    Although an IEP had not been finalized at that meeting, a proposed IEP was released to the parents on May 6, 2022.

45.    The IEP team had found P.H. eligible for special education services as a student with an IEP.

46.    This IEP, dated May 6, 2022, provided P.H. with three goals:

a.    One social work goal: "When given a task or direction, [P.H.] will begin the task within 1 minute and remain on task for a minimum of 10 minutes independently with no more than 2-3 prompts with 80% accuracy by April 2023."

b.    A second social work goal: "[P.H.] will identify his emotions (anger, worry, boredom, etc.) and will practice strategies to manage his emotions with 70% accuracy by April 2023."

c.    A fine motor goal: "[P.H.] will display functional educationally relevant visual motor integration skills by achieving the following objectives with 85% accuracy 1 year."

47.    The IEP provided the following supplementary aids and services:

a.    Adult support daily to support P.H. during classroom learning and transitions;

b.    Frequent breaks daily, or as needed, to support P.H.  in task completion and social-emotional regulation;

c.    Visual supports as needed throughout the school day to support P.H.'s comprehension of given directions and remind him of the expectations and routines;

d.    Present information through a multi-sensory approach as needed throughout the school day in order to meet [P.H.]'s needs. This can include visuals, kinesthetic learning opportunities, and auditory opportunities;

e.    Provide seating arrangement that matches student's needs. P.H. may benefit from sitting near a teacher or helper peer, where he can receive frequent feedback. This arrangement could also minimize distractions;

f.    Provide frequent feedback. P.H. benefits from frequent feedback so he remains aware of expectations;

g.    Repeat directions as needed throughout the school day to support P.H. in following through with directions and transitions;

h.    Provide extra time to answer questions and formulate responses as needed throughout the school day to allow P.H. adequate time to formulate answers and responses;

i.    Behavioral support as needed, to provide extra support and behavior resources to P.H., parents, and teachers;

j.    Consultation of Speech and Language Services. 5-10 minutes per month or as needed by staff or student to support social communications skills in the educational environment; and

k.    Consultation of Occupational Therapy Services. Monthly review of sensory integration strategies and implementation. Continue to collect educational environment data in areas of sensory integration.

48.    The IEP provided the following special education programs and services:

a.    Teacher Specialist – [specific learning disability]. Direct services 60-90 minutes daily;

b.    School Social Work. Direct services 2-4x per month for 20-30 minutes;

c.    Speech and Language Therapy. Consultative services 5-10 minutes a month or as needed by staff or student; and

d.    Occupational Therapy. Direct services 60-80 minutes per month per HPS calendar.

49.    The IEP identified the general education classroom as the least restrictive environment (LRE) for P.H.

50.    The IEP did not indicate that any services would be provided to P.H. outside of the general education classroom.

51.    The IEP did not indicate that P.H. would be on a reduced school day.

52.    For reasons that were not explained to C.H. and R.H., no behavioral support plan was put into place for P.H., despite his regular extreme and disruptive behaviors.

53.    On May 6, 2022, even though she was concerned about the IEP not including a behavior plan, C.H. signed the IEP to initiate services for P.H. because she was so desperate for him to get the help that he needed.

54.     That same day, C.H. also signed the IISD Consent for Medicaid School Services Program.

55.     That form provides parent consent for the requesting entity to bill Medicaid for services such as physical and occupational therapy, social work, and speech therapy.

56.     The form reads: "By signing below, I understand and agree that Ingham ISD (ISD) and its local districts may access my child's public benefits or insurance information in order to seek reimbursement for services rendered as listed on the Individualized Education Program (IEP), Individualized Family Service Plan (IFSP) or Plan of Care (POC)."

57.     Even though C.H. signed the required consent forms on May 6, 2022, HPS unilaterally decided that the IEP would not be implemented until Fall 2022.

### The 2022-2023 school year at Haslett Public Schools

58.     P.H. returned to WECC in Fall 2022 for Kindergarten.

59.     P.H.'s IEP provided him with a one-on-one aide.

60.     After her initial FBA requests went unanswered, C.H. again requested an FBA in August 2022.

61.     At that point, HPS put together a makeshift behavior plan which they emailed to C.H. on August 23, 2022.

62.     Quixotically, HPS refused to complete an FBA because staff said they found it too difficult to gather the necessary data due to P.H.'s behaviors.

63.     On August 23, 2022, HPS implemented their "behavior plan" for P.H.

64.     It is unclear what data this behavior plan was based upon, as HPS did not conduct a functional behavioral assessment (FBA) before completing the behavior plan.

65.     The behavior plan identified the following as problem behaviors for P.H.:

a. **Behavior 1: Non-compliance** Based on observations and teacher/staff report, Patrick demonstrates difficulty in following directions during non-preferred tasks. This involves ignoring directions and school expectations or refusing to work.

b. **Behavior 2: Property Destruction** Based on observations and teacher/staff report, Patrick demonstrates destructive behaviors such as throwing objects, knocking down items, and intentionally breaking items; and

c. **Behavior 3: Physical Aggression** Based on observation and teacher/staff report, Patrick demonstrates physically aggressive behaviors involving hitting, kicking, and pushing.

66.    The behavior plan was not developed by the IEP team as required by the IDEA, as neither C.H. nor R.H. was part of its development. 20 USC 1414 (d)(3)(B)(i).

67.    The behavior plan did not identify positive behavior interventions and supports as required by the IDEA. *Id.*

68.    Instead, the behavior plan identified "proactive" and "reactive" strategies for staff to use on P.H.

69.    The behavior plan also identified, with no supporting data, a set of "emergency procedures" for staff to follow if P.H. "demonstrate[d] behavior that [wa]s dangerous to himself or others."

70.    The behavior plan did not identify or provide examples of what type of behavior that might be.

71.    The behavior plan provided for the ample use of restraint and seclusion procedures.

72.    The behavior plan provided for P.H. to be removed from school in any of the following situations:

14

    a.   3 or more incidents in the Time Out Space;

    b.   90 minutes of inability to comply or calm down while in the Time Out Space, office, or spots the student has eloped to; and

    c.   Other times when staff deems removal from school appropriate for the safety, security and dignity of P.H. and other students or staff.

73.    Although she had serious concerns about the behavior plan, C.H. agreed to allow HPS to implement it because HPS staff assured her it would be the best way to ensure P.H.'s success in the upcoming school year.

