**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| **CHRISTI HENKE and RICH HENKE o/b/o P.H.,**<br><br>        Plaintiff,<br><br>v.<br><br>**EAST LANSING PUBLIC SCHOOLS and INGHAM INTERMEDIATE SCHOOL DISTRICT,**<br><br>        Defendants. | Case No.: 1:25-cv-680<br><br>Hon. Hala Y. Jarbou<br><br>**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

| | |
|---|---|
| Elizabeth Abdnour (P78203)<br>Megan N. Mitchell (P87213)<br>Jacquelyn Kmetz (P83575)<br>ABDNOUR WEIKER, LLP<br>325 E. Grand River Ave., Suite 250<br>East Lansing, MI 48823<br>(517) 994-1776<br>liz@education-rights.com<br>megan@education-rights.com<br>jacquelyn@education-rights.com<br><br>*Attorneys for Plaintiffs* | Erin H. Walz (P55484)<br>THRUN LAW FIRM, P.C.<br>2900 West Rd., Suite 400<br>P.O. Box 2575<br>East Lansing, MI 48826-2575<br>(517) 374-8830<br>ewalz@thrunlaw.com<br><br>*Attorneys for Defendant East Lansing Public Schools*<br><br>Jordan M. Bullinger (P72441)<br>CLARK HILL, PLC<br>200 Ottawa Ave. NW, Suite 500<br>Grand Rapids, MI 49503<br>(616) 608-1146<br>jbullinger@clarkhill.com<br><br>*Attorneys for Defendant Ingham Intermediate School District* |

## PLAINTIFFS' BRIEF IN SUPPORT FOR MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

This lawsuit dates to September 2023, when Defendants first began denying P.H. a free and appropriate public education (FAPE) under the Individuals with Disabilities in Education Act (IDEA). Appeal, ECF 8, PageID.228 at ¶ 111. Despite developing an IEP for P.H. that claimed he would be educated primarily in the general education classroom, Defendant East Lansing Public Schools (ELPS) increasingly isolated P.H. from his peers – leaving him to work primarily in the office, failing to address his escalating behaviors via increased supports or a functional behavior assessment, and subjecting P.H. to repeated inappropriate uses of seclusion. Am. Compl., ECF 8-1, PageID.253-273 at ¶ 18-114. Ultimately, ELPS and its regional partner, Defendant Ingham Intermediate School District (IISD), failed to address P.H.'s educational needs and the significant safety concerns created by his behaviors. As a result, Plaintiffs were forced to not only withdraw P.H. from the District, but to move him to Toledo, Ohio where he could attend a school that was willing to provide an educational program reasonably calculated to provide him with FAPE. *Id.* at PageID.274-277 at ¶ 115-124.

When Plaintiffs filed a due process complaint against Defendants for their respective failures to provide P.H. with FAPE, the administrative law judge inappropriately dismissed Defendant IISD as a party, citing prior decisions with no basis in statutory or binding case law. Appeal, ECF 8, PageID.214 at ¶ 34. As a result, the mix of responsibility between the two Defendants, ELPS and IISD, has not been established, or seriously considered. The two Defendants, but IISD especially, have never been held accountable for their actions and inactions, resulting in a deprivation of FAPE for P.H. and significant out-of-pocket expenses for Christi and Rich Henke. Am. Compl., ECF 8-1, PageID.277 at ¶ 124.

2

## STATEMENT OF FACTS

Plaintiffs are the parents and legal guardians of P.H. Appeal, ECF 8, PageID.209 at ¶ 1. P.H. is a 9-year-old child with qualifying disabilities under the IDEA and is therefore entitled to receive special education and related services under the IDEA. Am. Compl., ECF 8-1, PageID.248 at ¶ 5. P.H. was enrolled in East Lansing Public Schools (ELPS) from August 2023 to April 2024. *Id.* at ¶ 6. ELPS was the primary school district in which Plaintiffs and P.H. resided at all times relevant to their due process complaint. *Id.* at ¶ 26. IISD is the regional intermediate school district in which Plaintiffs and P.H. resided at all times relevant to their due process complaint. *Id.* at PageID.247 at ¶ 7, PageID.248 at ¶7d. ELPS and IISD worked in conjunction to develop and provide P.H. FAPE. Respondent's Offered and Admitted Exhibits A-X, ECF 28-2, PageID.2307-2311; Petitioners' Offered and Admitted Exhibits 1-62, ECF 28-3, PageID.2356, 2374, 2387-2424; Petitioners' Offered and Admitted Exhibits 1-62, ECF 28-4, PageID.2557, 2560-2561.

As the resident school district, ELPS managed the school building P.H. attended, Marble Elementary, and provided general education support and services, along with some limited special education services. Appeal, ECF 8, PageID.209 at ¶ 4. As the intermediate school district (ISD), IISD worked with ELPS to additionally provide P.H. special education services and supports. Respondent's Offered and Admitted Exhibits A-X, ECF 28-2, PageID.2307-2311; Petitioners' Offered and Admitted Exhibits 1-62, ECF 28-3, PageID.2356, 2360, 2365, 2374, 2379, 2383, 2387-2424; Petitioners' Offered and Admitted Exhibits 1-62, ECF 28-4, PageID.2557, 2560-2561. *See also* March 24, 2025 Decision and Order, ECF 8-4, PageID.388-392 at ¶¶ 290-341. Specifically, IISD employed both an occupational therapist and an autism consultant that both worked with P.H. and his ELPS service providers. March 24, 2025 Decision and Order, ECF 8-4, PageID.388-392 at ¶¶ 290-341.

3

In August 2024, Plaintiffs met with ELPS staff regarding P.H. potentially returning to ELPS, after attending a different school district for the 2023-2024 school year. *Id.* at PageID.367-368 at ¶¶ 8-15. Specifically, Plaintiffs shared P.H.'s traumatic experiences with seclusion and restraint at his previous school and, in response, ELPS staff assured Plaintiffs there was no seclusion room at ELPS. *Id.* at ¶¶ 8, 13. Following the meeting, Plaintiffs enrolled P.H. at Marble Elementary School for the 2024-2025 school year, and P.H. was immediately placed on a shortened school day. *Id.* at PageID.368 at ¶ 15, PageID.368 at ¶ 20. An IEP team meeting was held three weeks into the school year, on September 13, 2023. Petitioners' Offered and Admitted Exhibits 1-62, ECF 28-3, PageID.2356. P.H.'s areas of need included reading, socio-emotional behavior, speech and language, and fine motor skills, like his previous IEP. *Compare* Petitioners' Offered and Admitted Exhibits 1-62, ECF 28-3, PageID.2340-2342 *to* PageID.2358-2359. However, despite carrying over the same areas of need, the IEP inexplicably cut P.H.'s social work services, eliminated many of his supplementary aids and services, and failed to provide a behavior plan or positive behavioral intervention supports (PBIS) to address P.H.'s significant socio-emotional needs. *Compare id.* at PageID.2344-2345 *to* PageID.2360, 2365.

For the first half of the 2023-2024 school year, while P.H. was physically present in school, he began showing increasing signs of school avoidance and increased socio-emotional behaviors following the IEP meeting. March 24, 2025 Decision and Order, ECF 8-4, PageID.351; Respondent's Offered and Admitted Exhibits A-X, ECF 28-2 at PageID.2269-2271, 2273; February 12, 2025 Hearing Transcript Volume III, ECF 27-11, PageID.1693 at l 5-25; February 13, 2025 Hearing Transcript Volume IV, ECF 27-9, PageID.1459 at Tr 851 at l 13-25; February 14, 2025 Hearing Transcript Volume V, ECF 27-5, PageID.1391 at Tr 884 at l 3-25. P.H. began spending less time with peers, exhibiting increased anxiety, taking more frequent walking breaks,

4

and, most noticeably, spending an increasing amount of time spent in the bathroom. March 24, 2025 Decision and Order, ECF 8-4, PageID.399 at ¶¶ 429-436; February 10, 2025 Hearing Transcript Volume I, ECF 27-13, PageID.1999 at Tr 48 at l 11-15, PageID.2002 at Tr 57 at l 22 - Tr 58 at l 1; February 11, 2025 Hearing Transcript Volume II, ECF 27-12, PageID.1924 at l 6 – PageID.1925 at l 8; February 12, 2025 Hearing Transcript Volume III, ECF 27-11, PageID.1692 at l 16-22, PageID.1720 at l 22 – PageID.1721 at l 22, PageID.1722 at l 3-13; February 14, 2025 Hearing Transcript Volume V, ECF 27-5, PageID.1390-1391 at Tr 880-882, PageID.1391 at Tr 884 at l 8-19; Petitioners' Offered and Admitted Exhibits 1-62, ECF 28-8, PageID.2909, PageID.2914-2915, PageID.2917. On at least one occasion, P.H. fell asleep in the bathroom and by November 2023, he was requesting to use the bathroom at least 2-3 times an hour of an already significantly shortened school day. February 10, 2025 Hearing Transcript Volume I, ECF 27-15, PageID.2023 at Tr 141 at l 7-11; February 12, 2025 Hearing Transcript Volume III, ECF 27-11, PageID.1721 at l 12-14; February 14, 2025 Hearing Transcript Volume 5, ECF 27-6, PageID.1407 at Tr 949 at l 18-21.

