UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTI HENKE *ex rel.* P.H., et al.,

Plaintiffs,

v.

EAST LANSING PUBLIC SCHOOLS, et al.,

Defendants.

Case No. 1:25-cv-680

Hon. Hala Y. Jarbou

# OPINION

Plaintiffs Christi and Rich Henke, proceeding on behalf of their minor son P.H., bring this action under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq*., against Defendants East Lansing Public Schools (ELPS) and the Ingham Intermediate School District (IISD). Plaintiffs seek review of the decision of a Michigan administrative law judge (ALJ) finding that Defendants' provision of special education to P.H. during the 2023–2024 school year did not violate the IDEA. All parties have moved for adjudication based on the administrative record (ECF Nos. 32, 34, 35).[1] For the reasons explained below, the Court will affirm the ALJ's holding.

## I. BACKGROUND

This lawsuit concerns P.H's time at Marble Elementary—a school within ELPS—from August 2023 to April 2024, when P.H. was in first grade. P.H. was eligible for special education

[1] The parties style their motions as ones for summary judgment, but because no party has requested to add additional evidence to the record, the Court construes the motions as seeking adjudication based on the administrative record. *See Dong v. Bd. of Educ. of Rochester Cmty. Schs.*, 197 F.3d 793, 799 (6th Cir. 1999). Even if the Court were applying a summary judgment standard, the result would be the same because there are no material factual disputes.

due to autism and anxiety. (ALJ Op. 13, ECF No. 8-4.)[2] P.H. had attended a different school the prior year, and his parents were dissatisfied with that school's use of seclusion and restraint. (*See id.* at 28.) Christi and Rich initially met with Marble staff over the summer to discuss options for P.H.'s education. Marble's principal, Josh Robertson, told them that the school had an autism program, but that it was probably not a good fit for P.H. because most of the students in the program were nonverbal, unlike P.H. (*Id.*) Robertson said that they should plan to place P.H. in general education—that is, the traditional first-grade classroom with other students—but could explore other options if that was unsuccessful. (*Id.* at 28–29.) Christi and Rich testified that at the meeting, Robertson and Michelle Miller-Hogan—the school's social worker—assured them that Marble did not have a seclusion room. (*Id.* at 29, 37.) However, both Robertson and Miller-Hogan testified that Marble does have a seclusion room and that they would not have lied about that. (*Id.* at 42, 61.) Ultimately, the ALJ concluded that the Henkes likely misunderstood Robertson and Miller-Hogan, who merely promised that they would try to avoid using seclusion. (*Id.* at 17.)

On September 13, 2023, the Henkes met with the school to formulate an Individualized Education Program (IEP) for P.H. (*See id.* at 29.) The resultant IEP provided that P.H. would receive the following aids: adult support; frequent breaks; specific seating arrangements; repeat directions; extra time to answer questions and formulate responses; and consultant services to address behavioral, social, or academic needs. (IEP, ECF No. 28-3, PageID.2360.) In addition, the IEP provided that P.H. would receive the following special instruction: meetings with Miller-Hogan, the social worker, one to two times a week for 20 to 25 minutes; occupational therapy three times a month for 25 minutes; and speech and language therapy four to five times a month for 25 minutes. (*Id.*, PageID.2365.) In all other respects, P.H. would participate in general education.

---

[2] Although this Court is not bound by the ALJ's findings, for the sake of convenience it cites the ALJ's opinion regarding facts that the parties do not dispute.

(*Id.*) The IEP also stated that the Henkes "determined that they will slowly add time to [P.H.]'s school day." (*Id.*, PageID.2367.)

Initially, P.H. attended school from 8:40 a.m. to 11:00 a.m., and then attended an applied behavior analysis (ABA) program in the afternoons. (ALJ Op. 29.) As planned, P.H.'s school day was slowly extended, until he was attending through 1:00 p.m. in early November. (*Id.* at 12.) At that point, P.H. stopped attending the ABA program because the timing no longer worked. (*Id.*) It appears that P.H. was making progress in school through November of 2023. Stephanie Francisco, P.H.'s speech and language pathologist, reported in November of 2023 that P.H. was "progressing as expected." (*Id.* at 47.) Stacy Turke, P.H.'s occupational therapist, reported the same in November. (*Id.* at 50.) Rebecca Spitzer, P.H.'s teacher, testified that P.H. did well in the fall of 2023. (*Id.* at 54.) Robertson testified that he "felt that [P.H.]'s parents were happy with the progress that [P.H.] made during the fall 2023 semester." (*Id.* at 43.)