74.    Once C.H. consented to the behavior plan, HPS staff began secluding P.H. regularly.

75.    The repeated seclusions meant that P.H. was not being provided with the supports and services identified in his IEP.

76.    Further, during the fall of 2022, Stohrer told C.H. and R.H. that HPS was short-staffed, that she was the only psychologist for all of the students in the entire district, and that HPS had an unprecedented volume of students with special needs that year.

77.    During the 2022-2023 school year, P.H.'s behaviors escalated into violence such as hitting, kicking and spitting.

78.    On or around September 13, 2022, Polasek observed P.H. at the school. From there, he began visiting the school to try to assist with P.H.

79.    C.H. and R.H. were not informed by HPS of how often Polasek was working with P.H. but were told he would come to assist when called by HPS staff.

80.    Polasek would give P.H. clear expectations and initially, P.H. would comply, but his behaviors continued.

81.     Polasek's assistance ultimately did not work, and P.H. continuously exhibited aggressive behaviors.

82.     P.H. stabbed paraprofessionals and Polasek with pencils, kicked other children and regularly eloped.

83.     On or around September 15, 2022, HPS's ASD Consultant, Kelsey Kujawa, emailed C.H. to inform her that she would be working with P.H. twice a week going forward.

84.     C.H. and R.H. were not aware of any services Kujawa provided other than observation.

85.     Throughout the 2022-2023 school year, in violation of his IEP, HPS did not allow P.H. to participate in the general classroom.

86.     On or around October 17, 2022, P.H. told C.H. that he was being placed in the "calm down room" every day.

87.     This was new information to C.H.

88.     C.H. asked HPS staff about the use of seclusion.

89.     Candy Schneemann, P.H.'s paraprofessional, told C.H. that P.H. spent most of his day in the seclusion or "calm down" room or in the special education room.

90.     Schneeman said she was not able to get P.H. into the general education classroom because he would start having behavioral problems as soon as he entered the general education classroom. She did not clarify for C.H. what specific behaviors P.H. was engaging in, nor did she clarify how many times she had tried to get P.H. into the general education classroom.

91.     Schneemann then informed C.H. that P.H. was kept in the special education classroom instead of the general education classroom.

92.     When C.H. asked Schneeman why P.H. was being isolated, Schneeman said, "It is just too hard."

93.     Schneeman also told C.H. it was too noisy for P.H. with all the children in the general education classroom; since there were no children in the special education classroom, it was "easier" to put P.H. there.

94.     Upon information and belief, almost none of these instances of seclusion were documented, in violation of MCL 380.1307.

95.     Schneeman and HPS Special Education Teacher Jason Brown told C.H. that P.H. was occasionally taken outside for recess and placed on a bench.

96.     On or around October 16, 2022, C.H. sent an email to Brown, Schneemann and P.H.'s Kindergarten teacher Danijela Horn asking that P.H. be placed in the general education classroom in the morning and have options for a break as needed; asking why he was being kept out of recess; and asking to personally observe him in the classroom.

97.     On October 19, 2022, C.H. observed P.H. in the classroom.

98.     Later that day, C.H. sent an email to Horn, Brown, and WECC Principal Patrick VanRemmen with the following concerns:

> I wish there was a way to engage [P.H.] and prevent some of his disruptive behaviors. I can see his anxiety is preventing his participation and social interaction. I am open to any ideas that might help. I was curious if Kelsey Kujawa, the ASD consultant, has any insights to offer on ways to engage him? I recognize that this takes time. I would like to closely monitor any physical aggression that occurs in the classroom (hair pulling/physical contact with teacher/students). If this is escalating, please let me know.

99.     Only Horn responded to C.H.'s email, asking C.H. to let her know if she reached out to Kujawa and offering to meet again in November.

100.    On or around October 20, 2022, C.H. contacted Winslow to ask about engaging P.H. in social groups, because he was spending so much time alone and she was concerned about his social skills continuing to deteriorate.

101.    On October 25, 2022, Winslow sent an email to C.H. saying that she was "eventually" going to include P.H. in a group, with no timeline provided.

102.    On or around October 26, 2022, P.H. told C.H. that a substitute teacher, Gary Fant, had performed a hard "twister" on him and pushed his feet into the floor in a backward motion when he wouldn't pick up a chair that he had thrown.

103.    The "twister" P.H. referred to was a basket-hold restraint.[4]

104.    C.H. immediately contacted Polasek and VanRemmen by email due to P.H.'s report of physical abuse by Fant.

105.    C.H. also blind copied Watrich on the email.

106.    C.H. wrote, "[P.H.] is prone to exaggeration, but he detailed the action with specificity, leaving me no doubt that this occurred today and has been going on for some time. We have never been notified of any restraint use."

107.    C.H. also wrote that P.H.'s harmful behaviors were escalating and asked to address the situation.  She wrote,

> In the last two days [P.H.] has resorted to violence against adults and his peers. Prior to yesterday he had not had any incidents with children since Spring. He has not harmed children at ABA. He has been outstanding at home with the exception of his behavior after school today. I have gone to great lengths to provide him with a stable home environment. I greatly appreciate the efforts of Mr. Brown, Mrs. Schneeman and Ms. Winslow. I believe they have Patrick's best interest at heart. I also recognize that things happen,

---

[4] This form of physical restraint, called basket-hold, involves "confining the student in a chair or placing the student face down on the floor while restraining the student's arms." MaGee & Ellis, *The Detrimental Effects of Physical Restraint As a Consequence for Inappropriate Classroom Behavior*, 35 J Applied Behavioral Analysis 4, 501-504 (Winter 2001) <https://pmc.ncbi.nlm.nih.gov/articles/PMC1284345/pdf/11800190.pdf>.

and teachers and staff must attend to their outside life, but I will note Patrick struggles with the inconsistency.

In my visit to Mrs. Horn's room and attendance on the class field trip this month, I could see her plate is full. I am not sure if another classroom assignment should be contemplated or if other interventions should be considered. I will reach out to the ASD consultant to determine options for his social integration. I know Ms. Winslow is also working with him. I want to intervene with his behavior as soon as possible to put him at ease and eliminate the use of restraint.