P.H.'s behavior worsened after winter break. March 24, 2025 Decision and Order, ECF 8-4, PageID.351-352, PageID.361, PageID.368 at ¶ 25, PageID.369 at ¶ 34, 36; Petitioners' Offered and Admitted Exhibits 1-62, ECF 28-8 at PageID.2928; February 10, 2025 Hearing Transcript Volume I, ECF 27-13, PageID.2003 at Tr 64 at l 12-19. For the first few days after winter break, P.H. refused to enter his classroom and Christie had to coax him into the room, taking him through the front door instead of the usual back door. March 24, 2025 Decision and Order, ECF 8-4, PageID.368 at ¶ 25; February 10, 2025 Hearing Transcript Volume 1, ECF 27-13, PageID.2001 at Tr 55 at l 20 - Tr 56 at l 7. Other IEP team members, including P.H.'s speech and language therapist and occupational therapist, acknowledged the noticeable change in behaviors. February 12, 2025

Hearing Transcript Volume III, ECF 27-11, PageID.1516 at l 13-21, PageID.1593 at l 23 – PageID.1595 at l 11. By the end of January, P.H. was making threats against his paraprofessional and began exhibiting additional concerning behaviors, such as counting cars, lying on the floor, and inexplicably repeating numbers. February 10, 2025 Hearing Transcript Volume I, ECF 27-14, PageID.2005 at Tr 72 at l 7 – PageID.2006 at Tr 73 at l 16, PageID.2006 at Tr 74 at l 2-5, 13-24, PageID.2006 at Tr 75 at l 1-20; February 12, 2025 Hearing Transcript Volume III, ECF 27-11, PageID.1594 at l 11-19. P.H. even went so far as to pretend he was dead to avoid an occupational therapy session with IISD occupational therapist, Stacy Turke. February 12, 2025 Hearing Transcript Volume III, ECF 27-11, PageID.1594 at l 20-25. Ms. Turke even requested that Christie wait outside her classroom in case she needed to intervene for P.H.'s behaviors. February 10, 2025 Hearing Transcript Volume I, ECF 27-14, PageID.2006 at Tr 76 at l 10-17. Due to P.H.'s increasing socio-emotional needs and inability to participate in learning activities, he was not making any progress toward his IEP goals or the general education curriculum, particularly in reading, and Christie was attending with him daily just to get him into the building. February 10, 2025 Hearing Transcript Volume I, ECF 27-13, PageID.2002 at Tr 59 at l 4-9, PageID.2004 at Tr 65 l 23 – Tr 67 at l 10; February 10, 2025 Hearing Transcript Volume I, ECF 27-14, PageID.2005 at Tr 69 at l 23 – Tr 72 at l 22, PageID.2006 at Tr 75 at l 1-20. Yet, despite all these clear changes in P.H.'s behavior, neither Defendant took any action to amend P.H.'s IEP services, whether via a meeting or an amendment, nor to conduct a functional behavior assessment (FBA) or other relevant evaluations to address these increasing needs and lack of progress. February 10, 2025 Hearing Transcript Volume I, ECF 27-14, PageID.2008 at Tr 82 at l 16 – PageID.2009 at Tr 85 at l 23, PageID.2009 at Tr 86 at l 8.

Even worse than failing to amend P.H.'s services or conduct evaluations, Defendants then began further disrupting P.H.'s shortened school day by changing his schedule daily, based solely on the availability of Ms. Miller-Hogan (ELPS School Social Worker), Kristen Casby (ELPS special education teacher), Stacy Turke (IISD OT), and P.H.'s paraprofessionals, versus P.H. and his individual needs. February 10, 2025 Hearing Transcript Volume I, ECF 27-13, PageID.2004 at Tr 68 at l 7-23. Although Plaintiffs specifically requested P.H. be transferred to an autism spectrum disorder (ASD) classroom, to work with the reading intervention teacher, and to have Christie attend with P.H. in the general education classroom or otherwise engage with his peers, these requests were inexplicably denied with no alternatives offered. February 10, 2025 Hearing Transcript Volume I, ECF 27-14, PageID.2007 at Tr 80 at l 14-19, PageID.2009 at Tr 87 at l 4-9. Instead, Defendants only increasingly isolated P.H., denying him any access to general education peers, confining him only to the special education room, office conference room, or seclusion room. *Id.* at PageID.2005 at Tr 69 at l 21 - Tr 72 at l 1. When placed in the office due to lack of staff to supervise him, P.H. would simply sit and count cars in the parking lot. *Id.* at PageID.2006 at Tr 74 at l 13-24.

Without any increase or modifications to his special education services or supports, and with the added unpredictability of his daily schedule and increasing isolation from his peers, unsurprisingly, P.H.'s behaviors continued to exponentially worsen throughout February and March 2024. *Id.* at PageID.2009 at Tr 88 at l 19-24, PageID.2011 at Tr 96 at l 24 – PageID.2012 at Tr 97 at l 23. As of early February 2024, Defendants were only allowing P.H. to attend school in the special education classroom, despite his IEP still stating he was placed in the general education classroom. *Id.* at PageID.2005 at Tr 71 at l 6-25. He also continued to be aggressive with his paraprofessional and he would require Christie's assistance during transitions. *Id.* at

7

PageID.2006 at Tr 74 at l 3-8, Tr 76 at l 4-19. P.H.'s also began exhibiting increasing elopement. *Id.* at PageID.2011 at Tr 96 at l 24 – PageID.2012 at Tr 97 at l 23, PageID.2012 at Tr 99 at l 14 - Tr 100 at l 25, PageID.2013 at Tr 102 at l 1-19, Tr 103 at l 5-16. On February 9, 2024, while attending an occupational therapy session with Ms. Turke, P.H. ran away as Ms. Turke was attempting to take P.H. back to the office and transition him to the next service provider. *Id.* at PageID.2007 at Tr 77 at l 9-25. Both Ms. Turke and Ms. Miller-Hogan had to search the school for P.H., before ultimately finding him in the unoccupied STEM classroom, hiding between cabinets. *Id.* On February 27, 2024, P.H. managed to elope out of the building and try to run home, getting as far as the middle of one of the busiest intersections in East Lansing until Christie was able to catch up with him and bring him safely back to the school building. *Id.* at PageID.2012 at Tr 97 at l 24 – PageID.2013 at Tr 101 at l 25; February 10, 2025 Hearing Transcript Volume I, ECF 27-16, PageID.2050 at Tr 249 at l 21 - Tr 250 at l 12.

P.H.'s increasing needs and behaviors reached a peak on March 4, 2024. February 10, 2025 Hearing Transcript Volume I, ECF 27-14, PageID.2010 at Tr 89 at l 5-9. As P.H. was working in the office conference room due to his escalated behaviors that week, P.H. began knocking down coat racks, hitting the television, crawling under the desk, and trying to dump over the mini fridge. *Id.* at PageID.2010 at Tr 89 at l 1-12. At this time, Christie entered the room to try to assist and P.H. asked her about the "calm down room." *Id.* at Tr 89 at l 16 - Tr 90 at l 9. Recalling the initial meeting she had with Ms. Miller-Hogan and Ms. Robertson before the start of the school year, where they advised Plaintiffs that Marble Elementary did not have a seclusion room, Christie told P.H. there was no calm down room, only for P.H. to insist there was and describe it with alarming specificity. *Id.* at Tr 90 at l 17-24. Only after P.H. described the room did Ms. Miller-Hogan and Ms. Robertson acknowledge its existence, despite initially continuing to deny it. *Id.* at Tr 89 at l

8

18 - Tr 91 at l 14. Throughout this interaction, P.H. remained agitated, to the extent he began suffering a panic attack, something that had only happened once before, prompting Christie to take him home for the remainder of the day. *Id.* at Tr 90 at l 1-6, 25.