However, problems began to arise in November and December of 2023. Staff began to notice that P.H. was taking more and more bathroom breaks and often remaining in the bathroom for a long time. (*Id.* at 58.) Anastasia Shortridge, P.H.'s paraprofessional, noted that P.H. sometimes stayed in the bathroom up to 20 minutes, and she believed he was using bathroom breaks to avoid the classroom. (*Id.* at 60.) Spitzer indicated that at the beginning of the school year, P.H. took a bathroom break once an hour; in November, he was taking about two to three breaks an hour. (*Id.* at 56.) On one occasion, P.H. fell asleep in the bathroom for an hour. (*Id.* at 33.) On December 3, 2023, Miller-Hogan told the Henkes about the bathroom issue and discussed how they would address it. (*Id.* at 62.) P.H. also refused to go to school one day in December. (*Id.* at 29.)

The school's winter break occurred later in December, and P.H. had some behavioral difficulties over winter break. (*Id.* at 33.) During the first few days after break, P.H. again refused to attend school. (*Id.* at 29.) Christi requested that she be allowed to come to school with P.H., and Robertson allowed her to do so. (*Id.* at 43.) Christi told the school that P.H. had agreed to attend if the day was shortened and he could stay in the conference room instead of the classroom. (*See id.* at 33.) During January, Christi would go into school with P.H. and sit with him in the general education classroom for about 30 minutes until the resource teacher, Kristen Casby, came to get him. (C. Henke Testimony 59, ECF No. 27-13.)[3] Christi would then sit in the hallway during P.H.'s meetings with individual teachers, such as Casby and Francisco, the speech pathologist. (*Id.*) P.H.'s total time at school was reduced to two hours a day. (*Id.*)

Turke testified that P.H. "really struggled" during his first occupational therapy session after winter break. (Turke Testimony 631, ECF No. 27-11.) As Turke explained, P.H. "became a robot and he made robot-like motoric sorts of sounds," then told her that "This is not [P.H.] [P.H.] is dead." (*Id.*) Casby testified about a similar incident that occurred in her presence. (Casby Testimony 842, ECF No. 27-9.) Miller-Hogan told Christi about these instances of "disassociation," but Christi responded that that behavior was common for P.H. (ALJ Op. 63.) Casby also noted that during January of 2024 it was becoming difficult to convince P.H. to attend class, and that P.H. began to have issues getting along with other students. (*Id.* at 59.) Although Marble staff kept working to get P.H. back in class (*id.* at 62–63), by late January or early February he stopped going to general education classes and spent all his time in one-on-one meetings with teachers (*id.* at 30). Miller-Hogan testified that P.H. was often unwilling to go into general education. (*See* Miller-Hogan Testimony 927–28, ECF No. 27-6; *see also* ALJ Op. 55.)

[3] Portions of Christi's testimony are also found at ECF No. 27-14.

According to Christi, everyone agreed P.H. would not do well in general education without Christi present, but staff decided Christi could no longer come into the classroom, so P.H. was not able to attend general education anymore. (ALJ Op. 69–70.) Francisco reported that P.H. "made very limited progress" in speech after the winter. (*Id.* at 48.) Turke similarly reported in February of 2024 that P.H. was "making limited progress." (*Id.* at 50.) Miller-Hogan reported in March that P.H. was progressing as expected in some areas but making limited progress in others. (*Id.* at 63.)

In late January of 2024, Christi began to notice other concerning behaviors. Because P.H. was no longer going to general education, he would go to the main office at the beginning of school days. During that time, P.H. would often lay on the office floor and repetitively count the cars in the parking lot for long periods, sometimes up to 45 minutes. (C. Henke Testimony 72.) School staff told Christi to let him continue until he was ready to go to classes. (*Id.* at 72–74.) Christi noted that because of the long delays in the office, his actual time spent in classes became shorter and shorter. (*Id.* at 75.) Sometimes P.H. did not attend speech pathology because Francisco could not get him to cooperate. (*Id.* at 92.) Christi testified that there was some kind of issue basically every day in February. (*Id.* at 76.)