108.    On October 31, 2022, C.H. spoke to Polasek by phone about the incident.

109.    C.H. told Polasek that there were marks on P.H. after Fant performed the basket hold restraint on him.

110.    Polasek said when he and VanRemmen discussed the incident with Fant, Fant had denied  touching P.H. at all.

111.    Polasek said both he and VanRemmen believed Fant was lying.

112.    C.H. told Polasek she was concerned that Fant was permitted to work with nonverbal children.

113.    Polasek agreed with C.H. that this was a concern.

114.    C.H. asked Polasek to keep Fant away from P.H.

115.    Polasek agreed to this request and told C.H. that he had told Fant that he was not going to be working with P.H. anymore and was to stay on the other side of the building.

116.    Polasek then said the investigation would be very difficult because Fant was African American so there was a "race issue."

117.    C.H. did not understand what this meant.

118.    On November 1, 2022, Schneeman called C.H. to come pick P.H. up.

119.    When C.H. asked where P.H. was, the paraprofessional said P.H. was in the "calm down" room alone with Fant.

120.    Schneeman said she was not aware that Fant was supposed to be separated from P.H.

121.    Upon learning that Fant was with P.H., C.H. rushed to WECC.

122.    When C.H. arrived, Fant was still in the "calm down" room with P.H.

123.    This was the first time C.H. ever saw the room.

124.    The "calm-down" room was a very small, windowless room located in the middle of the building. The room housed a small table which faced a bare wall.

125.    When C.H. arrived, Fant and P.H. were still at the children's table.

126.    The table was very small, and Fant was extremely close to P.H. and in his personal space.

127.    C.H. took P.H. out of the "calm down" room and brought him home.

128.    When she got home, C.H. emailed Polasek and VanRemmen to reiterate that P.H. was not to be around Fant and to request a meeting to discuss her concerns about Fant.

129.    At the meeting on November 3, 2022, C.H. and R.H. requested a full investigation into Fant and asked HPS to put Fant on leave

130.    HPS agreed to open an investigation into the incident but refused to investigate any other interactions between P.H. and Fant that had occurred prior and refused to put Fant on leave.

131.    C.H. and R.H. decided to keep P.H. home from school until the investigation was completed in order to protect him from Fant, who continued to have unfettered access to students.

132.    C.H. continued communication with HPS about the investigation and keeping up with P.H.'s schooling during that time.

133.    On or around December 2, 2022, HPS Superintendent Steven Cook sent a letter to R.H. and C.H. notifying them that HPS concluded its investigation into Fant and found that he had not violated any HPS policies.

134.    This made no sense to C.H. and R.H., as Polasek had told C.H. that he and VanRemmen believed Fant was lying.

135.    At that point, C.H. and R.H. decided to withdraw P.H. from HPS and homeschool him for the remainder of the school year, as they did not believe HPS would keep him safe.

### The 2023-2024 school year at East Lansing Public Schools

136.    On or around August 4, 2023, C.H. and R.H. met with Marble Elementary Principal Josh Robertson and social worker Michelle Miller-Hogan to discuss P.H.'s needs and consider returning him to ELPS, as they did not think continuing to homeschool him was in his best interest.

137.    R.H. and C.H. told Robertson and Miller-Hogan about P.H.'s traumatic experiences with seclusion and restraint during his time at HPS and gave them detailed information about his daily seclusions and Fant's abuse.

138.    Robertson and Miller-Hogan assured C.H. and R.H. that there was no seclusion or "calm down" room at Marble Elementary.

139.    The group also discussed different options for ASD children at Marble Elementary.

140.    Robertson and Miller-Hogan repeatedly assured C.H. and R.H. that P.H. could try attending school at Marble and if this was not successful, they could "always" switch P.H. to one of the ASD classrooms in the district.

141.    Based on this meeting, despite the problems P.H. had in ELPS during the 2021-2022 school year, C.H. and R.H. decided to give ELPS another chance and enrolled P.H. at Marble Elementary for the 2023-2024 school year.

142.    On September 13, 2023, C.H. and R.H. met with a team of Marble Elementary staff to update P.H.'s IEP.

143.    The IEP identified several new areas of need and provided goals for them, including reading and perception/motor/mobility.

144.    The IEP provided the following special education programs and services:

    a.    School Social Worker. Direct services 1-2 times per month for 20-35 minutes;

    b.    Speech and Language Therapy.  Direct services 4-5 times per month for 25 minutes; and

    c.    Occupational Therapy. Direct services 3 times per month for 25 minutes.

145.    ELPS did not provide any explanation to C.H. or R.H. as to why it cut P.H.'s social work services in half and removed all of the supplementary aids and services provided in his prior IEP.

146.    The IEP identified the general education classroom as the least restrictive environment (LRE) for P.H.

147.    The IEP did not indicate that any services would be provided to P.H. outside of the general education classroom.

148.    The IEP did not indicate that P.H. would be on a reduced school day.

149.    P.H. was able to attend Marble Elementary from 8:45 a.m. to 1:00 p.m. for the Fall 2023 term with some success.

150.    By December 2023, however, P.H. was regularly spending one hour in the bathroom as a form of school avoidance.

151.    On one occasion, P.H. fell asleep in the bathroom.

152.    Throughout the second half of the 2023-2024 school year, Marble Elementary staff would change P.H.'s schedule daily based on provider availability.

153.    This included the availability of Miller-Hogan, special education teacher Kristen Casby, speech language pathologist Stephanie Francisco, occupational therapist Stacey Turke, and paraprofessionals.

154.    Turke was only at Marble on Fridays.

155.    If scheduled providers were out, Robertson could also step in, but generally ELPS would fill an hour and a half to two hours with these providers by shuffling them around according to provider availability.

156.    ELPS never informed C.H. and R.H. of what, if any, specialized training Robertson had to qualify him for providing the services P.H. needed.

157.    The inconsistency of this schedule negatively affected P.H. due to the characteristics of his ASD.

158.    When P.H. returned from winter break in January 2024, he felt overwhelmed by going back to school due to the lack of consistency and would refuse to leave the house on school days.

159.    Because of P.H.'s school avoidance, C.H. had to attend school with him.

160.    During the school days when C.H. attended with P.H., he would refuse to leave the office and would sit in the main office counting the cars in the parking lot for up to an hour.