ELPS convened an IEP meeting on March 5, 2024, to discuss the incident and finally made any changes to P.H.'s IEP. *Compare* Petitioners' Offered and Admitted Exhibits 1-62, ECF 28-3, PageID.2356-2367 *to* PageID.2371-2384. The changes to the present levels of academic achievement and functional performance section of P.H.'s IEP unequivocally indicated a clear increase in P.H.'s behavioral needs over the preceding six months. *Compare id.* at PageID.2356-2359 *to* PageID.2371-2378. However, despite documenting such regression, the only change to P.H.'s supplementary aids and services was to add a medical plan. *Compare id.* at PageID.2360 *to* PageID.2379. Relatedly, although P.H.'s social work services were nominally increased from 20-35 minutes, 1-2 times a week, to 20-50 minutes, 1-5 times a week, there were no changes to his occupational therapy services, and his speech and language therapy services were reduced. *Compare id.* at PageID.2365 *to* PageID.2383. There were also no changes made to P.H.'s ASD teacher consultant services, as the ASD Teacher Consultant, Kelsey Kujawa, was not invited to the meeting. February 12, 2025 Hearing Transcript Volume III, ECF 27-11, PageID.1649 at l 2-9. Equally concerning, the revised IEP continued to claim P.H. was spending most of the day in the general education setting, despite Defendants' having denied P.H. any access to his general education peers for months. Petitioners' Offered and Admitted Exhibits 1-62, ECF 28-3, PageID.2383. At the conclusion of the meeting, Plaintiffs raised their concerns about P.H.'s safety, due to his aggression and elopement, but Defendants failed to develop a safety plan or otherwise present any clear plan to address P.H.'s safety needs and expressly denied Plaintiffs' request to

move P.H. to an ASD classroom. February 10, 2025 Hearing Transcript Volume I, ECF 27-14, PageID.2011 at Tr 94 at l 23 – Tr 95 at l 16, PageID.2013 at Tr 102 at l 3 - Tr 103 at l 22.

The following day, March 6, P.H. had another significant behavioral incident. *Id.* at PageID.2013 at Tr 104 at l 24 – PageID.2014 at Tr 105 at l 2. While in the main office, P.H. began tearing things off the wall, attempting to shatter a window, ripping books and papers, and hitting and kicking staff members who attempted to get close to try to deescalate him. Petitioners' Offered and Admitted Exhibits 1-62, ECF 28-4, PageID.2455. Ms. Miller-Hogan and Ms. Robertson were ultimately able to reach P.H. and physically transport him to the seclusion, "calm down," room, with P.H. screaming the entire time, begging not to be taken there. February 10, 2025 Hearing Transcript Volume I, ECF 27-14, PageID.2013 at Tr 104 at l 24 – PageID.2014 at Tr 108 at l 25. Although Ms. Miller-Hogan had only approved a two-minute seclusion, Christie had to personally request Ms. Robertson release P.H. as more than two minutes had elapsed. *Id.* at PageID.2014 at Tr 105 at l 21 – Tr 106 at l 2, PageID.2014 at Tr 108 at l 19 – PageID.2015 at Tr 109 at l 4. Christie then walked P.H. back to the main office, stopping for a brief bathroom break, only for P.H. to suffer another behavioral episode almost immediately thereafter. *Id.* at PageID.109 at l 11-21. *See also* February 11, 2025 Hearing Transcript Volume II, ECF 27-12, PageID.1954 at l 7-11. P.H. destroyed hundreds of papers, destroyed numerous personal items, including picture frames, and hit Ms. Robertson with a closed fist. February 10, 2025 Hearing Transcript Volume I, ECF 27-14, PageID.2015 at Tr 109 at l 20-23; February 11, 2025 Hearing Transcript Volume II, ECF 27-12, PageID.1954 at l 7 – PageID.1955 at l 17. Although Christie requested to take P.H. home, as he was clearly severely escalated, Ms. Robertson refused, saying they could not let P.H. "win." February 10, 2025 Hearing Transcript Volume I, ECF 27-14, PageID.2015 at Tr 109 at l 24 - Tr

110 at l 2. It wasn't until 40 minutes elapsed that ELPS finally allowed Christie to take P.H. home. *Id.* at Tr 110 at l 9-15.

Following the March 6 incident, Plaintiffs attempted to work with ELPS to develop an appropriate IEP and safety plan that would allow P.H. to safely and effectively access his education and make appropriate progress. *Id.* at PageID.2017 at Tr 120 at l 2 – PageID.2018 at Tr 121 at l 23, PageID.2019 at Tr 126 at l 2 – Tr 127 at l 9. Unfortunately, these efforts were fruitless, and Plaintiffs ultimately disenrolled P.H. from Marble Elementary on May 8, 2024. *Id.* at PageID.2019 at Tr 127 at l 10-19; Respondent's Offered and Admitted Exhibits A-X, ECF 28-2, PageID.2233. Plaintiffs then filed a state complaint, alleging Defendant ELPS failed to provide P.H. with FAPE and received a favorable decision on August 30, 2024. Petitioners' Offered and Admitted Exhibits 1-62, ECF 28-4, PageID.2484-2504. Shortly thereafter, on December 2, 2024, Plaintiffs filed a due process complaint against ELPS and IISD. Am. Compl., ECF 8-1, PageID.246. On December 13, 2024, IISD filed a Motion to Dismiss. ECF 26-11, PageID.1068. IISD argued that it was not responsible for the identification, placement, or provision of FAPE to P.H. because it was not a LEA. *Id.* at PageID.1070-1074. In support of its Motion, IISD attached five opinions attached by MOAHR administrative law judges ("ALJs") serving as special education due process Hearing Officers in other due process hearings, all of which concluded that ISDs are not LEAs and therefore are not responsible for providing FAPE to students on IEPs. *Id.* at PageID.1073-1074, PageID.1077-1145.

On January 30, 2025, the Hearing Officer issued an order erroneously dismissing IISD as a party to the due process hearing based on incorrect legal arguments and wrongly analyzed prior caselaw cited by IISD in its Motion to Dismiss. January 30, 2025 Order Granting IISD's Mot. to Dismiss, ECF 8-2, PageID.286-292. The January 30 order wrongly held that Plaintiffs' only claims

11

against IISD were related to its supervisory responsibilities. *Id.* at PageID.290. However, in reaching that conclusion, the Hearing Officer failed to consider Plaintiffs' actual claims related to the IISD's direct denial of P.H.'s FAPE. *Compare id.* at PageID.286-292 *to* Am. Compl., ECF 8-1, PageID.281-282 at ¶¶ 146-147. In doing so, the Hearing Officer failed to consider whether the IISD had taken on direct responsibility for the education of a disabled student, as multiple IISD employees provided related services to P.H. via its Occupational Therapist (OT), Stacy Turke, and its ASD Teacher Consultant, Kelsey Kujawa, both of whom also regularly participated in P.H.'s IEP meetings to develop and deliver the offer of FAPE that was formally extended by ELPS. Am. Compl., ECF 8-1, PageID.258 at ¶ 51, 71; *see also* Appeal, ECF 8, PageID.237 at ¶ 179d, PageID.238 at ¶ 179h; Petitioners' Offered and Admitted Exhibits 1-62, ECF 28-3, PageID.2356, PageID.2369, PageID.2374; December 17, 2025 Opinion Denying IISD's Motion to Dismiss, ECF 9, PageID.716.