Around this time, according to Christi, P.H.'s schedule became less and less consistent. Part of the issue was a shortage of staff due to COVID-19. (*Id.* at 68.) Furthermore, P.H. was no longer able to go to the special education classroom when other students were there because he was not working well with them. (*Id.*) Francisco also decided to conduct P.H.'s speech therapy without other students present. (ALJ Op. 47.) Sometime in January, Christi spoke to Miller-Hogan about the possibility of doing a functional behavioral assessment (FBA) to better understand and address P.H.'s behavior. (C. Henke Testimony 83.) Miller-Hogan said that Christi would have to talk to Nick Hamilton, the ELPS director of student services, about that. (*Id.*)

On February 9, 2024, P.H. ran away from Turke during occupational therapy. (*Id.* at 77.) Hogan and Christi searched for him and found him in an empty classroom. (*Id.*) On February 27, P.H. ran out of the school and across the street; Christi chased him and was ultimately able to stop him. (*Id.* at 100–01.) P.H. attempted to leave the school again the next day, but Christi stopped him; there was also an additional incident around this time in which Robertson was able to stop P.H. from leaving. (*Id.* at 102–03.) On February 28, Christi discussed the issue with Robertson, who told her that they could not lock the school doors from the inside due to fire code regulations. (*Id.* at 102.)

On March 4, Christi was in the conference room with P.H., who told her that the day before he had knocked down some coat racks and pulled a TV off the wall. (*Id.* at 88–89.) P.H. said that he was going to pull down the TV again, then tried to do so and attempted to push over a mini-fridge. (*Id.* at 89.) He also broke a TV remote and was "wreaking havoc" in the room. (*Id.* at 90.) P.H. told Christi that he was going to have to "go to the calm down room," and Christi responded that there was no seclusion room at Marble. (*Id.* at 89.) P.H. said that he had seen the room, and Miller-Hogan confirmed that it existed. (*Id.*) P.H. became agitated and upset, so Christi took him home for the day. (*Id.* at 90.) The next day, Christi asked Miller-Hogan about the seclusion room, and Miller-Hogan said that she must have forgotten it existed when she told Christi the school had no such room. (*Id.* at 91.)

On March 5, Christi met with school staff and Hamilton, the director of student services. (*Id.* at 79–80.) She discussed the incidents of P.H. running out of the school, indicating she was concerned that he might end up on a busy street, but Hamilton told her there was nothing they could do other than put staff on alert. (*Id.* at 102–03.) Christi indicated that she did not want P.H. to ever be secluded, but Hamilton said if P.H. was going to try to elope, they would have to use

seclusion to stop him. (*Id.* at 104.) The meeting attendees also discussed what updates should be made to P.H.'s IEP. (*Id.* at 81.) Christi asked whether P.H. could be moved to the autism classroom, but Hamilton indicated that he would not consider moving P.H. until the summer. (*Id.* at 87.) Christi also raised the possibility of an FBA, and Hamilton seemed surprised that there was no previous FBA. (*Id.*) He and Robertson decided an FBA should be conducted, although noted that it would take time to do so. (*Id.* at 82.) P.H.'s IEP was also amended in several ways: his time in social work services was increased, his time in speech therapy was reduced, and a medical plan was added to his supplementary aids and services. (*See* Amended IEP, ECF No. 28-3, PageID.2374–2379.)

The following day, on March 6, P.H. had another behavioral incident. P.H. was in Miller-Hogan's office when he began throwing papers around, then broke a picture frame and and attempted to break a window. (ALJ Op. 44.) Robertson came and tried to calm P.H. down, to no avail. (*Id.*) P.H. began to hit and kick staff members who got close. (Seclusion and Restraint Form, ECF No. 28-4, PageID.2455.) Miller-Hogan told Christi they needed to use seclusion to stop P.H.'s behavior. (ALJ Op. 44.) Christi agreed that they could use seclusion for two minutes in order to test whether it worked. (C. Henke Testimony 105–06.) Robertson and Miller-Hogan led P.H. to the seclusion room while he shouted that he did not want to go in there. (*Id.* at 107.) They placed him in the room and Robertson held the door closed for two minutes, at which point Christi told him to let P.H. out, and he did so. (*Id.* at 108–09.) However, soon after, P.H. again became upset in Miller-Hogan's office and began to tear apart papers and pull down picture frames. (*Id.* at 109.) At one point, Robertson tried to stop P.H. from grabbing a pair of scissors and P.H. hit Robertson on the head with his fist. (ALJ Op. 45.) Christi wanted to take P.H. home, but Robertson told her they had to wait because if they let him go home now, he would "win[]." (C.