161.    P.H. would continually repeat the number of cars in the parking lot aloud.

162.    By January 2024, C.H. was attending school with P.H. every day.

163.    On January 29, 2024, C.H. sent an email to Robertson asking to meet about transferring P.H. to an ASD classroom as they had discussed at the August 4, 2023 meeting.

164.   In mid-February 2024, Miller-Hogan responded to C.H. and told her ELPS Director of Support Services Nick Hamilton would be reaching out to her to schedule the meeting.

165.   Hamilton never contacted C.H. to schedule the meeting.

166.   At this point, ELPS only permitted P.H. to attend school from 8:55 a.m. to 10:30 a.m. and, beginning in February 2024, only in the special education classroom.

167.   P.H. began struggling with anxiety about school and began regularly eloping.

168.   On or around February 9, 2024, C.H. was in the main office at Marble with P.H.

169.   On that day, P.H. was working with Turke, and when she went to transition P.H. to the next provider, he ran away from her.

170.   Turke could not find P.H.

171.   Turke alerted Miller-Hogan that P.H. was missing.

172.   Miller-Hogan then told C.H. that P.H. was missing.

173.   C.H. went to look for P.H. with Miller-Hogan.

174.   Turke joined them for a while and apologized to C.H. for losing P.H.

175.   C.H. ultimately found P.H. in the STEM room, which was not occupied at the time he was found.

176.   P.H. was hiding in between the cabinets in the room.

177.   Upon information and belief, ELPS did not document this incident.

178.   In mid-February 2024, C.H. suggested a schedule that would allow her to attend school with P.H. from 8:45 a.m. to 9:00 a.m. in the general education classroom.

179.   C.H. starting with P.H. for the first 15 minutes of the day would then allow Casby to retrieve P.H. from the general education classroom.

180.   C.H. was trying to get P.H. time with other children as much as possible.

181.    On or around February 12, 2024, Robertson told C.H. that C.H. was no longer allowed to accompany P.H. in class and her proposed schedule was denied.

182.    Robertson did not provide C.H. with any rationale for this change and the denial of her schedule request.

183.    As a result, P.H. was never again in the general education classroom or exposed to his peers during the rest of the 2023-2024 school year.

184.    Rather, P.H. was confined to the special education, office conference room, or isolation rooms.

185.    During this period, C.H. frequently asked for P.H. to be given time with peers.

186.    On a handful of occasions there were a few other children in the special education room with P.H., but they were kept at other tables and did not directly interact with P.H.

187.    In or around February 2024, Casby told C.H. and R.H. that things "worked best" when P.H. was alone, a sentiment she repeated during an IEP Team Meeting in March 2024.

188.    During this time, C.H. also asked for P.H. to work with the Reading Intervention teacher Stephani Lampi because, from C.H.'s observation of her, Lampi was able to get children to work well together.

189.    Miller-Hogan denied this request.

190.    Despite Robertson's directive that C.H. not attend school with P.H., Miller-Hogan repeatedly contacted C.H. after February 12, 2024, to come to school to accompany P.H. to or from meetings with providers.

191.    Further, upon information and belief ELPS failed to provide quarterly progress reports to C.H. and R.H., which made it difficult to monitor and understand P.H.'s progress in school.

192.    On February 27, 2024, P.H. eloped from Marble Elementary and attempted to run home.

193.    C.H. was in the office at the time and heard P.H. shouting.

194.    C.H. then saw P.H. run out of the building.

195.    C.H. chased P.H. into the middle of the intersection of Hagadorn Road and Burcham Drive – one of the busiest intersections in East Lansing, Michigan.

196.    C.H. ran out into the intersection and retrieved P.H.

197.    On or around February 28 or 29, 2024, C.H. spoke with Miller-Hogan and Roberston about the elopement on February 27.

198.    C.H. suggested that they keep Marble's doors locked during the school day to prevent students from eloping.

199.    During that conversation, Miller-Hogan and Robertson told C.H. that Marble Elementary's school doors could not be locked on exit. They informed C.H. that the doors were locked on entry but *not* on exit due to fire code, and that this could not be changed to prevent P.H. from eloping.

200.    Robertson told C.H. that the Marble Elementary staff would "try" to adequately supervise P.H. to ensure he did not elope into traffic again.

201.    Because ELPS could not guarantee P.H.'s safety following the February 27 elopement into heavy traffic, C.H. was forced to begin sitting in the main office at school every school day to watch the front door of Marble Elementary when P.H. was attending school.

202.    C.H. and R.H. are both law professors at Cooley Law School in Lansing, Michigan.

203.    Prior to January of 2024, C.H. worked in-person at Cooley.

204.    From January 6, 2024 onward, C.H. was forced to change her schedule to work remotely and primarily in the evenings so she could attend school with P.H. during the day.

205.    As a result, C.H. was no longer able to attend meetings with students and colleagues, which took place during the school day.

206.    R.H., who is also a law professor at Cooley, had to cover classes that C.H. was teaching during the school day so she could be available to assist at Marble with P.H.

207.    On Monday, March 4, 2024, Robertson, Miller-Hogan and P.H.'s paraprofessional, who C.H. only knew as "Ms. Sonia" were trying to get P.H. to work in the conference room inside the main office.

208.    C.H. was unable to see what was going on in the conference room from her position in the main office but she could hear.

209.    P.H. first began laying on the floor and making noises, then began to pull at Ms. Sonia. He then started to run around the conference room and started kicking and spitting, begged to leave the conference room, attempted to destroy the TV, and spit on Robertson.

210.    Robertson had P.H. lay on the floor and press his hands against Robertson's to try and calm him down.

211.    P.H. got up, hit the TV and coat racks, and repeatedly opened and closed the mini fridge.

212.    After several minutes, P.H. ran by the door and tried to open it.

213.     During this time, C.H. entered the conference room to assist.

214.    P.H. asked C.H. about the "calm-down" room.

215.    C.H. told P.H. that Marble Elementary did not have a "calm down" room, as this is what Robertson and Miller-Hogan had told her at the August 4, 2023 meeting.

216. P.H. told C.H. that Marble Elementary did have a "calm down" room.

217. Miller-Hogan reiterated that Marble did not have such a room.

218. P.H. then described where it was by saying it was by the "speech room."

219. P.H. then, with specificity, went on to describe a "calm down" room located within the Behavior classroom.

220. Robertson and Miller-Hogan then said P.H. was right and there was a room in the Behavior class.

221. Miller-Hogan told C.H. she had forgotten about that room.

222. Miller-Hogan told C.H.: "I do not know how [P.H.] knows that."

223. C.H. was stunned because not only had Robertson and Miller-Hogan falsely told her that Marble Elementary did not have an isolation room, but P.H. had clearly spent enough time in the room to be able to describe it in very specific detail.