Just before IISD was dismissed from the case, on January 10, 2025, Plaintiffs filed an Amended Due Process Complaint against Defendants, clarifying the issues for hearing. Appeal, ECF 8, PageID.219 at ¶ 61, 62. The due process hearing took February 10 to 14, 2025, regarding Plaintiffs' claims against ELPS only. *Id.* at PageID.220 at ¶ 66. As demonstrated during the hearing by testimony and supporting exhibits, Defendants repeatedly failed to implement P.H.'s IEP as written, failed to amend P.H.'s IEP to address his increasing disability-related behaviors and lack of progress, and, instead, repeatedly subjected to inappropriate uses of restraint and seclusion, all of which contributed to his denial of FAPE. *Id.* at PageID.230-241 at ¶¶ 123-197. On March 24, 2025, the Hearing Officer issued a final decision and order finding that ELPS had not violated IDEA. *Id.* at PageID.221 at ¶ 75.

12

In doing so, the Hearing Officer failed to properly analyze the issues for hearing, failed to apply the *Endrew F.* standard for determining the reasonableness of ELPS's offer of FAPE, ignored ample evidence regarding ELPS' violations of IDEA by a preponderance of the evidence, and contradicted his own statements made during the hearing. *Id.* at PageID.220-241 at ¶¶ 69-201. P.H. timely filed this appeal of that final order.

<u>**STANDARD OF REVIEW**</u>

Summary judgment should be granted if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003) (citing Fed. R. Civ. P. 56(c)). A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment "in favor of the party with the burden of persuasion . . . is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

The standard of review for IDEA appeals in the Sixth Circuit is "modified de novo." *See Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 849 (6th Cir. 2005); *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001). Under this standard, this Court is required to conduct an independent review of the entire record, including the administrative record and any additional evidence requested to be heard by a party, and then make an independent decision based on a preponderance of the evidence. *Deal*, 392 F.3d at 849. In reaching its decision, the Court must

13

also give due weight to the determinations made during the state administrative proceedings. *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982).

However, reviewing courts must not "simply adopt the state administrative findings without an independent re-examination of the evidence." *Doe ex rel. Doe v. Metro. Nashville Pub. Schs.*, 133 F.3d 384, 387 (6th Cir. 1998). "The modified de novo standard requires the Court to 'make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings.'" *B.S. v. Rochester Comm. Schs.*, No. 5:06-cv-00053 PageID.389 (W.D. Mich. Oct. 2, 2006), citing *McLaughlin v. Holt Pub. Schs. Bd.*, 320 F.3d 663, 669 (6th Cir. 2003) (quoting *Knable*, 238 F.3d at 764). Further, "[t]he amount of weight due to administrative findings depends on whether the finding is based on educational expertise." *McLaughlin*, 320 F.3d at 669. "Under the 'due weight' framework, '[l]ess weight is due to an agency's determinations on matters which educational expertise is not relevant because a federal court is just as well suited to evaluate the situation.'" *Rochester*, No. 5:06-cv-00053 PageID.389 (quoting *McLaughlin*, 320 F.3d at 669).

<u>**ARGUMENT**</u>

**A.  IISD should not have been dismissed from the due process proceeding.**

IISD was responsible for providing a FAPE to P.H. under the IDEA. Amended Compl., ECF 8, PageID.213 at ¶ 29. Under M.C.L. 380.1711, ISDs are responsible for developing, establishing, and continually evaluating and modifying a plan for the delivery of special education services for all students under the age of 26 who are residents of constituent districts and who have not graduated from high school. *Id.* at PageID.214-215 at ¶ 39; M.C.L. 380.1711(1)(a), (f). While courts have been clear that mere supervisory responsibility is not enough to trigger an ISD's obligation to an individual student (*see* March 16, 2026 Opinion and Order, *L.G. o/b/o G.G. v.*

14

*Kelloggsville Public Schools, et al.*, No. 1:24-cv-00833 PageID.3085-3086), the question remains, what level of direct involvement is? That is the question before this Court.

In reviewing the relevant statutes, M.C.L. 380.1711 does not limit an ISD's obligation only to those students that are currently enrolled in one of the ISD's programs or classrooms. Amended Compl., ECF 8, PageID.215 at ¶ 40. The Michigan Administrative Rules of Special Education (MARSE) provide for reimbursement for special education programs and services in compliance with the ISD plan approved by the Michigan Department of Education (MDE). MARSE R. 340.1809. As a result, IDEA, state law, the corresponding implementing regulations, and practice have created a system where an ISD, such as IISD, is responsible for not only generally ensuring that students with disabilities receive FAPE but can also be responsible for providing FAPE to individual students as well. Among an ISD's responsibilities are "maintaining a record of all students who are eligible for special education programs and services within the boundaries of one of its constituent districts" (IISD Mot. to Dismiss, ECF 26-11, PageID.1071), maintaining a "record of…the special education programs or services in which the student with a disability is participating…" M.C.L. 380.1711(1)(f), and operating "the special education programs or services or contract for the delivery of special education programs or services by local school district boards, in accordance with section 1702, as if a local school district under section 1751," M.C.L. 380.1711(1)(i). Per MDE's Guidance for the Development of Intermediate School District Plan for the Delivery of Special Education Programs and Services in Catamaran, ISDs must "develop and maintain an ISD Plan for the Delivery of Special Education Programs and Services" that specifically includes diagnostic and related services, such as occupational therapy or teacher consultant services, that are "provided to eligible students as part of a free appropriate public education (FAPE)." ECF 8-7, PageID.430, 434.

The IDEA is also clear that its provisions apply to ISDs:

**Applicability of this part to State and local agencies.**

(a) ***States.*** This part applies to each State that receives payments under Part B of the Act, as defined in § 300.4.

(b) ***Public agencies within the State.*** The provisions of this part—

(1) Apply to all political subdivisions of the State that are involved in the education of children with disabilities, including:

(i) The State educational agency (SEA).
(ii) Local educational agencies (LEAs), educational service agencies (ESAs), and public charter schools that are not otherwise included as LEAs or ESAs and are not a school of an LEA or ESA.

(iii) Other State agencies and schools (such as Departments of Mental Health and Welfare and State schools for children with deafness or children with blindness).

(iv) State and local juvenile and adult correctional facilities; and

(2) Are binding on each public agency in the State that provides special education and related services to children with disabilities, regardless of whether that agency is receiving funds under Part B of the Act.

34 C.F.R. § 300.2 (emphasis in original). Further, the IDEA's special education due process hearing procedural safeguards explicitly contemplate a parent filing a due process complaint against entities other than LEAs:

**Response to complaint**

**(i) Local educational agency response**

**(I) In general**

If the local educational agency has not sent a prior written notice to the parent regarding the subject

> matter contained in the parent's due process complaint notice, such local educational agency shall, within 10 days of receiving the complaint, send to the parent a response….

> **(ii) Other party response**

> Except as provided in clause (i), the non-complaining party shall, within 10 days of receiving the complaint, send to the complaint a response that specifically addresses the issues raised in the complaint.

20 U.S.C. § 1415(c)(2)(B) (emphasis in original). If Congress had not intended for parents to be able to file due process complaints against entities other than LEAs, such as ISDs and ESAs, it would have had no reason to include the language of 20 U.S.C. § 1415(c)(2)(B)(ii) in the IDEA.

Taken together, these state and federal statutes and regulations indicate that an ISD is a proper party to a due process complaint where it has voluntarily assumed the responsibility for an individual student's receipt of FAPE where it provides direct services to the student and establishes itself as a member of the student's IEP team. Applying that standard here, under the applicable laws and regulations, IISD was a proper party to Plaintiffs' initial due process complaint.