Henke Testimony 110.) After about 40 minutes, Christi told the staff to let her take P.H. home, which she did. (*Id.*)

On March 7, Christi again met with Hamilton, Robertson, and Miller-Hogan. (*Id.* at 111–12.) Christi told Hamilton that she had a doctor's note indicating P.H. could not be placed in seclusion because he has epilepsy. (*Id.* at 112.) Hamilton indicated that they could not promise to never seclude P.H. (*See id.*) Christi suggested that they return to the previous arrangement where she would walk P.H. to the classroom, but Robertson said that neither she nor Rich could come to the school anymore due to the way she had acted during the seclusion incident. (*Id.* at 112–13.) It later became clear that the issue was Christi's use of language—apparently she told Robertson, "I can't believe you have this f***ing room in your school." (ALJ Op. 44.)

After the seclusion incident, P.H. never returned to Marble. (*Id.* at 45.) The Henkes met again with school staff in April of 2024, where they indicated again that P.H. would not be placed in the autism classroom and that they were unable to follow the doctor's note barring seclusion. (*Id.* at 32.) The Henkes eventually withdrew P.H. from ELPS and enrolled him in an out-of-state private school for 2024–2025. (*Id.*) However, that school also used seclusion and restraint, so the Henkes ultimately transferred P.H. to a public school in Toledo, Ohio. (*Id.* at 34.) As of early 2025, P.H. was attending one hour a day of school with a paraprofessional and a behavioral analyst, and was not spending any time in general education. (*Id.*)

On December 3, 2024, the Henkes filed a due process complaint against ELPS, IISD, and P.H.'s previous school district. On January 10, 2025, the Henkes amended their complaint to remove the previous school district. On January 30, the ALJ dismissed IISD from the case, holding it was not liable for the actions of ELPS. On March 24, 2025, the ALJ issued a final decision finding that ELPS did not violate the IDEA. This action followed.

## II. LEGAL STANDARD

The parties style their motions as ones for summary judgment, but that label mistakes the relevant legal standard. The summary judgment standard is applicable to a case brought under IDEA if the parties introduce additional evidence beyond the administrative record. *See Doe v. Metro. Nashville Pub. Schs.*, 133 F.3d 384, 387 n.2 (6th Cir. 1998). But because the parties here have not introduced additional evidence, summary judgment is not the proper procedural vehicle to adjudicate the case. *Id.* Rather, the Court should "assume that the parties intend that the case be decided on the basis of the administrative record." *Dong v. Bd. of Educ. of Rochester Cmty. Schs.*, 197 F.3d 793, 799 (6th Cir. 1999). When deciding a case based on the administrative record, the Court must determine whether the ALJ's decision is supported by a preponderance of the evidence. *See Doe*, 133 F.3d at 387 n.2; *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 850 (6th Cir. 2004); 20 U.S.C. § 1415(i)(2)(C)(iii).

In deciding whether a preponderance of the evidence supports the ALJ's decision, "[t]he district court applies a 'modified de novo' standard of review." *L.H. v. Hamilton Cnty. Dep't of Educ.*, 900 F.3d 779, 790 (6th Cir. 2018) (quoting *Burilovich v. Bd. of Educ. of Lincoln Consol. Schs.*, 208 F.3d 560, 565 (6th Cir. 2000)). The court "must make an independent decision based on the preponderance of the evidence while also giving 'due weight' to the determinations made by the State ALJ." *Id.* (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982)). "The court may not 'simply adopt the state administrative findings without an independent re-examination of the evidence,' but neither may it 'substitute its own notions of sound educational policy for those of the school authorities which it reviews.'" *Id.* (cleaned up) (first quoting *Doe*, 133 F.3d at 387, then quoting *Rowley*, 458 U.S. at 206). A court should defer more to an ALJ's findings on issues implicating educational expertise. *Id.* The court also gives greater deference to the ALJ on substantive than procedural matters. *Id.* Plaintiffs bear the burden

of establishing that Defendants violated the IDEA. *See Dong*, 197 F.3d at 799; *Cordrey v. Euckert*, 917 F.2d 1460, 1466 (6th Cir. 1990).