224. While Robertson and Miller-Hogan were telling C.H. about the "calm down" room, P.H. continued to get very upset by the door.

225. P.H. said he couldn't breathe, and his eyes welled with tears.

226. P.H. was having a panic attack, something that had only happened once before in his life.

227. Because P.H. was so upset and clearly not improving, C.H. decided to take him home for the rest of the day.

228. C.H. and R.H. requested that P.H.'s IEP team reconvene because they were concerned about and how little progress he had made since January, how often he was continuing to elope, his lack of social skills, his increasingly disruptive behavior, his heightened anxiety and

stress, his lack of academic progress, and the fact that he had not been receiving some of the supportive services his IEP required.

229.    The IEP meeting took place on March 5, 2024 and included the below IEP team members:

        a.        C.H. and R.H.;

        b.        Casby;

        c.        Francisco;

        d.        Turke;

        e.        Miller-Hogan;

        f.        Robertson;

        g.        Hamilton;

        h.        General Education teacher Rebecca Spitzer.

230.    At the meeting, C.H. and R.H. said they felt P.H. was not doing well at Marble, asked the team to conduct an FBA, and said they feared P.H. would never return to the general education classroom.

231.    Further, at this meeting Hamilton asked how often the ASD Teacher Consultant was assisting for P.H. in accordance with his IEP and it was revealed that the ASD Teacher Consultant had not been consulted for P.H. at all.

232.    The March 2024 IEP included a section listing concerns from P.H.'s parents, including:

        a.        Concerns about P.H.'s safety;

        b.        P.H.'s elopement from the building;

        c.        P.H.'s heightened stress and anxiety;

d.      P.H.'s escalating behaviors;

e.      P.H.'s difficulty socializing with peers;

f.      P.H.'s academic progress, specifically in reading;

g.      P.H.'s inability to make it through an entire school day, and the fact that he was missing recess and special classes like gym.

233.    The IEP provided for the following supplementary aids and supports:

a.      Daily adult support throughout the building to support learning, socialization and assistance with breaks and transitions;

b.      Frequent breaks;

c.      Seating arrangements that match P.H.'s needs, primarily near a teacher, peer support, or adult support to assist in learning;

d.      Repeat directions;

e.      Extra time to answer questions or formulate responses;

f.      ASD Teacher Consultant 1-2 times a month for 20 minutes to address behavioral, social or academic needs;

g.      Medical plan for seizure protocol provided by P.H.'s doctor to be shared with all teachers and staff that have regular contact with P.H.

234.    The IEP provided the following annual goals:

a.      Visual Motor: P.H. will engage in visual motor and fine motor activities specially designed to support his ongoing fine motor endurance and visual motor accuracy/legibility 3 of 4 opportunities by 3/4/2025, as measured by Documented Observations and Criterion Referenced Assessments.

b.      Pragmatic Language: P.H. will increase his pragmatic language skills by engaging in conversational turn taking and taking perspective of others, using flexible thinking 2 of 3 opportunities by within one year, as measured by documented observation and teacher made tests.

c.      Emotional: P.H. will be able to identify when calming strategies are needed and be able to practice and demonstrate coping strategies to use in the school setting when experiencing frustration, unexpected change or sensory overload. 80% of the time by 1 year, as measured by documented observation.

235.    The IEP provided for the following services:

a.      Social Work Services for 20-50 minutes 1-5x a week, which was an increase from P.H.'s September 2023 IEP;

b.      Occupational Therapy for a minimum of 25 minutes 3x a month;

c.      Speech and Language Services for a minimum of 20 minutes 4-5x a month, which was a decrease from the minimum 25 minutes 4-5x a month in P.H.'s September 2023 IEP.

236.    ELPS provided no explanation for why speech and language services were reduced for P.H.

237.    The IEP identified the general education classroom as the least restrictive environment (LRE) for P.H.

238.    The IEP found that P.H. qualified for extended school year (ESY) services.

239.    Although P.H.'s September 2023 IEP provided for direct speech therapy services for periods of at least 20 minutes 4-5 times a month in the special education office, or the special

education or general education classroom settings, P.H. was not receiving speech therapy consistently and this was addressed during the March IEP meeting.

240.    During this meeting, Francisco admitted she couldn't do a speech therapy session with P.H. in the presence of a peer because of P.H.'s behavior.

241.    Francisco did not define which of P.H.'s behaviors she was concerned with.

242.    Francisco told C.H. that sometimes P.H. would not come to speech because he did not want to attend and would sometimes elope. She did not explain why she did not just go get P.H. and bring him to speech.

243.    Francisco then told C.H. that she was unable to ever have a peer present with P.H. because whenever she tried to get him to work with another student he was unwilling. She did not clarify how often she was trying to get P.H. to work with a peer.

244.    Through ELPS staff's statements at this meeting, it became clear to C.H. and R.H. that P.H. had not been around other students consistently since the end of January 2024.

245.    Instead, ELPS staff kept P.H. away from other students in sessions with providers for the two hours he was in school each day, and he would spend the first hour of school sitting in the office, staring out the window and counting all the cars in the parking lot.

246.    During these sessions, P.H. completed very little schoolwork.

247.    For example, with Casby, P.H. would do drawings and she would guess what he would draw and try and get him to do a few tasks.

248.    C.H. asked what the staff's plan was to keep P.H. in school given that all the doors were open and did not lock, he knew how to run home, and he was regularly eloping.

249.    Hamilton responded that staff would do their best to keep P.H. from eloping and stated he could not possibly guarantee P.H.'s safety.

250.    Hamilton said ELPS could not document every time "these kids" eloped because, he said, "they" do it all the time and it is just what "they" do.

251.    By "these kids," C.H. and R.H. understood Hamilton to mean students with disabilities.

252.    No one at the meeting provided any information to C.H. and R.H. about how ELPS would address P.H.'s regular elopement.

253.    Because it was clear that Marble could not effectively educate P.H., C.H. and R.H. requested that P.H. be transferred to one of the ASD classrooms located within the district, as Robertson and Miller-Hogan had promised her during their meeting on August 4, 2023, when P.H. first enrolled at ELPS.