Contrary to IISD's previous claims, P.H.'s educational records make clear that he was part of IISD's resident district and he was participating within IISD's programs and services. At all relevant times, P.H. attended Marble Elementary School, which is directly within IISD's jurisdiction. Am. Compl., ECF 8-1, PageID.254 at ¶ 26. More importantly, as demonstrated by P.H.'s IEPs, at all relevant times he received occupational therapy from IISD's occupational therapist and ASD teacher consultant services from the IISD's ASD teacher consultant. March 24, 2025 Decision and Order, ECF 8-4, PageID.388 at ¶¶ 290, 293-294, 296, and 299, PageID.389 at ¶ 308, PageID.390 at ¶ 325, PageID.391 at ¶¶ 329-330, 332, 337. Within those respective roles, IISD was in the room, guiding the IEP team decisions and then providing direct services to P.H.,

17

thereby voluntarily accepting responsibility for the provision of FAPE to P.H. *Id.* Further, in addition to both the OT and ASD teacher consultant's participation in the IEP meetings and provision of services, the OT's active role in regularly supervising P.H. during his shortened school days, clearly demonstrates that Defendants ELPS and IISD were working in conjunction to develop and provide P.H.'s offer of FAPE. February 10, 2025 Hearing Transcript, ECF 27-13, PageID.2002 at Tr 60 at l 17-24, PageID.2004 at Tr 68 at l 7-9. Due to the ALJ's premature dismissal of IISD from the due process proceeding, the actual extent of the collaboration is unknown, but M.C.L. 380.1751(b)[1] clearly indicates that at least some contract was in place allowing the ISD to provide those occupational therapy and teacher consultant services. In prematurely dismissing IISD as a party to the due process complaint, the ALJ also repeatedly made general, sweeping statements about IISD not being responsible without ever considering the facts of the matter. January 30, 2025 Order Granting IISD's Mot. to Dismiss, ECF 8-2, PageID.289-292. This Order failed to consider and analyze whether IISD's provision of services to P.H. via its OT and ASD teacher consultant, or the other repeated interactions P.H. was having with the IISD OT, created an obligation by IISD to P.H. under IDEA. *Id.* at PageID.286-292.

However, as clearly demonstrated by the ALJ's March 24, 2025 Decision and Order, the ALJ made numerous findings detailing IISD's responsibility to provide P.H. FAPE in his summary of the IISD providers' testimony. March 24, 2025 Decision and Order, ECF 8-4, PageID.388-392.

---

[1] "The board of a local school district shall provide special education programs and services designed to meet the individual needs of each student with a disability in its district on record under section 1711 for whom an appropriate educational or training program can be provided in accordance with the intermediate school district special education plan, in either of the following ways or a combination thereof . . . (b) Contract with its intermediate school board, another intermediate school board, another local school district board, an adjacent school district board in a bordering state, the Michigan schools for the deaf and blind, the department of health and human services, or any combination thereof, for delivery of the special education programs or services, or with an agency approved by the superintendent of public instruction for delivery of an ancillary professional special education service. The intermediate school district of which the local school district is constituent shall be a party to each contract even if the intermediate school district does not participate in the delivery of the program or services." M.C.L. 380.1751(1)(b).

18

Here, both the OT and the ASD teacher consultant played a consistent and direct role in developing his offer of FAPE via his IEP and progress monitoring. *Id.* at PageID.388 at ¶¶ 295, 297-298, PageID.389 at ¶¶ 304, 307, PageID.390 at ¶¶ 314-315, 320-321, PageID.391 at ¶¶ 329-330, 332. Both staff testified at length regarding their direct involvement with and observation of P.H. as part of their service delivery. *Id.* at PageID.388-392. Thus, given the level of the occupational therapist's direct involvement in P.H.'s development and receipt of FAPE, it is clear he was participating in one of the IISD's programs and services – the provision of occupational therapy.

For these reasons, Plaintiff is entitled to summary judgment as a matter of law. The Tribunal should not have dismissed IISD as a party to the due process proceeding as it was clearly a proper party under the relevant statutes. Due to the ALJ's failure to analyze IISD's involvement and responsibility to provide FAPE to P.H. specifically, and not as a general hypothetical scenario, his decision to dismiss IISD is due little, if any, deference. Under the modified *de novo* standard, an independent review of the administrative record makes clear that IISD was actively involved in P.H.'s receipt of FAPE via the related services provided to him. The due process hearing decision does not deserve any particular weight or deference because no educational expertise was relevant or applied.

The decision failed to consider IISD's active involvement in the provision of P.H.'s FAPE, instead dismissing it simply based on prior, inapplicable, non-binding individual due process hearing decisions with no further consideration of the merits.  IISD played an active and material role in the development and delivery of P.H.'s offer of FAPE. No genuine issue of material fact exists that would allow a jury to find otherwise. P.H. ought to have the opportunity to try his claims against the IISD, and this Court should grant summary judgment on this issue.

19

**B. Defendants failed to provide P.H. with FAPE**

The IDEA guarantees "a substantially adequate program of education to all eligible children." *Endrew F. v. Douglas Co. Sch. Dist. RE-1*, 137 S. Ct. 988, 995 (2017) (citing *Bd. of Ed. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 200-02 (1982)). The touchstone of this right is an IEP "reasonably calculated to . . . be appropriately ambitious in light of his circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom." *Id.* at 999-1000. To that effect, the IDEA and its implementing regulations, along with MARSE, create a series of obligations states and school districts must follow, that are designed to ensure a child is receiving the required FAPE. 20 U.S.C. § 1400 *et seq.*; 34 C.F.R. § 300.1 *et seq.*; MARSE R. 340.1701 *et seq.* Here, the ALJ failed to analyze the correct issues for hearing that were clearly stated in Plaintiff's Amended Due Process Complaint. Appeal, ECF 8, PageID.216 at ¶ 49 – PageID.225 at ¶ 94. *See also* Am. Compl., ECF 8-1, PageID.281-282 at ¶¶ 146a-c; Petitioner's Closing Brief, ECF 8-3, PageID.296-298, 299-300. When properly analyzing the correct issues for the due process hearing, an independent review of the administrative record clearly demonstrates that Defendants denied P.H. FAPE.

**1. Defendants failed to reevaluate P.H. when his needs warranted a reevaluation**

As detailed at length in Plaintiffs' closing brief following the due process hearing, the IDEA and state law place specific obligations on districts to utilize evidence-based, positive behavioral interventions to address student behavior. Petitioner's Closing Brief, ECF 8-3, PageID.301-303. *See also* 34 C.F.R. § 300.324(a)(2)(i), 34 C.F.R. § 300.320(a)(4), M.C.L. 380.1307h(l). This specifically includes requiring local educational agencies to conduct reevaluations if the student's "educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation," 20 U.S.C. § 1414 (a)(2)(A)(i); 34 C.F.R. §

20

300.303(a)(1), and details numerous criteria Districts must meet for conducting an appropriately comprehensive evaluation. 20 U.S.C. § 1414 (b)(2)(A)(ii); 34 C.F.R. § 300.303(b)(2); 34 C.F.R. § 300.304(2); USC 1414 (b)(2)(A)(ii); 34 C.F.R. § 300.303(b)(2). Particularly relevant here, given the increasing severity and frequency of P.H.'s behaviors, is that state law specifically indicates a functional behavior assessment is warranted when a student exhibits a pattern of behavior that increases the risk that emergency seclusion or restraint will be utilized. M.C.L. 380.1307d(c)(i). While IDEA does not explicitly define "functional behavior assessment," state law defines such an assessment as:

> an evidence- and research-based systematic process for identifying the events that trigger and maintain problem behavior in an educational setting. A functional behavioral assessment shall describe specific problematic behaviors, report the frequency of the behaviors, assess environmental and other setting conditions where problematic behaviors occur, and identify the factors that are maintaining the behaviors over time.

M.C.L. 380.1307h(g).