## III. ANALYSIS

The IDEA "requires states that receive federal funds for education to provide every disabled child who wants it a free and appropriate public education (FAPE)." *Hamilton*, 900 F.3d at 788 (cleaned up); *see* 20 U.S.C. § 1412(a)(1)(A). One component of this obligation is that states must educate students with disabilities in the "[l]east restrictive environment," meaning that "[t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled." 20 U.S.C. § 1412(a)(5). Another component is that schools must create IEPs for each eligible student, which specify the special education and supplementary aids and services the student will receive, as well as "the extent, if any, to which the child will not participate with nondisabled children in the regular class." *Id.* §§ 1412(a)(4), 1414(d)(1)(A)(i)(IV), (V). In addition, because the IDEA's definition of a FAPE incorporates some special education standards established by the state, *see id.* § 1401(9)(B), "[i]f a state special-education law is more protective than the IDEA, a violation of state law can amount to a violation of the IDEA." *I.L. ex rel. Taylor v. Knox Cnty. Bd. of Educ.*, 257 F. Supp. 3d 946, 964 (E.D. Tenn. 2017) (citing *Doe ex rel. Doe v. Bd. of Educ. of Tullahoma City Schs.*, 9 F.3d 455, 457 (6th Cir. 1993)).

Plaintiffs contend that Defendants failed to provide a FAPE for several reasons. The Court addresses each contention below, and finds that Plaintiffs have not established a violation of the IDEA.[4]

---

[4] IISD argues separately that it is not a proper party to this suit and that Plaintiffs' claims against it are untimely. Because the Court finds for Defendants on the merits, it does not address this alternative argument. *Cf. Ahart v. Bradshaw*, 122 F. App'x 188, 192 (6th Cir. 2005) (dismissing case on the merits without addressing statute of limitations argument).

*First*, Plaintiffs argue that Defendants excessively placed P.H. in seclusion. Michigan law defines "seclusion" as "the confinement of a pupil in a room or other space from which the pupil is physically prevented from leaving," Mich. Comp. Laws § 380.1307h(s), and prohibits the use of seclusion except in emergencies, *id.* § 380.1307b(d). "'Emergency seclusion' means a last resort emergency safety intervention involving seclusion that is necessitated by an ongoing emergency situation and that provides an opportunity for the pupil to regain self-control while maintaining the safety of the pupil and others." *Id.* § 380.1307h(e). As the ALJ recognized, the record reveals only one instance of seclusion, which occurred for two minutes on March 6 during an emergency. (*See* ALJ Op. 20.) The ALJ correctly rejected Plaintiffs' contention that Defendants frequently engaged in "informal seclusion" by teaching P.H. alone in a conference room. (*Id.*) The definition of seclusion does not depend on how many other students are in the room; if it did, any instance of one-on-one instruction would be prohibited, which makes little sense. Plaintiffs also assert that P.H. was sometimes physically prevented from leaving the conference room or the main office, but they do not cite any evidence that supports this assertion. (*See* Pl.'s Br. in Supp. 36, ECF No. 36 (citing C. Henke Testimony 63–64).) Thus, Plaintiffs have not established that Defendants excessively used seclusion.

*Second*, Plaintiffs argue that Defendants should have provided P.H. more time in general education. P.H.'s initial IEP contemplated that he would spend most of his time in a general education classroom, aside from the specific appointments with special education instructors. However, P.H. spent less and less time in general education throughout January, and no time there in February. Plaintiffs argue that Defendants failed to comply with the IEP, but the record indicates that P.H. was removed from general education because it was not feasible to keep him there. Miller-Hogan testified that staff tried various methods to try to get P.H. to go into general education