254.    Hamilton said he would not entertain such a request during the school year but might consider giving it a try during the summer.

255.    On or around March 6, 2024, C.H. was in the main office as usual when P.H.'s behavior began escalating.

256.    P.H. began tearing things off the wall and destroying them, attempting to shatter a large window, and ripping up books and papers.

257.    Whenever a staff member would get close to P.H. or prevent him from striking the window, he would hit, grab, or kick them.

258.    Miller-Hogan and Robertson then each took P.H. by the arm and walked him across the school to the "calm down" room.

259.    C.H. followed them.

260.    The "calm down" room at Marble Elementary is hidden in the back of a classroom designated for children with behavior issues.

261.    C.H. was shocked because the room was located in the back of the behavior classroom, a room in which only students with IEPs were supposed to be present.

262.    C.H. was further shocked by the size of the "calm-down" room, which was no bigger than a walk-in closet.

263.    During the walk to the "calm-down" room P.H. was screaming: "Do not bring me to that room! I hate that room!"

264.    Later that day, after working briefly with Casby, Roberson secluded P.H. in Miller-Hogan's office.

265.    P.H. began to tear apart Miller-Hogan's office.

266.    C.H. was in the main office during this time and saw what was happening through the open door into Miller-Hogan's office.

267.    P.H. destroyed hundreds of papers and personal items, threw a water bottle at Robertson, and took apart picture frames.

268.    C.H. kept intervening and asked Roberson to end the seclusion end but Robertson and Miller-Hogan told her that P.H. would "win" if she took him home.

269.    Ultimately, after about 45 minutes, C.H. intervened and took P.H. out of Miller-Hogan's office in order to protect and deescalate him.

270.    On or around March 7, 2024, C.H. provided ELPS with a doctor's note stating that P.H. could not be secluded.

271.    That same day, C.H. met with Hamilton, Robertson, and Miller-Hogan to address the prior day's incidents.

272.    At that meeting, Hamilton told C.H. that the school would not comply with P.H.'s doctor's recommendation and would continue secluding P.H.

273.    Hamilton said the district wanted to consult P.H.'s medical providers directly and ELPS would then decide whether or not to honor his doctor's recommendation.

274.    Hamilton told C.H. that without seclusion, P.H. would elope, and baselessly claimed P.H. would likely respond quickly to seclusion and that he would not need to be secluded for a long period of time.

275.    Robertson also claimed P.H. had responded well to many commands given to him when he was destroying Miller-Hogan's office on March 6.

276.    This also made no sense, as P.H.'s outburst lasted for over 45 minutes and did not end until C.H. entered the room and removed him.

277.    These communications directly contradicted ELPS' prior communications with C.H. throughout the school year, in which Robertson, Miller-Hogan and Hamilton had all acknowledged that P.H.'s behaviors would escalate if C.H. were not present in school with him.

278.    C.H. asked what would happen if she dropped P.H. off at school and he began to chase her when she left.

279.    Robertson said he would tell staff to keep P.H. in the school.

280.    Robertson provided no information or explanation as to how staff would keep P.H. in school when they had not been able to do so up to that point.

281.    All parties present at the meeting acknowledged that P.H. would likely be secluded on Monday, March 11, 2024, upon his return to school.

282.    C.H. explained again that, based on P.H.'s doctor's recommendation, due to his epilepsy and ASD diagnoses this was not acceptable, and said she would bring P.H. to school on Monday and attend school with him to keep him safe.

283.    At this point, Robertson informed C.H. that she was being banned from Marble Elementary because she had used profanity during P.H.'s seclusion the week prior.

284.    At that time, upon discovering P.H. in the "calm down" room, C.H. had exclaimed in shock, "You told me you didn't even have this fucking room!" in reference to the assurances that had been made to her and R.H. before enrolling P.H. at Marble.

285.    Robertson claimed C.H.'s excited utterance had disrupted the classroom environment even though she had made the statement outside an empty classroom where only her own child was present, behind a closed door where he could not hear her.

286.    C.H. objected to being banned from the school and said R.H. would attend school with P.H. on March 11 instead.

287.    Robertson then told C.H. that R.H. would not be permitted to attend with P.H., either.

288.    Robertson provided no explanation as to why R.H. was banned from Marble Elementary.

289.    Hamilton told C.H. that without seclusion, P.H. would elope.

290.    C.H. again inquired what ELPS' plan was for March 11, 2024, if P.H. were to return.

291.    Miller-Hogan said they would just keep trying different things and did not elaborate on what those different things might be.

292.    After the meeting, C.H. and R.H. decided not to send P.H. to school on Monday, March 11, 2024, because Marble staff could not guarantee P.H. would be safe from elopement or seclusion.

293.    However, C.H. signed consent forms for ELPS to contact P.H.'s medical providers and for ELPS to initiate an FBA.

294.    ELPS staff contacted only one of P.H.'s medical providers, Dr. Gregory Holzhei, P.H.'s pediatrician.

295.    Dr. Holzhei told R.H. and C.H. that he had spoken with Hamilton on or around April 1, 2024, and said Hamilton had told Dr. Holzhei that he "[would] not guarantee no seclusion, no matter what."

296.    On April 5, 2024, C.H. and her special education advocate met with Hamilton and several other Marble staff to try to create a plan to allow P.H. to safely return to ELPS.

297.    C.H. asked for P.H. to be transferred to one of ELPS's ASD classrooms, for the ban on her and R.H.'s presence at Marble to be lifted, and for ELPS to stop secluding P.H.

298.    Marble staff denied all of these requests other than agreeing to allow R.H. two thirty-minute observation periods.

299.    The April 5 meeting did not result in any conclusive plan to allow P.H. to return to ELPS safely, so C.H. and R.H. still did not feel comfortable returning him to Marble because of the safety concerns.

300.    On April 22, 2024, C.H. sent a letter to ELPS Superintendent Dori Leyko about her concerns about Marble Elementary's use of seclusion on P.H. against the recommendations of his medical providers about Marble staff's failure to properly respond to P.H.'s elopements and included a request that the District work with the family to resolve the issues.

301.    On May 6, 2024, Leyko sent a letter to C.H. accusing her of sending a letter "filled with inaccuracies" while failing to actually identify any inaccuracies.