As clearly demonstrated by the administrative record, signs that a reevaluation of P.H. was warranted began in the Fall 2023 semester and were certainly present before ELPS finally conducted a functional behavior assessment (FBA) in March 2024. As demonstrated by ELPS staff's own testimony, P.H. began exhibiting behavioral changes in early November 2023 as the length of his school day increased. Respondent's Offered and Admitted Exhibits A-X, ECF 28-2, PageID.2269-2271, PageID.2273. However, as his school hours increased, so did his time away from his peers. February 10, 2025 Hearing Transcript Volume I, ECF 27-13, PageID.1999 at Tr 47 at l 4-11; February 12, 2025 Hearing Transcript Volume III, ECF 27-11, PageID.1693 at l 5-10, 22-25. P.H. began managing his anxiety and overstimulation through frequent and prolonged bathroom breaks, sometimes as many as three per hour. February 12, 2025 Hearing Transcript

Volume III, ECF 27-11, PageID.1721 at l 12-14; February 13, 2025 Hearing Transcript Volume IV, ECF 27-9, PageID.1459 at Tr 851 at l 13-25; February 14, 2025 Hearing Transcript Volume V, ECF 27-05, PageID.1391 at Tr 884 at l 3-25. On November 13, 2023 ELPS suggested Christie shorten P.H.'s school day. February 12, 2025 Hearing Transcript Volume III, ECF 27-11, PageID.1693 at l 5-25; February 13, 2025 Hearing Transcript Volume IV, ECF 27-9, PageID.1459 at Tr 851 at l 14-25. The cumulative observations, undocumented behaviors, and ongoing concerns surrounding P.H.'s increased anxiety, avoidance tactics, and agitation described above demonstrate a clear and escalating pattern of distress that warranted a FBA well before December 15, 2023. February 10, 2025 Hearing Transcript Volume I, ECF 27-15, PageID.2023 at Tr 141 at l 7-11; February 11, 2025 Hearing Transcript Volume II, ECF 27-12, PageID.1924 at l 6 – PageID.1925 at l 8; February 12, 2025 Hearing Transcript Volume III, ECF 27-11, PageID.1696 at l 16-22; February 13, 2025 Hearing Transcript Volume IV, ECF 27-08, PageID.1452 at Tr 823 at l 4-23; February 14, 2025 Hearing Transcript Volume V, ECF 27-05, PageID.1391-1393; Petitioners' Offered and Admitted Exhibits 1-62, ECF 28-8, PageID.2909, 2914-2915, 2917. Despite ongoing internal recognition of his struggles by ELPS staff during the first semester, no formal evaluation was ever conducted. *Id.*

Further, as expert witness Dr. Cheryl Light Shriner testified, ELPS should have had even more documentation and gathered data surrounding P.H.'s behaviors, mainly because he had behavioral goals on his IEP. February 11, 2025 Hearing Transcript Volume II, ECF 27-12, PageID.1764-1765. Despite this and the fact that P.H.'s IEP included a self-regulation goal, ELPS failed to document any behavior or information relating to his self-regulation goal, even positive information. *Id.* Still, Dr. Light Shriner testified that she felt even the limited documentation

available in this case clearly supported an FBA. *Id.* at PageID.1785 at l 18-25, PageID.1787 at l 2-15, PageID.1790-1791.

Following the 2023-2024 winter break, P.H.'s behavioral decline continued. February 10, 2025 Hearing Transcript Volume I, ECF 27-13, PageID.2001-2004; February 10, 2025 Hearing Transcript Volume I, ECF 27-14, PageID.2005-2006; March 24, 2025 Decision and Order, ECF 8-4, PageID.352 at ¶¶ 4-7. P.H.'s behavior significantly worsened in February, as P.H. began eloping not only from the classroom, but also the building. February 10, 2025 Hearing Transcript Volume I, ECF 27-14, PageID.2007 at Tr 77 at l 3-4, 8-16, PageID.2011 at Tr 96 at l 24 – PageID.2012 at Tr 97 at l 23, PageID.2012 at Tr 99 at l 14 - Tr 100 at l 25, PageID.2013 at Tr 102 at l 1-19, Tr 103 at l 5-16.

In what would be the start of a worrying pattern of elopement and avoidance, on February 9, 2024, Stacy Turke, the IISD occupational therapist, came into the office and told Christie and Michelle Miller-Hogan, ELPS's social worker, that she couldn't find P.H. and had physically "lost" track of him. *Id.* at PageID.2007 at Tr 77 at l 8-16. Shortly thereafter, P.H. had four school elopement incidents in quick succession. *Id.* at PageID.2012 at Tr 99 at l 19 - Tr 100 at l 25, PageID.2013 at Tr 102 at l 1-19, Tr 103 at l 5-16. In one harrowing elopement, P.H. made it into the busy intersection of Burcham and Hagadorn outside of Marble Elementary. *Id.* at PageID.2011 at Tr 96 at l 20 – PageID.2012 at Tr 97 at l 5, PageID.2012 at Tr 99 at l 17-18. While P.H., and those that came to get him out of the intersection, were not injured, at this point, ELPS was clearly on notice that P.H.'s behaviors could cause himself or others serious harm. For a compliant response, an FBA would have been the immediate next step to better understand the motivation behind his behaviors and uncovering the essential concern that P.H. was trying to communicate by running away. Then, ELPS and IISD could have created a behavior support plan aimed supporting

23

his transition away from elopement and toward safer, more prosocial behaviors while still acknowledging and honoring the message that P.H. was trying to communicate.

Instead, ELPS Director of Student Services Nick Hamilton rebuffed Plaintiffs' request for an FBA by claiming that this kind of elopement was a commonplace occurrence for students like P.H. *Id.* at PageID.2013 at Tr 102 at l 21-25. Common or not, ELPS did not have an informed plan in place to respond to P.H.'s elopement behaviors. *Id.* at Tr 103 at l 17 – Tr 104 at l 23.

In his findings of fact in the March 24 Decision and Order, the ALJ expressly acknowledged the increasing behavioral concerns from fall 2023 to February 2024 as documented and observed by Defendants. March 24, 2025 Decision and Order, ECF 8-4, PageID.351, PageID.352 at ¶¶ 4-7. Specifically, the ALJ himself acknowledged the significant change in P.H.'s behavior following winter break, noting, "the switch that seems to have flipped." February 14, 2025 Hearing Transcript Volume V, ECF 27-6, PageID.1410 at Tr 961 at l 16-17.

Although the ALJ found Dr. Shriner's testimony to be "mostly credible," (only citing concern with her description of seclusion) and despite qualifying Dr. Shriner as an expert, the ALJ largely ignored her testimony related to P.H.'s need for a FBA before March 2024. March 24, 2025 Decision and Order, ECF 8-4, PageID.356, PageID.360-362. Instead, despite recognizing the noticeably change in behavior, the ALJ dismissed this as "hindsight" and erroneously deferred to Defendants' decision to wait until March to conduct the FBA as "reasonable." *Id.* at PageID.361-362. However, as noted above, the changes in P.H.'s behaviors were being documented and observed in real time by Defendants' own employees, and this information was contemporaneously available to the entire IEP team for appropriate decision-making. Thus, an independent review of the administrative record under the modified *de novo* standard makes it clear that Defendants were aware of P.H.'s increasing behavioral needs and failed to timely conduct an FBA, or other

appropriate reevaluations, to identify the root cause and address the educational needs. For these reasons, Defendants denied P.H. FAPE by failing to reevaluate him when his educational or related service needs, including the need for increased emotional, behavioral, and academic supports, warranted a reevaluation.

### 2. Defendants failed to offer and/or provide P.H. an appropriate IEP, including failing to provide P.H. the supports as listed in his IEPs

In *Endrew F. v. Douglas County School District*, the Supreme Court held that an IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." 137 S. Ct. at 999. Endrew F. was an elementary school student diagnosed with autism. Endrew attended Douglas County schools from preschool through fourth grade. However, by fourth grade, Endrew's "academic and functional progress had essentially stalled" as he faced behavioral problems in the classroom. *Id.* at 996. As evidence of this stall, Endrew's IEPs "largely carried over the same basic goals and objectives from one year to the next." *Id.* When the school district presented a proposed fifth grade IEP which was "pretty much the same as his past" IEPs, Endrew's parents removed him from his school and enrolled him in a private school specializing in educating children with autism. *Id.* At the new school, Endrew was given increased academic goals and a new behavioral intervention plan. Almost immediately, Endrew's behavior improved, and he began making academic progress well beyond that made at his prior school. Six months later, Endrew's parents met again with the Douglas County School District, and the district presented a new IEP that parents believed was "no more adequate" than the prior IEP, and no new behavioral plan that incorporated the changes and progress made at the private school. *Id.* at 997. Endrew's parents continued sending Endrew to the private school and filed a complaint alleging a denial of FAPE and seeking reimbursement of tuition. In the administrative hearing, Endrew's parents "...contended that the final IEP proposed by the school district was not 'reasonably

25

calculated to enable him to receive educational benefits…'" and therefore the school district denied Endrew FAPE. *Id.* The Court held that "a student offered an educational program providing 'merely more than de minimis' progress from year to year can hardly be said to have been offered an education at all. For children with disabilities, receiving instruction that aims so low would be tantamount to 'sitting idly . . . awaiting the time when they were old enough to drop out.'" *Id.* at 1001 (citing *Rowley*, 458 U.S. at 179). The Court noted that because an IEP "is not a form document" and the offered instruction must be specially designed to meet the unique needs of a child on an individualized basis, "the IEP must be appropriate in light of the child's circumstances." *Id.* at 999. This analysis must be performed on a case-by-case basis because "the adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." *Id.* at 1001. The Court explicitly stated that "the 'reasonably calculated' qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials. . . informed not only by the expertise of school officials, but also by the child's parents or guardians." *Id.* at 999. Unfortunately, the ALJ failed to apply this rigorous standard in analyzing Defendants' actions (or lack thereof) in providing P.H. FAPE and an independent review of the administrative review clearly demonstrates that Defendants failed to provide P.H. FAPE.