(Miller-Hogan Testimony 927–28), but it ultimately did not work out. Miller-Hogan also told Christi that P.H. could not be in a classroom with other children because he was not getting along with them (C. Henke Testimony 69). Christi testified that ELPS did not keep P.H. in general education because "[e]veryone agreed . . . that it would be very difficult to get him into the gen ed classroom with [Christi] not being there." (C. Henke Testimony 63; *see also id.* at 69–71.) And ELPS was entitled to refuse to allow a parent to remain in the classroom with a student. Even if keeping P.H. out of general education contravened the IEP, Plaintiffs cannot establish a denial of a FAPE because there is no evidence that Defendants' actions caused P.H. material harm. *See Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 765 (6th Cir. 2001) ("[A] school district's failure to comply with the procedural requirements of the [IDEA] will constitute a denial of a FAPE only if such violation causes substantive harm to the child or his parents."). Rather, Plaintiffs seem to concede that P.H. was not doing well in general education, and forcing him to be there was not productive.

*Third*, Plaintiffs contend that Defendants should have placed P.H. in the autism classroom, which was a less restrictive environment than the resource room and special education room because other students were present. However, Defendants' initial goal—supported by Plaintiffs—was to keep P.H. in the general education classroom as much as possible. Even once P.H.'s situation worsened, it was reasonable for Defendants to continue to try to get him back in the general education classroom, rather than move him to a more restrictive environment like the autism classroom. In addition, Defendants believed that the autism classroom was not a good fit for P.H. because most of the students there were nonverbal. Moreover, given that Defendants were instructing P.H. one-on-one due to his issues getting along with other students, it is not clear that placing him in the autism classroom was a viable alternative once general education had been ruled

out. In March, after it had become clear that general education was not working, Hamilton said that P.H. could try out the autism classroom in the summer. He did not want to move P.H. earlier in part because he wanted the autism classroom teacher to evaluate P.H. and see if that classroom was a good fit. (*See* Hamilton Testimony 797, ECF No. 27-8.) For all these reasons, Defendants did not violate the IDEA by failing to place P.H. in the autism classroom.

*Fourth*, Plaintiffs contend that Defendants' implementation of P.H.'s shortened school day violated the IDEA. Plaintiffs cite Michigan Department of Education guidance stating that a shortened school day is only appropriate if the school has a plan to increase the day to full-length. (*See* Michigan Department of Education Office of Special Education, *Guidance: Shortened School Day*, 3 (Sep. 2022), https://www.michigan.gov/-/media/Project/Websites/mde/specialeducation/discipline/ShortenedSchoolDay.pdf [https://perma.cc/9JHJ-TPVW].) The guidance also states that a school should not implement a shortened day even at the request of the student's parents unless the IEP team decides that a shortened day is necessary. (*See id.* at 5.) Plaintiffs argue that Defendants implemented a shorter school day without the agreement of the IEP team and without any plan to return to a full-length day.

As an initial matter, some of Plaintiffs' factual assertions are belied by the record. Though the IEP does not specify how long P.H. will be in school each day, it does note that "Parents determined that they will slowly add time to [P.H.'s] school day." (IEP, PageID.2367.) Thus, Plaintiffs are incorrect that the IEP contemplates only a full school day. Moreover, Defendants did initially try to return P.H. to a regular-length school day—his time in school increased steadily throughout the first few months. And the record indicates that the length of P.H.'s school day was primarily under the control of Plaintiffs. (*See* ALJ Op. 19.)[5] Plaintiffs also note that P.H.'s day

[5] Christi testified to one instance where his day had to be shortened because Casby was out. (C. Henke Testimony 80.) But her testimony does not establish that this was a recurring issue.

was functionally shortened by the time he spent in the main office each morning, but there is no indication that Defendants had the power to make P.H. leave the office and go to class. (*See* C. Henke Testimony 75 (P.H. would lay on the floor until "ultimately, [ELPS staff] might get him to go do one of the things on his schedule").) Plaintiffs' assertion that P.H. was "placed in the office due to lack of staff to supervise him" is unsupported by the record. (Pls.' Br. in Supp. 7 (citing C. Henke Testimony 74).)

Even assuming that Plaintiffs can establish a procedural violation of the IDEA based on the school's acquiescing to their decision to shorten P.H.'s school day—*see Spring Branch Indep. Sch. Dist. v. Hannah W. ex rel. O.W.*, 961 F.3d 781, 799 (5th Cir. 2020) (school violated IDEA by shortening school day with consent of parent)—Plaintiffs would also have to show that the procedural violation caused substantial harm to P.H. *See Knable*, 238 F.3d at 765. And Plaintiffs do not provide evidence that P.H.'s education was harmed by his shortened school day; to the contrary, their choice of that shortened day suggests that they agreed it was in his best interest, and that spending more time in school would only have exacerbated the behavioral issues.