302.    Leyko's letter did not address any of C.H.'s concerns about P.H.'s safety and ELPS's failure to provide him with a free and appropriate public education (FAPE).

303.    At that point, R.H. and C.H.'s fears that P.H. would not be safe if he returned to Marble Elementary were fully realized.

304.    Not only had ELPS refused to address their concerns about seclusion and refused to honor Robertson's promise that P.H. could switch to an ASD classroom at any time, but it could not guarantee P.H.'s safety from elopement.

305.    Leyko's letter made clear that ELPS had no intention of working with the family or providing P.H. with FAPE.

306.    C.H. and R.H. withdrew P.H. from ELPS on May 8, 2024, and continued homeschooling him.

307.    C.H. ultimately moved to Ohio with P.H. so he could attend a school that would provide him with a FAPE.

308.    Further, C.H. was forced to decline a significant promotion which would have shifted her formal role at Cooley Law School. C.H. was an adjunct professor at Cooley since 2008. She has always had an office and was the only adjunct permitted to teach required courses. In November 2022, C.H. was promoted to Assistant Director, which increased her job responsibilities and salary. Six months later in April 2023, C.H. was promoted to Director and given a substantial salary increase. She was next set to become a tenure-track professor in January 2024.

309.    Due to the ongoing issues with P.H. caused by HPS and ELPS, and the move to Ohio that became necessary for P.H., C.H. had to put off the promotion and ultimately had to decline it in May 2024. The difference in salary from C.H.'s current position to the tenure-track professorship was a minimum of approximately $30,000. The promotion also included various

other contributions and financial incentives as well. This promotion was something C.H. had been working toward for over a decade, and was made impossible by the actions of HPS and ELPS.

310.    R.H. remains in Michigan to continue his work at Cooley Law School, which has not only forced the family to spend money on maintaining two residences but has also forced them to spend significant time apart.

311.    C.H. and R.H. filed a state complaint against ELPS with the Michigan Department of Education (MDE) on July 2, 2024.

312.    On August 30, 2024, MDE issued a determination finding that ELPS violated the IDEA by failing to implement the services in P.H.'s IEP and failing to document the provision of supplementary aids and services.

### CAUSES OF ACTION / ISSUES

### COUNT I
**Violation of the Individuals with
Disabilities in Education Act, 20 U.S.C. § 1400** *et seq.*,
**and implementing federal and state regulations**

313.    Petitioner re-alleges all prior paragraphs as though fully set forth herein.

314.    The IDEA requires that qualifying children with disabilities receive a free appropriate public education ("FAPE").  20 USC 1412(a)(1)(A); 34 CFR 300.101(a).  To achieve this goal, IDEA and its implementing regulations require that Respondents design and develop an individualized education program ("IEP") for each qualifying child with a disability in their district.  20 USC 1412(a)(4), 1414(d); 34 CFR 300.112, 300.320-24.

315.    34 CFR 300.17 defines a Free Appropriate Public Education, in relevant part, as "special education and related services that . . . are provided at public expense, under public supervision and direction, and without charge . . . [and] are provided in conformity with an individualized education program (IEP)."

316.    The IDEA and its implementing regulations define Special Education as specially designed instruction to meet the unique needs of a child with a disability and ensure access to the general curriculum. 20 USC 1401(29); 34 CFR 300.39(b)(3).

317.    In *Endrew F v Douglas County School District Re-1*, 137 S Ct 988, 999 (2017), the Supreme Court defined FAPE as an offer of education, "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *See also* US Department of Education, *Q&A on U.S. Supreme Court Case Decision Endrew F. v. Douglas County School District Re-1* at 5 (December 7, 2017) <https://sites.ed.gov/idea/files/qa-endrewcase-12-07-2017.pdf>.

318.    In *Endrew F*, the Court further clarified that, in designing an IEP, "every child should have the chance to meet challenging objectives," and the team must give, "careful consideration to the child's present levels of achievement, disability, and potential for growth." *Endrew F*, 137 S Ct at 999-1000.

319.    In developing the IEP, IDEA and its implementing regulations require that the IEP include, "a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child." 34 CFR 300.320(a)(4).

320.    IDEA and its implementing regulations also require a local education agency to "ensure that the IEP Team . . . revises the IEP as appropriate to address any lack of expected progress toward the annual goals and in the general education curriculum . . . ; the results of any reevaluation conducted . . . ; the child's anticipated needs; or other matters." 20 USC 1414 (d)(4)(A)(ii); 34 CFR 300.324(b)(1)(ii).

321.    IDEA and its implementing regulations provide additional requirements and protections where a student with a disability is being disciplined or otherwise removed from the school setting for student conduct.

322.    Pursuant to 34 CFR 300.530(b)(2), "After a child with a disability has been removed from his or her current placement for 10 school days in the same school year, during any subsequent removal the public agency must provide services to the extent required under paragraph (d) of this section."

323.    Where current removals are less than 10 consecutive school days, school staff are responsible for determining the provision of services, "so as to enable the child to continue to participate in the general education curriculum, although in another setting, and to progress toward meeting the goals set out in the child's IEP." 34 CFR 300.530(d)(4). However, if the removal is for ten or more consecutive days, constituting a change in placement, the IEP team is responsible for determining the services. 34 CFR 300.530(d)(5).

324.    If a school district proposes to remove the child for 10 or more consecutive days, constituting a change in placement, the school must conduct a manifestation determination review (MDR) to determine whether the conduct "was caused by, or had a direct and substantial relationship to, the child's disability," or "was the direct result of the [school's] failure to implement the IEP," and in doing so, the meeting participants must, "review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents." 34 CFR 300.530(e)(1).

325.    If the MDR team members determine the conduct was a manifestation of the child's disability, the school must "conduct a functional behavioral assessment . . . and implement a behavioral intervention plan for the child" or "if a behavior intervention plan has already been

developed, review the behavioral intervention plan and modify it, as necessary, to address the behavior." 34 CFR 300.530(f)(1).

326.   Despite continuously removing P.H. from the general education classroom and placing him in seclusion, reducing his school day, and/or sending him home from school for well over 10 school days per year, at no time did either HPS, ELPS, or IISD conduct a manifestation determination review to assess whether his conduct was a manifestation of his disability.