As explained *supra* in Section B(1), Defendants failed to conduct the evaluations necessary to determine why P.H. was not making educational progress appropriate to his circumstances and was behaviorally regressing. Further, Defendants failed to appropriately document P.H.'s services and behaviors and whether he was making progress. Without this critical information, there is no way for a school district to understand whether the supports and services being provided are effective. Put another way, without tracking both service delivery along with any student progress, there's no way to determine with any accuracy whether the student, here P.H., is making *any*

26

progress, let alone appropriate progress, as required by *Endrew F*. February 12, 2025 Hearing Transcript Volume III, ECF 27-11, PageID.1531 at l 21 – PageID.1522 at l 6, PageID.1522 at l 20 – PageID.1523 at l 2, PageID.1535 at l 10-23, PageID.1540 at l 7 – PageID.1543 at l 17, PageID.1545 at l 10 – PageID.1546 at l 16, PageID.1646 at Tr 683 at l 3-15, PageID.1651 at Tr 688 at l 8-20; February 14, 2025 Hearing Transcript Volume V, ECF 27-6, PageID.1406 at l 6 – PageID.1407 at l 14; Petitioners' Offered and Admitted Exhibits 1-62, ECF 28-3, PageID.2365, PageID.2419; Petitioners' Offered and Admitted Exhibits 1-62, ECF 28-4, PageID.2484-2504; Respondent's Offered and Admitted Exhibits A-X, ECF 28-2, PageID.2305-2311, PageID.2316.

This specifically included Defendants' service logs and testimony at the due process hearing directly admitting that P.H.'s services were not being implemented as stated in his IEP. February 12, 2025 Hearing Transcript Volume III, ECF 27-11, PageID.1535 at l 10-23; Petitioners' Offered and Admitted Exhibits 1-62, ECF 28-3, PageID.2365, 2419. Even the ALJ admitted that the service providers' record keeping was "poor" and proved that services were not implemented consistent with P.H.'s IEP. March 24 Decision and Order, ECF 8-4, PageID.357. Taken together, Defendants failed to implement numerous material or important parts of P.H.'s IEP. *Id.* The IISD OT failed to provide documentation of at least an entire month of P.H.'s occupational therapy services. *Id.* P.H. also missed out numerous minutes of speech and language services spread over multiple sessions. *Id.* In addition to failing to provide these services with fidelity, P.H. was repeatedly placed in seclusion and on a shortened schedule, although his IEP clearly stated he was attending a full day of school in the general education setting. March 24 Decision and Order, ECF 8-4, PageID.351; February 10, 2025 Hearing Transcript Volume 1, ECF 27-13, PageID.2002 at Tr 57 at l 22-25; February 10, 2025 Hearing Transcript Volume 1, ECF 27-14, PageID.2005 at Tr 71 at l 2-3; Petitioners' Offered and Admitted Exhibits 1-62, ECF 28-3, PageID.2365, 2383.

27

The Michigan Department of Education has issued clear guidance concerning the use of shortened days. MDE guidance, issued in September 2022, states that to use a shortened day schedule, the district must have in place a plan to return the student to a full day. Michigan Department of Education Office of Special Education, *Guidance: Shortened School Day*, https://www.michigan.gov/-/media/Project/Websites/mde/specialeducation/discipline/ShortenedSchoolDay.pdf?rev=d49b4cafa2f24339a245e680c7ac805f> (accessed April 27, 2026). Arrangements like this can provide a student who has difficulty with attending school the opportunity to gradually build up the skills and familiarity necessary to attend a full day of school. School avoidance is a behavior. Likewise, unsafe choices, like elopement into street or destruction of school property, are also behaviors. There can be many causes for these behaviors. To ensure that students attend school regularly and make safe choices, an FBA can help a school understand the underlying motivation for these types of behavior. For that reason, a shortened day return plan can include an FBA, along with a behavior plan, and a set of goals that include clear behavioral expectations that the student is expected to meet. Those expectations are founded upon the belief that if the student attends for the shortened day, builds the appropriate skills, and learns to trust his educational environment, then transition toward a full day can begin.

It is true that P.H.'s parents requested the shortened day program. It was their intuition that he needed an on ramp to a full day, and they were right. It is equally true that ELPS did not follow MDE guidance in arranging for that on ramp. Instead, ELPS conveniently stated he was attending a full day and avoided any need to create a plan, informed by appropriate evaluation, such as an FBA. P.H.'s parents are not to blame for ELPS's failures in this regard.

Due to Defendants' failure to implement P.H.'s IEPs as written, P.H.'s behavioral and social-emotional needs continued to exponentially increase, demonstrating he was failing to make appropriate progress in light of his unique circumstances as FAPE requires under the more rigorous *Endrew F.* standard.

As outlined above, contrary to the text of the ALJ's decision and order, Plaintiffs *did* present clear evidence, via the contemporaneous service logs and testimony, that P.H.'s services were not being provided and the failure to implement P.H.'s IEP services with fidelity was a material failure. It's also significantly concerning that, in claiming the failure to provide services was not a material failure, the decision ignored the robust contemporaneous evidence detailing the lack of services in favor of the unsupported verbal claims of Defendants' service providers. March 24, 2025 Decision and Order, ECF 8-4, PageID.357-358. In his discussion of the speech language pathologist's unilateral decision to change the duration and modality of P.H.'s services, the ALJ inaccurately claimed that service providers had the discretion to deviate from the IEP minutes and, thus, "Any failures by the Respondent to provide the IEP's duration of services constitute the "minor discrepancy" noted by the *Van Duyn* court," citing *Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J,* 502 F.3d 811 (9th Cir. 2007). *Id.* at PageID.358. However, as Plaintiffs also argued in their closing brief, in *M.C. by and through M.N. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1197 (9th Cir. 2017), the Court of Appeals for the Ninth Circuit held that the IEP "embodies a binding commitment and provides notice to both parties as to what services will be provided to the student during the period covered by the IEP." Petitioners' Closing Brief, ECF 8-3, PageID.324. Yet, the decision made no reference to this, nor did it otherwise explain how ELPS's failure to implement P.H.'s services was only a minor discrepancy in light of his clearly increasing behavioral needs. March 24, 2025 Decision and Order, ECF 8-4, PageID.357-358. The decision's

29

failure to acknowledge that Defendants did not provide P.H. with appropriate services is even more

egregious when the service providers' own documentation repeatedly acknowledged P.H.'s failure

to make progress. Petitioners' Offered and Admitted Exhibits 1-62, ECF 28-3, PageID.2387-2410;

Petitioners' Offered and Admitted Exhibits 1-62, ECF 28-4, PageID.2560-2563; Petitioners'

Offered and Admitted Exhibits 1-62, ECF 28-5, PageID.2566-2569. For these reasons, an

independent review of the record under the modified de novo standard finds that Defendants

denied P.H. FAPE by failing to offer and/or provide P.H. an appropriate IEP.