*Fifth*, Plaintiffs argue that Defendants failed to provide P.H. with all of the speech pathology time contemplated by the IEP. In support of this point, Plaintiffs cite the ALJ's observation that P.H.'s speech sessions were at some point reduced from 25 minutes to 20 minutes. (ALJ Op. 18.) Plaintiffs disagree with the ALJ's conclusion that this reduction in time was not a "material failure" to comply with the IEP and thus not actionable under the IDEA. *Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 822 (9th Cir. 2007). But even accepting Plaintiffs' contention that a repeated five-minute reduction can be significant over time, once again the absence of substantial harm is decisive. Francisco testified that she reduced the session length because P.H. was meeting with her one-on-one instead of with other students (as the IEP had

contemplated). (Francisco Testimony 560–61, ECF No. 27-11.) Adjusting the time to account for the fact that no other students are present does not cause any harm. Moreover, there is evidence that Francisco was having difficulty getting P.H. to attend speech therapy at all (*see* C. Henke Testimony 72), so it is doubtful that forcing him to spend more time there would have made him better off. The ALJ declined to hold "that a service provider would need to continue working with a Student despite making no progress or possibly even causing harm (such as causing a behavioral meltdown) simply because the IEP indicated that 25 minutes was required." (ALJ Op. 19.) The Court agrees.

*Sixth*, Plaintiffs argue that Defendants failed to properly document P.H.'s progress throughout the year. They note especially that Defendants did not record any information related to the self-regulation goal on P.H.'s IEP. The ALJ acknowledged that Defendants did not keep all of the proper documentation, but nevertheless found that Defendants provided the services guaranteed by the IEP. (*See* ALJ Op. 18.) Plaintiffs contend that had Defendants kept better documentation, they would have been better equipped to address P.H.'s regression in scores and behavioral issues. But Plaintiffs do not provide sufficient factual support for this speculative claim. Plaintiffs do not contend that Defendants were unaware of P.H.'s academic and behavioral issues, and they have not provided evidence that the mere failure to formally document these facts impacted Defendants' ability to provide P.H. adequate services. Thus, the Court agrees with the ALJ that any documentation problems did not cause substantial harm to P.H.'s education.

*Lastly*, Plaintiffs argue that Defendants should have revised P.H.'s IEP and provided an FBA sooner than they did. The parties disagree as to whether this argument was properly preserved before the ALJ. But it is unnecessary to resolve that dispute because even if this argument was preserved, it is unsuccessful. The Court agrees with the ALJ that Defendants acted

reasonably after discovering the issues with P.H.'s existing plan. During the fall semester, there was little indication that significant revisions were needed to P.H.'s routine. Although there were a few issues, such as extensive bathroom breaks, P.H. was generally progressing satisfactorily. It was only in mid-January that more significant problems arose, starting with P.H.'s refusal to attend school and culminating in the March seclusion incident. Hamilton decided to conduct an FBA on March 5, which was soon after these issues arose. Plaintiffs point out that state law "encourage[s]" schools to conduct an FBA if "a pupil exhibits a pattern of behavior that poses a substantial risk of creating an emergency situation in the future that could result in the use of emergency seclusion." Mich. Comp. Laws § 380.1307d(c)(i). But the incidents that increased P.H.'s risk of seclusion did not occur until February, and Hamilton ordered an FBA shortly thereafter. Although Plaintiffs argue that Defendants should have acted more swiftly or noticed the problems sooner, the Court agrees with the ALJ that any delay on Defendants' part was not significant enough to constitute the denial of a FAPE.

## IV. CONCLUSION

For the reasons explained above, the Court agrees with the ALJ that Plaintiffs have failed to establish that Defendants deprived P.H. of a free and appropriate public education in violation of the IDEA. An order and judgment will enter in accordance with this Opinion.

Dated: September 23, 2026

/s/ Hala Y. Jarbou
HALA Y. JARBOU
CHIEF UNITED STATES DISTRICT JUDGE