327.   Despite numerous academic and behavior concerns, including increasingly escalating behavior concerns, ELPS, HPS, and IISD consistently failed to request parent consent to conduct reevaluations of P.H. to accurately determine his present level of academic and functional performance and related needs.

328.   Despite numerous academic and behavior concerns, including increasingly escalating behavior concerns, HPS and IISD consistently failed to honor C.H.'s requests to conduct an FBA of P.H. to determine the functions of his behaviors and develop a data-based behavior intervention plan, and ELPS only eventually did so in March 2024.

329.   Despite C.H.'s repeated requests that ELPS consider whether P.H. needed a more restrictive environment, as it was clear that he could not be educated in the general education classroom, at no time did ELPS or IISD take any action to reconsider his LRE.

330.   Although the number of P.H.'s removals totaled more than 10 days in a school year, HPS, ELPS, and IISD failed to consistently provide P.H. with educational services to allow him to continue to make progress toward the general education curriculum and his IEP goals.

331.   Therefore, HPS, ELPS, and IISD denied W.F. FAPE by:

a.  Failing to develop an IEP reasonably calculated to allow P.H. to make appropriate progress in light of his unique circumstances in his May 2022, September 2023 and March 2024 IEPs;

b.  Failing to request parent consent for and conduct comprehensive reevaluations, including a functional behavior assessment, to address P.H.'s lack of progress toward his IEP goals and in the general education curriculum, new information provided by C.H., P.H.'s anticipated academic and behavior needs, and P.H.'s ongoing behavior issues resulting in formal or informal removals from the classroom;

c.  Failing to seek C.H.'s consent to conduct an FBA within 10 school days of making the request;

d.  Failing to implement PBIS to support P.H.'s behavioral needs;

e.  Failing to educate P.H. in the least restrictive environment;

f.  Isolating P.H. from his peers;

g.  Failing to review and revise P.H.'s IEP to address his poor academic performance, ongoing and increasing behavior issues, and lack of progress toward his IEP goals and the general education curriculum; and

h.  Failing to consistently provide W.F. with services to allow him to make progress toward his IEP goals and the general education curriculum for all removals after 10 removals within a school year.

## **REMEDIES REQUESTED**

WHEREFORE, as a "proposed resolution of the problem" under 20 USC 1415(b)(7)(A)(ii)(IV) and 34 CFR 300.508(b)(6), Petitioners request the following relief:

43

A.      Find that Respondents violated state and federal law;

B.      Order Respondents to provide P.H. a compensatory education and related services bank of 400 hours, with no expiration date, for academic and related services, including but not limited to: academic tutoring, counseling, occupational therapy, social work services and speech and language services to be delivered by providers of Petitioners' choosing, at their normal and customary rates;

C.      Order Respondents to reimburse R.H. and C.H. for tutoring evaluation and services for P.H. during the 2023-2024 school year in the amount of: $1300;

D.      Order Respondents to reimburse C.H. for lost income;

E.      Order Respondents to reimburse R.H. and C.H. for moving expenses necessitated by Respondents' failure to provide P.H. with FAPE;

F.      Order Respondents to provide financing for a 3–6-month ABA therapy program local to P.H. to get P.H. back on track academically, to be delivered by providers of Petitioners' choosing at their normal and customary rates;

G.      Find that Petitioners are the prevailing party; and

H.      Order any and all remedies available to Petitioners, pursuant to case law, statute, and equity. The IDEA expressly gives broad authority to hearing officers and courts to order appropriate remedies, without regard to whether the family specifically mentions each and every possible remedy that might be deemed appropriate by a hearing officer. "[W]here legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Bell v Hood*, 327 US 678, 684 (1946), and the existence of a statutory right

implies the existence of all necessary and appropriate remedies. *Sullivan v Little Hunting Park, Inc*, 396 US 229, 239 (1969) (citations omitted).

Dated: December 2, 2024                              Respectfully submitted,


                                        */s/ Megan N. Mitchell*_____
                                        Elizabeth K. Abdnour (P78203)
                                        Megan N. Mitchell (P87312)
                                        Abdnour Weiker LLP
                                        500 E. Michigan Ave., Suite 130
                                        Lansing, MI 48912
                                        E: liz@education-rights.com
                                        E: megan@education-rights.com


                    Petitioner:      _____
                                     Christi Henke (Dec 2, 2024 12:45 EST)


## PROOF OF SERVICE

I have served a copy of Petitioner's Complaint and Request for Due Process Hearing under the IDEA upon the parties listed below by electronic mail on this second day of December, 2024. Please contact me if you would like to receive a hard copy of this document.

                                        */s/ Megan N. Mitchell*_____
                                        Megan N. Mitchell


Michigan Department of Education
Office of Special Education – Due Process Complaints
608 West Allegan
P.O. Box 30008
Lansing, MI 48909
Email: MDE-MIComplaints@michigan.gov

Dori Leyko
Superintendent

East Lansing Public Schools
501 Burcham Dr.
East Lansing, MI 48823
dori.leyko@elps.us

Patrick Malley
Superintendent
Haslett Public Schools
5593 Franklin Street
Haslett, MI 48840
malleypm@haslett.k12.mi.us

Jason Mellema
Superintendent
Ingham ISD
2630 West Howell Road
Mason, MI 48854
communications@inghamisd.org

# Henke Due Process Complaint 12-2-24

Final Audit Report                                                                    2024-12-02

| | |
|---|---|
| Created: | 2024-12-02 |
| By: | Mark Weiker (laura@education-rights.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAYfwdgntawAi0Nm3UBwcpgtWTEWG5UOD2 |

## "Henke Due Process Complaint 12-2-24" History

📄 Document created by Mark Weiker (laura@education-rights.com)
2024-12-02 - 5:22:22 PM GMT

✉ Document emailed to christi.henke@gmail.com for signature
2024-12-02 - 5:22:31 PM GMT

📄 Email viewed by christi.henke@gmail.com
2024-12-02 - 5:40:53 PM GMT

✍ Signer christi.henke@gmail.com entered name at signing as Christi Henke
2024-12-02 - 5:45:19 PM GMT

✍ Document e-signed by Christi Henke (christi.henke@gmail.com)
Signature Date: 2024-12-02 - 5:45:21 PM GMT - Time Source: server

✅ Agreement completed.
2024-12-02 - 5:45:21 PM GMT

**Adobe Acrobat Sign**