### 3. Defendants failed to educate P.H. in his least restrictive environment

With respect to educational placement of students, IDEA requires the following:

> Each public agency must ensure that— (i) To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are nondisabled; and (ii) Special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

34 C.F.R. § 300.114(a)(2). School districts are required to provide alternate educational settings

for students who cannot access a FAPE in general education classes: "Each public agency must

ensure that a continuum of alternative placements is available to meet the needs of children with

disabilities for special education and related services." 34 C.F.R. § 300.115(a). IDEA defines LRE

as a concept, not a place, based on the individual student's needs and their capacity to withstand

the regular education environment. 34 C.F.R. § 300.411(a)(2). Hence, the use of such phrases as

"to the maximum extent appropriate" and approving removal based on the severity or nature of

the disability, not just having a disability in general. *Id.*

30

The individuality of LRE has repeatedly been upheld by courts. As one extreme example, in *Anchorage School District v D.S.*, the school district filed a motion for summary judgment arguing that the Autism Partnership could not provide FAPE because, in relevant part, it was not the LRE. *Anchorage Sch. Dist. v. D.S.*, 688 F. Supp. 2d 883, 890 (D. Alaska 2009). Denying the district's motion, the *Anchorage* court held that the LRE must be considered in light of the individual student's needs:

> …where a home-based program is necessary for a student to receive meaningful benefit from his education, it is appropriate. "Disabled children, to the maximum extent appropriate, should be educated with children who are not disabled, i.e., they should be mainstreamed.... The education of a disabled child should take place in the least restrictive environment.... However, residential placement is appropriate for a disabled child if necessary for her to receive benefit from her education."

*Id.*, quoting *Seattle Sch. Dist. v. B.S.*, 82 F.3d 1493, 1500 (9th Cir. 1996).

While IDEA does not specifically reference seclusion or restraint, it does repeatedly place obligations on school districts as to how to appropriately address problematic student behaviors. As explained in the preceding section of this brief, where a child's "behavior impedes the child's learning or that of others," the IEP team must, "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 34 C.F.R. § 300.324(a)(2)(i). M.C.L. 380.1307b expressly prohibits the use of any seclusion other than in an emergency. Seclusion is defined as, "[T]he confinement of a pupil in a room or other space from which the pupil is physically prevented from leaving." M.C.L. 380.1307h(s). M.C.L. 380.1307c then goes on to further qualify what constitutes an emergency, noting seclusion may only be used "under emergency situations and only if essential to providing for the safety of the pupil or safety of another," M.C.L. 380.1307c(a), and it "may not be used in place of appropriate less restrictive interventions." *Id.* at (b). When emergency seclusion is used, it should generally be no longer than

31

15 minutes. *Id.* at (f). In Michigan, seclusion is defined as: "…confinement of a pupil in a room or other space from which the pupil is physically prevented from leaving." M.C.L. 380.1307h.

Yet, despite these clear regulations regarding the limited scope and purpose of seclusion, rather than revising P.H.'s IEP to provide appropriate positive behavioral interventions and supports, ELPS instead continued to rely on the inappropriate use of seclusion. February 10, 2025 Hearing Transcript Volume I, ECF 27-14, PageID.2013 at Tr 104 at l 24 – PageID.2014 at Tr 108 at l 25. From the beginning of the 2023-2024 school year, P.H. was isolated from his peers every time he was forced to work in the office or the hallway, directly placing him outside of the classroom environment. February 11, 2025 Hearing Transcript Volume II, ECF 27-12, PageID.1789 at Tr 331 at l 10 – PageID.1790 at Tr 332 at l 4.

As Dr. Light Shriner discussed, P.H was informally secluded in the conference room at ELPS multiple times. February 11, 2025 Hearing Transcript Volume II, ECF 27-12, PageID.1789 at l 9 – PageID.1790 at l 15. On March 6, 2024 alone, P.H. was secluded three times; one documented, and two informally in a conference room and Miller-Hogan's office, resulting in P.H. spent the entire day of March 6, 2024 in crisis, with no safety plan, behavior intervention plan, or FBA. February 10, 2025 Hearing Transcript Volume I, ECF 27-14, PageID.2013 at Tr 104 at l 24 – PageID.2014 at Tr 108 at l 25, PageID.2015-2016; February 11, 2025 Hearing Transcript Volume II, ECF 27-12, PageID.1954 at l 1 – PageID.1955 at l 17; February 12, 2025 Hearing Transcript Volume III, ECF 27-11, PageID.1664 at l 22 – PageID.1665 at l 6;  Petitioners' Offered and Admitted Exhibits 1-62, ECF 28-4, PageID.2455, PageID.2464. While the ALJ took issue with Dr. Shriner's categorization of P.H.'s time in the conference room as "informal" seclusion, and subsequently diminished her credibility over it, her testimony does not actually conflict with Michigan's definition of seclusion, as cited above. Rather than placing P.H. in his general

32

education peers, where he was supposed to be educated per his IEP, P.H. was confined to the conference room (or the office) and physically prevented from leaving – he was not allowed to join his peers to access his education. February 10, 2025 Hearing Transcript Volume I, ECF 27-13, PageID.2003 at Tr 63 at l 5 – Tr 64 at l 11.

As IISD's ASD teacher consultant Kujawa testified, she regularly met with P.H.'s teacher to find out how he was doing in class. February 12, 2025 Hearing Transcript Volume III, ECF 27-11, PageID.1648 at l 12-23. Kujawa testified that she only met with the special education teacher Kristen Casby during her consultative sessions, not general education teacher Rebecca Spitzer. *Id.* Christie's numerous requests to place P.H. in a different classroom or school building, specifically including one of the ASD classrooms operated by IISD, were repeatedly denied by ELPS. February 10, 2025 Hearing Transcript Volume I, ECF 27-14, PageID.2009 at Tr 86 at l 21 - Tr 87 at l 18. Placing P.H. in an ASD classroom would have been less restrictive and isolating than the way he was being educated at ELPS: assigned to general education on paper yet left to work separated from peers in the most available administrative space at Marble Elementary.

For these reasons, Defendants denied P.H. FAPE by failing to educate him in the least restrictive environment.

## CONCLUSION AND RELIEF REQUESTED

For the reasons set forth above, Plaintiffs respectfully request that this Court issue an order granting Plaintiffs summary judgment under Federal Rule of Civil Procedure 56, finding that Defendants denied P.H. FAPE for the 2023-2024 school year, and granting Plaintiffs the following relief:

A. Order Defendants, jointly and severally, to provide P.H. with a compensatory education and related services bank of 400 hours, with no expiration date, for academic and related

33

services, including but not limited to academic tutoring, speech and language therapy, occupational therapy, social-emotional support, and behavioral therapy, to be delivered by providers of Plaintiffs' choosing at their normal and customary rates;

B.  Order Defendants, jointly and severally, to provide financing for a 3-6 month Applied Behavior Analysis therapy program, local to P.H., to address his ASD-related behavioral and academic needs, to be delivered by providers of Plaintiffs' choosing at their normal and customary rates;

C.  Order Defendants, jointly and severally, to reimburse Plaintiffs for tutoring evaluation and services for P.H. during the 2023-2024 school year in the amount of $1,300;

D.  Order Defendants, jointly and severally, to reimburse Plaintiffs for lost income, moving expenses, and increased household expenses necessitated by Defendants' failure to provide P.H. with FAPE;

E.  Find that Plaintiffs are the prevailing party;

F.  Order attorney fees to be awarded to Plaintiffs as the prevailing party; and

G.  Order any such further relief as the Court deems just and appropriate.

Dated: April 27, 2026

Respectfully submitted,
ABDNOUR WEIKER, LLP

*/s/ Elizabeth K. Abdnour*
Elizabeth K. Abdnour (P78203)
Megan N. Mitchell (P87213)
Jacquelyn Kmetz (P83575)
325 E. Grand River Ave., Suite 250
East Lansing, MI 48823
(517) 994-1776
liz@education-rights.com
megan@education-rights.com
jacquelyn@education-rights.com

*Attorneys for Plaintiffs*

34

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this Brief complies with the limits set forth in LCivR 7.2(b)(i). Further, based on the Word Count function of Microsoft Word for Mac word processing software, applied to include all include headings, footnotes, citations and quotations, but not to include the case caption, cover sheets, any table of contents, any table of authorities, the signature block, attachments, exhibits, and affidavits, I certify that this Brief contains 10,694 words.

*/s/ Elizabeth K. Abdnour*
Elizabeth K. Abdnour (P78203)

**CERTIFICATE OF SERVICE**

I hereby certify that on April 27, 2026, I electronically filed the foregoing document with the Clerk of Court using the Court's ECF system, which will send notification of such filing to all counsel of record.

*/s/ Elizabeth K. Abdnour*
Elizabeth K. Abdnour